# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HI-TECH PHARMACAL CO. INC., | ) |
| | ) |
| Plaintiff, | ) Case No. 1:08-cv-01495 (JDB) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF'S MOTION FOR EXPEDITED PRELIMINARY INJUNCTIVE RELIEF

Pursuant to Fed. R. Civ. P. 65(a), and LCvR 7(f), 65.1(c) and 65.1(d), Plaintiff, Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") respectfully requests that this Court enter a preliminary injunction enjoining Defendant, the United States Food and Drug Administration ("FDA"), from granting final marketing approval to any Abbreviated New Drug Application ("ANDA") for generic COSOPT, other than Hi-Tech's, for 180 days from the date that Hi-Tech begins to commercially market its generic drug product under ANDA 77-847. Hi-Tech expects that its ANDA will be approved by FDA on October 28, 2008. Thus, that day will be the first date that Hi-Tech will be permitted by law to market its generic COSOPT, and the date on which Hi-Tech will in fact begin to market, if approved.

An expedited hearing is essential pursuant to LCvR 65.1(d), because Plaintiff will otherwise suffer irreparable injury. Hi-Tech must have relief from this Court sufficiently

in advance of October 28, 2008, to allow Hi-Tech to adequately prepare to market its product on October 28, 2008, without the threat of having its marketing infringed upon by the unlawful marketing of other generic COSOPT products.  For this reason, Plaintiff respectfully requests that the Court set an expedited hearing date.  *See* LCvR 65.1(d).

Counsel for Hi-Tech contacted counsel for the United States Food and Drug Administration (FDA) prior to filing this motion and discussed the anticipated motion with opposing counsel, in a good faith effort to determine whether there is any opposition to the relief sought.  Based upon that conversation, counsel for Hi-Tech understands that FDA intends to oppose this motion.

This motion is based upon the Statement of Points and Authorities and supporting exhibits, including the Declaration of William Peters, filed along with the instant motion.

Dated September 3, 2008                    Respectfully submitted,


                                            /s/ J.P. Ellison
                                           John R. Fleder (D.C. Bar No. 176123)
                                           Robert A. Dormer (D.C. Bar No. 267641)
                                           J.P. Ellison (D.C. Bar No. 477931)
                                           Kurt R. Karst (D.C. Bar No. 482615)
                                           Hyman, Phelps & McNamara, P.C.
                                           700 13th Street, N.W., Suite 1200
                                           Washington, D.C.  20005
                                           Phone: (202) 737-5600
                                           Fax: (202) 737-9329

                                           **Attorneys for Hi-Tech Pharmacal Co., Inc.**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HI-TECH PHARMACAL CO. INC., | ) |
| | ) |
| Plaintiff, | ) Case No. 1:08-cv-01495 (JDB) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## STATEMENT OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF'S MOTION FOR
## EXPEDITED PRELIMINARY INJUNCTIVE RELIEF

## INTRODUCTION

This case arises under the Federal Food, Drug, and Cosmetic Act ("FDC Act"), 21 U.S.C. §§ 301 *et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271) ("Hatch-Waxman Amendments") and the Medicare Modernization Act of 2003 ("MMA"), section 1102(b)(1), Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271). These statutory provisions determine whether and when a generic drug manufacturer is eligible for 180 days of market exclusivity, and whether an eligible generic drug manufacturer has forfeited that exclusivity.

Plaintiff Hi-Tech Pharmacal Co. ("Hi-Tech") has filed this suit against defendant, the United States Food and Drug Administration ("FDA"), seeking declaratory, injunctive, and other relief because of FDA's refusal to declare that Hi-Tech is entitled to the statutorily mandated 180 days of market exclusivity for a generic version of Merck & Co., Inc.'s ("Merck's") ophthalmic drug product COSOPT (dorzolamide hydrochloride; timolol maleate). Only through relief to be provided by this Court will Hi-Tech be able to enforce this right to 180-day exclusivity once Hi-Tech is eligible to enter the market, which is expected to occur on October 28, 2008, when FDA is expected to approve Hi-Tech's product.

Until April 28, 2008, COSOPT was protected from generic competition by a U.S. patent held by Merck. Thereafter, Merck's product continues to be protected from generic competition by virtue of a statutorily mandated six-month "pediatric exclusivity" period, which ends on October 28, 2008.

On April 10, 2008, FDA granted "tentative approval" to an Abbreviated New Drug Application ("ANDA") submitted by Hi-Tech seeking approval to market a generic version of COSOPT. On July 31, 2008, FDA separately granted tentative approval to an ANDA submitted by Apotex, Inc. ("Apotex") for its generic version of COSOPT. Although FDA has all of the necessary information, FDA has refused to rule on the question of whether Hi-Tech – the first applicant to submit an ANDA containing a paragraph IV patent certification – is entitled to 180 days of (generic) market exclusivity, or has forfeited that right under the 2003 MMA amendments to the Hatch-Waxman

Amendments.  For the reasons stated in this Memorandum, Hi-Tech is clearly entitled to exclusivity and has not forfeited that exclusivity.

Hi-Tech filed this case as a last resort after FDA failed to render a timely decision on this issue.  On July 11, 2008, Hi-Tech's counsel sought a ruling from FDA by submitting a Memorandum to FDA's Office of Chief Counsel.  FDA rebuffed Hi-Tech's request and has made it clear to Hi-Tech that FDA will not rule on whether Hi-Tech has exclusivity until no earlier than October 28, 2008 – the same date on which FDA could approve Apotex's ANDA.  As shown below, it is simply not possible for Hi-Tech to wait until October 28, 2008, to file a lawsuit and seek and obtain relief from this Court.  If FDA incorrectly decides on that date that Hi-Tech is not entitled to 180-day exclusivity, two interrelated events will occur: (1) Apotex will almost certainly *immediately* begin marketing its product; and (2) as a result of that marketing, Hi-Tech will lose its 180 days of statutory exclusivity.  To preserve its statutory rights, Hi-Tech must therefore obtain relief from this Court well before October 28, 2008.

It is FDA's position that it need not rule on the issue of exclusivity until final approval is granted to one or both ANDAs on October 28, 2008.  This position is arbitrary and capricious and constitutes a clear denial of due process.  An FDA decision wrongfully denying Hi-Tech exclusivity and simultaneously approving Apotex's ANDA will allow Apotex to instantly flood the market with generic product[1] and irrevocably

---

[1]    Apotex is a large company with the capacity to *instantly* ship massive amounts of product, and has a history of doing so.  Perhaps the most recent well-known example of Apotex's capacity and inclination to flood a market occurred in connection with its launch of generic Plavix, notwithstanding ongoing litigation.  In that case, Apotex put six

terminate any possibility of Hi-Tech's market exclusivity irrespective of the merits of

FDA's decision.  Based on its track record in other matters, and what is common in the

industry as a whole, Apotex has likely solicited orders and built inventories in advance of

a possible October 28, 2008, approval date, so that Apotex can be in a position for

making massive shipment of goods within minutes of receiving final FDA approval.

Absent judicial relief before October 28, 2008, there is *no* possibility of Hi-Tech

obtaining timely injunctive relief to prevent massive shipments by Apotex.  Moreover,

neither FDA nor Apotex will have any monetary liability to Hi-Tech should a court

subsequently determine that FDA wrongfully deprived Hi-Tech of exclusivity by

approving Apotex's ANDA or any other ANDA for generic COSOPT.

The foregoing result is not simply a theoretical possibility.  In a recent decision

concerning 180-day exclusivity for the drug Acarbose,[2] FDA issued a ruling finding that

---

months of its product out in three weeks and captured 75% of new prescriptions.  Several
documents reflecting Apotex's practices are collectively attached as Exhibit 1.  *See*
Exhibit 1-A, *U.S. Judge Halts Sales of Generic Plavix*, Associated Press (Sept. 1, 2006)
(noting that Apotex "quickly gained market share after its launch Aug. 8" and that "[f]or
the week ended Aug. 18, the generic version captured 60.2 percent of the total
prescriptions written for the drug and 74 percent of the new prescriptions, according to
Verispan LLC, which collects prescription data."); *see* Exhibit 1-B, *Blow Seen to Profit
at Bristol*, The New York Times (Sept. 2, 2006) (noting that "Sanofi said it believed that
Apotex had shipped enough of the generic drug to satisfy 'substantially all market
demand through the end of 2006.'"); *see* Exhibit 1-C, Appellant's Emergency Motion for
Stay of Preliminary Injunction Pending Appeal, *Sanofi-Synthelabo v. Apotex, Inc.*, (Fed.
Cir. 2006) at 17 (Apotex's own statement that "[it would] flood the market with perhaps
as much as a billion dollars worth of drug as quickly as possible."); *id.* at 20 ("Sanofi
allowed Apotex' [sic] massive launch.  By August, 2006, 78% of all new prescriptions
were for Apotex' [sic] product. . . .  While a 3-6 month supply has shipped, it is not
equally divided among all vendors.").

[2]     *See* Letter from FDA to William A. Rakoczy, Esq. (May 7, 2008), concerning Cobalt
Pharmaceuticals, Inc.'s 180 exclusivity for Acarbose Tablets under ANDA No. 77-532
(hereafter the "Acarbose Matter"), a copy of which is attached as Exhibit 2.

generic exclusivity had been forfeited. FDA simultaneously approved two competing

ANDAs for immediate market entry, thereby barring any effective judicial review on the

180-day exclusivity issue raised in that matter. As will be demonstrated in more detail

below, FDA's Acarbose Matter was wrongly decided and, if applied by FDA to the vastly

different facts of this case, would result in yet another arbitrary miscarriage of justice that

escapes judicial review because the harm Hi-Tech will suffer is irrevocable and cannot be

remedied by a Court.

Hi-Tech's requests to FDA for a pre-October 28, 2008, determination were

particularly appropriate because it is beyond dispute that the plain language of the MMA

forfeiture provisions makes it impossible for any forfeiture event to occur between now

and October 28, 2008, that will change these issues.[3] The only possible forfeiture issues

here are matters of statutory interpretation with respect to events that occurred before a

patent covering COSOPT expired on April 28, 2008. No additional events can occur

between now and October 28, 2008, that will affect the determination of whether Hi-Tech

is entitled to 180-day exclusivity. Despite the fact that the issues are ripe for decision

now and that the harm to Hi-Tech that will result from a wrongful adverse decision

unreasonably withheld until October 28, 2008, is clear, FDA rebuffed Hi-Tech's requests

---

[3]    The Federal Circuit agrees. On August 21, 2008, it dismissed a declaratory judgment
action filed by Apotex that sought to trigger a forfeiture of Hi-Tech's 180-day exclusivity
by procuring a judgment that the Merck patents challenged by Hi-Tech were not
infringed by Apotex. *See Merck & Co., Inc. vs. Apotex, Inc.*, No. 2008-1133 (Fed. Cir.
Aug. 21, 2008), a copy of which is attached hereto as Exhibit 3. In so doing, the Federal
Circuit noted that a forfeiture under the MMA by October 28, 2008, was no longer
legally possible because Hi-Tech would have 75 days from the date of any forfeiture-
triggering event to commence commercial marketing and avoid forfeiture.

and has informed Hi-Tech that FDA refuses to commit to act on these issues before no earlier than October 28, 2008. In other words, it is quite apparent that FDA will tell Hi-Tech about its right to 180-day exclusivity on the date when Hi-Tech can do absolutely nothing to mount a meaningful challenge to FDA's decision. Accordingly, this Court must decide the issues relating to Hi-Tech's 180-day exclusivity and should grant Plaintiff's Motion for Expedited Preliminary Injunctive Relief.

## LEGAL BACKGROUND

This case concerns the proper and timely interpretation of the provisions of the Hatch-Waxman Amendments and the MMA concerning when generic drug manufacturers are eligible for 180-day exclusivity, and whether they have forfeited that exclusivity. In particular, this case concerns the so-called "failure to market" provisions of the MMA.

This Court has already addressed much of the relevant statutory background for this case in its ruling in *Apotex, Inc. v. FDA*:

> In order to market an original pharmaceutical product, a company must file a New Drug Application ("NDA") with the FDA, providing technical information regarding the pharmaceutical's composition, clinical trial results as to safety and effectiveness, the method of manufacture, and proposed labeling for the pharmaceutical's use. *See* 21 U.S.C. § 355(b)(1). The FDA must approve the NDA, and the applicant must also submit information concerning patents that "claim[ ] the drug . . . or which claim[ ] a method of using such drug . . . ." 21 U.S.C. §§ 355(b)(1), (c)(2). The FDA then "lists" this information, once approved, in a publication called "Approved Drug Products With Therapeutic Equivalence Evaluations" (also known as "the Orange Book"). *See* 21 U.S.C. § 355(c)(2); 21 C.F.R. § 314.53(a).
>
> [Hatch-Waxman] governs the marketing of generic versions of pharmaceuticals that are covered by pre-existing NDAs. *See* 21 U.S.C. § 355(j). The generic pharmaceutical company must submit an [ANDA],

- 6 -

which is a truncated version of the original NDA, enabling the generic applicant to avoid the considerable expense of repeating the detailed clinical studies originally conducted in connection with the NDA. *See Dr. Reddy's Labs., Inc. v. Thompson*, 302 F.Supp.2d 340, 343 (D.N.J. 2003). The ANDA-applicant must establish that its generic product is bioequivalent to the NDA-product, and must ordinarily show that the ANDA-product has the same active ingredient, dosage form and strength, method of administration, and labeling as the NDA-product. *See* 21 U.S.C. § 355(j)(2)(A). In addition, the ANDA must include one of four certifications as to each patent that is listed in the Orange Book in connection with the NDA-product. *See* 21 U.S.C. § 355(j)(2)(A)(vii). The four available certifications state that: (1) there is no patent information ("paragraph I certification"); (2) the listed patent has expired ("paragraph II certification"); (3) the ANDA-applicant will not market its generic drug until the listed patent expires ("paragraph III certification"); or (4) the listed patent is invalid and/or will not be infringed by the ANDA-drug ("paragraph IV certification"). *See* 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV).

An ANDA-applicant seeking to market its drug before the NDA-drug's patent has expired must make a paragraph IV certification with respect to the "listed patents" (*i.e.*, the patents that are listed in the Orange Book when the ANDA is filed), as well as those that are placed in the Orange Book subsequently (*i.e.*, "later-listed patents"), and must further advise the NDA-holder of the legal and factual grounds for the certifications. *See* 21 U.S.C. § 355(j)(2)(B). Under the law, as soon as an ANDA-applicant makes a paragraph IV certification as to a patent that claims the NDA-drug, the ANDA-applicant has infringed that patent, and the NDA-holder may immediately sue the ANDA-applicant for infringement. *See* 35 U.S.C. § 271(e)(2)(A). If the NDA-holder files the infringement suit within forty-five days of the date on which it received notice of the paragraph IV certification, then any approval of the ANDA is automatically stayed for thirty months thereafter. *See* 21 U.S.C. § 355(j)(5)(B)(iii). The thirty-month stay will not apply, however, if a final court decision is rendered earlier in the patent case, or if the presiding court orders otherwise. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

As an incentive for generic pharmaceutical companies to further the statutory purpose of helping the public gain access to lower-cost drug products more expeditiously, the Hatch-Waxman Amendments grants a 180-day period of generic marketing exclusivity to a "previous" ANDA-applicant that has filed a paragraph IV certification. *See* 21 U.S.C. § 355(j)(5)(B)(iv).

*Apotex, Inc. v. FDA*, 414 F. Supp. 2d 61, 63-64 (D.D.C. 2006).

Because Congress was concerned that this 180-day exclusivity period could result in a "bottleneck" to approving subsequently submitted ANDAs, Congress, in section 1102 of the MMA, enacted new forfeiture provisions, pursuant to which a generic manufacturer eligible for 180-day exclusivity could forfeit that exclusivity. *See* 21 U.S.C. § 355(j)(5)(D); *see also Apotex, Inc. v. FDA*, 2006 WL 1030151 at *4 (D.D.C. 2006) (noting that "Congress significantly changed the 180-day exclusivity provision through the [MMA]"). The forfeiture provisions were designed and intended to ensure that 180-day exclusivity would remain as an incentive for generic companies to challenge weak patents and bring consumers quicker access to affordable generic drugs while providing for forfeiture of exclusivity in situations where the first applicant created a "bottleneck" to subsequent ANDA applicants by failing to market in a timely manner after the listed patents (or statutory exclusivities) were removed as a barrier. *See* 149 CONG. REC. S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer).

There is absolutely no indication in the wording of the MMA or in its legislative history that Congress intended to punish a company that would otherwise be eligible for 180-day exclusivity by having that exclusivity forfeited in a situation – like the case at bar – where an applicant could not market a product because FDA had not yet approved it. Indeed, Congress has made a clear legislative judgment that 180-day market exclusivity should not be taken away in whole or in part in situations where a company cannot market a drug through no fault of its own. The 2002 Best Pharmaceuticals for Children Act ("BCPA"), 21 U.S.C. § 355a(n), explicitly tolls the running of 180-day exclusivity if the ANDA holder's inability to enter the market is the result of pediatric

exclusivity.  Surely, if Congress had intended to reverse this legislative judgment that

companies should not lose 180-day exclusivity for events beyond their control, there

would have been legislative history to that effect when Congress enacted the MMA.

There is none.  Indeed, Congress reauthorized the BPCA in 2007 without disturbing its

earlier judgment that exclusivity is not lost for events beyond the applicant's control.  *See*

Best Pharmaceuticals for Children Act of 2007, Pub. L. No. 110-85, 121 Stat. 876 (2007).

At issue in the present case are the "failure to market" forfeiture provisions found

at 21 U.S.C. § 355(j)(5)(D)(i)(I), which state that 180-day exclusivity can be forfeited if a

"forfeiture event" occurs.  Such an event occurs when:

The first applicant fails to market the drug by the later of--

(aa) the earlier of the date that is--

(AA) 75 days after the date on which the approval of the application of
the first applicant is made effective under subparagraph (B)(iii); or

(BB) 30 months after the date of submission of the application of the first
applicant; or

(bb) with respect to the first applicant or any other applicant (which other
applicant has received tentative approval), the date that is 75 days after the
date as of which, as to each of the patents with respect to which the first
applicant submitted and lawfully maintained a certification qualifying the
first applicant for the 180-day exclusivity period under subparagraph (B)(iv),
at least 1 of the following has occurred:

(AA) In an infringement action brought against that applicant with respect
to the patent or in a declaratory judgment action brought by that applicant
with respect to the patent, a court enters a final decision from which no
appeal (other than a petition to the Supreme Court for a writ of certiorari)
has been or can be taken that the patent is invalid or not infringed.

(BB) In an infringement action or a declaratory judgment action described
in subitem (AA), a court signs a settlement order or consent decree that

enters a final judgment that includes a finding that the patent is invalid or not infringed.

(CC) The patent information submitted under subsection (b) or (c) of this section is withdrawn by the holder of the application approved under subsection (b) of this section.

Under the statute, a forfeiture event occurs when the first applicant **fails** to market the drug by the *later* of two dates. One date is calculated under item (aa) by determining the *earlier* of a date that is either 75 days after the first applicant's ANDA is approved (subitem (AA)) or 30 months after the date of submission of the first applicant's ANDA (subitem (BB)). The other date is calculated under item (bb) based upon certain events involving court action. These events include, very generally, when a court enters a final decision that the patent is invalid or not infringed (subitem (AA)), a court signs a settlement order or consent decree entering final judgment that includes a finding that the patent is invalid or not infringed (subitem (BB)), or the patent information for the listed drug is withdrawn from the Orange Book (subitem (CC)). If a (bb) event occurs, an applicant has 75 days to begin commercial marketing. The statute directs that once an (aa) and a (bb) event can be calculated, the later date is the relevant date for a failure to market determination.

While FDA acknowledges that "[t]hese provisions are quite complex and, because of the value of 180-day exclusivity, are of substantial interest to regulated industry," FDA has failed to issue regulations implementing the statutory forfeiture provisions. *See* Letter from FDA to Marc A. Goshko (January 17, 2008) (hereafter the

"Granisetron Matter"), a copy of which is attached as Exhibit 4.  Instead, FDA has issued

letters to generic companies telling them whether or not they have forfeited exclusivity.

Two such recent letters warrant mention.  First, in the Granisetron Matter, FDA

determined that if an (aa) event has occurred, but a (bb) event has not occurred, no

forfeiture is triggered.  Second, in the Acarbose Matter, FDA "interpret[ed] the NDA

holder's request for patent delisting to constitute withdrawal of the patent information

under section 505(j)(5)(D)(i)(I)(bb)(CC) of the Act," Exhibit 2 at 7 n.13, and further read

the same "plain language" to apply "whenever" such a request is made – even though the

patent remained listed in the Orange Book.  In so finding, FDA dismissed as inapplicable

*Ranbaxy Labs., Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006), which held that in the

context of the pre-MMA version of the FDC Act FDA could not withdraw a patent from

the Orange Book that was the subject of a paragraph IV certification based upon a request

from an NDA holder or patent owner to do so, because it would wrongfully oust a

generic applicant from its 180-day exclusivity entitlement.  *See* Exhibit 2 at 7 n.13, 8, and

8 n.14.

## FACTUAL BACKGROUND

In August 2005, Hi-Tech submitted ANDA No. 77-847 to FDA containing a

paragraph IV certification as to each of the three Orange Book-listed patents covering

COSOPT: United States Patent Nos. 4,797,413 ("the '413 patent"), 6,248,735 ("the '735

patent"), and 6,316,443 ("the '443 patent").  FDA "received" the ANDA as of October

11, 2005.[4]  On or about December 2, 2005, Hi-Tech sent a notice to Merck challenging

the validity of each of the listed patents.  On January 18, 2006, within 45 days after

receiving the patent certification notice, Merck commenced an action for patent

infringement in the United States District Court for the District of New Jersey with

respect to the '413 patent.  That patent expired on April 28, 2008, but the brand drug is

subject to a six-month period of pediatric exclusivity expiring on October 28, 2008.

Merck did not bring suit with respect to the '735 or '443 patents, both of which expire on

April 17, 2011, and on January 26, 2006, Merck provided Hi-Tech with a covenant not to

sue Hi-Tech with respect to these patents.

    The validity and enforceability of the '413 patent was upheld by the United States

Court of Appeals for the Federal Circuit.  *See Merck & Co., Inc. v. Hi-Tech Pharmacal,
Inc.*, 482 F.3d 1317 (Fed. Cir. 2007).  Consequently, Hi-Tech was enjoined from

marketing its generic version of COSOPT until October 28, 2008.[5]

    On April 10, 2008, less than thirty months after Hi-Tech's ANDA was considered

submitted to FDA, the Agency tentatively approved the application.  A copy of Hi-Tech's

tentative approval letter is attached as Exhibit 5.  By definition, on that date, Hi-Tech met

the requirements to begin marketing, but was legally prohibited from doing so because of

---

[4]     FDA "receives" an ANDA when it determines that the ANDA is substantially complete.
        Once an ANDA has been received, the ANDA applicant provides notice to the NDA
        holder and patent owner of its paragraph IV certification.  *See* 21 C.F.R. § 314.101(b)(1).

[5]     As noted above, the '413 patent expired on April 28, 2008, but the brand drug is subject
        to a six-month period of pediatric exclusivity expiring on October 28, 2008.

the '413 patent.  *See* 21 U.S.C. § 355(j)(5)(B)(IV)(dd) ("The term 'tentative approval'

means:

> notification to an applicant by the Secretary that an application under this
> subsection meets the requirements [for approval], but **cannot** receive
> effective approval because the application does not meet the requirements
> of this subparagraph, there is a period of exclusivity for the listed drug
> under subparagraph (F) or section 355a of this title, or there is a 7-year
> period of exclusivity for the listed drug under section 360cc of this title.

*Id.* (emphasis added)).  The failure to obtain tentative approval within thirty months

is a separate ground for forfeiture.  *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV).  The

tentative approval letter states that FDA was "unable to grant final approval to

[Hi-Tech's] ANDA at this time because of the patent issue noted below."  The letter

then states that all three patents are "listed" and shows patent expiration dates of

October 28, 2008 (the '413 patent) and April 17, 2011 (the '735 and '443 patents).

On April 18, 2006, Merck disclaimed the '735 and '443 patents and requested that

FDA delist those patents from the Orange Book.  In December 2006, Merck made

another request to FDA to delist the patents.  Despite Merck's requests, FDA never

delisted the '735 and '443 patents from the Orange Book.  Indeed, FDA's April 10, 2008,

tentative approval letter to Hi-Tech specifically states that the '735 and '443 patents are

"currently listed," and the tentative approval letter does not mention Merck's delisting

requests.[6]  In addition, the Electronic Orange Book contains a list of all patents that have

---

[6]     Sometime in mid-April 2008, FDA published a notice in the Orange Book that Merck
        had requested delisting of the patents, but that the patents remain listed because of
        180-day exclusivity.

been delisted and, as of the date of FDA's tentative approval letter – and indeed, as of the date of this Memorandum – the '735 and '443 patents have not been delisted.

In November 2006, because the '735 and '443 patents remained listed in the Orange Book despite Merck's requests to delist, Apotex submitted an ANDA to FDA containing a paragraph IV certification to those patents, as well as to the '413 patent. Merck failed to sue for infringement on the '735 and '443 patents within the statutory 45-day period, although Merck did sue Apotex for infringement of the '413 patent. Apotex subsequently filed a counterclaim seeking a declaratory judgment of non-infringement of the '735 and '443 patents in the United States District Court for the District of New Jersey. *See Merck & Co., Inc. v. Apotex, Inc.*, C.A. No. 06-cv-5789, slip op. (D.N.J. Nov. 15, 2007), Exhibit 7. The appeal from the dismissal of Apotex's counterclaim was decided by the Federal Circuit on August 21, 2008. *See Merck & Co., Inc. v. Apotex, Inc.*, No. 2008-1133 (Fed. Cir.) (Aug. 21, 2008), Exhibit 3. The court noted that as of August 7, 2008 (the date of argument in that case), the delisting of the '735 and '443 patents had not occurred. *See id.* at 3 n.2. As previously noted, the Federal Circuit dismissed the Apotex declaratory judgment action because no decision could be rendered before August 14, 2008, and any decision rendered after that date would be within 75 days of October 28, 2008, and could not create a (bb)(AA) forfeiture event.

In its own litigation concerning the '413 patent, Apotex agreed to be bound by the outcome of the earlier Hi-Tech challenge to the '413 patent. Accordingly, following the March 2007 Federal Circuit decision in the *Hi-Tech* case, the New Jersey District Court

entered an injunction prohibiting Apotex from marketing a generic version of COSOPT until October 28, 2008.  On July 31, 2008, FDA tentatively approved Apotex's ANDA for its generic version of COSOPT.  A copy of the tentative approval letter is attached hereto as Exhibit 6.  Just as in Hi-Tech's case, FDA's tentative approval letter states that the three patents are currently "listed" in the Orange Book.  And just as in Hi-Tech's case the tentative approval letter makes no mention of Merck's delisting requests.

In preparation for the commencement of its commercial marketing on October 28, 2008, Hi-Tech sought from FDA confirmation that it was eligible for, and had not forfeited, its 180-day exclusivity.  *See* Memorandum dated July 11, 2008, from Robert A. Dormer and Kurt R. Karst to Elizabeth H. Dickinson, Esq., a copy of which is attached hereto as Exhibit 7.  In addition, Hi-Tech, through its counsel, met with FDA on August 25, 2008.  Based upon that meeting, it is Hi-Tech's understanding that FDA will not render any decision on exclusivity until no earlier than October 28, 2008.

## ARGUMENT

The standards for granting a preliminary injunction were set out by this Court in *Apotex, Inc. v. FDA:*

> When considering a motion for preliminary injunction or temporary restraining order, a court must weigh four factors: (1) the prospective irreparable injury to the movant in the event that the requested relief is denied; (2) the possibility of harm to other parties in the event that the relief is granted; (3) the likelihood that the movant will prevail on the merits; and (4) the public interest.  *See, e.g., Mova Pharms. Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C.Cir.1998).  "These factors interrelate on a sliding scale and must be balanced against each other," *Davenport v. Int'l Bd. of Teamsters AFL-CIO,* 166 F.3d 356, 360-61 (D.C.Cir.1999), such that a particularly strong showing with respect to one may compensate for a weaker showing with respect to another, *CityFed Fin. Corp. v. OTS,* 58 F.3d 738, 747

> (D.C.Cir.1995).  Specifically, the "likelihood of success on the merits"
> inquiry is inversely proportional to the "degree of irreparable harm" inquiry-
> that is, a court may grant the sought-after relief when the movant is very
> likely to succeed on the merits, in the face of a lesser degree of potential
> irreparable injury.  *Cuomo v. U.S. Nuclear Reg. Comm'n*, 772 F.2d 972, 974
> (D.C.Cir.1985).

*Apotex, Inc. v. FDA*, 2006 WL 1030151 at *7 (footnote omitted); *see also National Head Start Ass'n. v. HHS*, 297 F. Supp. 2d 242, 246 (D.D.C. 2004).  Hi-Tech satisfies the requirements for obtaining a preliminary injunction in this case.

**A.     Hi-Tech Has a Substantial Likelihood of Success on the Merits.**

**1.     Hi-Tech has not forfeited its 180-day exclusivity period.**

Hi-Tech is entitled to prevail on the legal issue presented in this case, namely that Hi-Tech, the first company to submit an ANDA containing a paragraph IV patent certification with respect to the Merck patents, has not forfeited the 180-day exclusivity to which it is entitled.  The MMA "failure to market" forfeiture provisions were enacted by Congress to prevent a first applicant from failing to make timely use of 180-day exclusivity, thereby delaying subsequent applicants from entering the market.  Those "failures" could occur if a first applicant failed to market when there was no patent or exclusivity barrier to such marketing.  However, a "failure" cannot possibly occur when no applicant is entitled to final approval because all are barred by an unexpired patent or a subsequent period of pediatric exclusivity.  The reality in this case is that no generic company may enter the market until October 28, 2008, when Merck's pediatric exclusivity on the '413 patent expires.  Hi-Tech has tentative approval to enter the market with a generic version of COSOPT, which it intends to do on October 28, 2008 – the very

first day that any generic manufacturer could legally enter the market. There is no bottleneck here. To the contrary, this is a case where a patent challenge has assured the public of generic competition at the earliest possible moment and the challenger, Hi-Tech, has earned the reward of a 180-day head start in the generic market.

The structure of the MMA provisions makes clear that there can be no "failure to market" unless and until there is a legal right to market. FDA's construction of the MMA's "failure to market" provisions in the prior Granisetron and Acarbose Matters fails to consider how the forfeiture provisions were meant to work in those circumstances where, as in this case, a first applicant has received a timely tentative approval within thirty months after ANDA submission but is legally barred from receiving final approval because of the existence of a remaining patent or pediatric exclusivity barrier.

The MMA not only added a definition of "tentative approval" to the FDC Act but also a separate forfeiture provision for failure to obtain tentative approval within thirty months. The term "tentative approval" means that a first applicant cannot obtain final approval and cannot legally market a product even though it has met the technical requirements for final approval because a listed patent, Hatch-Waxman exclusivity, pediatric exclusivity, orphan drug exclusivity, or thirty-month stay prohibits final approval. *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd). In that circumstance, there can be no "failure to market" and forfeiture can only occur if there has been a failure to obtain tentative approval. Unless the MMA forfeiture provisions are construed as requiring **either** actual marketing or a tentative approval within thirty months – but not both – the statute would make no sense. The issuance of a tentative approval at the end of the

thirty-month period would be meaningless because even though a tentative approval would forestall forfeiture under § 355(j)(5)(D)(i)(IV), forfeiture of exclusivity would always occur anyway under § 355(j)(5)(D)(i)(I)(aa)(BB) as a result of a failure to market within thirty months even though no legal right to market existed.  In other words, on the same day that a company obtained tentative approval and avoided forfeiture under § 355(j)(5)(D)(i)(IV), FDA could determine that the company forfeited exclusivity because it failed to begin commercial marketing.  Congress could not possibly have intended such an absurd result.

As shown below, statutory terms are to be interpreted consistent with their natural and clear meaning given the context of the statute.  Black's Law Dictionary defines "failure" as: "[a]n omission of an *expected* action, occurrence, or performance."  BLACK'S LAW DICTIONARY, 631 (8th ed. 2004) (emphasis added).  Clearly, the term "failure to market" in the context of the MMA presumes a legal right to market and the failure to market forfeiture provisions only apply in those instances – not present in this case – where a first applicant could have marketed, but failed to do so, within the parameters defined by the MMA.

The Supreme Court has addressed this issue in another context that nevertheless applies here.  In *Williams v. Taylor*, 529 U.S. 420 (2000), the Court considered the term "failed to develop" in the context of a federal habeas corpus petition.  28 U.S.C. § 2254(e)(2) states: "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim . . . ."  In ruling that the term "failed to develop" implies some lack of diligence, the Court

discussed at length the meaning of the words "fail" and "failed."  Writing for a

unanimous court, Justice Kennedy concluded that:

> We do not deny "fail" is sometimes used in a neutral way, not importing fault
> or want of diligence.  So the phrase "We failed to understand his argument"
> can mean simply "We cannot understand his argument."  This is not the
> sense in which the word "failed" is used here, however.
>
> We give the words of a statute their "'ordinary, contemporary, common
> meaning,'" absent an indication Congress intended them to bear some
> different import.  In its customary and preferred sense, "fail" connotes some
> omission, fault, or negligence on the part of the person who has failed to do
> something.  *See, e.g.*, Webster's New International Dictionary, 910 (2d ed.
> 1939)(defining "fail" as "to be wanting; to fall short; to be or become
> deficient in any measure or degree," and "failure" as "a falling short," "a
> deficiency or lack," and "[o]mission to perform"); Webster's New
> International Dictionary's 814 (3d ed. 1993)("to leave some possible or
> expected action unperformed or some condition unachieved").  *See also*
> Black's Law Dictionary, 594 (6th ed. 1990) defining "fail" as "[f]ault,
> negligence or refusal").  To say a person has failed in a duty implies he did
> not take the necessary steps to fulfill it.  He is, as a consequence, at fault and
> bears responsibility for the failure.  In this sense, a person is not at fault when
> his diligent efforts to perform an act are thwarted, for example, by the
> conduct of another or by happenstance.  Fault lies, in those circumstances,
> either with the person who interfered with the accomplishment of the act or
> with no one at all.  We conclude Congress used the word "failed" in the sense
> just as described.  Had Congress intended a no-fault standard, it would have
> had no difficulty in making its intent plain.  It would have had to do no more
> than use, in lieu of the phrase "has failed to," the phrase "did not."

*Williams v. Taylor*, 529 U.S. at 431-32 (citation omitted).

The same reasoning applies here.  Had Congress wanted to impose a no-fault

standard it could have used the words "does not market" rather than "fails to market."  In

this case, Hi-Tech did not "fail" to market its product.  Hi-Tech was ready to do so at the

end of the thirty month period as demonstrated by the fact that it received tentative

approval.  However, through no fault of Hi-Tech, it could not receive final approval

because of Merck's remaining exclusivity. Therefore, there has not been a failure to market within the meaning of the statute, and thus no item (aa) event has occurred.

Hi-Tech has also not forfeited its exclusivity under the "failure to market" provisions because a "later of" date cannot be calculated under the statute. This is so because none of the subitem (AA)-(CC) forfeiture events under item (bb) have occurred as to the '735 and '443 patents. Specifically, there has been no judgment or settlement as to these patents that would trigger subitems (AA) and (BB). Indeed, the litigation commenced by Apotex for purposes of triggering such an (AA) or (BB) event was dismissed by the Federal Circuit on August 21, 2008, because the court recognized that the time for Apotex to create a forfeiture (on or before August 14, 2008), had passed and therefore "[a]s a practical matter, this Court is unable to provide any realistic relief." *See Merck & Co., Inc. vs. Apotex, Inc.*, No. 2008-1133, at 5, Exhibit 3.

That leaves for consideration the question of whether Merck's failed attempts to delist the '735 and '445 patents, taken together with the Acarbose Matter, creates a basis for concluding that a forfeiture event has occurred under subitem (CC) of the failure to market provisions. *See* 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC). The present case is factually distinguishable from the situation FDA considered in the Acarbose Matter. In any event, FDA's Acarbose decision is dead wrong and does not set a precedent that is in any way binding on the outcome here. Indeed, FDA's interpretation is entitled to no deference because the decision claims to be based on the "plain language" of the statutory provisions, and this Court should simply "give effect to the unambiguously expressed

intent of Congress." *Apotex, Inc. v. FDA*, 414 F. Supp. 2d at 66-67 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).

In the Acarbose Matter, FDA concluded that the listed patents were "withdrawn" from the Orange Book when the patent holder filed its request for delisting – despite the fact that the patents remained listed in the Orange Book – and this withdrawal (without delisting) triggered a forfeiture event under § 355(j)(5)(D)(i)(I)(bb)(CC). It is both factually and legally impossible for FDA to make such a finding in this case. Here, in November 2006, long after Merck's initial April 2006 delisting request, Apotex asserted a paragraph IV patent challenge with respect to the '735 and '443 patents and also subsequently filed a declaratory judgment action with respect to those patents. The sole legal basis for those actions by Apotex was the fact that the '735 and '443 patents remained listed in the Orange Book. And the sole purpose of those actions was to seek to trigger a forfeiture of Hi-Tech's entitlement to 180-day market exclusivity.

If, as FDA's Acarbose decision absurdly suggests, the Merck patents had actually been withdraw as a result of Merck's delisting requests, it would have been legally impossible for Apotex to make a paragraph IV certification and there would have been no basis for filing a declaratory judgment action with respect to those patents. The patents would have simply disappeared from the Orange Book; required no certification of any kind; and ceased to be either a barrier to the approval of the Apotex ANDA or the basis for Hi-Tech's claim to 180-day exclusivity. FDA cannot simply roll back the clock and pretend that the '735 and '443 patents were delisted or that Apotex never filed a paragraph IV certification or commenced a declaratory judgment action. Indeed, nothing

in the MMA provisions or elsewhere grants FDA the legal authority to oust the courts from jurisdiction after the fact or to deprive Apotex of its right to seek a judgment that could have triggered an MMA forfeiture event with respect to patents that clearly stood in its path to approval.

The bottom line is that the '735 and '443 patents have never been withdrawn or delisted from the Orange Book.  FDA recognized this fact in its April 10, 2008, tentative approval letter to Hi-Tech wherein it stated that the '735 and '443 patents are "currently listed" in the Orange Book; and it recognized it again in the July 31, 2008, letter granting tentative approval to Apotex.  More importantly, the Federal Circuit's August 21, 2008, decision dismissing Apotex's declaratory judgment action specifically noted that as of the date of oral argument (August 7, 2008) delisting of the Merck patents had not occurred. Had the patents been delisted, the District Court and the Federal Circuit would not have had jurisdiction to hear Apotex's declaratory judgment claims.

In reality, the structure of the Hatch-Waxman provisions providing for 180-day exclusivity prohibits FDA from delisting a patent from the Orange Book after a first applicant has submitted an ANDA containing a paragraph IV certification.  This was, in fact, the holding in *Ranbaxy Labs., Ltd. v. Leavitt*, 469 F. 3d 120 (D.C. Cir. 2006), a case decided under the pre-MMA statutory provisions, but that clearly applies with equal force to post-MMA cases such as Hi-Tech's.[7]  Under current law, 21 U.S.C.

---

[7]    In a recent pre-MMA case, Judge Lamberth ruled that FDA improperly delisted a patent from the Orange Book and ordered FDA to relist the patent.  *See Teva Pharmaceuticals USA, Inc. v. Leavitt,* 08-cv-00395 (RCL) (D.D.C. Apr. 11, 2008), *appeal docketed*, No. 08-5141 (D.C. Cir. May 20, 2008).

§ 355(j)(5)(B)(iv), the mechanism for creating 180-day generic exclusivity involves a prohibition against FDA approval of a second or subsequent ANDA *containing a paragraph IV certification* against the same patents which created the first applicant's entitlement to exclusivity.  Specifically, the statute states:

> **(iv) 180-day exclusivity period.—**
>
>> **(I) Effectiveness of application.—** Subject to subparagraph (D), if the application contains a certification described in paragraph (2)(A)(vii)(IV) and is for a drug for which a first applicant has submitted an application containing such a certification, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug (including the commercial marketing of the listed drug) by any first applicant.

21 U.S.C. § 355(j)(5)(B)(iv).  Therefore, unless and until the first applicant actually forfeits exclusivity, FDA must require subsequent ANDA applicants to maintain paragraph IV certifications with respect to the same patent – and FDA cannot do so unless those patents remain listed in the Orange Book.

In this case, Merck submitted its requests to delist the '735 and '443 patents long before the date that was thirty months after Hi-Tech submitted its ANDA.  Under the "later of" determination required by the MMA "failure to market" provisions, no delisting could lawfully be permitted, at the earliest, prior to the end of the thirty-month period because no forfeiture could possibly occur before the thirty months expired.  If FDA actually delisted a patent immediately upon receipt of a request from a patent holder, even though a "later event" is required for forfeiture (*i.e.*, thirty months from filing had not occurred), subsequently submitted ANDAs that were technically approvable within less than thirty months from the date of the first

- 23 -

applicant's submission would not contain a paragraph IV certification and would have to be approved. But such an approval would wrongfully deprive the first applicant of 180-day exclusivity. It is precisely because FDA recognized the existence of this dilemma that it did not delist the Acarbose patent or the '735 and '443 COSOPT patents from the Orange Book in response to the requests by the patent owner for withdrawal of the patents.

Ironically, in refraining from delisting the patents, FDA was clearly applying the rationale of *Ranbaxy* which held that the delisting of a patent is not permitted if, to do so, would wrongfully oust a first applicant from the 180-day exclusivity to which it is entitled under Hatch-Waxman. Yet, for inexplicable reasons, FDA's Acarbose decision claims that *Ranbaxy* is inapplicable to post-MMA cases. That makes no sense. In truth, FDA is trying to read the same provisions of the MMA literally and non-literally at the same time – a clearly impossible proposition. Specifically, FDA is seeking to treat a patent as continuing to be listed for purpose of preserving a first applicant's exclusivity while simultaneously treating it as delisted for the purpose of triggering a forfeiture of that exclusivity. As the facts here prove, however, it is simply not possible for FDA to have its cake and eat it too. A patent is either listed in the Orange Book or it is not. Indeed, in its brief in the *Ranbaxy* case, FDA stated that "a patent that is 'withdrawn' is *withdrawn from the Orange Book*; it does not remain fictitiously listed there for some purposes but not for others." Federal Defendants' Memorandum in Support of Motion for Summary

Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment at 21 n.12 (italics in original), *Ranbaxy Labs., et al., v. Leavitt et al.*, C.A. No. 05-cv-1838 (D.D.C. filed Dec. 2, 2005), attached hereto as Exhibit 8.  FDA's present interpretation of "withdrawn" is in total conflict with its earlier position and cannot withstand judicial scrutiny.  If a patent remains listed, subsequent ANDA applicants are required by law to certify to that patent, and such applicants are encouraged by law to seek judgments that would remove the patent as a barrier to marketing – just as Apotex did here in submitting an ANDA containing a paragraph IV certification and subsequently commencing a declaratory judgment action with respect to the '735 and '443 patents covering COSOPT.  FDA, having allowed the patents to remain listed in the Orange Book in order to protect generic exclusivity, cannot subsequently disregard the legal effect of that continued listing in causing the Apotex paragraph IV challenge and declaratory judgment action by literally construing the MMA amendments, after the fact, as though the delisting had occurred before the Apotex challenged was commenced.

In short, FDA was simply wrong when it stated in the Acarbose Matter that it made no difference whether the patent delisting was treated as occurring when the delisting was published in the Orange Book or when delisting was requested by the patent owner.  At most, it made no difference to the outcome of the Acarbose Matter because, unlike the situation here: (1) no subsequent applicant filed a paragraph IV patent certification and commenced patent challenge litigation between the date of the request for delisting and when the delisting was published in the Orange Book;

- 25 -

(2) no applicant had tentative approval when the Acarbose patent was actually delisted; and (3) no applicant was in a position to market the product within 75 days after the delisting.  Here, FDA cannot treat the '735 and '443  patents as being delisted as of the date the request for delisting was made without undermining Hi-Tech's entitlement to exclusivity and the court's jurisdiction to hear the Apotex patent challenge, which arose solely because the patents remained listed.  Nor can FDA properly oust Apotex from its legal right to seek a judgment that might have triggered a forfeiture event under the MMA.  Finally, if FDA delisted the '735 and '443 patents tomorrow, there would be no possible forfeiture because Hi-Tech has tentative approval and will enter the market on October 28, 2008, which is less than 75 days from now.[8]

For the foregoing reasons, Hi-Tech has a strong likelihood of success in showing that it has not forfeited its 180-day exclusivity because there has been no "failure" to market and because the listed patents have not been withdrawn.

### 2.    This Court cannot await an FDA decision.

A court can grant injunctive relief and a declaratory judgment, provided the case before it is ripe.  *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148-9 (1967).  The instant

---

[8]    Even if FDA had delisted the '735 and '443 patents on April 11, 2008 – thirty months after FDA received Hi-Tech's ANDA – or in mid-April 2008 when the Orange Book first showed a delisting request for these patents and the first time any ANDA applicant would have had formal notice of a potential forfeiture event, in order to trigger a delisting forfeiture, there would have been no forfeiture in this case because Merck's pediatric exclusivity began on April 28, 2008.  And as we have shown above, pediatric exclusivity cannot create forfeiture because Hi-Tech obtained tentative approval within 30 months of the date on which Hi-Tech's ANDA was received.  In addition, 180-day exclusivity cannot be lost when entry into the market is barred by pediatric exclusivity under the BPCA.

case is plainly ripe for decision now, and FDA's unwillingness to act until it is too late should remove any doubt that this Court can and should act now. The Administrative Procedure Act requires that "[w]ith due regard for the *convenience and necessity* of the parties or their representatives and *within a reasonable time*, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b) (emphasis added).

Contrary to this statutory directive, and despite Hi-Tech's requests, FDA has given no regard to Hi-Tech's need for a decision prior to October 28, 2008. Moreover, FDA's refusal to commit to providing a decision prior to that date is unreasonable in the present case. There are no relevant facts that could change between now and October 28, 2008. Therefore, regardless of what FDA has done in other cases, this case should have been decided by FDA no later than August 21, 2008. That was the date on which the Federal Circuit confirmed that the date for a (bb)(AA) or a (bb)(BB) event had already passed, and thus could not trigger forfeiture of Hi-Tech's eligibility for 180-day exclusivity.[9]

FDA's refusal – not inability, but refusal – to consider giving Hi-Tech an answer in advance of October 28, 2008 is unreasonable. Here, the statute at issue concerns 180-day exclusivity – a statutory entitlement that once lost, cannot be recovered. If FDA is permitted to withhold its decision on 180-day exclusivity until the very moment that it also approves a subsequent applicant, FDA effectively insulates its decision – however incorrect or unlawful it may be – from judicial scrutiny. Indeed, this Circuit has

---

[9]    As Hi-Tech explained in its July 11, 2008 letter to FDA, even before August 21, 2008, FDA had before it all of the facts and law necessary to make a decision in the present case. FDA should have ruled in the first instance, providing an answer to Hi-Tech and giving this Court an agency decision to review.

explained that an agency "cannot, by its delay, substantially nullify rights which the Act confers, though it preserves them in form." *American Broadcasting Co. v. FCC*, 191 F.2d 492, 501 (D.C. Cir. 1951) (citation omitted). By waiting until the date of final approval to decide on 180-day exclusivity, an FDA decision adverse to Hi-Tech would nullify Hi-Tech's exclusivity and Hi-Tech's right to judicial review of that decision, in violation of the law.

FDA's insistence on perpetuating unnecessary uncertainty is particularly perplexing, especially when FDA has previously recognized that the Hatch-Waxman Amendments should ***not*** be administered in such a manner that it creates "'the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.'" *Apotex, Inc. v. FDA*, 2006 WL 1030151 at *6 (quoting FDA).

In any event, there is no obstacle to this Court deciding this question in the first instance. As the D.C. Circuit has recognized:

> [C]ourts are certainly not without power to address the interests of a regulatory beneficiary (properly before the court) when unwarranted agency delay prejudices those interests. "At some point administrative delay amounts to a refusal to act, with sufficient finality and ripeness to permit judicial review." *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1100 (D.C. Cir. 1970). In these situations - when delay is extremely lengthy or when "exigent circumstances render it equivalent to a final denial of petitioners' request," *id*. at 1098 - the court can undertake review as though the agency had denied the requested relief . . . .

*Public Citizen Health Research Group v. Commissioner, Food and Drug Administration*, 740 F.2d 21, 32 (D.C. Cir. 1983). The propriety of this Court ruling now is especially clear because FDA has not issued regulations in this area despite an acknowledged need

to do so nearly four years ago.  *See* FDA Memorandum dated September 30, 2004, a copy of which is attached as Exhibit 9 (stating that "[t]he patent delisting issues raised by the MMA changes will be addressed in the proposed regulations.").  Nearly four years later – and nearly five years after enactment of the MMA – FDA has not issued any proposed regulations, and has instead addressed important issues raised by the MMA only in *ad hoc* decision making that is rarely, if ever, subjected to meaningful judicial review.  Assuming *arguendo* that it is not *per se* unlawful for FDA to persist in *ad hoc* decisions rather than a rulemaking, *see Shays v. FEC*, 424 F. Supp. 2d 100, 113 (D.D.C. 2006) (discussing why rulemaking is preferable to adjudication, and noting that reliance on adjudication can be an abuse of discretion), untimely piecemeal adjudication is patently inadequate, *id.* at 116.

In the present case, where FDA's refusal to commit to providing a decision in advance of October 28, 2008, will deprive Hi-Tech of any meaningful judicial review – no matter how expeditiously Hi-Tech applies for a temporary restraining order on October 28, 2008 – this Court should timely grant Hi-Tech a hearing and decision in the instant matter.

FDA cannot be heard to assert that it has a longstanding policy to defer decisions relating to exclusivity and other drug approval issues until FDA actually approves a drug. Significantly, FDA has, in other instances, provided interested parties with such decisions in advance of the date on which those decisions would take effect.  While Hi-Tech is not in a position to know of each and every instance in which FDA has done so, Hi-Tech

provides the following examples to dispel any notion that FDA always adheres to the

patently unfair practice that it is insisting upon in the present case:

- FDA Docket No. 1990P-0240:  FDA issued a decision in April 1992 concerning the approvability of ANDAs for cefadroxil monohydrate drug products.  A company had earlier requested that FDA not approve certain ANDAs (and included a plea to FDA that the Agency respond to the petition in a timely manner).  FDA denied the petition on April 6, 1992, and the agency approved the ANDAs on April 21 and 22, 1992.

- FDA Docket No. 1999P-0334:  On October 16, 1998, FDA issued a decision confirming that the agency would stay subsequent ANDA approvals for 180 days from the date on which TorPharm first commercially marketed the company's ticlopidine HCl drug product.  FDA subsequently approved TorPharm's ANDA No. 75-089 on July 1, 1999.

- FDA Docket No. 1998P-0493:  FDA issued a decision in March 1999 concerning the approvability of ANDAs for tamoxifen citrate drug products.  FDA determined that Barr was eligible for 180-day exclusivity, and that FDA would "stay the effective date of approval of any ANDA for tamoxifen citrate other than the one submitted by Barr Laboratories, Inc., until 180 days after the date of the first commercial marketing of the drug under Barr's ANDA."  FDA approved Barr's ANDA on February 20, 2003.

- FDA Docket No. 2001P-0495:  FDA issued a decision on June 11, 2002, concerning generic Ultram (tramadol HCl) labeling carve-out issues.  FDA stated that the agency "will approve Teva's ANDA if it is labeled" as described in the petition response (as well as an Apotex ANDA).  FDA approved the Teva ANDA on June 19, 2002 and the Apotex (TorPharm) ANDA on July 10, 2002.

- FDA Docket No. FDA-2007-P-0169:  FDA denied a petition on April 25, 2008, stating that the agency "may approve an ANDA for a dronabinol product whose labeling omits information relating to use of the drug to treat anorexia associated with weight loss in AIDS patients."  FDA approved Par's ANDA No. 78-292 on June 27, 2008 with carved out labeling.

Copies of these petition responses are collectively attached as Exhibit 10. These FDA rulings, which occurred before approval of the drugs in question, demonstrate that FDA cannot rely on "agency practice" to justify its refusal to provide an answer here. Indeed, FDA has admitted that it does not *always* wait until the last minute, as it seems set on doing in this case. In its *Ranbaxy* brief, FDA stated that with respect to the timing of 180-day exclusivity determinations: "To account for possible changes in the status of patents and paragraph IV certifications, FDA does not make any specific exclusivity determinations until exclusivity could bar final approval of an ANDA, which is *generally* when any ANDA for the drug product is ready for final approval." Federal Defendants' Memorandum in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment at 23 (emphasis added), *Ranbaxy Labs., et al., v. Leavitt et al.*, C.A. No. 05-cv-1838 (D.D.C. filed Dec. 2, 2005), Exhibit 8. Here, all of the facts that conceivably could be relevant to a "failure to market" forfeiture have crystallized. They either have or have not taken place and FDA's refusal to address the question based solely upon bureaucratic inflexibility is unconscionable in light of the serious consequences to Hi-Tech.

**B.    Hi-Tech Will Be Irreparably Injured if a Preliminary Injunction Is Not Granted.**

Absent a preliminary injunction, Hi-Tech could be permanently deprived of its statutory entitlement to 180-day exclusivity. This Court has previously correctly recognized that deprivation of that statutory right constitutes irreparable injury warranting a preliminary injunction. *See Apotex, Inc. v. FDA*, 2006 WL 1030151 at *17 ("Once the

statutory entitlement has been lost, it cannot be recaptured"). The prospect of irreparable injury resulting from this deprivation of a statutory entitlement is particularly plain in light of the facts of this case.

Hi-Tech is a small, publicly traded, company with 258 full-time and 18 part-time employees. *See* Declaration of William Peters, Chief Financial Officer, Hi-Tech Pharmacal Co., Inc. ("Peters Decl.") at ¶ 3, a copy of which is attached hereto as Exhibit 11. Hi-Tech's payroll for those employees is approximately $17 million. *Id.* at ¶ 4. In the most recent fiscal year Hi-Tech had sales of $62.0 million and a loss of $5.1 million. *See id.* at ¶¶ 5-6.

Using FDA's own data, Hi-Tech estimates that with a 180-day period of exclusivity, its generic COSOPT could add $134 million in sales and $39 million in net income for the company. *See id*. at ¶¶ 7-8 . Given Hi-Tech's small size and its financial circumstances, Hi-Tech's statutory entitlement to 180-day exclusivity is extremely important to the company. This is so because – again using FDA's data – Hi-Tech projects that with one other generic competitor in the first 180 days, its net income could decrease to $10.2 million, and with two or more other generic competitors its net income could be $5.5 million or less. A decrease in net income to $5.5 million or less could be disastrous for Hi-Tech . *See id*. at ¶¶ 9-10. The company has made several significant investments in research and development projects, raw materials, and capital expenditures believing that a 180-day exclusivity period on generic COSOPT would bring the company's bottom line from a loss to a profit, and generate the necessary cash to fund these investments. *See id*. at ¶ 14. Specifically, Hi-Tech has already invested

$2 million in a research and development project that will require a total of $6 million to complete. *See id.* at ¶ 11. In anticipation of the launch of its generic COSOPT, Hi-Tech has also purchased raw materials and components worth approximately $2 million. *See id.* at ¶ 12. In addition, the company has begun a $2 million capital expenditure. *See id.* at ¶ 13.

Hi-Tech has been able to fund losses for the last two years with the cash on its balance sheet. The company's cash balance dropped to $11.7 million at fiscal year end. *Id.* at ¶ 15. Therefore, if Hi-Tech is deprived of its statutory entitlement to 180-day exclusivity, and other generics are allowed to enter the market during what should be Hi-Tech's exclusivity period for its generic COSOPT, the company will not have the profits, and therefore will not have the cash, to continue with the research and development project or the capital expenditure in which it has already invested $4 million without making changes to its current cost structure. In other words, that $4 million investment would be completely lost. *Id.* at ¶ 16. In such circumstances, Hi-Tech's cost structure would be such that the company will also have to consider laying-off employees. *Id.* at ¶ 17.

Apotex, the other company that has also received tentative approval from FDA for its generic COSOPT, has revenues ten times greater than Hi-Tech and a demonstrated ability and inclination to "flood" the generic market in a very short time period. *See id.* at ¶ 18; *see also* Exhibit 1. Once Apotex floods the market, Hi-Tech will be permanently deprived of its exclusivity and very likely will never get contracts with customers that would have placed orders and entered into contracts with Hi-Tech, but for an FDA

decision denying Hi-Tech its statutory entitlement to 180-day exclusivity. *See* Peters Decl. at ¶ 19. Hi-Tech is fully prepared to launch its generic COSOPT on the very first day that it is permitted to do so by law. The only reason that Hi-Tech has not already launched its product is because it is legally prohibited from doing so by the brand manufacturer's period of pediatric exclusivity. *See id.* at ¶ 20. On the very first day that it is permitted to market its generic COSOPT, Hi-Tech plans to ship approximately 500,000 units, the equivalent of two months worth of drug product based upon IMS market data. Apotex has the capacity to ship as many, if not more, units as soon as it receives approval, and therefore could put two months or more of its drug product into the hands of customers before Hi-Tech could even apply to a Court for a temporary restraining order. *See id.* at ¶ 21.

Given the importance of generic COSOPT to Hi-Tech, the unique opportunity presented to a first generic entrant during a 180-day exclusivity period, and the disparity in size between Hi-Tech and its potential competitor, Apotex, Hi-Tech will be irreparably injured in the absence of an injunction. *See Apotex, Inc. v. FDA*, 2006 WL 1030151 at *17; *see also Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997), *aff'd*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (finding that a small company may be irreparably injured by the loss of 180-day generic drug exclusivity if it was forced to compete against a much larger company); *Collagenex Pharm., Inc. v. Thompson*, 2003 WL 21697344 (D.D.C. 2003) at *10 ("Its David-and-Goliath size comparison . . . could make competition between the two a very uneven match. These are the kinds of circumstances where irreparable injury has been found."). Hi-Tech has devoted research and

development time to its generic COSOPT in reliance on its 180-day exclusivity period, which has been recognized as an independent grounds for irreparable injury.  *See Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 28-29 (D.D.C. 1997) (finding irreparable injury based upon a small company's research and development costs).  Moreover, because of Apotex's much larger size, in the absence of an injunction, Hi-Tech will likely lose customer contracts to Apotex and once Hi-Tech loses those customers, it will be difficult to regain them.  *See Express One Int'l, Inc. v. United States Postal Serv.*, 814 F. Supp. 87, 91 (D.D.C. 1992) (irreparable injury where lost contract would impair company's business relationships).  Regardless, the significant decrease in sales and profits – should Hi-Tech be unlawfully denied its statutory entitlement to exclusivity – could force the company to lay off employees, which has also been recognized as irreparable injury.  *See id.*; *see also Ace-Federal Reporters, Inc. v. F.E.R.C.*, 732 F. Supp. 10, 13 (D.D.C. 1990) (finding "irreparable injury to the plaintiff in that plaintiff might be required to lay off employees ").  For all of the above-reasons, the near certainty of irreparable injury to Hi-Tech warrants a preliminary injunction.

## C.    The Public Interest and Injury.

"Where as here, the FDA is administering a statute that has been placed within its charge, and has no financial interest in the outcome, its interest is deemed to be aligned with that of the public."  *See Apotex, Inc. v. FDA*, 2006 WL 1030151 at *18.   Indeed, "Congress has determined that the public interest is also furthered by the 180-day statutory entitlement provided to a first ANDA filer.  *Teva Pharmaceuticals USA, Inc. v. Food & Drug Admin.*, 404 F.Supp. 2d 243, 246 (D.D.C. 2005) (denying Apotex's motion

for injunctive relief pending appeal in a case where this Court had enjoined FDA from allowing any other pharmaceutical company to market a generic drug in competition with Teva's drug).

The public interest dictates that the incentives of the Hatch-Waxman Amendments for generic drug companies to challenge patents, and thus bring less expensive drugs to consumers, must be maintained. *See Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 33 (D.D.C. 2006) ("Congress enacted Hatch-Waxman to preserve incentives to generic companies by providing first-filers with a 180-day exclusivity period in order to reward their risk-taking and encourage further patent challenges in the future. Thus, [a decision] that effectively eliminates such exclusivity would fundamentally disrupt the intent of Congress"), *aff'd*, 2006 U.S. App. LEXIS 22343 (D.C. Cir. 2006); *Mova Pharm. Corp.*, 955 F. Supp. at 131 (faithful application of Hatch-Waxman Amendments, which was "designed with consumers in mind," outweighs "marginal increase in [availability of] low-cost generic products [in a particular instance]"). Indeed, FDA itself has recognized that an interpretation of the Hatch-Waxman Amendments that "more jealously safeguard[ed] exclusivity entitlements" was "more consistent with congressional intent" although it "could theoretically slow the entry of lower-cost generic drugs into the marketplace" because such an interpretation "also facilitates patent challenges 'overall.'" *Apotex, Inc. v. FDA*, 2006 WL 1030151 at *5. A decision that Hi-Tech forfeited its exclusivity in this case would be directly contrary to an important purpose of the Hatch-Waxman Amendments – to encourage suits to bring generic drugs to market. *See id.* at 11 (noting the importance of "preserv[ing] the incentives to undertake the very

substantial risks and costs associated with patent challenges . . . [and] facilitat[ing]
certainty and consistency on an industry-wide basis").

In an effort to clear the way for generic drug approval, Hi-Tech took steps to
expedite the litigation with respect to the '413 patent which made it possible to obtain a
final judgment on appeal only fourteen months after the case began.  And Hi-Tech sent
Merck a notice with respect to the paragraph IV patent certifications to '735 and '443
patents that was so comprehensive in laying out the reasons why those patents were
invalid and unenforceable that Merck disclaimed the patents without a fight.  Clearly,
Hi-Tech has not taken any action that could be remotely construed as delaying the timely
approval and marketing of its generic version of COSOPT.  Rather, it has furthered the
purposes of the Hatch-Waxman Amendments.  In fact, in circumstances similar to those
present here, FDA considered a question of potential forfeiture of 180-day exclusivity in
the Granisetron Matter.  In so doing, FDA stated:

> Although the structure of the 180-day exclusivity and forfeiture provisions
> may give rise to concerns about parking of exclusivity, and the premature
> review of ANDAs, neither of these is a factor in the current granisetron
> matter.  Teva has not parked its exclusivity (indeed, it actively pursued final
> approval and initiated commercial marketing promptly upon approval), and it
> submitted its ANDA only three and a half years before the expiration of the
> patent to which it filed a paragraph III certification.  This timing is entirely
> reasonable.

Granisetron Matter, Docket No. FDA-2007-N-0269-003 at 6 (Jan. 17, 2008).

If FDA considered Teva's actions reasonable and concluded that they involved no
"parking" of exclusivity, then Hi-Tech's efforts to ensure that a generic version of
COSOPT can be marketed on the first day after Merck's pediatric exclusivity expires, are

clearly in the public interest.  Such a ruling by this Court would further the behavior that the Hatch-Waxman Amendments and the MMA were intended to encourage.

In sum, the public interest supports an injunction based on these facts because the forfeiture of Hi-Tech's 180-day exclusivity would be contrary to the applicable law, the purposes of Hatch-Waxman Amendments and the public interest it promotes.  *See Mylan Pharms. v. Henney*, 94 F. Supp. 2d 36, 60 (D.D.C. 2000) (noting the "equally compelling, if perhaps less emotive, public interest in stimulating competition, which the statutory Exclusivity Incentive, as written, promises to do").

## CONCLUSION

For all of the above-referenced reasons, this Court should grant Hi-Tech's Motion for Preliminary Injunction.

Dated: September 3, 2008                      Respectfully submitted,


                                                _/s/ J.P. Ellison_____
                                                John R. Fleder (D.C. Bar No. 176123)
                                                Robert A. Dormer (D.C. Bar No. 267641)
                                                J.P. Ellison (D.C. Bar No. 477931)
                                                Kurt R. Karst (D.C. Bar No. 482615)
                                                Hyman, Phelps & McNamara, P.C.
                                                700 13th Street, N.W., Suite 1200
                                                Washington, D.C.  20005
                                                Phone:  (202) 737-5600
                                                Fax:  (202) 737-9329

                                                **Attorneys for Plaintiff Hi-Tech**
                                                    **Pharmacal Co., Inc.**

# EXHIBIT 1



## U.S. judge halts sales of generic Plavix

*Associated Press*

*Updated: Fri. Sep. 1 2006 8:47 AM ET*

NEW YORK — A cheap generic version of blood thinner Plavix, which is used by 48 million Americans, has been blocked by a judge because of a patent dispute just three weeks after it launched.

U.S. District Judge Sidney H. Stein in Manhattan on Thursday ruled that Canadian company Apotex Inc. must stop selling generic Plavix.

The injunction was issued at the request of Sanofi-Aventis, the holder of a patent on the drug, and its U.S. partner Bristol-Myers Squibb Co.

However, the judge denied demands by Sanofi-Aventis and Bristol-Myers that Apotex be forced to remove from the market the generic product it had already sold to distributors.

Apotex's drug sells for about $124 for 30 pills, compared with $148 for a month's supply for the branded version, and quickly gained market share after its launch Aug. 8.

For the week ended Aug. 18, the generic version captured 60.2 percent of the total prescriptions written for the drug and 74 percent of the new prescriptions, according to Verispan LLC, which collects prescription data.

One large purchaser of Plavix, who requested anonymity, said it had supply that would last into the fourth quarter.

In a statement, Apotex said it will appeal and it is filing an emergency motion with the Court of Appeals for the Federal Circuit to stay the injunction pending the appeal.

Bristol-Myers shares jumped $1.75, or 8 percent, to $23.50 in extended trading on the New York Stock Exchange. The ruling was issued after the close of regular trading.

U.S. shares of Sanofi-Aventis, which is based in France, rose $1.55, or 3.4 percent, to $44.95 on the NYSE.

"This is very good news," said Jason Napodano, an analyst at Zacks Independent Research. Still, he said Bristol-Myers earnings would suffer because Apotex didn't have to recall its product. Since it is unclear how much generic Plavix is on the market, determining the extent of the damage is difficult.

Plavix is the world's second best selling drug after Pfizer Inc.'s cholesterol-lowering agent Lipitor. It is Bristol-Myers best selling product and analysts estimate it accounts for one-third of the company's profits. The drug is considered crucial to helping Bristol-Myers maintain its dividend, which props up the stock.

Napodano noted that Sanofi-Aventis and Bristol-Myers, which sells Plavix in the United States, still have to win the patent case before declaring victory. The case is set to begin in January.

However, the judge said Sanofi-Aventis, which owns a patent on Plavix, had adequately demonstrated that questions Apotex raised as to the validity and enforceability of its patent were without substantial merit.

He said he also concluded Sanofi-Aventis would suffer irreparable harm if Apotex were permitted to continue distributing its generic product and Apotex's hardships primarily result from the company's own calculated risk-taking.

The judge also considered the public interest of permitting competition to continue, noting that a large number of Americans have seen a significant cost savings since Apotex entered the market.

"Although there are competing -- and substantial -- public interests at stake on both sides of this

litigation, the balance of those competing public interests slightly favors Sanofi," the judge wrote. "The public interest in lower-priced drugs is balanced by a significant public interest in encouraging the massive investment in research and development that is required before a new drug can be developed and brought to market."

"We're pleased that the court has granted a preliminary injunction," said Bristol-Myers spokesman Tony Plohoros.

"We're not going to speculate on the amount of generic product introduced into the marketplace.'

Apotex had argued that a patent protecting sales of Plavix from competitors was no longer valid and that it was in the public interest to permit sales of its generic version of the drug because lower prices mean even more people can use a lifesaving drug.

Ontario-based Apotex began selling its product Aug. 8 after negotiations among the three companies failed to settle the dispute.

The judge said he based his decision on the chances that Apotex could ultimately prove it is entitled to sell its generic drug; the level of irreparable harm each side might suffer; the balance of hardships; and the impact on the public. He also ordered Sanofi to put up bond of $400 million, an amount meant to cover losses Apotex will have suffered if it eventually wins the case. Apotex said the amount was "grossly inadequate" to compensate for the damages it was in jeopardy of incurring.

Bristol-Myers disclosed last month that the Department of Justice was investigating a deal in which Bristol-Myers and Sanofi-Aventis agreed to pay Apotex at least $40 million to keep its version of Plavix off the market until 2011. The deal was rejected by state attorneys general.

At the hearing before Stein, attorney Evan Chesler of Sanofi-Aventis said that allowing Apotex to flood the market with its product and force prices lower would cripple the spirit of drug innovators, jeopardizing future pioneering medical breakthroughs.

"You can never put this Humpty-Dumpty back together if it's not stopped," Chesler said.

Chesler did not immediately return a telephone call for comment Thursday.

Frank Allen Bernatowicz, an accountant, testified for Apotex that the company stood to lose up to $4 billion in costs, future sales and lost opportunity if it was forced to withdraw its drug from the marketplace.

He said Sanofi-Aventis and Bristol-Myers stood to lose half as much and could withstand the hit much easier because they were much larger than Apotex, a company with $1 billion in annual sales.

It is a pharmaceutical product considered so important in preventing potentially fatal blood clots around metal stents and cholesterol deposits that lawyers on both sides referred frequently to lives being saved if they won the case.

© 2007 CTVglobemedia  All Rights Reserved.

# Exhibit 1-B

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY


September 2, 2006

# Blow Seen to Profit at Bristol

By STEPHANIE SAUL

Bristol-Myers Squibb, reeling from the incursion of a generic competitor to its top-selling drug Plavix, said yesterday evening that the impact would reduce its profits this year by at least 20 cents a share, or about $400 million.

Instead of a profit of at least $2.3 billion that the company had been expecting earlier, Bristol-Myers now expects to earn only $1.9 billion for the year.

The company also said that 2007 sales of Plavix could be harmed if large enough supplies of the generic competitor from Apotex, a Canadian company, are already in wholesale channels.

Apotex began marketing its drug last month in violation of an existing patent. Apotex is challenging that patent in court.

A federal judge on Thursday issued an order blocking additional distribution of the generic drug and signaled that the patent was likely to be upheld at a trial next year. But Bristol-Myers's revised earnings forecast yesterday indicated the extent of the damage the company expects from the supply of the lower-priced generic already on the market.

Plavix sales in the United States amounted to $3.5 billion last year and accounted for 30 percent of Bristol-Myers's profit. The drug is used by 48 million Americans primarily to prevent the recurrence of heart attack and stroke. Earlier in the day, the company's partner in sales of the drug, the French company Sanofi-Aventis, announced a lowered earnings forecast for the year, predicting growth of earnings per share of 2 percent rather than the 12 percent previously announced by the company.

In that statement, Sanofi said it believed that Apotex had shipped enough of the generic drug to satisfy "substantially all market demand through the end of 2006."

During stock trading yesterday, shares of both Bristol-Myers and Sanofi rose as investors responded to the judge's ruling, which had come on Thursday after the market's close.

Bristol's shares rose 5.5 percent yesterday, to end at $22.95.

American depository receipts of Sanofi climbed nearly 1 percent, to close at $45.37.

The decision by Apotex to begin selling its drug Aug. 8 followed the unraveling of a proposed agreement by the three companies to settle the patent dispute. Under that agreement, Bristol-Myers and Sanofi would have allowed Apotex early access to the Plavix market a few months before the patent expires in late 2011.

That agreement, as originally drafted, did not receive clearance from the Federal Trade Commission and state attorneys general, apparently in part because it provided for payments by the big companies to the generic maker.

The attempt by Bristol-Myers Squibb and Sanofi-Aventis to settle the lawsuit with Apotex has been seen as emblematic of an increasing tendency by big drug makers to settle patent challenges, rather than risk courtroom battles over their exclusive rights to market drugs.

Such truces increasingly involve payments from the brand-name companies to the generic makers. In 2006, at least 6 of the 10 agreements between brand companies and generics to settle patent lawsuits have included payments from the brand maker to the generic company, accompanied by agreements to delay introduction of the generic drug. As recently as 2004, none of the 14 patent settlements by drug companies included such payments, according to statistics from the Federal Trade Commission.

Some F.T.C. officials have expressed concern that such payments amount to a restraint of trade and could result in higher costs to consumers.

In an interview published yesterday by The Associated Press, the chairman of the commission, Deborah Platt Majoras, said she was concerned that payments by brand- name drug makers to their generic rivals may be nothing more than payoffs to keep cheap drugs off the market, depriving consumers of low-cost medicines.

Apotex, based in Toronto, filed a request yesterday with Judge Sidney H. Stein of United States District Court in Manhattan to stay his Thursday order that ended distribution of the generic, pending an appeal that the company plans to file next week. The patent trial is expected to begin in January, but Judge Stein signaled in his ruling this week that he believes that the patent is valid.

The Justice Department is investigating allegations by the chief executive of Apotex, Bernard C.

Sherman, that Bristol-Myers and Sanofi entered an illegal "side deal" with his company during negotiations — a deal he says was meant to be concealed from the F.T.C. and state attorneys general.

Yesterday, a Bristol-Myers spokesman, Tony Plohoros, repeated the company's assertion that "based on an ongoing review by the company's outside counsel, we do not believe there was an unlawful conduct by any Bristol-Myers Squibb employee."

According to claims Apotex filed in court, that secret deal arose as the companies tried to renegotiate the settlement agreement that had been rejected in May by the F.T.C. and states.

Mr. Sherman has said that in the side deal, Bristol-Myers and Sanofi agreed not to contest a $60 million "breakup" fee that had been due Apotex under the original settlement but was not mentioned in the revised settlement the companies submitted to regulators.

But a person briefed on Bristol-Myers's version of the negotiations said there was no such side deal over the $60 million. Instead, this person said, Mr. Sherman had threatened to sue for the $60 million after the first deal was rejected. Bristol-Myers and Sanofi contend that after arguing that they did not owe that $60 million, the three companies simply agreed to set aside that dispute for the time being while continuing to negotiate a revised patent settlement.

Bristol-Myers has denied the existence of another and potentially more lucrative secret agreement that Mr. Sherman says exists: that the two bigger companies would not sell their own generic version of the drug for six months after Apotex entered the market in 2011. Such an agreement was included in the original written settlement submitted to the F.T.C. and states, but deleted from the second agreement when government officials objected.

In court testimony, the lawyer for Sanofi and Bristol-Myers accused Mr. Sherman of intentionally trying to torpedo the patent settlement by making false allegations to the Justice Department about the conduct of Andrew G. Bodnar, the Bristol-Myers' executive who negotiated the agreement on behalf of both companies. Mr. Bodnar has declined repeated requests for an interview.

During negotiations with Mr. Sherman to settle the dispute, the companies agreed to provisions — which none of the parties dispute — that made it easier for Apotex to market its generic immediately if the revised agreement was turned down.

Those concessions included Sanofi and Bristol-Myers's agreement to waive their federal rights to collect triple Apotex's sales of the generic as financial damages, if they ultimately win the

Blow Seen to Profit at Bristol New York Times                                  Page 4 of 4

patent case. Instead, the big companies agreed to accept damages equal to only half of the generic drug's sales if Apotex loses the court case.

Sanofi and Bristol-Myers also agreed that they would not go to court to challenge Apotex's distribution of the generic product until five days after it began shipment.

When regulators did subsequently reject the revised settlement agreement, Apotex began shipping its product on Aug. 8. By the time the big companies were able to present their challenge to Judge Stein and he ruled on it, Apotex had been able to ship hundreds of millions of dollars' worth of its lower-priced competitor to Plavix that remains on the market.

Copyright 2006 The New York Times Company

Privacy Policy  |  Search  |  Corrections  |  **XML**  |  Help  |  Contact Us  |  Work for Us  |  Site Map

**Exhibit 1-C**

2006-_____

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

SANOFI-SYNTHELABO,
SANOFI-SYNTHELABO INC. and
BRISTOL-MYERS SQUIBB SANOFI
PHARMACEUTICALS HOLDING
PARTNERSHIP,

Plaintiffs-Appellees

v.

APOTEX, INC. and APOTEX CORP.

Defendants-Appellants

---

APPELLANTS' EMERGENCY MOTION FOR STAY OF
PRELIMINARY INJUNCTION PENDING APPEAL

---

Appeal from the United States District Court
For the Southern District of New York
The Honorable Sidney H. Stein
District Court Case No. 02-CV-2255 (SHS)

LANGER & GROGAN PC
Howard I. Langer
John J. Grogan
Edward A. Diver
1600 Market Street, Suite 2020
Philadelphia, PA 19103

CAESAR, RIVISE, BERNSTEIN,
COHEN & POKOTILOW, LTD.
Robert S. Silver
Manny D. Pokotilow
Bruce J. Chasan
Mona Gupta
Lynn M. Terrebonne
1635 Market Street, 11th Floor
Philadelphia, PA 19103
*Attorneys for Defendants-Appellants
Apotex, Inc. and Apotex Corp.*

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................1

    A.   Application for Relief...............................................1

    B.   Relevant Background ............................................1

        1.   Sanofi's '265 Patent and Plavix® Product ..................3

        2.   Procedural Background.............................................4

II.  THE INJUNCTION SHOULD BE STAYED PENDING APPEAL .............5

    A   Jurisdiction ...........................................................5

    B.   Applicable Legal Standards ...................................5

    C.   The District Court Committed Multiple Errors And Abused Its Discretion In Assessing Likelihood Of Success On The Merits ...........6

        1.   The District Court Clearly Erred In Finding That Apotex's Anticipation Defense Lacked Substantial Merit ..........................7

        2.   The District Court Erroneously Imported a "Motivation to Combine" Requirement into Its Anticipation Analysis...............10

        3.   The District Court Erred in Relying on the Number of Compounds Covered by Claim 1 of the '596 Patent. .................11

        4.   The District Court Erred in Finding the '596 Patent Does Not Enable Clopidogrel. ........................................12

        5.   The District Court Clearly Erred in Finding That Apotex' Obviousness Defense Lacked Substantial Merit........................14

    D.   The District Court Clearly Erred in Finding That Apotex' Inequitable Conduct Defense Lacked Substantial Merit .......................15

  E. The District Court Erred in Finding Irreparable Harm............................16

III. CONCLUSION.................................................................................................20

STATEMENT OF OPPOSITION TO THE MOTION ...............................................20

2006-\_\_\_\_\_

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

SANOFI-SYNTHELABO,
SANOFI-SYNTHELABO INC. and
BRISTOL-MYERS SQUIBB SANOFI
PHARMACEUTICALS HOLDING
PARTNERSHIP,

**Plaintiffs-Appellees**

v.

APOTEX, INC. and APOTEX CORP.

**Defendants-Appellants**

_____

APPELLANTS' EMERGENCY MOTION FOR STAY OF
PRELIMINARY INJUNCTION PENDING APPEAL

_____

Appeal from the United States District Court
For the Southern District of New York
The Honorable Sidney H. Stein
District Court Case No. 02-CV-2255 (SHS)

LANGER & GROGAN PC
Howard I. Langer
John J. Grogan
Edward A. Diver
1600 Market Street, Suite 2020
Philadelphia, PA 19103

CAESAR, RIVISE, BERNSTEIN,
COHEN & POKOTILOW, LTD.
Robert S. Silver
Manny D. Pokotilow
Bruce J. Chasan
Mona Gupta
Lynn M. Terrebonne
1635 Market Street, 11th Floor
Philadelphia, PA 19103
*Attorneys for Defendants-Appellants
Apotex, Inc. and Apotex Corp.*

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................1

    A.   Application for Relief.....................................................................1

    B.   Relevant Background ......................................................................1

        1.   Sanofi's '265 Patent and Plavix® Product..................................3

        2.   Procedural Background....................................................4

II.  THE INJUNCTION SHOULD BE STAYED PENDING APPEAL ...............5

    A    Jurisdiction ................................................................................5

    B.   Applicable Legal Standards ........................................................5

    C.   The District Court Committed Multiple Errors And Abused Its
        Discretion In Assessing Likelihood Of Success On The Merits ...........6

        1.   The District Court Clearly Erred In Finding That Apotex's
            Anticipation Defense Lacked Substantial Merit ..........................7

        2.   The District Court Erroneously Imported a "Motivation to
            Combine" Requirement into Its Anticipation Analysis...............10

        3.   The District Court Erred in Relying on the Number of
            Compounds Covered by Claim 1 of the '596 Patent....................11

        4.   The District Court Erred in Finding the '596 Patent
            Does Not Enable Clopidogrel.......................................12

        5.   The District Court Clearly Erred in Finding That
            Apotex' Obviousness Defense Lacked
            Substantial Merit.......................................................14

    D.   The District Court Clearly Erred in Finding That
        Apotex' Inequitable Conduct Defense Lacked
        Substantial Merit .......................................................15

i

      E.    The District Court Erred in Finding Irreparable Harm ............................16

III.    CONCLUSION ........................................................................................20

STATEMENT OF OPPOSITION TO THE MOTION ...............................................20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abbott Laboratories, v. Andrx Pharmaceuticals, Inc.,*
  452 F.3d 1331 (Fed. Cir. 2006) ............................................................ 6, 7

*In re Adamson,*
  275 F.2d 952 (CCPA 1960) ........................................................ 2, 9, 13, 14

*Amazon.com, v. Barnesandnoble.com, Inc.,*
  239 F.3d 1343 .................................................................................... 6

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
  314 F.3d 1313 (Fed. Cir. 2003) ........................................................ 12

*Aptix Corp. v. Quickturn Design System Inc.,*
  269 F.3d 1369 (Fed. Cir. 2001) ........................................................ 16

*Arkie Lures, Inc. v. Gene -Larew Tackle, Inc.,*
  119 F.3d 953 (Fed. Cir. 1997) .......................................................... 14

*Bristol-Myers Squibb Co. v.  Ben Venue Laboratories,*
  246 F.3d 1368 (Fed. Cir. 2001) .......................................................... 9

*Cordis Corp. v. Boston Scientific Corp.,*
  2003 WL 22843072 (D. Del. 2003)
  *aff'd,* 99 Fed. Appx. 928 (Fed. Cir. 2004) ...................................... 17

*eBay Inc. v. MercExchange, L.L.C.,*
  126 S. Ct. 1837 (2006) ................................................................. 3, 16

*Eli Lilly & Co. v. Generix Drug Sales, Inc.,*
  324 F. Supp. 715 (S.D. Fla. 1971) ...................................................... 9

*Genentech, Inc. v. Novo Nordisk, A/S,*
  108 F.3d 1361 (Fed. Cir. 1997) .......................................................... 6

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
  349 F.3d 1373 (Fed. Cir. 2003) ........................................................ 12

*Glaxo Group Ltd. v. Ranbaxy Pharms., Inc.,*
    262 F.3d 1333 (Fed. Cir. 2001) ................................................................ 6

*Hewlett-Packard Co. v. Mustek System, Inc.,*
    340 F.3d 1314 (Fed. Cir. 2003) ........................................................ 11, 12

*High Tech Medical Instrumentation, Inc. v. New
Image Industrial, Inc.,*
    49 F.3d 1551 (Fed. Cir. 1995) .............................................................. 17

*Hilton v. Braunskill,*
    481 U.S. 770 (1987) ............................................................................. 6

*In re Jones,*
    958 F.2d 347 (Fed. Cir. 1992) .............................................................. 14

*In re May,*
    574 F.2d 1082 (CCPA 1978) ............................................................... 14

*Merck & Co. v. Teva Pharms. USA, Inc.,*
    347 F.3d 1367 (Fed. Cir. 2003) ............................................................ 8

*Nicholson v. Scoppetta,*
    344 F.3d 154 (2d Cir. 2003) ................................................................. 7

*Perricone v. Medicis Pharm. Corp.,*
    432 F.3d 1368 (Fed. Cir. 2005) ........................................................... 11

*In re Petering,*
    301 F.2d 676 (CCPA 1962) .............................................................. 9, 12

*Pfizer Inc. v. Ranbaxy Labs. Ltd.,*
    --- F.3d -- 2006 WL. 2137244 (Fed. Cir. Aug. 2, 2006) ........................... 9

*Precision Instrument Manufacturing v. Automotive Maintenance
Machinery Co.,*
    324 U.S. 806 (1945) ........................................................................... 16

*In re Schaumann,*
    575 F.2d 312 (CCPA 1978) .................................................................. 9

*In re Sivaramakrishnan,*
    673 F.2d 1383 (CCPA 1982) ................................................................ 11

*Standard Havens Products, Inc. v. Gencor Industrial, Inc.,*
    897 F.2d 511 (Fed. Cir. 1990) .......................................................... 6

*T.J. Smith & Nephew, Ltd. v. Consolidated Medical Equip., Inc.,*
    821 F.2d 646 (Fed. Cir. 1987) .......................................................... 17

## FEDERAL STATUTES

28 U.S.C. §§1292(c)(1) ...................................................................... 5

# I.    INTRODUCTION

## A.    Application for Relief

Defendant-Appellant respectfully requests an immediate stay of the district court's preliminary injunction pending appeal.

## B.    Relevant Background

This case involves Plavix®, the second largest selling drug in the world. The court below enjoined further generic sales after the largest generic drug launch in history. This is the first time a preliminary injunction issued where the patent holder has by contract, <u>explicitly agreed</u> to permit a massive billion dollar launch of a generic drug that dramatically changed the *status quo*, and then sought to restore its monopoly by a preliminary injunction claiming the very harm that it agreed to permit, and for which it received substantial consideration.

Emergency relief is necessary because Sanofi[1] agreed to terms that allowed Apotex to deliver hundreds of millions of dosages of its product. The injunction will wreak havoc in the pharmaceutical markets where statutes and insurers require that prescriptions be filled with generic product. Currently, generic product is unevenly apportioned among distributors, wholesalers and benefit managers, confounding orderly distribution. Moreover, Apotex received 180 days' exclusivity (valued at about $2 billion) as an incentive to challenge Sanofi's patent under the

---

[1]    Plaintiffs are a partnership including Sanofi and Bristol Myers Squibb. This motion, as did the district court, refers to Plaintiffs as "Sanofi," the patent holder.

1

Hatch-Waxman Act. That exclusivity has been triggered and is lost each day that the injunction remains, and will likely be entirely lost absent a stay. Moreover, the $400 million bond is wholly inadequate to cover Apotex' impending losses where it had already captured 78% of the $4 billion annual market.

The district court, following a truncated hearing,[2] issued a preliminary injunction (Appendix, A-57-58). The district court erroneously assessed the science, the patent, and the law. The patent at issue was for an enantiomer of a stereoisomeric compound that Sanofi had previously patented. *In re Adamson*, 275 F.2d 952, 954 (CCPA 1960), held that an enantiomer was not patentable over its previously disclosed racemate, and that the differing biologic activity of the enantiomers would be expected by one skilled in the art. The district court cited neither *Adamson*, its progeny, nor other controlling authority. Moreover, it confused the anticipation and obviousness standards. Further, its assessment of the prior art, omitted reference to that part that provides the primary basis for analyzing anticipation, obviousness, and obviousness-type double-patenting. These plain errors alone warrant an immediate stay.

The court briefly assessed irreparable harm. Even though Sanofi had agreed

---

[2] The hearing lasted only two days over Defendant's protest. Defendant was able to call just two of its six listed witnesses. Defendants submitted ten expert declarations. The court also prevented Apotex from presenting evidence establishing the unenforceability of the patent due to Plaintiffs' unclean hands.

to Apotex' launch knowing it would be enormous, effectively consenting to any harm that befell Sanofi, the court applied a presumption of irreparable harm in Sanofi's favor, in direct contravention of *eBay, Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837 (2006). Its subsequent findings of actual irreparable harm were contradicted by Sanofi's arguments and the testimony of Sanofi's witnesses. The court failed to properly consider Apotex' massive irreparable harm, including the loss of its enormously valuable exclusivity and the great harm to third parties.

### 1.    Sanofi's '265 Patent and Plavix® Product

Sanofi holds an approved NDA 20-839 for Plavix®. The active ingredient in Plavix® is clopidogrel in the form of a bisulfate salt; it is used as an anti-clotting drug. Clopidogrel is an *enantiomer* of a particular thienopyridine ester compound—namely, methyl alpha-5(4,5,6,7-tetrahydro (3,2-c) thieno pyridyl) (2-cholorphenyl)-acetate ("MATTPCA"). Claim 3 of U.S. Patent No. 4,847,265 ("the '265 patent") claims clopidogrel bisulfate.[3] (A-489)

When MATTPCA is synthesized, two kinds of molecules are formed that have the same constituent atoms, but are mirror images of each other, *i.e.*, "enantiomers" or "stereoisomers." They are identified as "dextrorotatory" or "levorotatory" enantiomers. A compound of an equal mixture of enantiomers is a

---

[3]    More precisely, claim 3 of the '265 patent claims the "[h]ydrogen sulfate of the dextro-rotatory isomer of [MATTPCA] substantially separated from the levo-rotatory isomer." (A-480, col. 12:37-40.)

"racemate."[4] Clopidogrel is the dextrorotatory (or "d-") enantiomer of MATTPCA.

Clopidogrel bisulfate is the bisulfate salt form of clopidogrel. It was previously disclosed in Sanofi's own now-expired U.S. Patent No. 4,529,596 ("the '596 patent) (A-482), which expressly claims MATTPCA and its enantiomers and mixtures, and their pharmaceutically acceptable salt forms.

### 2.    **Procedural Background**

On November 16, 2001, Apotex filed an ANDA seeking FDA approval to market generic clopidogrel with a Paragraph IV Certification stating that the '265 patent was invalid. On March 21, 2002, Sanofi sued for infringement. Apotex stipulated to infringement of claim 3, but asserted invalidity and unenforceablity.

On March 17, 2006, the parties signed a settlement agreement (A-419-425), that required approval by the FTC and state attorneys general under a consent decree between Bristol-Myers Squibb, the FTC, and the states. (A-493-522) On May 5, the states rejected the agreement. (A-491) On May 26, the parties signed a second agreement, (A-427-431) which the states rejected on July 28, 2006. (A-441).

Both agreements contained two sets of provisions, those that: (1) settled the litigation upon regulatory approval, and (2) were effective if not approved.

---

[4]    Sanofi calls the hydrochloride of racemic MATTPCA, PCR 4099. (A-479,9:23-25)

Both agreements contemplated that, if the settlement were not approved, Apotex would enter the market before a judgment on the merits. Both limited Apotex' damages if it launched; under the second, were Sanofi to prevail at trial, it damages would be just 50% of Apotex' net sales. (A-430, ¶ 14(ii)); and Sanofi also agreed not to seek a TRO and to wait five business days after Apotex's launch before seeking an injunction. (A-430, ¶15(i), (ii)) These provisions made it clear that: (1) Sanofi did not consider Apotex' "at risk" launch to constitute irreparable harm; (2) Sanofi quantified its specific damages from a launch in monetary terms, and (3) the *status quo* would be dramatically changed by agreement before a motion for preliminary relief.

On August 8, 2006, Apotex launched.[5] On August 15, Sanofi moved for a preliminary injunction. On August 18 and 21, the court held a truncated hearing. On August 31, the court granted the preliminary injunction, but refused to order a recall of clopidogrel already sold. (A-3) On September 1, 2006, the court denied a stay of the injunction pending appeal (A-59).

## II.   THE INJUNCTION SHOULD BE STAYED PENDING APPEAL

### A.   Jurisdiction
This Court has jurisdiction under 28 U.S.C. §§1292(c)(1).

---

[5]   Sanofi twice moved unsuccessfully for a TRO (A280-281; 312-315).

5

**B.    Applicable Legal Standards**

The standard for a stay of an injunction pending appeal is:

> (1) whether the applicant made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990). These factors are weighed together, and a strong showing of likely success on the merits requires a lesser showing of harm. *Id.* at 512, 515.

A court may vacate a preliminary injunction upon finding that "the district court abused its discretion, or based its decision on an erroneous legal standard or clearly erroneous findings of fact." *Glaxo Group Ltd. v. Ranbaxy Pharms., Inc.*, 262 F.3d 1333, 1335 (Fed. Cir. 2001).

**C.    The District Court Committed Multiple Errors And Abused Its Discretion In Assessing Likelihood Of Success On The Merits**

A likelihood of success on the merits cannot be shown if the defendant "raises a substantial question" regarding validity that the patentee "cannot prove lacks substantial merit." *Abbott Labs., v. Andrx Pharmaceuticals, Inc.*, 452 F.3d 1331, 1335 (Fed. Cir. 2006); *See also Amazon.com, v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350-51; *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997). A substantial question of validity is raised where a

6

defendant establishes the "vulnerability" of the patent-in-suit based on any invalidity/unenforceability defense. *Abbott Labs.*, 452 F.3d at 1335. Because Sanofi tried to change a *status quo* it created by agreement, it must meet an even "more rigorous likelihood-of-success standard." *Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003).

### 1.  The District Court Clearly Erred In Finding That Apotex's Anticipation Defense Lacked Substantial Merit

The district court's anticipation analysis completely ignores controlling cases which establish that Apotex has—at the very least—raised a "substantial question as to validity." The court never mentions the controlling authority.[6]

The '265 patent was anticipated particularly by Sanofi's own '596 patent (A-482-489). Sanofi obtained FDA approval to market Plavix® in 1997 (A-899, ¶12), and listed the '596 patent in the Orange Book (19th Edition). It conceded that the '596 patent covered clopidogrel bisulfate, and so stipulated (A-905, ¶32).

Claim 2 of the '596 patent (A-489) claims and describes "methyl [α]-(4,5,6,7-tetrahydro (3,2-c) 5-pyridyl)-o.cholorphenyl)-acetate" (also "MATTPCA" as this nomenclature equal to that in claim 3 of the '265 patent) (A-905, ¶31). A person of ordinary skill in the art (POSA) knows—and the patent makes clear—that compound is stereoisomeric. Because claim 2 does not specifically indicate a

---

[6]     Nor did the court cite the recent South Korean decision invalidating the corresponding patent on similar grounds (A848-292).

particular enantiomer, or any mixture such as the racemate (an equal mixture of the two enantiomers), the claim, on its face, applies to *all* such forms. And because MATTPCA is intended for pharmaceutical use, a POSA knows that it can be prepared as a number of different salt forms. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371-72 (Fed. Cir. 2003) (patent infringed "whether administered as the pure acid or in the form of the acid salt," where claim recited scientific name of free acid without explicit mention of salt forms). Thus, claim 2 covers MATTPCA in all of these forms.

Any ambiguity of the scope of claim 2 is removed by reading the '596 patent as a whole (A-482-489). The specification states: *"[t]he invention* relates both to *each enantiomer* and their mixture. The *invention* also includes addition salts with pharmaceutically acceptable mineral or organic acids." (A-483, col. 1:40-44) (italics added).[7] Since "the invention" refers to the claims, claim 2 necessarily describes and claims enantiomers and salt forms of MATTPCA.

Moreover, the '596 patent identifies only three preferred salt forms or individual members of a class: the hydrochloride, the hydrobromide, and bisulfate. Thus, a POSA reading the patent would immediately see that claim 2 describes MATTPCA in any enantiomeric form and in any of these three salt forms. When a

reference identifies a discrete class of readily identified members, that reference "has described to those with ordinary skill in this art each of the various permutations ... as fully as if he had drawn each structural formula or had written each name." *In re Petering*, 301 F.2d 676, 682 (CCPA 1962); *see also In re Schaumann*, 575 F.2d 312, 316-17 (CCPA 1978) (reaffirming *Petering*, and finding that "the reference provides a description of those compounds just as surely as if they were identified in the reference by name"); *Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 246 F.3d 1368, 1380 (Fed. Cir. 2001). The '596 patent clearly describes clopidogrel bisulfate, and these other forms, to a POSA. The district court failed to cite *Petering* and *Schaumann*, which are controlling and failed to mention claim 2 (A-489, '596 patent), the most significant basis for anticipation.

Moreover, the court held that disclosing a stereoisomeric compound makes a POSA aware of the enantiomers. *See Adamson*, 275 F.2d at 954:

> [O]ne of ordinary skill in the stereoisomer and pharmaceutical arts would recognize that the Adamson compounds exist as racemates, hence the fact that no reference to stereoisomerism is made in the Adamson references themselves is of no moment.

The district court did not cite *Adamson*.

This Court held that a structural formula in a claim showing a single

---

7    The '596 abstract also notes that the patent covers "addition salts with pharmaceutically acceptable mineral or organic acids ..., as well as the two

enantiomer encompassed both enantiomers and "any (equal or unequal) mixtures thereof." *Pfizer Inc. v. Ranbaxy Labs. Ltd*, --- F.3d ---, 2006 WL 2137244 (Fed. Cir. Aug. 2, 2006); *Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 324 F. Supp. 715, 717 (S.D. Fla. 1971) (where patent disclosed general formula, "in light of the state of the art ..., [the] patent specification also implicitly and inherently made available the active [enantiomer]"). The case is stronger here. MATTPCA is described in claim 2 of the '596 patent in a general form, and the patent specifies that the individual enantiomers, mixtures, and salt forms are covered and thus disclosed. A POSA would immediately envisage each enantiomer of MATTPCA, and the racemate, purified as each of the three relevant salt forms. Thus, each of these forms is described in the prior art. The court did not cite these cases either.

2.     **The District Court Erroneously Imported a "Motivation to Combine" Requirement into Its Anticipation Analysis.**

The district court confused anticipation and obviousness in its anticipation conclusion. Five pages of its anticipation analysis discuss whether one would be *motivated* to select clopidogrel. (A-21-25). Motivation is irrelevant to anticipation.

The district court did not conclude that a POSA would not envisage each enantiomer of MATTPCA, nor that a POSA would not envisage the bisulfate of those enantiomers. Instead, concludes that a POSA "would not be motivated to split the enantiomers of 4099," (A-22), and would "not have been led to prepare enantiomers and their mixture" of the covered compounds (A-482).

10

[clopidogrel] as a bisulfate salt." (A-25). These findings are irrelevant to anticipation. The issue is whether a POSA reading the '596 patent would be made aware of clopidogrel bisulfate. Under *Petering* and *Schaumann*, the '596 patent—especially claim 2—gives rise to such an understanding and teaching to a POSA.

That a POSA would also understand other forms of MATTPCA does not alter the analysis. *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1376 (Fed. Cir. 2005) rejected the argument that a disclosure "cannot anticipate because it appears without special emphasis in a longer list. To the contrary, the disclosure is prior art to the extent of its enabling disclosure." The issue is "solely whether the prior art reference discloses and enables the claimed invention, and not how the prior art characterizes that disclosure or whether alternatives are also disclosed." *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1324 n.6 (Fed. Cir. 2003). *See also In re Sivaramakrishnan*, 673 F.2d 1383, 1385 (CCPA 1982). The court's holding that the disclosure of clopidogrel is negated because other forms of MATTPCA are also disclosed is clearly erroneous.

3.    **The District Court Erred in Relying on the Number of Compounds Covered by Claim 1 of the '596 Patent.**

The district court never mentions claim 2 of the '596 patent (A-489), which discloses clopidogrel bisulfate, and is the principal basis for Apotex' defenses of

11

anticipation, obviousness, and obviousness-type double patenting.[8] Instead, it focused on the general formula in claim 1, which may cover millions of compounds. It thus found that clopidogrel bisulfate must be selected from the vast number of unidentified compounds in claim 1 (A-489). But the number of compounds in claim 1 has nothing to do with a POSA's understanding of claim 2. Claim 2 covers "a limited class" of compounds, and specifically, clopidogrel, each of which is identifiable to a POSA. *See Petering*, 301 F.2d at 682. In *Petering*, as here, the prior art in which the limited class was identified also described a much larger class of claim compounds. It matters not "whether alternatives are also disclosed," *Hewlett-Packard*, 340 F.3d at 1324 n.6, no matter how many alternatives may exist. The enormous "genus" in claim 1 is irrelevant.

### 4.    The District Court Erred in Finding the '596 Patent Does Not Enable Clopidogrel.

Citing only to Sanofi's experts but no law, the district court overlooked controlling precedent on enablement. A prior-art patent is presumed to enable what

---

[8]    The failure to discuss claim 2 makes the district court's determination of the double-patenting defense clearly erroneous. The court determined that double-patenting was "subsumed by the broader [obviousness] inquiry ... because Sanofi's entire '596 patent was prior art at the time the '265 patent issued." (A-35). Even assuming this was true, *but see Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 n.1 (Fed. Cir. 2003) (motivation to modify prior art not required for double-patenting), the court would at least have to have analyzed the relevant portion of the prior patent. Apotex' submits that claim 3 of the '265 patent

it claims and what it merely discloses. *Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1354 (Fed. Cir. 2003). The '596 patent discloses and claims clopidogrel bisulfate, and it is presumed enabled for both claimed and unclaimed. *Id.* Sanofi should not be heard to argue otherwise regarding its own patent.

The *Adamson* court directly addressed the ability of a POSA to separate enantiomers, relying on a prior art reference that taught the same separation method Sanofi used. *Adamson,* 275 F.2d at 954-955 (Karrer would suggest to POSA that the racemates of the prior art may be resolved into their l and d isomers, and appellants in following the cited prior art have done no more than the obvious.) Karrer teaches the same thing here (A-906-918; McClelland, A-452-457). The court below did not even cite *Adamson.*[9]

It is indisputable that the enantiomers here can be separated by a classical method taught in every common textbook of organic chemistry (diastereomer separation). (A-749, ¶ 52). The district court held that there was no enablement because a POSA would not know *which* of several common methods to use. It ignored the evidence that the method Sanofi used is the most common. Moreover, the prior art identifies systematic processes for enantiomeric resolution. Using such

---

is not patentably distinct from claim 2 of the '596 patent. Because the court never construed claim 2, the relevant analysis was never done.

[9]     The parties stipulated that the PTO rejected the '265 application process claims as obvious and Sanofi then cancelled them. (A-901-903, ¶21, 24)

13

a method, "there need be few—if any—failures in intelligently and systematically executed resolutions." (A-463; A-922, p. 378). Since the '596 patent claims the enantiomer, Sanofi cannot say it is not enabled. The court below erred by focusing on Sanofi's difficulties in enantiomer resolution. Since a POSA obviously knew that enantiomers could be separated, Sanofi, for reasons of its own, may have chosen not to start with the classical method of separation and there is no evidence that it systematically tried to find a successful method as a POSA would do, perhaps attempting to develop a commercial process from the get go. Focusing upon Sanofi's failures was clear error because obviousness is properly evaluated from a hypothetical POSA and not from the skill or lack thereof, of the inventor. *Arkie Lures, Inc. v. Gene -Larew Tackle, Inc.*, 119 F.3d 953, 956 (Fed. Cir. 1997).

## 5. **The District Court Clearly Erred in Finding That Apotex' Obviousness Defense Lacked Substantial Merit**

The district court overlooked binding law that enantiomers are *prima facie* obvious over racemate disclosure. *See Adamson*, 275 F.2d at 955; *see also In re Jones*, 958 F.2d 347, 349-50, fn. 1 (Fed. Cir. 1992); *In re May*, 574 F.2d 1082, 189-90 (CCPA 1978).

The court's findings of unexpected results are also clearly erroneous. Discovering known characteristics of a known compound is not patentable. As

14

discussed below, the activity and toxicity levels were entirely expected from the

prior art. *Adamson* rejected a similar argument, 275 F.2d at 955:

> [A]ppellants have done no more than is suggested by the prior art and have ascertained no more than what would be expected by one skilled in the art, i.e., the activities are different. The toxicity of the racemate is shown by the affidavit to lie between that of its isomers, which fact appears to us to be particularly expected. We find that the contentions based upon the properties of the claimed compounds are devoid of persuasive force upon the issue of those compounds' obviousness.

### D.   THE DISTRICT COURT CLEARLY ERRED IN FINDING THAT APOTEX' INEQUITABLE CONDUCT DEFENSE LACKED SUBSTANTIAL MERIT

Space limitation precludes explanation of the court's serious errors in its

discussion of inequitable conduct and preclusion of evidence relating to unclean

hands which Apotex fully briefed (A-381-383). The court conflates the statement

that clopidogrel had surprising therapeutic *activity* with the statement that it had

surprising toxicity and/or tolerance, or a surprising combination of these

properties.[10] Nothing supports the assertion that the difference in therapeutic

---

[10]   Sanofi's Maffrand conceded that the prior art described that enantiomers have different biological activities (A-170:14-20). The activity and toxicity levels were entirely expected from the prior art. Sanofi's patent attorney Laforest wrote a memo regarding a draft patent application that the pharmacology results were not surprising (A-382) Her comment referred to the anti-platelet activity of the d-enantiomer, not to any toxicity results (which had not then been determined). Sanofi allowed the false statement to remain in the application regarding the "unexpected" differences in anti-platelet activity, in contravention of their duty of candor.

15

activity was surprising. Yet Sanofi stated in the '265 patent, "In an unexpected manner, only the dextro-rotatory enantiomer exhibits a platelet aggregation inhibiting activity ....". (A475; col. 1:36-41)

The court precluded evidence of Sanofi's unclean hands in seeking government approval of the settlement that would have insulated the patent from judicial review (A-54-55). However, its conduct has led to convening of a grand jury. (A-406) The press reports that the FBI raided the office of Bristol Meyers' CEO. Sanofi's unclean hands were directly relevant to invoking the court's equity powers. *See, Precision Instrument Mfg. v. Automotive Maintenance Machinery Co.* 324 U.S. 806 (1945); *Aptix Corp. v. Quickturn Design Sys. Inc.* 269 F.3d 1369, 1374 (Fed. Cir. 2001) both involving unclean hands arising from settlement or litigation misconduct. (A-334-340, 346-348)

### E.    THE DISTRICT COURT ERRED IN FINDING IRREPARABLE HARM

The settlement agreements here eliminated any basis for irreparable harm. As the district court found (A-56):

> Sanofi participated in a knowing business decision, in exchange for which it received valuable consideration ... to face a market situation whereby Apotex had launched its generic product into the marketplace and Sanofi agreed not to seek an injunction for a limited period of time during which Apotex concededly was permitted to sell its generic (internal record citation omitted).

In return for the chance to protect its patent until 2011, Sanofi allowed

16

Apotex to deliver hundreds of millions of doses to the market—a six month supply for America—for which Sanofi would receive 50% of net sales if it prevailed at trial. Nonetheless, the district court entered an injunction upsetting this contractually created *status quo*.

The district court erroneously presumed irreparable harm, (A-42-43), and disregarded the *eBay* decision, requiring that all four criteria of an injunction be met in patent cases, without using a "categorical rule" presuming irreparable harm.

Reliance on such a presumption was especially inappropriate here, where Sanofi conceded that in settlement talks, Apotex told Sanofi that if Apotex ever launched at-risk "... [it would] flood the market with perhaps as much as a billion dollars worth of drug as quickly as possible." (A-259). Thus, Sanofi entered into the agreement knowing it would change the *status quo*.

The district court found Apotex's launch was foreseeable by Sanofi (A-56.)

Thus, Sanofi sanctioned Apotex' launch on an unprecedented scale that changed the *status quo*, and agreed to a clear liquidated measure of monetary damage. Its actions were "incompatible with the emphasis on the right to exclude that is the basis for the presumption [of irreparable harm] in a proper case" *T.J. Smith & Nephew, Ltd. v. Consol. Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987); *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) ("HTMI offered a license to New Image, so it is clear

17

that HTMI is willing to forgo its patent rights for compensation. That evidence suggests that any injury ... would be compensable in damages ..."); *Cordis Corp. v. Boston Scientific Corp.* 2003 WL 22843072 (D. Del. 2003); *aff'd*, 99 Fed.Appx. 928 (Fed. Cir. 2004).

Sanofi's argument, adopted below (A-48), that Apotex should have waited until after the trial to launch and could have avoided the market disruption, ignores that Apotex' right to launch was a benefit it gained by contract. After trial it could not launch if Sanofi won. The contract eliminated this risk. Sanofi knew that it was forgoing the right to exclude a competitor before trial, thereby permitting a dramatic change in the market, in return for substantial consideration.

The district court also found *actual* irreparable harm based on a theory of "price erosion," but Sanofi's expert testified that any "price erosion" was foreseeable under the agreement and had already occurred by the launch.[11]

The court held that "price erosion" would occur because:

> The introduction of a generic product will ordinarily lead third-party payors to place Plavix in a less favorable tier, causing patients to pay a higher copay for the drug. Sanofi has shown, on the evidence adduced so far, that this change will have several irreversible side effects on

---

[11]    Dr. Hausman, conceded that he had neither experience nor any text to support his price erosion theory in a case like this (A-172, p. 326); he lacked any background to determine if there were market substitutes (A-174-175, p. 336-338); and that a major benefits provider could not operate without Plavix® in its formulary, which undercut the entire basis for his "irreversible price erosion theory." (A-181, p. 362)

> Sanofi. First, *if Sanofi decides to provide discounts or rebates* to persuade third-party payors to maintain Plavix on a favorable pricing tier, it will face pressure from those third-party payors to continue the discount or rebate scheme, even if Apotex were ordered to discontinue distributing generic clopidogrel.

(A-43) (emphasis added). But by the time of the hearing Sanofi had *already* offered these discounts, (A-731, ¶ 19) and Plavix® had *already* been consigned to a less-favorable pricing tier. (A-179; 353:2-20) Sanofi's expert testified that once these discounts were provided, prices could never be restored.[12] The "irreparable" harm had already occurred; it could not be prevented or remedied by an injunction.

The district court then cited a second strategy that Sanofi *could* have adopted: not lowering prices and conceding market share, which could lead to "irreparable harm." (A-43). But Sanofi had rejected this strategy and had *already* lowered its prices by the time of the hearing. (A-731, ¶19; A-179, pp. 353-54).

The court also stated without record citation: "There are substitutes for Plavix® available, and patients may request, or doctors may prescribe, these substitutes." (A-44). But, Sanofi represented and produced evidence that Plavix®

---

[12] Dr. Hausman testified:

> Q. Now, so in terms of the first reasons that you have given as to why the price can never be restored, those have all already occurred and are irrevocable as a result of the launch, isn't that correct?
>
> A. Yes, they are certainly not going to change. (A-179, p. 353-54)

was the only drug in its class and that no other drug came close to its therapeutic value.[13] Sanofi's expert conceded that a major pharmaceutical benefits manager could not operate without Plavix® in its formulary (see fn. 12, *supra*).

The court below concluded that irreparable harm may occur because, "if the amount of the copay a consumer must pay rises [later after prices had dropped in response to the generic], the consumer may stop taking the drug even earlier." (A-44). However, price had *already* fallen due to Apotex' launch. Any price rise would be caused by the injunction itself, not the continued sales of generic clopidogrel. This concern for the public was reason to deny the injunction. The public is severely harmed by the disruption that is occurring from the injunction.[14]

## III.    CONCLUSION

Based on the foregoing, Apotex respectfully requests a stay of the

---

[13]    Dr. Grabowski, Sanofi's economic expert for the patent trial, said in his report: "Prior to introduction of Plavix, no approved drug filled the existing need for an antiplatelet agent without the potentially severe side effects..." (A-659). The market study prepared by Sanofi when developing Plavix recognized that no other drug company even had a close substitute. ("No antiplatelet agent is currently in phase III development for the indications sought for clopidogrel." A-685, ¶5).

[14]    Moreover, the public concern the court voiced mandates an immediate stay because it will wreak havoc on the public. Sanofi allowed Apotex' massive launch. By August, 2006, 78% of all new prescriptions were for Apotex' product. (A-897; A-167-168, p. 308-309). While a 3-6 month supply has shipped, it is not equally divided among all vendors. A consumer required by an insurer to purchase the generic may find it available in one city—or at one store—and not at others. The permutations and problems are immense.

preliminary injunction pending the appeal of the August 31, 2006, Order.

Dated: September 6, 2006          Respectfully submitted,

By: _____
Robert S. Silver
CAESAR, RIVISE, BERNSTEIN, COHEN &
POKOTILOW, LTD.
*Attorneys for Appellants*
*APOTEX, INC. and APOTEX CORP.*

21

## II.     STATEMENT OF OPPOSITION TO THE MOTION

Apotex' counsel has discussed this motion with counsel for Plaintiffs-Appellees' counsel who oppose this motion and will file a response.

Dated: September 6, 2006          Respectfully submitted,

By: _____
Robert S. Silver
Manny D. Pokotilow
Bruce J. Chasan
Mona Gupta
Lynn M. Terrebonne
CAESAR, RIVISE, BERNSTEIN, COHEN &
POKOTILOW, LTD.
*Attorneys for Appellants*
*APOTEX, INC. and APOTEX CORP.*

22

## CERTIFICATE OF INTEREST

Counsel for Appellants APOTEX, INC. and APOTEX CORP. certifies the following:

**1.    The full name of every party or amicus represented by me is:**

APOTEX, INC. and APOTEX CORP.

**2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Not applicable.

**4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

**Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd.**

Manny D. Pokotilow
Robert S. Silver
Bruce J. Chasan
Mona Gupta
Lynn M. Terrebonne

**Langer & Grogan, PC**

Howard I. Langer
John J. Grogan
Edward A. Diver

**Pryor Cashman**

Karen J. Bernstein
**Amster, Rothstein & Ebenstein**

Karen J. Bernstein

Dated: September 6, 2006

## PROOF OF SERVICE BY OVERNIGHT COURIER

I am a citizen of the United States and employed in Washington, D.C. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 1750 K Street, NW, Suite 475, Washington, D.C. 20006.

On September 7, 2006, I served two true and correct copies of each of the foregoing documents described as:

**APPELLANTS' EMERGENCY MOTION FOR STAY OF INJUNCTION PENDING APPEAL**

**APPELLANTS' APPENDIX IN SUPPORT OF EMERGENCY MOTION FOR STAY OF INJUNCTION PENDING APPEAL (CONFIDENTIAL: FILED UNDER SEAL)**

**APPELLANTS' APPENDIX IN SUPPORT OF EMERGENCY MOTION FOR STAY OF INJUNCTION PENDING APPEAL (NONCONFIDENTIAL)**

in a sealed envelope, postage fully paid, addressed as follows:

Evan R. Chesler
Cravath, Swaine & Moore LLP
825 8th Street
New York, NY 10019

Robert L. Baechtold
Fitzpatrick, Cella, Harper & Scinto
30 Rockefeller Plaza
New York, NY 10112

On the above date, I sealed the above document(s) in an envelope or package designated by UNITED PARCEL SERVICE, an express service carrier, addressed to the above, and I deposited that sealed envelope or package in a box or other facility regularly maintained by the express service carrier, or delivered that envelope to an authorized courier or driver authorized by the express service

carrier to receive documents, located in Washington, D.C., with delivery fees paid or otherwise provided for to the parties noted above, whose address is set forth above.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 7, 2006, at Washington, D.C.


Justin March
The LEX Group DC
1750 K Street, NW
Suite 475
Washington, DC  20006

# EXHIBIT 2



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

William A. Rakoczy, Esq.
Rakoczy, Molino, Mazzochi & Siwik, LLP
6 West Hubbard St.
Suite 500
Chicago, IL 60610

Dear Mr. Rakoczy:

This letter addresses the eligibility of Cobalt Pharmaceuticals, Inc. (Cobalt) for 180-day exclusivity for acarbose tablets, for which it has submitted abbreviated new drug application (ANDA) No. 77-532. We are responding to issues raised in submissions to the Food and Drug Administration (FDA) from Cobalt and others (see attached listing) regarding the applicability to this ANDA of the exclusivity and forfeiture provisions in section 505(j) of the Federal Food, Drug, and Cosmetic Act (FDCA or Act).[1]  The statutory provisions at issue were enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the MMA), Pub. L. 108-173, 117 Stat. 2066 (Dec. 8, 2003).

After considering the facts and applicable law, we have concluded that Cobalt was eligible for 180-day exclusivity for acarbose tablets as a first applicant, but for the reason described below, has forfeited that eligibility. Because no applicant is eligible for 180-day exclusivity, FDA may approve any ANDA for acarbose tablets that is otherwise eligible for approval.

  I.      Factual Background

          A.      Bayer's New Drug Application for Precose

Precose 25-mg and 50-mg tablets were approved on September 6, 1995. The 100-mg strength of Precose tablets was approved on May 29, 1997. Bayer submitted U.S. Patent No. 4,904,769 (the '769 patent) to FDA for listing in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book) for all strengths of Precose tablets. On April 16, 2007, Bayer requested that the '769 patent be delisted from the Orange Book.[2]  On September 25, 2007, FDA published the request for delisting in the Orange Book.

---

[1] You have requested that FDA explain Cobalt's eligibility for 180-day exclusivity and the application of the forfeiture provisions to its ANDA. As we have previously stated, it is FDA's practice to make decisions on eligibility for 180-day exclusivity in the context of specific ANDAs that are otherwise eligible for approval. This approach is necessary because of the many factors that may influence eligibility for exclusivity up to the time an application is ready for approval (e.g., patent expiration, patent delisting, failure to obtain a tentative approval within 30 months, withdrawal of ANDA) and could thus render a premature eligibility determination incorrect. When the agency makes an approval decision with respect to an ANDA, it will inform an applicant affected by exclusivity that, for example, it is (1) a first applicant and entitled to exclusivity, (2) a first applicant that has forfeited its exclusivity, (3) eligible only for a tentative approval because one or more first applicants are eligible for 180-day exclusivity, or (4) eligible for approval because a first applicant has forfeited its exclusivity. Today, FDA is approving ANDAs held by Cobalt and by Roxane Laboratories, Inc. (Roxane) for acarbose tablets; therefore, we are explaining our conclusions regarding 180-day exclusivity for these products.

[2] By letter dated April 11, 2007, to FDA's Drug Information Service Branch, Cobalt raised questions regarding the patent information that was published in the Orange Book for Precose. Pursuant to 21 CFR 314.53(f), Cobalt

B.    Cobalt's Abbreviated New Drug Application for Acarbose Tablets

Cobalt's ANDA was initially stamped as received by the FDA document room on January 14, 2005. FDA reviewed the application to determine whether it was sufficiently complete to permit a substantive review, as described under 21 CFR 314.101(b). On March 9, 2005, FDA refused to receive Cobalt's ANDA for several reasons, which were enumerated in a letter to the company. On March 22, 2005, FDA received Cobalt's response to the refusal to receive letter, and the ANDA was found acceptable for filing, with a receipt date of March 22, 2005. The Cobalt ANDA contained a paragraph IV certification to the '769 patent, which is the only patent at issue in this matter. Cobalt was the first applicant to submit an ANDA referencing Precose that contained a paragraph IV certification to a patent listed for that drug. Cobalt provided notice of its paragraph IV certification to the NDA holder and patent owner, as required. No patent infringement action was initiated by the NDA holder or patent owner within the 45-day period following receipt of Cobalt's notice of paragraph IV certification. On October 17, 2007, Cobalt brought a declaratory judgment action against the patent owner and NDA holder (*Cobalt Pharmaceuticals Inc. v. Bayer Aktiengesellschaft,* No. 07CV5875 (N.D. Ill. filed Oct. 17, 2007)). The court granted Cobalt's notice of voluntary dismissal, without prejudice, on February 20, 2008.[3]

Cobalt's ANDA contained in vivo bioequivalence studies, which had been conducted before Cobalt received FDA's bioequivalence recommendations.[4] The bioequivalence recommendations for acarbose were sent by FDA to Cobalt on January 6, 2005, and contained information related to both in vivo and in vitro methodologies. The bioequivalence data Cobalt submitted with its ANDA were deficient. Over the course of its consideration of Cobalt's ANDA, the agency sent Cobalt a number of letters describing deficiencies in the application. Cobalt responded to these deficiencies. The last step of the application review involved

---

disputed the accuracy of the Precose patent information and requested that FDA require the New Drug Application (NDA) holder (Bayer) to correct the patent information to reflect the grant of a patent term extension to the '769 patent which extended the patent expiration date from February 27, 2007, to September 6, 2009. On April 12, 2007, FDA's Office of Drug Information forwarded a redacted copy of Cobalt's correspondence to Bayer and requested a prompt response. On April 16, 2007, Bayer informed FDA that the assignee of interest of the '769 patent, Bayer Healthcare AG, had filed a statutory disclaimer under 35 U.S.C. 253, disclaiming all issued claims of the '769 patent, and that the filed disclaimer had been published by the USPTO on February 27, 2007. Bayer further stated that "[i]n view of this disclaimer, the NDA-holder Bayer Pharmaceuticals Corporation hereby requests that the '769 patent be de-listed from the Orange Book."

[3] We note that Cobalt initiated its declaratory judgment action regarding the '769 patent well after the PTO had published the disclaimer to all claims of the '769 patent by its assignee and on the same day that it submitted its first comment to the docket established by FDA on September 26, 2007, regarding certain legal/regulatory issues that pertain to generic drug applications for acarbose tablets.

[4] On September 5, 2003, Cobalt had written to the Office of Generic Drugs (OGD) seeking guidance on the development of bioequivalence criteria for acarbose tablets. Acarbose is a non-systemically absorbed oligosaccharide that reversibly inhibits α-glucosidases. Its mechanism of action is not by means of systemic absorption, rather its antihyperglycemic action is by means of enzyme inhibition in the intestines. Conventional bioequivalence criteria for systemically absorbed products therefore would not apply to acarbose. Because of these factors, and due to other priorities, OGD did not provide bioequivalence guidance for acarbose until January 6, 2005. ANDA applicants are not required to await product-specific guidance from FDA before they begin their bioequivalence studies; however, the information provided in such guidance may be useful to the applicant and prevent the need for additional studies should those conducted by the applicant not be acceptable for establishing bioequivalence.

inspection of the Australian facility used by Cobalt to conduct the bioequivalence studies, which had not previously been inspected and which FDA did not plan to inspect until it had determined that the studies conducted at the facility were otherwise acceptable to support approval of the ANDA. On December 11, 2007, after conducting an off-site data audit, FDA determined that the Australian facility used by Cobalt was acceptable.[5]

On October 24, 2007, Cobalt submitted an "Emergency Petition for Stay of Action" requesting that FDA stay approval of any subsequent ANDAs for acarbose tablets until Cobalt's 180-day exclusivity expires (Docket 2007P-0414).[6] Sixteen days later, on November 9, 2007, Cobalt submitted a Citizen Petition and another Emergency Petition for Stay of Action challenging as inadequate and inappropriate the in vitro bioequivalence recommendations FDA had provided to Cobalt in January 2005, and requesting the agency stay approvals of all ANDAs until they contain adequate in vivo bioequivalence data (Docket 2007P-0448).[7] These November 2007 petitions appear to have been based on the assumption that other ANDA applicants had chosen to conduct in vitro bioequivalence studies, rather than in vivo bioequivalence studies such as those conducted by Cobalt.

The issues raised in Cobalt's petition triggered a reassessment of appropriate in vitro and in vitro bioequivalence methodologies for acarbose tablets. This assessment was conducted by staff from the Office of Generic Drugs and from the Office of Clinical Pharmacology with input from the Division of Metabolism and Endocrine Products. While it reviewed the question whether the methods used by Cobalt and other applicants were adequate to establish bioequivalence for acarbose, FDA delayed approval of the acarbose ANDAs. FDA determined, as required by section 505(q) of the Act, that such a delay was necessary to protect the public health. The agency has completed its review of the bioequivalence issues, and is responding to your petitions on that issue in a separate letter. Because both in vitro and in vivo methods may be appropriate for establishing bioequivalence for acarbose products, FDA may approve Cobalt's ANDA and ANDAs containing appropriate in vitro bioequivalence data.

II.    Abbreviated New Drug Applications and 180-day Exclusivity

Under the Drug Price Competition and Patent Term Restoration Act of 1984 (Hatch-Waxman Amendments), an NDA applicant must submit information for each patent that claims the drug or method of using the drug that is the subject of the NDA and for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the

---

[5] OGD requests an inspection of clinical facilities or analytical laboratories conducting BE studies included in an unapproved ANDA if there is a question about the quality or integrity of the data submitted in an ANDA; or if a clinical facility or analytical testing site is identified in the ANDA that has no inspection history, was classified "official action indicated" on its last inspection, or has not been inspected within the past 3 years; or a clinical facility and/or analytical laboratory is performing a non-conventional BE study for which it has never been inspected (e.g., a study using pharmacodynamic endpoints to assess bioequivalence). The inspection of the Australian facility was necessitated by the fact that it had no inspection history as well as the non-conventional nature of the BE study.

[6] The docket number was changed to FDA-2007-P-0249 as a result of FDA's transition to its new docketing system (Regulations.gov) in January 2008.

[7] The docket number was changed to FDA-2007-P-0418 as a result of FDA's transition to its new docketing system (Regulations.gov) in January 2008.

manufacture, use, or sale of the drug" (sections 505(b)(1) and (c)(2) of the Act).  FDA publishes this patent information in the Orange Book.

An applicant must include in its ANDA one of the following certifications with respect to each patent for the listed drug it references:

> (I)  that such patent information has not been filed (a paragraph I certification),
> (II)  that such patent has expired (a paragraph II certification),
> (III)  of the date on which such patent will expire (a paragraph III certification), or
> (IV)  that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted (a paragraph IV certification).

Section 505(j)(2)(A)(vii).[8]  See also 21 CFR 314.94(a)(12)(i)(A).  An applicant submitting a paragraph IV certification to a listed patent must provide the NDA holder and the patent owner notice of its patent certification, including a description of the legal and factual basis for its assertion that the patent is invalid or not infringed (section 505(j)(2)(B) of the Act).  If the NDA holder or patent owner initiates a patent infringement action against the ANDA applicant within 45 days of receiving the required notice, approval of the ANDA generally will be stayed for 30 months from the date of the notice or such shorter or longer time as the court might order (section 505(j)(5)(B)(iii) of the Act).

The MMA exclusivity provisions, like those in the Hatch-Waxman Amendments, provide the first applicant(s) to submit a paragraph IV certification challenging a patent — and thus undertake the risk of litigation — an incentive in the form of the opportunity to be the only generic drug manufacturer to compete with the innovator for a 180-day period.  The requirements for obtaining and retaining this 180-day exclusivity period are described at sections 505(j)(5)(B)(iv) and 505(j)(5)(D) of the Act.

Section 505(j)(5)(D) describes a significant new feature of 180-day exclusivity under the MMA in the form of a set of conditions under which an ANDA applicant loses — or forfeits — eligibility for 180-day exclusivity.  These are the provisions at issue in this matter.

A.    Cobalt's Eligibility for 180-day Exclusivity

Cobalt's ANDA 77-532 was the first ANDA that contained a paragraph IV certification to a listed patent for Precose.  Because this ANDA was submitted after December 8, 2003, 180-day exclusivity for ANDAs referencing Precose is governed by section 505(j)(5)(D) of the FDCA, as amended by Title XI of the MMA (*see* section 1102(b) of the MMA).  FDA has not yet promulgated regulations implementing these new statutory provisions; until it does so, it will regulate directly from the statute in determining whether ANDA applicants are entitled to exclusivity.

---

[8]  The Act provides only one circumstance in which an ANDA applicant need not certify to a listed patent: "if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection," the applicant can submit "a statement that the method of use patent does not claim such a use" (referred to as a "section viii statement") (section 505(j)(2)(A)(viii); see also 21 CFR 314.94(a)(12)(iv)).

4

The MMA established a new set of forfeiture events under which an applicant previously eligible for 180-day exclusivity could lose that eligibility. These provisions are quite complex and, because of the value of 180-day exclusivity, are of substantial interest to regulated industry. In recognition of this interest, and to obtain the benefit of comment from interested parties on the interpretation and application of the new provisions in specific factual settings, we are establishing public dockets to receive comments on certain MMA issues. Because of the complex regulatory issues related to Cobalt's eligibility for exclusivity, we solicited comments on the matter from acarbose ANDA applicants and established a public docket to receive comments from other interested persons.[9] In considering the applicability of the MMA forfeiture and exclusivity provisions to the acarbose ANDAs, we have considered the views of Cobalt and the other parties submitting comments.

B.    Forfeiture of Exclusivity

After considering the Cobalt ANDA in light of the MMA forfeiture provisions, we have determined that ANDA 77-532 for acarbose tablets is no longer eligible for 180-day exclusivity. The Act provides that the 180-day exclusivity period described in section 505(j)(5)(B)(iv) "shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant" (section 505(j)(5)(D)(ii) of the Act). Cobalt has forfeited its exclusivity because a forfeiture event as to the '769 patent has occurred under section 505(j)(5)(D)(i)(I) of the Act ("Failure to Market"). We also have analyzed forfeiture of Cobalt's exclusivity under section 505(j)(5)(D)(i)(IV) of the Act ("Failure to Obtain Tentative Approval"). This letter discusses the application of each provision in turn.

1.    Cobalt has Forfeited Exclusivity for Failure to Market

Under section 505(j)(5)(D)(i)(I) of the Act, a forfeiture event arises whenever any of the following occurs:

(I) FAILURE TO MARKET .--The first applicant fails to market the drug by the later of--
    (aa)   the earlier of the date that is--
        (AA)  75 days after the date on which the approval of the application of the first applicant is made effective under subparagraph (B)(iii); or
        (BB)  30 months after the date of submission of the application of the first applicant; or
    (bb)   with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the

---

[9] Comments were initially submitted to OGD in response to OGD's correspondence # 07-1254 of September 26, 2007 (attached), which had solicited comment on legal and regulatory issues. The public docket was assigned docket number 2007N-0417. The docket number was changed to FDA-2007-N-0445 as a result of FDA's transition to its new docketing system (Regulations.gov) in January 2008. FDA has used a similar process to solicit comments on exclusivity issues related to granisitron hydrochloride injection (Docket 2007N-0389) and ramipril capsules (Docket 2007N-0382).

5

first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:

(AA)   In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

(BB)   In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

(CC)   The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

Section 505(j)(5)(D)(i)(I).

Application of these forfeiture provisions requires a series of analyses based on the timing of specific events. The statute directs that a forfeiture event occurs when the first applicant fails to market the drug by the later of two dates. One of these dates is calculated under item (aa) by determining the earlier of a date that is either 75 days after the first applicant's ANDA is approved (subitem (AA)) or 30 months after the date of submission of the first applicant's ANDA (subitem (BB)).[10] Cobalt's ANDA is being approved on May 7, 2008; the 75 day period would expire on July 21, 2008. Cobalt submitted a substantially complete ANDA containing a paragraph IV certification on March 22, 2005; 30 months from that was September 22, 2007. September 22, 2007 is earlier than July 21, 2008. Therefore, September 22, 2007, controls for the analysis of item (aa).

The statute directs that we look to the later of the dates under items(aa) and (bb) of section 505(j)(5)(D)(i)(I). Item (bb) states that the occurrence of at least one of the enumerated events as to a first applicant or any other applicant[11] will begin a 75-day period leading to possible

---

[10] Section 505(j)(5)(D)(i)(I)(aa)(BB) states that the 30-month period should be calculated from the date of "the submission of the application of the first applicant." In applying the MMA 180-day exclusivity provisions, FDA considers the date an ANDA containing a paragraph IV certification is submitted to be the date the ANDA is "received" pursuant to 21 CFR 314.101(b). Both this regulation, and the definition of "first applicant" at section 505(j)(5)(B)(iv)(II)(bb) of the Act, require that the ANDA containing the paragraph IV certification be substantially complete, meaning it is sufficiently complete to permit a substantive review. When an ANDA containing a paragraph IV certification is determined, upon review, to have been substantially complete as of the day it was submitted to FDA, it will be deemed to have been received as of the date it was submitted (i.e., date-stamped by the appropriate FDA mail-room). When OGD sends the applicant a refusal to receive letter describing the additional information that must be submitted to render an ANDA substantially complete, the ANDA is deemed received on the day the information necessary to find the application substantially complete was submitted.

[11] Item (bb) looks to the occurrence of any of the enumerated events "with respect to the first applicant or any other applicant (which other applicant has received tentative approval)." This language reasonably anticipates that a first applicant will not forfeit its exclusivity unless another applicant has met the technical and scientific requirements for approval of its ANDA. There are, however, applications not eligible for tentative approval (i.e., because there are no unexpired patents, 30-month stay, or exclusivity) that may otherwise be ready for final approval. As to these applications — for which there are no barriers to marketing but the first applicant's eligibility for 180-day

forfeiture of exclusivity. These events include, very generally, when a court enters a final decision that the patent is invalid or not infringed, a court signs a settlement order or consent decree entering final judgment that includes a finding that the patent is invalid or not infringed, or the patent information for the listed drug is withdrawn by the NDA holder. To date, no action for infringement of the '769 patent has been brought against Cobalt or any subsequent applicant. As noted in the background on Cobalt's ANDA above, on October 17, 2007, Cobalt filed an action for declaratory judgment of non-infringement and invalidity of the '769 patent. This case has been voluntarily dismissed without prejudice. No court has entered a final judgment of invalidity or non-infringement, and no court has signed a settlement order or consent decree entering final judgment of invalidity or non-infringement. Therefore, neither of the litigation-related events factor into the forfeiture analysis. In this case, the relevant event under section 505(j)(5)(D)(i)(I)(bb) of the Act is that the NDA holder for Precose requested on April 16, 2007, that the '769 patent be delisted from the Orange Book. This triggered the start of the 75-day period under section 505(j)(5)(D)(i)(I)(bb)(CC) of the Act, which begins when the patent information submitted to the agency is withdrawn by the holder of the NDA.

On April 16, 2007, FDA received a letter from Bayer Pharmaceuticals Corporation advising the Agency that all issued claims of the '796 patent had been disclaimed by the patent assignee of interest.[12] Accordingly, Bayer requested that the '796 patent be delisted from the Orange Book for the Precose NDA 20-482. The request for patent delisting was noted in the Orange Book on September 25, 2007.[13] Under section 505(j)(5)(D)(i)(I)(bb) of the Act, the applicable date for calculating whether a failure to market forfeiture event has occurred is 75 days after the patent information is withdrawn by the NDA holder. In this case, the date that is 75 days after the NDA holder withdrew the information on the '796 patent, i.e., April 16, 2007, was June 30, 2007.

Forfeiture under section 505(j)(5)(D)(i)(I) of the Act occurs if a first applicant fails to market by the later of the dates under item (aa) or (bb). The September 22, 2007, date under section 505(j)(5)(D)(i)(I)(aa) is the later date, therefore it is the date that controls. Cobalt forfeited its

---

exclusivity — forfeiture of a first applicant's exclusivity will have the effect of permitting immediate approval and marketing of generic products. Therefore, in applying section 505(j)(5)(D)(i)(I), the agency will look both to whether there are other applicants that have received tentative approval and whether there are other applicants that have met the requirements for approval under section 505(j) and would be eligible for final approval with the forfeiture of the first applicant's exclusivity. We note, for example, that Roxane's ANDA for acarbose was not eligible for tentative approval on the basis of a 30-month stay or (upon withdrawal of the '769 patent) an unexpired patent blocking final approval.

[12] See footnote 2.

[13] The publication of the request for patent delisting in the Orange Book was accompanied by an annotation reading "Patent number 4904769 listed on all products of NDA 20482 Precose (Acarbose) was requested to be delisted by the sponsor on 4/16/2007. This patent has remained listed because, under section 505(j)(5)(D)(i) of the Act, a first applicant may retain eligibility for 180-day exclusivity based on a paragraph IV certification to this patent for a certain period." Because immediate removal of patent information from the Orange Book upon withdrawal of the patent information by the NDA holder could result in ANDA applicants withdrawing corresponding patent certifications prematurely and thus undermining a first applicant's exclusivity, FDA will leave information related to withdrawn patents in the Orange Book until it has determined that any related 180-day exclusivity has expired. In this case, the patent information was retained in the Orange Book until the agency could resolve these complex issues and respond to Cobalt's questions regarding its eligibility for 180-day exclusivity. We interpret the NDA holder's request for patent delisting to constitute withdrawal of the patent information under section 505(j)(5)(D)(i)(I)(bb)(CC) of the Act.

180-day exclusivity on September 22, 2007, because it did not begin to market its acarbose product by that date.[14]

We have considered and rejected the argument made in comments to FDA's docket that eligibility for 180-day exclusivity following the NDA holder's voluntary withdrawal of its patent should be governed not by the MMA forfeiture provisions, but by the rule established in *Ranbaxy Labs., Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006). *Ranbaxy* held that FDA may not condition the delisting of a patent on the existence of patent litigation, and thus deprive an ANDA applicant that had submitted the first ANDA to contain a paragraph IV certification of a period of marketing exclusivity for which it would otherwise be eligible (see 469 F.3d at 125-26). These comments argue that the forfeiture event described in section 505(j)(5)(D)(i)(I)(bb)(CC) of the Act applies only if the withdrawal of a patent is pursuant to the process described at section 505(j)(5)(C)(ii) of the Act. Section 505(j)(5)(C)(ii) contemplates that, as a result of a counterclaim by the ANDA applicant in patent infringement litigation, a court may issue an order requiring that patent information be corrected or deleted. Only in that situation, the argument goes, would the withdrawal of patent information trigger the statutory forfeiture provision.

We do not find this argument persuasive. First, the Ranbaxy court noted that the decisions rendered by the FDA and the district court had been made pursuant to the Act "as it stood before the MMA and, because the MMA was not made retroactive ... this decision is also geared to the Act pre-MMA" (469 F.3d at 122). Therefore, the court did not purport to render a decision on patent delisting and exclusivity under the MMA. The effect of patent delisting on eligibility for 180-day exclusivity is expressly addressed by the plain language of section 505(j)(5)(D)(i)(I) of the Act. We agree with the comment that, if a patent were withdrawn by the NDA holder as a result of a counterclaim by an ANDA applicant, a first applicant's continued eligibility for 180-day exclusivity would be governed by section 505(j)(5)(D)(i)(I); however, the scope of the patent delisting forfeiture provision is much broader. Section 505(j)(5)(D)(i)(I)(bb)(CC) applies to more than just those patents withdrawn as a result of a counterclaim; on its face, it applies when "[t]he patent information ... is withdrawn by the holder of the [NDA]." Therefore, FDA reads the plain language of 505(j)(5)(D)(i)(I)(bb)(CC) to apply whenever a patent is withdrawn (or requested to be "delisted") by the NDA holder.

That section 505(j)(5)(D)(i)(I)(bb) of the Act is broadly applicable to all patent withdrawals is apparent from the text of the provision. Unlike subitems (AA) and (BB) of section 505(j)(5)(D)(i)(I)(bb), which begin with "[i]n an infringement action ...," and thus anticipate events occurring in the context of litigation, subitem (CC) contains no prefatory language suggesting that it applies only in the context of infringement litigation. Moreover, subitem (CC) does not refer to section 505(j)(5)(C)(ii) of the Act, i.e., the counterclaim provision, nor does section 505(j)(5)(C)(ii) refer to subitem (CC). Because subitem (CC) is not limited by its terms

---

[14] Even if FDA were to calculate the forfeiture event under section 505(j)(5)(D)(i)(I)(bb) of the Act from the date the delisting of the '796 patent information was published (which we do not believe is supported by the statutory language), Cobalt would still forfeit exclusivity. If the agency were to use the September 25, 2007, publication date as the date the patent was withdrawn, the date that is 75 days later is December 9, 2007. This date under item (bb) is later than the September 22, 2007 date under item (aa); therefore the later date as between items (aa) and (bb) would be December 9, 2007. Cobalt did not market its acarbose product by December 9, 2007, so even under this analysis, it has forfeited 180-day exclusivity.

to a particular context in which the patent withdrawal occurs, it applies whenever an NDA holder withdraws a patent.

In addition to being consistent with the plain language of section 505(j)(5)(D)(i)(I) of the Act, there are a number of additional considerations that support the application of the statutory forfeiture provisions whenever a patent is withdrawn by the NDA holder. The forfeiture provisions are structured such that, even if a patent is withdrawn as a direct result of an ANDA applicant's counterclaim seeking such withdrawal, the first applicant will have only the period contemplated under the appropriate "failure to market" period of section 505(j)(5)(D)(i)(I) within which to begin commercial marketing and use its exclusivity. Given this time-limited period of eligibility for exclusivity even when the patent delisting is a direct result of an ANDA applicant's efforts, it would make little sense to provide a potentially longer period of eligibility for exclusivity (i.e., until the first applicant's exclusivity has been triggered and run or the patent expires) when the NDA holder withdraws the patent voluntarily or for reasons unrelated to an ANDA applicant's counterclaim in patent litigation (e.g., because of a decision by the patent owner or NDA holder that the patent does not claim the approved drug product or its use, or as part of an FTC settlement). Therefore, FDA sees no basis for applying the forfeiture provision of 505(j)(5)(D)(i)(I) only in cases when a patent is withdrawn pursuant to an ANDA applicant's counterclaim in a patent infringement case.

       2.    Cobalt has not Forfeited under the Failure to Obtain Tentative Approval Forfeiture Provision

The MMA also established that an ANDA applicant forfeits exclusivity if it fails to obtain a tentative approval within a given period of time. Under this provision, a forfeiture event occurs when:

> [t]he first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

section 505(j)(5)(D)(i)(IV).

A "first applicant" is "an applicant that, on the first day on which a substantially complete application containing a [paragraph IV certification] is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a [paragraph IV certification]" (section 505(j)(5)(B)(iv)(II)(bb) of the Act). The term "tentative approval" means notification to an applicant by FDA that an ANDA "meets the requirements of [505(j)(2)(A)], but cannot receive effective approval because there is [a patent or period of exclusivity protecting the listed drug]" (section 505(j)(5)(B)(iv)(II)(dd) of the Act).

To calculate the start of the 30-month period under this forfeiture provision, it is reasonable to use the date that qualifies the applicant as a first applicant for 180-day exclusivity purposes: the date the ANDA is sufficiently complete to permit a substantive review.[15] A first applicant's

---

[15] We note that, in contrast, the failure to market provision at section 505(j)(5)(D)(i)(I)(aa)(BB) of the Act calculates the 30-month period from the date of "submission," rather than the date the application is "filed." The exclusivity

ANDA must be a "substantially complete application" (section 505(j)(5)(B)(iv)(II)(bb)). A "substantially complete application" is an application that "on its face is sufficiently complete to permit substantive review and contains all the information required by [section 505(j)(2)(A)]" (section 505(j)(5)(B)(iv)(II)(cc)). The first applicant's submission of an ANDA that is determined to be sufficiently complete to permit review establishes eligibility for the benefits of 180-day exclusivity, and carries with it the requirement that — to maintain that eligibility — the first applicant must work diligently to obtain a tentative approval before the 30-month period expires.

Cobalt's ANDA was sufficiently complete to permit review and was received[16] on March 22, 2005. Therefore, the date that would be used to calculate both whether Cobalt was a first applicant for 180-day exclusivity purposes and the date from which the 30-month forfeiture period would begin to run is March 22, 2005, as that is the date upon which the ANDA both contained a paragraph IV certification and was determined to be substantially complete. The 30-month period began on March 22, 2005, and ended on September 22, 2007. Cobalt had not received either a tentative approval or an approval as of that date.

The failure to obtain tentative approval provision requires that an applicant obtain a tentative approval within 30 months after the date on which the application is filed, unless that failure is "caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed" (section 505(j)(5)(D)(i)(IV)). Congress has recently clarified this provision in the FDA Amendments Act, Pub. L. 110-85, 121 Stat. 823 (Sept. 27, 2007) (FDAAA), in which it provided that for an applicant eligible for 180-day exclusivity (such as Cobalt), if "approval of the application was delayed because of a petition, the 30-month period under such subsection is deemed to be extended by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition (inclusive of such beginning and ending dates) ...." (section 505(q)(1)(G) of the Act).[17] We note that no petition related to acarbose was submitted until November 9, 2007, when Cobalt itself submitted a citizen petition and petition for stay regarding the appropriate methodology for establishing bioequivalence for acarbose products.

---

provisions appear to use the terms "submit" and "file" interchangeably; there is no evidence that Congress intended a difference in meaning between these latter two terms. Because both terms are used in the context of "first applicant" status, we will interpret the terms to refer to the time that the agency has determined ANDA to be sufficiently complete to permit substantive review. If we interpreted the term "submission" in this context to mean the date the ANDA is date-stamped by FDA, regardless of whether the application is found to have been reviewable, an applicant whose ANDA cannot be reviewed without the submission of additional information would find its failure to market period under section 505(j)(5)(D)(i)(I)(aa)(BB) to have begun to run even before the agency could begin a substantive review of the application.

[16] FDA's regulations use the term "filed" in the context of the processing and review of new drug applications (NDAs); in the context of ANDAs, FDA uses the term "received" or "received for substantive review" to refer to the action described in the Act as filing (see 21 CFR 314.101).

[17] FDAAA further clarifies that section 505(j)(5)(D)(i)(IV) gives a first applicant 30 months in which to obtain either tentative approval or approval. Section 505(q)(1)(G) of the Act, added by FDAAA, provides that as to a first applicant's ANDA, if *"approval of the application was delayed because of a petition, the 30-month period under such subsection [section 505(j)(5)(D)(i)(IV)] is deemed to be extended by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition ..."* (emphasis added). Thus, section 505(j)(5)(D)(i)(IV) also applies when the first applicant is eligible for a final approval, but not for a tentative approval. The absence of patent or exclusivity protection that would necessitate a tentative — rather than final — approval, does not exempt a first applicant from the requirement that it show that its application meets the scientific and technical requirements of 505(j) within 30 months of filing.

After reviewing Cobalt's ANDA, we have concluded that a change in bioequivalence requirements resulted in a delay in obtaining a tentative approval.[18] Cobalt's failure to obtain a tentative approval within 30 months was caused — in part — by the agency's change in or review of the bioequivalence requirements; specifically, by a change in the reference listed drug[19] against which Cobalt was to conduct its bioequivalence study. Orange Book Preface at x-xi. Throughout the relevant period, FDA identified the 100-mg strength tablet in the Orange Book as the drug product to be used in a bioequivalence study. Cobalt initially conducted its bioequivalence study using that strength of the drug, but was informed by FDA on August 8, 2006, that its in vivo bioequivalence using the 100 mg strength was not acceptable. After further study by Cobalt, it relied upon a different strength of acarbose tablets for its in vivo bioequivalence study. This change in requirements for bioequivalence data necessitated a longer review of the Cobalt ANDA.[20] Therefore, because FDA changed the requirements for the bioequivalence study, Cobalt did not forfeit its exclusivity pursuant to section 505(j)(5)(D)(i)(IV) of the Act.

> 3.    The 30-Month Periods in Sections 505(j)(5)(D)(i)(I) and (IV) do not
>        Begin to Run with Receipt of the First Applicant's Notice Letter

You assert that FDA must interpret the two 30-month periods described in the MMA forfeiture provisions as beginning not from the date the application is submitted or filed, but rather from the date the NDA holder and patent owner receive the first applicant's notice of paragraph IV certification. Cobalt's argues that this reading alone is consistent with congressional intent. We disagree. As we have stated elsewhere in this response, although there is some ambiguity created by the use of the term "submission" in section 505(j)(5)(D)(i)(I)(aa)(BB) and "filed" in section 505(j)(5)(D)(i)(IV) to identify what appears to have been intended to be the same event, that ambiguity can be easily resolved in a manner that is both consistent with the agency's use of these terms in the review of ANDAs and with the statutory scheme. You ask that we forgo this reading — one that reasonably reconciles the provisions — in favor of an interpretation entirely unmoored from statutory language. Congress, you assert, did not intend the 30-month periods to run from the date the first applicant's application is complete and FDA may begin its review; rather you would have it begin possibly months later, with receipt of notice of a paragraph IV certification.

---

[18] Under section 505(j)(5)(D)(i)(IV), exclusivity is forfeited "unless" there has been a review of or change in requirements that has delayed approval or tentative approval of the ANDA. The statute does not permit either FDA or an ANDA applicant to comb through the ANDA review records and decide whether, had the review been conducted differently, the application could have received an approval or tentative approval before the forfeiture occurred. The review order for the very large number of ANDAs, amendments, and supplements is established through internal policies and established practice. In 2007, for example, with a total staff of approximately 210, OGD issued approval, tentative approval, not approvable, or refuse to receive letters on 1,893 ANDAs, in addition to approving or not approving 3,429 chemistry supplements. OGD does not give preferential treatment to ANDAs that are eligible for 180-day exclusivity and are, therefore, subject to the potential forfeiture of that exclusivity. To do so would draw scarce resources away from the review of other applications that may, for example, have been submitted earlier and have been waiting longer in the review queue.

[19] A reference listed drug (RLD) means the listed drug identified by FDA as the drug product upon which an applicant relies in seeking approval of its abbreviated application (see 21 CFR 314.3(b)).

[20] Applicants who waited to conduct their bioequivalence studies until they had received FDA's recommendations used a methodology that permitted use of the 100 mg RLD identified in the Orange Book.

You are correct that the 30-month stay period in section 505(j)(5)(B)(iii) begins with the receipt of notice of a paragraph IV certification; however, there is nothing in the statutory language or the way the stay of approval and forfeiture provisions interrelate that necessitates the significant divergence from the statutory text that you suggest. When Congress intended to measure events from the receipt of notice of paragraph IV certification, it specifically said so. Section 505(j)(5)(B)(iii) of the Act states that if a patent infringement action is initiated within the 45-day period following notice of a paragraph IV certification "the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order…." Moreover, the result of interpreting the statute as written, i.e., possibly different dates for termination of the 30-month stay and the running of a forfeiture period, are not absurd, as is suggested by Cobalt.

III.    Conclusion

After consideration of the Cobalt ANDA, the applicable law, and the comprehensive and thoughtful comments submitted by interested parties, we have concluded that Cobalt was eligible for 180-day exclusivity for the '769 patent, but that exclusivity was forfeited under the failure to market forfeiture provisions at section 505(j)(5)(D)(i)(I) of the Act. Because Cobalt has forfeited 180-day exclusivity, FDA may approve any ANDA for acarbose tablets that is otherwise ready to be approved.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

Attachments

cc:    Docket No. FDA-2007-P-0249
       Docket No. FDA-2007-N-0445

12

**Correspondence on 180-Day Exclusivity Issues for Acarbose Tablets**

April 11, 2007: Letter from William Rakoczy to Gary Buehler, Director, Center for Drug Evaluation and Research (CDER) and Sheldon Bradshaw, Associate General Counsel/FDA Chief Counsel.

April 11, 2007: Letter from William Rakoczy to Drug Information Services Branch and Mary Ann Holovac, Director, Drug Information, CDER.

April 16, 2007: Letter from Barbara Shimel, Director, Patents & Licensing, Bayer Health Care to Mary Ann Holovac.

June 4, 2007: Letter from William Rakoczy to Elizabeth Dickinson, Office of Chief Counsel.

September 26, 2007: Letter from Gary Buehler to ANDA Applicants.

September 28, 2007: Letter from Elizabeth Ernst, Director, DRA-Multisource Products, Roxane Laboratories, Inc. to Gary Buehler.

October 8, 2007: Letter from Sean Mahoney, Intellectual Property Counsel, Upsher-Smith Laboratories, Inc. to Cecelia Parise, Office of Generic Drugs.

October 16, 2007: Letter from Marc Goshko Executive Director, Teva Parenteral Medicines to Gary Buehler.

October 17, 2007: Letter from William Rakoczy and Christine Siwik to Gary Buehler.

October 17, 2007: Letter from William Rakoczy and Christine Siwik to Gary Buehler.

October 26, 2007: Letter from Mark Shaw, Vice-President, Regulatory Affairs and Compliance, Impax Laboratories, Inc. to Gary Buehler.

November 6, 2007: Letter from William Rakoczy and Christine Siwik to Gary Buehler.

November 13, 2007: Letter from Brian Malkin, Frommer, Lawrence & Haug LLP to Cecelia Parise, Office of Generic Drugs.

December 3, 2007: Letter from Mark Shaw to Division of Dockets Management and Gary Buehler.

March 24, 2008: Letter from William Schultz and Andrew Goldfarb, Zuckerman Spaeder LLP to ANDA 78-470.

(Note: Some of these submissions were made as controlled correspondence to ANDAs that were not approved at the time of submission. Therefore they were not included in the public dockets.)



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
_____

Food and Drug Administration
Rockville, MD 20857

**SENT VIA TELEFAX**

Reference Number:  OGD #07-1254

Dear ANDA Applicant:

We are writing to solicit comment on certain legal/regulatory issues that pertain to generic drug applications for Acarbose Tablets.  This letter is being sent to all applicants with pending abbreviated new drug applications (ANDAs) for Acarbose Tablets, and is being posted on FDA's web-site at http://www.fda.gov/cder/ogd/index.htm#New.

The reference listed drug (RLD) for Acarbose Tablets is Precose Tablets, the new drug application (NDA) held by Bayer Pharmaceuticals (Bayer).  There is one patent listed for Acarbose Tablets, U.S. Patent No. 4,904,769 (the '769 patent), which expires on September 6, 2009.  As you probably are aware, for it appears on the "Paragraph IV list" on FDA's website, at least one ANDA for Acarbose Tablets containing a paragraph IV certification was received by the agency on March 22, 2005.  By virtue of this filing, at least one applicant became eligible for 180-day generic drug exclusivity.

As you know, the agency makes determinations regarding 180-day exclusivity only when it is in the position to either approve an application that may be eligible for 180-day exclusivity, or to act on a subsequent applicant's ANDA as to which final approval may be delayed by another application's eligibility for exclusivity.

As of the date of this letter, which is more than 30 months from March 22, 2005, no first applicant's ANDA has been approved.  Also, on April 16, 2007, Bayer requested that the '769 patent be "delisted" as to Precose, i.e., they withdrew the patent information.  On September 26, 2007, FDA indicated in its "Approved Drug Products with Therapeutic Equivalence Evaluations" (the Orange Book), available on FDA's website at http://www.accessdata.fda.gov/scripts/cder/ob/docs/patexclnew.cfm?Appl_No=020482&Product_No=001&table1=OB_Rx, that the request to delist this patent had been submitted on April 16, 2007.

To determine whether any ANDA referencing Precose is eligible for final approval, the agency must consider how the 180-day generic drug exclusivity forfeiture provisions at section 505(j)(5)(D) of the Federal Food, Drug, and Cosmetic Act (the Act) apply to this set of facts.  As part of the process for making such a determination, we are seeking your views regarding the applicability of sections 505(j)(5)(D)(i)(IV) -- failure to obtain tentative approval within 30 months -- and 505(j)(5)(D)(i)(I)(aa)(BB) -- failure to market by 30 months.  We also are interested in your views regarding the applicability of section 505(j)(5)(D)(i)(I)(bb)(CC) -- relating to the delisting of a patent.

We are asking that you submit your comments to us by close of business on Wednesday, October 10, 2007. Please include the OGD Reference Number listed above in your correspondence.

If you have any questions regarding this correspondence, please contact Cecelia M. Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs, at 240-276-9310.

Sincerely,


Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
---------------------------------------------------------------------

```
 /s/
----------------------
Robert L. West
9/26/2007 10:39:25 AM
for Gary Buehler
```

------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

------------------------------------------------------------------------

/s/
--------------------
Gary Buehler
5/7/2008 06:11:59 PM

# EXHIBIT 3

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1133

MERCK & CO., INC.,

Plaintiff-Appellee,

v.

APOTEX, INC. and APOTEX CORPORATION,

Defendants-Appellants.

Robert L. Baechtold, Fitzpatrick, Cella, Harper & Scinto, of New York, New York, argued for plaintiff-appellee.  With him on the brief was John D. Carlin.  Of counsel on the brief were Edward W. Murray and Karen M. Stoffan, Merck & Co., Inc., of Rahway, New Jersey.

William A. Rakoczy, Rakoczy Molino Mazzochi Siwik LLP, of Chicago, Illinois, argued for defendants-appellants.  With him on the brief were Christine J. Siwik and Andrew M. Alul.  Of counsel on the brief was Shashank Upadhye, Apotex, Inc., of Toronto, Ontario, Canada.

Appealed from:  United States District Court for the District of New Jersey

Judge Mary L. Cooper

NOTE:   This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1133

MERCK & CO., INC.,

Plaintiff-Appellee,

v.

APOTEX, INC.  and APOTEX CORPORATION,

Defendants-Appellants.

Appeal from the United States District Court for the District of New Jersey in case no. 06-CV-5789, Judge Mary L. Cooper.

_____

DECIDED:  August  21, 2008

_____

Before MAYER and LINN, <u>Circuit Judges</u>, and ILLSTON, <u>District Judge</u>[*].

PER CURIAM.

Appellants Apotex, Inc. and Apotex Corporation appeal from the final judgment of dismissal of their counterclaims for declaratory judgment against appellee Merck & Co., Inc.  Because we find that the current dispute does not "'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts,'" <u>MedImmune, Inc.  v.  Genentech, Inc.</u>, 549 U.S. 118, ___, 127 S. Ct. 764, 771 (2007) (quoting <u>Aetna Life Ins.  Co.  v.  Haworth</u>,

_____

[*]    Honorable  Susan  Illston,  District  Judge,  United  States  District  Court  for  the Northern District of California, sitting by designation.

300 U.S. 227, 240-41, 57 S. Ct. 461 (1937)), and, thus, does not present a justiciable case or controversy, we affirm the judgment of dismissal.

## I. BACKGROUND

Appellee Merck manufactures and sells glaucoma medications Trusopt® and Cosopt®. Each of these medications received approval by the Food and Drug Administration ("FDA") after completion of the extensive procedures required by the FDA for New Drug Applications ("NDAs"). In the course of the NDA approval process, Merck informed the FDA that three patents – U.S. Patents No. 4,797,413 ("the '413 patent"), No. 6,248,735 ("the '735 patent") and No. 6,316,443 ("the '443 patent") – covered the drugs, and these three patents were listed in the FDA publication "Approved Drug Products with Therapeutic Equivalence Evaluations" (known as the "Orange Book").

At least two generic drug manufacturers have taken steps pursuant to the Hatch-Waxman Act[1] to obtain permission to manufacture generic versions of Trusopt® and Cosopt®. The first to file was Hi-Tech Pharmacal Co., which filed its Abbreviated New Drug Application ("ANDA") on October 11, 2005. Hi-Tech submitted a Paragraph IV certification, see 21 U.S.C. § 355(j)(2)(A)(vii)(IV), setting forth a factual and legal basis for asserting that the three Orange-Book-listed Merck patents are invalid or would not be infringed by Hi-Tech's product.

---

[1]    The Hatch-Waxman Act is the name commonly used to refer to the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585, 21 U.S.C. §§ 355, 360(cc) (2000), 35 U.S.C. §§ 156, 271, 282 (2000), as amended by the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003).

The Hatch-Waxman Act provides that the filing of a Paragraph IV certification constitutes an act of patent infringement. 35 U.S.C. § 271(e)(2). On January 18, 2006, Merck sued Hi-Tech for infringing the '413 patent. Merck did not assert the '735 and '443 patents against Hi-Tech. Rather, on April 18, 2006, Merck filed disclaimers of the '735 and '443 patents under 35 U.S.C. § 253. Merck asserts that the legal effect of the disclaimers is that the claims of the patents were expunged nunc pro tunc.[2]

The infringement action against Hi-Tech as to the '413 patent was resolved in Merck's favor in the trial court on April 25, 2006, and that decision was affirmed by this Court on March 29, 2007. As a consequence, Hi-Tech was enjoined from marketing its generic versions of Merck's Trusopt® and Cosopt® until October 28, 2008,[3] and lost its generic marketing exclusivity on the '413 patent. See 221 U.S.C. § 355(j)(5)(D)(i)(VI). However, Hi-Tech potentially retained 180 days of generic marketing exclusivity on the '735 and '443 patents, which it could exercise at will unless a forfeiture event forced it to begin marketing.[4]

Appellants Apotex, Inc. and Apotex Corporation (collectively "Apotex") attempted to supply such a forfeiture trigger. In March 2006, approximately six months after Hi-

---

[2]    Merck has since several times requested that the FDA de-list the '735 and '443 patents from the Orange Book. As of the time of argument in this case, the de-listing had not occurred.

[3]    The '413 patent expired on April 28, 2008, but Merck was entitled to six months of pediatric exclusivity, taking the period of exclusivity to October 28, 2008.

[4]    Exclusivity forfeiture provisions were added by the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA"), in order to reduce potential bottlenecks to competition which could be created by the Hatch-Waxman exclusivity periods. The MMA provides that the 180-day exclusivity period "shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant." The forfeiture events are spelled out in 21 U.S.C. § 355(j)(5)(D)(i). The "failure to market" forfeiture events, 21 U.S.C. § 355(j)(5)(D)(i)(I)(aa) and (bb), are the ones primarily implicated in this action.

Tech filed its ANDA, Apotex filed an ANDA to market its own generic versions of Trusopt® and Cosopt®. Like Hi-Tech, Apotex included in its ANDA a Paragraph IV certification as to all three of Merck's Orange-Book-listed patents. When Merck learned of Apotex's application, it filed suit on December 4, 2006 alleging infringement of the '413 patent only. Apotex counterclaimed alleging non-infringement and invalidity of the '735 and '443 patents, despite the fact that these patents had been disclaimed over six months earlier.

Apotex agreed to be bound by the results of Hi-Tech's appeal to this Court on the '413 infringement issue. Thus, when Merck prevailed in that action, Apotex was similarly enjoined from marketing any generics infringing the '413 patent until October 28, 2008.

The district court dismissed Apotex's counterclaims as to the '735 and '443 patents for failure to state an Article III case or controversy. It is this dismissal which is now challenged on appeal. We have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

Apotex seeks a judgment of invalidity and non-infringement of the two disclaimed patents. It is Apotex's theory that if it can obtain a final judgment in its favor (invalidity or non-infringement) on these patents, such a judgment would act as a forfeiture trigger should Hi-Tech fail to market its generic version of Cosopt® within 75 days of the date of Apotex's final judgment.[5] Since Hi-Tech is enjoined from marketing its generics any time before October 28, 2008, Apotex asserts that a final judgment of invalidity or non-

---

[5]    The forfeiture trigger referred to is found in 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA).

infringement as to the '735 and '443 patents obtained on or before August 14, 2008 would create a forfeiture of exclusivity for Hi-Tech and would allow Apotex to market its competing generic immediately upon final approval of its ANDA.

As a practical matter, this Court is unable to provide any realistic relief. Oral argument on this appeal took place on August 7, 2008. The relief sought by Apotex in its briefs was that "this Court should reverse and vacate the dismissal of Apotex's declaratory judgment action and remand this matter to the district court for resolution of Apotex's counterclaims for declaratory relief on the merits, including directions to enter summary judgment as a matter of law for Apotex." Even with prompt action by this panel, the final judgment sought by Apotex cannot be provided in time to be meaningful.

The mandate issued by this Court will issue "7 calendar days after the time to file a petition for rehearing expires, or 7 calendar days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later." Fed. R. App. P. 41. The time to file a petition for rehearing expires 14 days after entry of judgment. Fed. R. App. P. 40. Thus, any judgment by this Court will be "final" no earlier than 21 days after the date of this opinion, without consideration of time to petition the Supreme Court. At oral argument, Apotex's counsel argued that this Court itself could enter judgment of invalidity or non-infringement, without remanding to the district court. Even if such an unusual step were taken, the action would be too late to provide the relief requested.

Accordingly, this Court finds that standards set by the Supreme Court in MedImmune require affirmance of the district court's judgment of dismissal. As we noted in Caraco Pharmaceutical Laboratories, Ltd. v. Forest Laboratories, Inc., the

Supreme Court framed the proper standard for determining whether a declaratory judgment action satisfies the Article III case or controversy requirement as "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  527 F.3d 1278, 1290 (Fed.  Cir.  2008) (quoting MedImmune, 127 S.  Ct.  at 771).  "[T]he Supreme Court emphasized that Article III requires that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial, and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"  Id.  (quoting MedImmune, 127 S.  Ct.  at 771)  At this juncture, the dispute presented does not "admit of specific relief through a decree of a conclusive character" and, thus, does not present a justiciable case or controversy.

## III.  CONCLUSION

For the aforementioned reasons, we affirm the judgment of dismissal.

# EXHIBIT 4



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

Marc A. Goshko
Executive Director, Teva North America
Teva Parenteral Medicines
19 Hughes
Irvine, CA 92618-1902

        RE:    Docket No. 2007N-0389
               ANDA 77-165: Granisetron Hydrochloride Injection, 1 mg/mL

Dear Mr. Goshko:

This is in response to your letter dated September 28, 2007 (Teva Letter), in which you assert that abbreviated new drug application (ANDA) 77-165 is entitled to 180-day generic drug exclusivity. This ANDA is for Granisetron Hydrochloride Injection in 1 milligram/1 milliLiter single dose vials. It was submitted by SICOR Pharmaceuticals, Inc., now Teva Parenteral Medicines, Inc. (Teva), and was received for filing on June 1, 2004. The reference listed drug for this ANDA is Kytril Injection (Kytril), the new drug application (NDA) for which is held by Hoffman-LaRoche, Inc. As explained in this letter, it is the Agency's position that Teva is entitled to 180-day exclusivity with respect to ANDA 77-165. The Teva ANDA was approved on December 31, 2007, and Teva was granted 180-day exclusivity at that time.

Teva's ANDA 77-165 was the first ANDA for this drug product containing a paragraph IV certification to a listed patent for Kytril. Because this ANDA was submitted after December 8, 2003, the 180-day exclusivity for ANDAs referencing Kytril is governed by section 505(j)(5)(D) of the Federal Food, Drug, and Cosmetic Act (FFDCA or Act), as amended by the provisions of Title XI of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the MMA), Pub. L. 108-173, 117 Stat. 2066 (Dec. 8, 2003). *See* section 1102(b) of the MMA. FDA has not promulgated regulations implementing these new statutory provisions; until it does so, it will regulate directly from the statute in determining whether ANDA applicants are entitled to exclusivity.[1]

---

[1] It is FDA's practice to make decisions on eligibility for 180-day exclusivity only in the context of specific ANDAs that are otherwise eligible for approval. This approach is based on the multiple factors that may influence eligibility for exclusivity or forfeiture up to the time an application is ready for approval (e.g., patent expiration, patent delisting, failure to obtain a tentative approval within 30 months, withdrawal of ANDA) and could thus render a premature eligibility determination incorrect. When the agency must make an approval decision for an ANDA, it will inform the applicant that it is either 1) a first applicant and entitled to exclusivity, 2) a first applicant that has forfeited its exclusivity, or 3) eligible only for a tentative approval because one or more first applicants are eligible for 180-day exclusivity. It is possible that an ANDA applicant could be informed upon approval that it is a "first applicant" eligible for 180-day exclusivity pursuant to section 505(j)(5)(B)(iv), but later forfeit that exclusivity under section 505(j)(5)(D). FDA will consider whether there has been a forfeiture of 180-day exclusivity when approval of a subsequent ANDA may be blocked by a first applicant's exclusivity.

The MMA established a new set of forfeiture events under which an applicant previously eligible for 180-day exclusivity could lose that eligibility. These provisions are quite complex and, because of the value of 180-day exclusivity, are of substantial interest to regulated industry. In recognition of this interest, and to obtain the benefit of comment from interested parties on the interpretation and application of the new provisions in specific factual settings, we are establishing public dockets to receive comments on certain complex MMA issues. The Teva Letter raised issues regarding forfeiture of 180-day exclusivity that, while product specific, also could have a significant effect on exclusivity for other products. We established a docket on October 11, 2007, to permit public comment on the issues raised by the Teva Letter. We received comments from four interested parties. Three of these (Sun Pharmaceuticals, Ltd., Ranbaxy, Inc., and Baxter Healthcare Corporation (Baxter)[2]) agreed that Teva was eligible for 180-day exclusivity; one (Olsson Frank Weeda (OFW)) believed that Teva has forfeited its exclusivity.

In considering the applicability of the MMA forfeiture and exclusivity provisions to the granisetron ANDAs, we have considered the views of Teva and the other parties submitting comments.

## I.    STATUTORY AND REGULATORY BACKGROUND

Under the 1984 Hatch-Waxman Amendments (Hatch-Waxman Amendments) to the Act, an NDA applicant must submit information for each patent that claims the drug or method of using the drug that is the subject of the NDA and for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the patent owner engaged in the manufacture, use, or sale of the drug." Sections 505(b)(1) and (c)(2). FDA publishes this patent information in *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book).

An applicant must include in its ANDA one of the following certifications with respect to each listed patent for the listed drug it references:

> (I)   that such patent information has not been filed (a paragraph I certification),
> (II)  that such patent has expired (a paragraph II certification),
> (III) of the date on which such patent will expire (a paragraph III certification), or
> (IV)  that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted (a paragraph IV certification).

Section 505(j)(2)(A)(vii).[3] See also 21 CFR 314.94(a)(12)(i)(A). An applicant submitting a paragraph IV certification to a listed patent must provide the NDA holder and the patent owner notice of its patent certification, including a description of the legal and factual basis for its

---

[2] Baxter acknowledges that it shares Teva's interest in this matter because it is the first filer with respect to a different granisetron injection product, and has the identical risk of forfeiture as described in the Teva Letter. The other parties who submitted comments did not identify what, if any, interest they have in the outcome.

[3] The Act provides only one circumstance in which an ANDA applicant need not certify to a listed patent: "if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection," the applicant can submit "a statement that the method of use patent does not claim such a use" (a section viii statement). Section 505(j)(2)(A)(viii); see also 21 CFR 314.94(a)(12)(iv).

assertion that the patent is invalid or not infringed.  Section 505(j)(2)(B).  Should the NDA holder or patent owner initiate a patent infringement action against the ANDA applicant within 45 days of receiving the required notice, approval of the ANDA will be stayed for 30 months from the date of the notice or such shorter or longer time as the court might order.  Section 505(j)(5)(B)(iii).

The MMA exclusivity provisions, like those in the Hatch-Waxman Amendments, provide the first applicant(s) to submit a paragraph IV certification challenging a patent - and thus undertake the risk of litigation - an incentive in the form of the opportunity to be the only generic drug manufacturer to compete with the innovator for a 180-day period.  The requirements for obtaining and retaining this 180-day exclusivity period are described at sections 505(j)(5)(B)(iv) and 505(j)(5)(D) of the Act.

Section 505(j)(5)(D) describes a significant new feature of 180-day exclusivity under the MMA in the form of a set of conditions under which an ANDA applicant loses - or forfeits - eligibility for 180-day exclusivity.  Only one of these possible forfeiture events is at issue in this matter, i.e., the "failure to market" event, which appears in the Act as follows:

(I)  FAILURE TO MARKET .--The first applicant fails to market the drug by the later of--
- (aa)  the earlier of the date that is--
  - (AA)  75 days after the date on which the approval of the application of the first applicant is made effective under subparagraph (B)(iii); or
  - (BB)  30 months after the date of submission of the application of the first applicant; or
- (bb)  with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:
  - (AA)  In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.
  - (BB)  In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.
  - (CC)  The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

Section 505(j)(5)(D)(i)(I).

3

## II.    FACTUAL BACKGROUND

Teva is eligible for 180-day exclusivity for granisetron hydrochloride injection 1 mg/mL, because it was a "first applicant," as described in section 505(j)(5)(D)(iv)(II)(bb). Teva's ANDA was received for filing on June 1, 2004. At that time it contained a paragraph III certification to U.S. Patent No. 4,886,808 ('808 patent); a section viii statement to a method-of-use patent, U.S. Patent No. 5,953,340 ('340 patent); and a paragraph IV certification to U.S. Patent No. 6,294,548 patent ('548 patent). Teva provided notice of the certification to the NDA holder and patent owner as required. The paragraph IV certification to the '548 patent qualified Teva as the sole first applicant eligible for 180-day exclusivity.

There are two features of Teva's patent certifications that, operating together, raise the question of Teva's possible forfeiture of its 180-day exclusivity. The first is that ANDA 77-165 was received for filing on June 1, 2004, which is almost 43 months before the December 29, 2007 expiration date of the '808 patent. The paragraph III certification to the '808 patent meant that FDA could not approve the ANDA before the date the '808 patent was due to expire, regardless of Teva's success in its paragraph IV certification challenge to the '548 patent. The second factor is that neither Teva nor any subsequent applicant was sued as a result of its paragraph IV certification to the '548 patent, or has yet brought a declaratory judgment action regarding that patent, and the '548 patent remains listed in the Orange Book.

## III.    DISCUSSION

Application of the "failure to market" forfeiture provisions in section 505(j)(5)(D)(i)(I) requires a series of earlier-of/later-of analyses. The statute directs that a forfeiture event occurs when the first applicant fails to market the drug by the later of two dates. One of these dates is calculated under subpart (aa) by determining the earlier of a date that is either, under subitem (AA), 75 days after the first applicant's ANDA is approved or, under subitem (BB), 30 months after the date of submission of the first applicant's ANDA.[4] Teva's ANDA was approved on December 31, 2007, so the 75-day period under (AA) would expire on March 15, 2008. The relevant date under subitem (BB) is 30 months after the date of submission of Teva's ANDA, or December 1, 2006. Because the date under (BB) is earlier than the March 15, 2008 date under (AA), the "30 month from submission date" of December 1, 2006, is the applicable date under the subpart (aa) analysis.

The statute then directs that FDA look to the "later of" the December 1, 2006 date or a date under subpart (bb) of section 505(j)(5)(D)(i)(I). Subpart (bb) identifies three events that, if occurring as to a first applicant or any other applicant, could start a 75-day period leading to forfeiture. These events include, very generally, when (a) a court enters a final decision that the patent is

---

[4] Section 505(j)(5)(D)(i)(I)(aa)(BB) states that the 30 month period should be calculated from the date of "the submission of the application of the first applicant." In applying the MMA 180-day exclusivity provisions, FDA will consider the date an ANDA containing a paragraph IV certification is submitted to be the date the agency considers the ANDA to have been "received" pursuant to 21 CFR 314.101(b). Both this regulation and the definition of "first applicant" at section 505(j)(5)(B)(iv)(II)(bb) of the Act require that the ANDA containing the paragraph IV certification be substantially complete, meaning it is sufficiently complete to permit a substantive review. When an ANDA containing a paragraph IV certification is determined, upon review, to have been substantially complete as of the day it was submitted to FDA, it will be considered to be received as of the date it was submitted (i.e., date-stamped by the appropriate FDA mail-room).

invalid or not infringed, (b) a court signs a settlement order or consent decree entering final judgment that includes a finding that the patent is invalid or not infringed, or (c) the patent information for the listed drug is withdrawn by the NDA holder. To date, no action for infringement of the '548 patent has been brought against Teva or any subsequent applicant, nor has any granisetron ANDA applicant brought a declaratory judgment action regarding infringement of the '548 patent in an attempt to gain patent certainty and initiate the 75-day period leading to forfeiture. Therefore, no court has entered a final judgment of invalidity or non-infringement, and no court has signed a settlement order or consent decree entering final judgment of invalidity or non-infringement. The holder of the reference listed drug also has not requested that the patent be withdrawn from the Orange Book. Thus, none of the events contemplated in the statute's "later of" construct has occurred. Moreover, there is no pending litigation that could lead to a final judgment or decision that would start the 75-day forfeiture period.

The question posed by this set of circumstances is whether, when no "later" event as identified under subpart (bb) has occurred at the time the agency makes its exclusivity determination, forfeiture of 180-day exclusivity occurs when the applicant fails to market the drug by the applicable date under subpart (aa).[5]

We find that under the plain language of the statute, 180-day exclusivity is not forfeited for failure to market when an event under subpart (aa) has occurred, but - as in this case - none of the events in subpart (bb) has occurred. The "failure to market" provision results in forfeiture when there are two dates on the basis of which FDA may identify the "later" event as described in section 505(j)(5)(D)(i)(I). The provision does not effect a forfeiture when an event under subpart (aa) has occurred, but no event under subpart (bb) has yet occurred.

This is not a situation in which it would be impossible for a later event to occur. Although at the time FDA made its exclusivity decision, there was no litigation regarding the '548 patent pending that could result in a forfeiture event under subitem (AA) or (BB) of subpart (bb), there was nevertheless the possibility that either an additional ANDA applicant would be sued as a result of a paragraph IV certification to the patent or one of the applicants would bring a declaratory judgment action against the NDA holder or patent owner. Either of these actions could result in a forfeiture event. In addition, the patent could be withdrawn by the NDA holder, resulting in a forfeiture event under subitem (CC). Because at least one of the events described in subpart (bb) could still have occurred and, if it did, would necessarily occur "later" than December 1, 2006, Teva did not forfeit its exclusivity.[6]

---

[5] We note that in this matter, there is no allegation that Teva has "parked" its exclusivity (where it would serve as an effective barrier against approval of any subsequent ANDAs referencing the same listed drug) as a result of settlement of patent litigation with the NDA holder and/or patent owner. Teva's failure to obtain final approval and trigger its exclusivity with commercial marketing before December 31, 2007, as anticipated under section 505(j)(5)(B)(iv)(I), appears to have been a function solely of its paragraph III certification to a patent that expired December 29, 2007, more than three years after the ANDA was submitted.

[6] Inherent in the structure of the "failure to market" forfeiture provisions is the possibility that a first applicant would be able to enter into a settlement agreement with the NDA holder or patent owner in which a court does not enter a final judgment of invalidity or non-infringement (i.e., without a forfeiture event under subpart (bb) occurring), and that subsequent applicants would be unable to initiate a forfeiture with a declaratory judgment action. This inability to force a forfeiture of 180-day exclusivity could result in delays in the approval of otherwise approvable ANDAs owned by applicants that would market their generic drugs if they could but obtain approval. This potential scenario is not one for which the statute currently provides a remedy.

The comment submitted by OFW disagrees with this interpretation of the "failure to market" forfeiture provision. It asserts that FDA should base its forfeiture decision on the state of events as of a specific date, without regard to the possibility that certain relevant events may occur in the future. OFW argues that, if on the date when a subsequent ANDA would be eligible for final approval but for the first applicant's 180-day exclusivity, "there is no *actually* pending patent litigation, no final court decision that the patent is invalid or not infringed, and the patent remains in the Orange Book," then subpart (bb) should be "disregarded completely" and only the events in subpart (aa) should be considered. OFW Letter, at 3.

The comments from OFW apparently concede that, if there is patent litigation pending, it would be premature for FDA to make a forfeiture decision solely on the grounds that a subsequent ANDA would be eligible for final approval but for 180-day exclusivity. When patent litigation is pending, OFW notes, the Agency cannot make a forfeiture determination until the litigation is resolved and the agency can ascertain whether a forfeiture event in subpart (bb) has occurred.

Whatever appeal OFW's proposal might have for a hypothetical exclusivity forfeiture program, it is not consistent with the statutory language in section 505(j)(5)(D)(i)(I). The MMA could have employed the approach suggested by OFW, in which the agency determines - at the time a subsequent ANDA is ready for approval - whether any of certain events have occurred. It did not. Instead, the scheme Congress adopted expressly directs that, even if an earlier event has occurred, the Agency await the occurrence of one of certain "later" events before finding a forfeiture of exclusivity. Section 505(j)(5)(D)(i)(I). By including the declaratory judgment mechanism as a means for initiating a forfeiture, Congress may have intended to provide subsequent applicants with an effective tool for clearing the path to final ANDA approval. As OFW notes, whether declaratory judgments will prove to be an effective means for establishing patent certainty - and forcing forfeiture of exclusivity - remains to be seen. Nevertheless, the Agency may not read out of the statute the forfeiture provisions that rely on an ANDA applicant's success in patent litigation.[7]

Although the structure of the 180-day exclusivity and forfeiture provisions may give rise to concerns about parking of exclusivity, and the premature review of ANDAs, neither of these is a factor in the current granisetron matter. Teva has not parked its exclusivity (indeed, it actively pursued final approval and initiated commercial marketing promptly upon approval), and it submitted its ANDA only three and a half years before the expiration of the patent to which it filed a paragraph III certification. This timing is entirely reasonable.

---

[7] The OFW comment raises a point that has been a source of some concern to the Agency irrespective of the forfeiture provisions, and that is that the "race" to earn 180-day exclusivity by submitting the first ANDA to challenge a patent may result in the submission of ANDAs that may also contain one or more paragraph III certifications to patents that do not expire until well into the future and that will preclude approval of the application for many years. We have received ANDAs for which, based on the patent expiration dates and corresponding certifications, the sponsor has no intention to obtain approval and market the generic drug for 12 years or more. OFW is correct when it notes that this practice may result in agency resources being committed to unnecessary reviews. There is the very real possibility that events will occur in the years between initial review and patent expiration such that the sponsor ultimately will decide not to obtain approval of and market the generic drug product. See OFW Letter, at 7-8. Furthermore, should the sponsor seek final approval after the lapse of many years from initial review and tentative approval, the ANDA would almost certainly have to be reviewed a second time before a final approval could issue.

## IV.    CONCLUSION

For the reasons discussed above, the Agency has determined that Teva is entitled to 180-day exclusivity with respect to ANDA 77-165.

If you have any questions regarding this correspondence, please contact Cecelia M. Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs, at 240-276-9310.

Sincerely yours,


Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

cc:     Docket No. 2007N-0389
         Winston & Strawn LLP, Counsel for Sun Pharmaceuticals, Ltd.
         David Adams, Counsel for Ranbaxy, Inc.
         Baxter Healthcare Corporation
         Olsson Frank Weeda

---------------------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
---------------------------------------------------------------------------------

```
 /s/
 --------------------
Gary Buehler
1/17/2008 07:57:06 AM
```

# EXHIBIT 5



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Rockville, MD 20857

ANDA 77-847

Hi-Tech Pharmacal Co., Inc.
Attention: Joanne Curri
            Director, Regulatory Affairs
369 Bayview Avenue,
Amityville, NY 11701

Dear Madam:

This is in reference to your abbreviated new drug application (ANDA) dated August 12, 2005, submitted pursuant to section 505(j) of the Federal Food, Drug, and Cosmetic Act (the Act), for Dorzolamide Hydrochloride and Timolol Maleate Ophthalmic Solution, 2%/0.5%.

Reference is made to your amendments dated April 24, 2006, January 11, November 9, December 10, and December 18, 2007; February 25 (two amendments), March 20, March 26, and April 9, 2008.

We have completed the review of this ANDA, and based upon the information you have presented to date we have concluded that the drug is safe and effective for use as recommended in the submitted labeling. However, we are unable to grant final approval to your ANDA at this time because of the patent issue noted below. Therefore, the ANDA is **tentatively approved**. This determination is based upon information available to the agency at this time (i.e., information in your ANDA and the status of current good manufacturing practices (cGMPs) of the facilities used in the manufacturing and testing of the drug product) and is therefore subject to change on the basis of new information that may come to our attention. This letter does not address notice issues related to the 180-day exclusivity provisions under section 505(j)(5)(B)(iv) of the Act.

The reference listed drug product (RLD) upon which you have based your ANDA, Cosopt (dorzolamide hydrochloride and timolol maleate) Ophthalmic Solution, of Merck & Co., Inc., is subject to periods of patent protection. The following patents and expiration dates are currently listed in the agency's publication titled Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book"):

U.S. Patent Number            Expiration Date

    4,797,413 (the '413 patent        October 28, 2008
    6,248,735 (the '735 patent)       April 17, 2011
    6,316,443 (the '443 patent)       April 17, 2011

Your ANDA contains paragraph IV certifications to the '413, '735, and '443 patents under section $505(j)(2)(A)(vii)(IV)$ of the Act stating that these patents are invalid, unenforceable, or will not be infringed by your manufacture, use, or sale of your Dorzolamide Hydrochloride and Timolol Maleate Ophthalmic Solution, under this ANDA. Section $505(j)(5)(B)(iii)$ of the act provides that approval of an ANDA shall be made effective immediately, unless an action is brought against Hi-Tech Pharmacal Co., Inc. (Hi-Tech) for infringement of one or more of the patents that were the subjects of the paragraph IV certifications. This action must have been brought against Hi-Tech prior to the expiration of 45 days from the date the notice you provided under section 505 $(j)(2)(B)(i)$ was received by the NDA/patent holder(s). You notified the agency that Hi-Tech complied with the requirements of section $505(j)(2)(B)$ of the Act, and litigation for infringement of the '413 patent was brought against Hi-Tech in the United States District Court for the District of New Jersey [Merck & Co., Inc. v. Hi-Tech Pharmacal Co., Inc., Civil Action No. No. 3:06-cv-00268-MLC-JJH]. You have also notified the agency that with regards to the '735 and '443 patents, Hi-Tech complied with the requirements of section $505(j)(2)(B)$ of the Act, and that no action for infringement was brought against within the statutory 45-day period, which action would have resulted in a 30-month stay under section $505(j)(5)(B)(iii)$.

Therefore, final approval cannot be granted until:

1.    a.    the expiration of the 30-month period provided for in section $505(j)(5)(B)(iii)$[1]

        b.    the date the court decides[2] that the patent(s) is/are invalid or not infringed. See sections $505(j)(5)(B)(iii)(I)$, (II), and (III) of the Act, or,

        c.    the listed patent(s) has/have expired, and

    2.    The agency is assured there is no new information that would affect whether final approval should be granted.

---

[1] Because information on the '413, '735, and '443 patents was/were submitted to FDA before August 18, 2003, this reference to section 505(j)(5)(B)(iii) is to that section of the Act as in effect prior to December 8, 2003, when the Medicare Prescription Drug, Improvement and Modernization Act (MMA) (Public Law 108-173) was enacted. See MMA § 1101(c)(3).

[2] This decision may be either a decision of the district court or the court of appeals, whichever court is the first to decide that the patent is invalid or not infringed.

To reactivate your ANDA prior to final approval, please submit a "MINOR AMENDMENT – FINAL APPROVAL REQUESTED" 90 days prior to the date you believe that your ANDA will be eligible for final approval. This amendment should provide the legal/regulatory basis for your request for final approval and should include a copy of a court decision, or a settlement or licensing agreement, as appropriate. It should also identify changes, if any, in the conditions under which the ANDA was tentatively approved, i.e., updated information such as final-printed labeling, chemistry, manufacturing, and controls data as appropriate. This amendment should be submitted even if none of these changes were made, and it should be designated clearly in your cover letter as a MINOR AMENDMENT – FINAL APPROVAL REQUESTED.

In addition to the amendment requested above, the agency may request at any time prior to the date of final approval that you submit an additional amendment containing the requested information. Failure to submit either or, if requested, both amendments may result in rescission of the tentative approval status of your ANDA, or may result in a delay in the issuance of the final approval letter.

Any significant changes in the conditions outlined in this ANDA as well as changes in the status of the manufacturing and testing facilities' compliance with current good manufacturing practices (cGMPs) are subject to agency review before final approval of the application will be made. Such changes should be categorized as representing either "major" or "minor" changes, and they will be reviewed according to OGD policy in effect at the time of receipt. The submission of multiple amendments prior to final approval may also result in a delay in the issuance of the final approval letter.

This drug product may not be marketed without final agency approval under section 505 of the Act. The introduction or delivery for introduction into interstate commerce of this drug product before the final approval date is prohibited under section 301 of the Act. Also, until the agency issues the final approval letter, this drug product will not be deemed to be approved for marketing under section 505 of the Act, and will not be listed in the "Orange Book."

For further information on the status of this application, or prior to submitting additional amendments, please contact Rosalyn Adigun, Pharm.D. Project Manager, at (240) 276-8518.

Sincerely yours,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

# EXHIBIT 6



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Rockville, MD 20857

ANDA 78-201

RECEIVED
JUL 3 1 2008
REGULATORY AFFAIRS
Apotex Corp.

Apotex Corp.
U.S. Agent for: Apotex Inc.
Attention:  Kiran Krishnan, MPharm, RAC
            Associate Director, Regulatory Affairs
2400 North Commerce Parkway, Suite 400
Weston, FL 33326

Dear Sir:

This is in reference to your abbreviated new drug application (ANDA) dated March 29, 2006, submitted pursuant to section 505(j) of the Federal Food, Drug, and Cosmetic Act (the Act), for Dorzolamide Hydrochloride and Timolol Maleate Ophthalmic Solution, 2% (base)/0.5% (base).

Reference is made to your amendments dated June 12, 2007; and February 27, May 14, June 23, July 4, July 24, and July 28, 2008.

We have completed the review of this ANDA, and based upon the information you have presented to date we have concluded that the drug is safe and effective for use as recommended in the submitted labeling. However, we are unable to grant final approval to your ANDA at this time because of the exclusivity issue noted below. Therefore, the ANDA is tentatively approved. This determination is based upon information available to the agency at this time (i.e., information in your ANDA and the status of current good manufacturing practices (cGMPs) of the facilities used in the manufacture and testing of the drug product). This determination is subject to change on the basis of new information that may come to our attention. This letter does not address issues related to the 180-day exclusivity provisions under section 505(j)(5)(B)(iv) of the Act.

The reference listed drug product (RLD) upon which you have based your ANDA, Cosopt (Dorzolamide hydrochloride and Timolol Maleate), Ophthalmic Solution, of Merck Research Laboratories, is subject to multiple periods of patent protection. The following patents and expiration dates are currently listed in the agency's publication titled Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book") for this drug product:

| U.S. Patent Number | Expiration Date |
|---|---|
| 4,797,413 (the '413 patent) | October 28, 2008 (pediatric extension) |
| 6,248,735 (the '735 patent) | April 17, 2011 |
| 6,316,443 (the '443 patent) | April 17, 2011 |

Your ANDA contains paragraph IV certifications to each of the patents under section 505(j)(2)(A)(vii)(IV) of the Act stating that the patents are invalid, unenforceable, or will not be infringed by your manufacture, use, or sale of Dorzolamide Hydrochloride and Timolol Maleate Ophthalmic Solution, 2% (base)/0.5% (base), under this ANDA. Section 505(j)(5)(B)(iii) of the act provides that approval of an ANDA shall be made effective immediately, unless an action was brought against Apotex Inc. (Apotex) for infringement of one or more of these patents that were the subjects of the paragraph IV certifications. This action must have been brought against Apotex prior to the expiration of 45 days from the date the notice you provided under section 505 (j)(2)(B)(i) was received by the NDA/patent holder(s). You notified the agency that Apotex complied with the requirements of section 505(j)(2)(B) of the Act, and that litigation for infringement of the '413 patent was brought against Apotex in the United States District Court for the District of New Jersey [Merck & CO., INC. v. Apotex, Inc. and Apotex Corporation, Civil Action No. 06-5789 (MLP)]. You notified the agency of the judgment entered in the United States District Court for the District of New Jersey which upheld the ruling on the '413 patent in Merck's favor, and precludes the approval of Apotex's application before the expiration of all exclusivities associated with the '413 patent.

You have also notified the agency that with regards to the '735 and '443 patents, Apotex complied with the requirements of section 505(j)(2)(B) of the Act, and that no action for infringement was brought against Apotex within the statutory 45-day period, which action would have resulted in a 30-month stay under section 505(j)(5)(B)(iii).

Therefore, final approval cannot be granted until:

1.
   a.    the pediatric exclusivity associated with the '413 patent has expired, and

2.    The agency is assured there is no new information that would affect whether final approval should be granted.

To reactivate your ANDA prior to final approval, please submit a "MINOR AMENDMENT – FINAL APPROVAL REQUESTED" 90 days prior to the date you believe that your ANDA will be eligible for final approval. This amendment should provide the legal/regulatory basis for your request for final approval and should include a copy of a court decision, or a settlement or licensing agreement, as appropriate. It should also identify changes, if any, in the conditions under which the ANDA was tentatively approved, i.e., updated information such as final-printed labeling, chemistry, manufacturing, and controls data as appropriate. This amendment should be submitted even if none of these changes were made, and it should be designated clearly in your cover letter as a MINOR AMENDMENT – FINAL APPROVAL REQUESTED.

In addition to the amendment requested above, the agency may request at any time prior to the date of final approval that you submit an additional amendment containing the requested information. Failure to submit either or, if requested, both amendments may result in rescission of the tentative approval status of your ANDA, or may result in a delay in the issuance of the final approval letter.

Any significant changes in the conditions outlined in this ANDA as well as changes in the status of the manufacturing and testing facilities' compliance with current good manufacturing practices (cGMPs) are subject to agency review before final approval of the application will be made. Such changes should be categorized as representing either "major" or "minor" changes, and they will be reviewed according to OGD policy in effect at the time of receipt. The submission of multiple amendments prior to final approval may also result in a delay in the issuance of the final approval letter.

This drug product may not be marketed without final agency approval under section 505 of the Act. The introduction or delivery for introduction into interstate commerce of this drug product before the final approval date is prohibited under section 301 of the Act. Also, until the agency issues the final approval letter, this drug product will not be deemed to be approved for marketing under section 505 of the Act, and will not be listed in the "Orange Book."

For further information on the status of this application, or prior to submitting additional amendments, please contact Rosalyn Adigun, Project Manager, at (240) 276-8518.

                    Sincerely yours,

                    *(See appended electronic signature page)*

                    Gary Buehler
                    Director
                    Office of Generic Drugs
                    Center for Drug Evaluation and Research

This is a representation of an electronic record that was signed electronically and
this page is the manifestation of the electronic signature.

/s/
--------------------------
Robert L. West
7/31/2008 12:53:38 PM
Deputy Director, for Gary Buehler

# EXHIBIT 7

LAW OFFICES

# HYMAN, PHELPS & McNAMARA, P.C.

700 THIRTEENTH STREET, N.W.
SUITE 1200
WASHINGTON, D. C. 20005-5929
(202) 737-5600

FACSIMILE
(202) 737-9329
———
www.hpm.com

Direct Dial (202) 737-4282

July 11, 2008

## MEMORANDUM

<u>BY E-MAIL</u>

TO:          Elizabeth H. Dickinson, Esq.
             Associate Chief Counsel for Drugs
             Office of the Chief Counsel, FDA

FROM:        Robert A. Dormer
             Kurt R. Karst

CC:          Gary J. Buehler, R.Ph.
             Director, Office of Generic Drugs, FDA

SUBJECT:     Request for Exclusivity Determination; ANDA 77-847 - Dorzolamide
             Hydrochloride, 2%/Timolol Maleate, 0.5%, Ophthalmic Solution


        We are writing to you on behalf of our client, Hi-Tech Pharmacal Co., Inc. ("Hi-Tech"), to request that the Food and Drug Administration ("FDA") confirm that upon final approval of the above-referenced Abbreviated New Drug Application ("ANDA"), Hi-Tech will be granted 180-day exclusivity. On April 10, 2008, FDA tentatively approved ANDA 77-847, but could not grant final approval because the reference listed drug product, Merck & Co., Inc.'s ("Merck") COSOPT (dorzolamide HCl, 2%; timolol maleate, 0.5%) Ophthalmic Solution, is subject to periods of patent protection. Specifically, FDA identified the following patents as being currently listed in the Agency's <u>Approved Drug Products with Therapeutic Equivalence Evaluations</u> ("Orange Book"): U.S. Patent Nos. 4,797,413 ("the '413 patent"), 6,248,735 ("the '735 patent"), and 6,316,443 ("the '443 patent"). The 413 patent expired on April 28, 2008, but is subject to a period of pediatric exclusivity expiring on October 28, 2008. The '735 and '443 patents will expire on April 17, 2011. Hi-Tech will be submitting a minor amendment to ANDA 77-847 90 days prior to October 28, 2008 that will address the

4819 EMPEROR BOULEVARD
SUITE 400
DURHAM, NORTH CAROLINA  27703
(919) 313-4750
FAX  (919) 313-4751

Memorandum                                     HYMAN, PHELPS & MCNAMARA, P.C.
July 11, 2008
Page 2

company's entitlement to 180-day exclusivity. Hi-Tech is submitting this letter to FDA
in advance of that amendment to give the Agency early notice of the issue so that it can
be resolved without the need for litigation.

As of October 28, 2008, the date on which the pediatric exclusivity for the '413
patent expires, ANDA 77-847 will be eligible for final approval. As explained below,
because ANDA 77-847 was the first application submitted to FDA containing a
paragraph IV certification to the Orange Book-listed patents covering COSOPT, Hi-Tech
is a first applicant eligible for a period of 180-day exclusivity. This exclusivity will be
triggered by the company's first commercial marketing of the drug product covered under
ANDA 77-847. Given the unique facts surrounding ANDA 77-847, Hi-Tech requests
that FDA confirm that the company's 180-day exclusivity period will begin when Hi-
Tech begins commercial marketing. Hi-Tech's request is based on the following facts:

1. On October 11, 2005, Hi-Tech submitted ANDA 77-847 containing paragraph IV
   certifications as to each of the three Orange Book-listed patents for COSOPT.

2. On or about December 2, 2005, Hi-Tech served a patent certification notice on
   Merck which challenged the validity of each of the listed patents. On January 18,
   2006, within 45 days after receiving the patent certification notice, Merck
   commenced an action for patent infringement in the U.S. District Court for the
   District of New Jersey with respect to the '413 patent, but did not bring suit with
   respect to the '735 or '443 patents.

3. On January 26, 2006, Merck provided Hi-Tech with a covenant not to sue Hi-Tech
   with respect to the '735 and '443 patents. A copy of the Merck letter is attached
   hereto as Exhibit 1.

4. The validity and enforceability of the '413 patent was upheld by the U.S. Court of
   Appeals for the Federal Circuit in a decision dated March 29, 2007. See Merck &
   Co., Inc. v. Hi-Tech Pharmacal, Inc., 482 F.3d 1317 (Fed. Cir. 2007). Based on
   that decision, the New Jersey District Court enjoined Hi-Tech from marketing its
   generic version of COSOPT - as well as a generic version of Merck's TRUSOPT
   (dorzolamide HCl) Ophthalmic Solution, 2% -- until October 28, 2008.

5. On April 10, 2008, less than 30 months after ANDA 77-847 was considered
   submitted to FDA, the Agency tentatively approved the application.

6. The '413 patent expired on April 28, 2008; however, pediatric exclusivity
   applicable to the patent prevents FDA from granting final approval of ANDA 77-
   847 until October 28, 2008.

Memorandum
July 11, 2008
Page 3

HYMAN, PHELPS & MCNAMARA, P.C.

7.  In April 2006, Merck disclaimed the '735 and '443 patents and requested that
    FDA delist those patents from the Orange Book. Despite the request, FDA has
    never delisted the '735 and '443 patents. Indeed, FDA's April 10, 2008 tentative
    approval letter to Hi-Tech specifically states that the '735 and '443 patents are
    "currently listed." In addition, the Electronic Orange Book contains a list of all
    patents that have been delisted and, as of the date of this letter, the '735 and '443
    patents have not been delisted.

8.  Further evidence of the fact that the '735 and '443 patents have never been
    delisted from the Orange Book is the existence of a pending paragraph IV patent
    challenge with respect to those patents. In November 2006, long after Merck had
    filed its request to delist, Apotex, Inc. ("Apotex") submitted an ANDA containing
    a paragraph IV certification to the '735 and '443 patents. Merck failed to sue for
    infringement within the statutory 45-day period, and Apotex subsequently
    commenced a declaratory judgment action in the U.S. District Court for the
    District of New Jersey with respect to those patents. See Merck & Co., Inc. v.
    Apotex, Inc., No. 06-5789, slip op. (D. N.J. Nov. 15, 2007). That action is
    pending on appeal before the Federal Circuit. See Merck & Co., Inc. vs. Apotex,
    Inc., appeal docketed (Fed. Cir. Dec. 12, 2007). In the appeal, Apotex challenges
    the district court's decision dismissing the Apotex declaratory judgment action for
    lack of a case or controversy with respect to the patents. A copy of the district
    court decision is attached as Exhibit 2. According to the briefs on appeal,
    Apotex's sole reason for pursuing the declaratory judgment is to obtain a court
    decision that would allegedly trigger a forfeiture of Hi-Tech's 180-day exclusivity
    unless Hi-Tech commences marketing within 75 days thereafter. The appeal is
    scheduled for oral argument on August 7, 2008 – just 83 days before Hi-Tech's
    ANDA becomes eligible for final approval.

9.  Apotex also served Merck with a paragraph IV certification notice with respect to
    the '413 patent and was sued for infringement. In the ensuing litigation, Apotex
    agreed to be bound by the outcome of the earlier Hi-Tech challenge to the '413
    patent. Accordingly, following the March 2007 Federal Circuit decision in the Hi-
    Tech case, the New Jersey District Court entered an injunction prohibiting Apotex
    from marketing a generic version of COSOPT until October 28, 2008. A copy of
    the injunction is attached as Exhibit 3.

    Since ANDA 77-847 was submitted to FDA subsequent to December 8, 2003, and
is the first ANDA for a generic version of COSOPT containing a paragraph IV
certification, eligibility for 180-day exclusivity is governed by Section 505(j)(5)(D) of the
Federal Food, Drug, and Cosmetic Act ("FDC Act"), as amended by Title XI of the

Memorandum                                  HYMAN, PHELPS & MCNAMARA, P.C.
July 11, 2008
Page 4

Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA").
The MMA provisions do not alter the basic incentive of the Hatch-Waxman Act which
entitles a first applicant that submits an ANDA containing a paragraph IV certification
challenging an Orange Book-listed patent to be the only generic manufacturer to compete
with the innovator for a 180-day period. However, under the new MMA provisions an
ANDA applicant can forfeit exclusivity under certain circumstances. Those
circumstances are not present in this case.

Hi-Tech submitted ANDA 77-847 to FDA less than 31 months before the '413
patent expired. The ANDA contained a paragraph IV patent certification to all three
Orange Book-listed patents covering COSOPT. In an effort to clear the way for approval,
Hi-Tech took steps to expedite the litigation with respect to the '413 patent which made it
possible to obtain a final judgment on appeal only 14 months after the case began. And
Hi-Tech sent to Merck a notice with respect to the paragraph IV patent certification to
'735 and '443 patents that was so comprehensive in laying out the reasons why those
patents were invalid and unenforceable that Merck disclaimed the patents without a fight.
Clearly, Hi-Tech has not taken any action which could be remotely construed as delaying
the timely approval and marketing of the product covered by ANDA 77-847. In
circumstances similar to those present here, FDA considered a question of potential
forfeiture of 180-day exclusivity for Teva's ANDA 77-165 for Granisetron HCl. In so
doing the FDA stated:

> Although the structure of the 180-day exclusivity and forfeiture provisions
> may give rise to concerns about parking of exclusivity, and the premature
> review of ANDAs, neither of these is a factor in the current Granisetron
> matter. Teva has not parked its exclusivity (indeed, it actively pursued final
> approval and initiated commercial marketing promptly upon approval), and it
> submitted its ANDA only three and a half years before the expiration of the
> patent to which it filed a paragraph III certification. This timing is entirely
> reasonable.

FDA Granisetron Decision, Docket No. FDA-2007-N-0269-003 at 6 (Jan. 17, 2008).

If Teva's actions were reasonable and involved no "parking," then Hi-Tech's
efforts to ensure that a generic version of COSOPT can be marketed on the first day after
Merck's legitimate exclusivity expires is exemplary as a demonstration of the behavior
that the Hatch-Waxman Act and the MMA were intended to encourage! Had Hi-Tech
delayed in challenging the '735 and '443 patents there would have been a real possibility
that Merck would have engaged in litigation over those worthless patents solely to extend
its market exclusivity for as long as possible after the '413 patent expired.

Memorandum
July 11, 2008
Page 5

HYMAN, PHELPS & MCNAMARA, P.C.

As noted in Senator Schumer's remarks on the Senate floor during the debate on the MMA, the forfeiture provisions were designed and intended to ensure that 180-day exclusivity would remain as an incentive to challenge weak patents and bring consumers quicker access to affordable generic drugs while providing for forfeiture of exclusivity in situations where the first applicant created a bottleneck to subsequent ANDA applicants by failing to market in a timely manner after the listed patents or exclusivities were removed as a barrier. See 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer). That is, the forfeiture provisions were aimed at those situations where a first applicant's failure to commence marketing was due to a collusive agreement with the patent owner to delay marketing or where a first applicant failed to gain timely approval of its ANDA due to technical deficiencies in the application. Neither of these situations is present in this case.

Significantly, but for the period of pediatric exclusivity applicable to the '413 patent which began on April 28, 2008 when the patent expired, Hi-Tech would have commenced marketing a generic version of COSOPT on April 28, 2008. As of that date (and as of today), no other party has received tentative approval to market a generic version of COSOPT. Moreover there has been no final judgment entered by any court with respect to the validity or enforceability of the '735 and '443 patents, and the FDA has not delisted those patents. In short, the conditions for forfeiture simply did not exist as of April 28, 2008, and do not exist today. Under Section 10 of the Best Pharmaceuticals for Children Act ("BPCA"), Pub. L. No. 107-109 (Jan. 4, 2002), which was reauthorized by Congress in September 2007 by Title V of the FDA Amendments Act, Pub. L. No. 110-85 (Sept. 27, 2007), 180-day exclusivity is tolled to the extent that it would run concurrently with pediatric exclusivity. See FDC Act § 505A(m). When the BPCA tolling provisions are construed in conjunction with the MMA forfeiture provisions, it must be concluded that 180-day exclusivity cannot be forfeited during pediatric exclusivity.[1] Therefore, since no other ANDA applicant received tentative

---

[1] Under pre-MMA law, a court decision would trigger 180-day exclusivity and the tolling provisions of the pediatric exclusivity law would prevent the loss of exclusivity. Under the MMA, a court decision or patent delisting triggers a potential forfeiture of 180-day exclusivity unless marketing commences within 75 days thereafter. The sole purpose of the tolling provisions is to prevent situations in which the existence of pediatric exclusivity deprives a first applicant of the 180-day exclusivity to which that applicant is otherwise entitled. Since the tolling statute was reauthorized by Congress subsequent to the enactment of the MMA amendments, simple logic dictates that the pediatric tolling provisions were intended to forestall forfeiture under the MMA amendments. Any other reading of the two statutes would result in the unacceptable conclusion that the tolling provisions of the statute that Congress reauthorized in September 2007 are meaningless in the face of the MMA.

Memorandum
July 11, 2008
Page 6

HYMAN, PHELPS & McNAMARA, P.C.

approval as of April 28, 2008 when the '413 patent expired and pediatric exclusivity began, there was no possibility of a forfeiture before April 28, 2008 – and none exists today during the pediatric exclusivity period which extends until October 28, 2008 - as a matter of fact or law. Hi-Tech will be eligible for final approval and will commence marketing on October 28, 2008, the very first day that any ANDA could receive final approval to market a generic version of COSOPT. Any subsequent ANDA, if tentatively approved prior to October 28, 2008, would be held off the market only for the 180-day period to which Hi-Tech is legally entitled under the Hatch-Waxman Act – and not a day more. Accordingly, there is no possibility of any bottleneck or delay that could give rise to an assertion of forfeiture under any reasonable interpretation of the MMA forfeiture provisions.

In previous decisions construing the MMA "failure to market" forfeiture provisions at FDC Act § 505(j)(5)(D)(i)(I), including FDA's rulings involving Granisetron and Acarbose, FDA has taken a literal approach to the construction of the statute rather than viewing it as a whole and has concluded that "[f]orfeiture under 505(j)(5)(D)(i)(I) of the Act occurs if a first applicant fails to market by the later of the dates under (aa) or (bb)." FDA Acarbose Decision, Docket No. FDA-2007-N-0445-0026, at 7 (May 7, 2008).[2] When the MMA provisions are read as a whole and consistent with their legislative intent and purpose, it is clear that neither an (aa) nor a (bb) forfeiture event has occurred in Hi-Tech's case either before or after the expiration of the '413 patent on April 28, 2008.

The structure of the MMA provisions, when read in the light of their intent, makes clear that there can be no "failure to market" unless and until there is a legal right to market. FDA's literal construction of the MMA's "failure to market" provisions in prior decisions did not take into account how the forfeiture provisions were meant to work in those circumstances where, as in this case, a first applicant has received a timely tentative approval within 30 months after ANDA submission but is legally barred from receiving final approval because of the existence of a remaining patent or exclusivity barrier. The MMA not only added a definition of "tentative approval" to the FDC Act but also a separate forfeiture provision for failure to obtain tentative approval within 30 months. The term "tentative approval" means that a first applicant cannot obtain final approval and cannot legally market a product even though it has met the technical requirements for final approval because a listed patent, Hatch-Waxman exclusivity, pediatric exclusivity, orphan drug exclusivity, or a 30-month stay prohibits final approval. See FDC Act

---

[2]    Under FDC Act § 505(j)(5)(D)(i)(I), the (aa) date is the earlier of 75 days after the effective date of approval or 30 months from the date the ANDA was submitted. The (bb) dates are 75 days after the entry of a final judgment holding a challenged patent invalid or non-infringed or the delisting of the patents.

HYMAN, PHELPS & MCNAMARA, P.C.

§ 505(j)(5)(B)(iv)(II)(dd).  In that circumstance there can be no "failure to market" and forfeiture can only occur if there has been a failure to obtain tentative approval.  Unless the MMA provisions are construed as requiring either actual marketing or a tentative approval within 30 months – but not both – the statute would make no sense.  The issuance of a tentative approval at the end of the 30-month period would be meaningless because even though a tentative approval would forestall forfeiture under FDC Act § 505(j)(5)(D)(i)(IV) of the MMA forfeiture provisions, forfeiture of exclusivity would always occur anyway under § 505(j)(5)(D)(i)(I)(aa)(BB) as a result of a failure to market within 30 months even though no legal right to market existed.  That is not what Congress could possibly have intended because it produces an absurd result.

The MMA provisions were enacted to prevent a first applicant's failure to make timely use of 180-day exclusivity from delaying subsequent applicants from entering the market.  Those delays could occur if a first applicant failed to market when there was no patent or exclusivity barrier to such marketing, but cannot possibly occur when no applicant is entitled to final approval because all are barred by an unexpired patent or period of exclusivity.  Statutory terms are to be interpreted consistent with their natural and clear meaning given the context of the statute.  Black's Law Dictionary defines "failure" as: "[a]n omission of an expected action, occurrence or performance." BLACK'S LAW DICTIONARY, 631 (8th ed. 2004) (emphasis added).  Clearly, the term "failure to market" in the context of the MMA presumes a legal right to market and the failure to market forfeiture only applies in those instances where a first applicant could have marketed but failed to do so within the parameters defined by the MMA.  The U.S. Supreme Court has addressed this issue in another context that applies here.

In Williams v. Taylor, 529 U.S. 420 (2000), the Supreme Court considered the term "failed to develop" in the context of a federal habeas corpus petition.  28 U.S.C. § 2254(e)(2) states: "[i]f the applicant has failed to develop the factual basis of the claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim . . . ." In ruling that the term "failed to develop" implies some lack of diligence, the court discussed at length the meaning of the words "fail" and "failed."  Writing for a unanimous court, Justice Kennedy stated that:

We do not deny "fail" is sometimes used in a neutral way, not importing fault or want of diligence.  So the phrase "We failed to understand his argument" can mean simply "We cannot understand his argument."  This is not the sense in which the word "failed" is used here, however.

We give the words of a statute there "'ordinary, contemporary, common meaning,'" absent an indication Congress intended them to bear some different import [citations omitted].  In its customary and preferred sense,

Memorandum                          HYMAN, PHELPS & MCNAMARA, P.C.
July 11, 2008
Page 8

"fail" connotes some omission, fault, or negligence on the part of the person
who has failed to do something. See, e.g., Webster's New International
Dictionary, 910 (2d ed. 1939)(defining "fail" as "to be wanting; to fall short;
to be or become deficient in any measure or degree," and "failure" as "a
falling short," "a deficiency or lack," and "[o]mission to perform");
Webster's New International Dictionary's 814 (3d ed. 1993)("to leave some
possible or expected action unperformed or some condition unachieved").
See also Black's Law Dictionary, 594 (6th ed. 1990) defining "fail" as
"[f]ault, negligence or refusal"). To say a person has failed in a duty implies
he did not take the necessary steps to fulfill it. He is, as a consequence, at
fault and bears responsibility for the failure. In this sense, a person is not at
fault when his diligent efforts to perform an act are thwarted, for example, by
the conduct of another or by happenstance. Fault lies, in those
circumstances, either with the person who interfered with the
accomplishment of the act or with no one at all. We conclude Congress used
the word "failed" in the sense just as described. Had Congress intended a no-
fault standard, it would have had no difficulty in making its intent plain. It
would have had to do no more than use, in lieu of the phrase "has failed to,"
the phrase "did not."

<u>Id.</u> at 431-32.

The same reasoning applies here. Had Congress wanted to impose a no-fault
standard it could have used the words "does not market" rather than "fails to market." In
this case, Hi-Tech did not "fail" to market its product. It was ready to do so at the 30-
month period as demonstrated by the fact that it received tentative approval, but could not
receive final approval because of Merck's remaining exclusivity. Therefore, there has
not been a failure to market within the meaning of the statute and no forfeiture event
under FDC Act § 505(j)(5)(D)(i)(I)(aa) has yet occurred.

The fact that there is pending paragraph IV litigation between Merck and Apotex
with respect to the '735 and '443 patents should put to rest any question as to whether
any forfeiture event has occurred under FDC Act § 505(j)(5)(D)(i)(I)(bb)(AA) or (BB).
To put it simply, Hi-Tech was never sued and Apotex has never procured a final
judgment despite the company's continuing efforts to do so.[3]

---

[3]    It is now too late for Apotex to succeed in triggering a (bb) forfeiture event. From and
after April 28, 2008, the BPCA tolling provisions prevent a court decision from causing
forfeiture. In any event, from and after August 15, 2008, no forfeiture can occur because
Hi-Tech will receive final approval and commence marketing on October 28, 2008,
which is within 75 days after August 15, 2008. Oral argument of the Apotex appeal will

Memorandum
July 11, 2008
Page 9

HYMAN, PHELPS & McNAMARA, P.C.

That leaves for consideration the question of whether Merck's attempt to delist the '735 and '445 patents, taken together with FDA's Acarbose decision, somehow creates a basis for concluding that a forfeiture event has occurred under FDC Act § 505(j)(5)(D)(i)(I)(bb)(CC). Hi-Tech believes that the present case is factually distinguishable from the situation FDA was presented with in Acarbose, and that FDA's Acarbose decision does not set a precedent which is anyway binding on the outcome here.

In FDA's Acarbose decision, the Agency concluded that the listed patents were considered to have been withdrawn from the Orange Book when the patent holder filed its request for delisting, and that this delisting triggered a forfeiture event under FDC Act § 505(j)(5)(D)(i)(I)(bb)(CC). It is both factually and legally impossible for FDA to make such a finding in this case. Here, Merck's request for delisting was filed in April 2006. Yet, in November 2006, long after Merck had requested delisting, Apotex amended its ANDA in order to assert a paragraph IV certification and later filed a declaratory judgment action with respect to the '735 and '443 patents. If the patents had actually been delisted in response to Merck's request, it would have been legally impossible for Apotex to make a paragraph IV certification and there would have been no statutory basis for filing a declaratory judgment action with respect to those patents. The patents would have simply disappeared from the Orange Book and required no certification of any kind. FDA cannot simply roll back the clock and pretend that Apotex never filed a paragraph IV certification or commenced a declaratory judgment action with respect to the listed patents. Indeed, nothing in the MMA provisions or elsewhere grants FDA the legal authority to oust the courts from jurisdiction after the fact or to deprive Apotex of its right to seek a judgment that could have triggered an MMA forfeiture event with respect to patents that clearly stood in its path to approval. The bottom line is that the '735 and '443 patents have never been withdrawn or delisted. FDA recognized this fact in its April 10, 2008 tentative approval letter to Hi-Tech. The letter explicitly states that the '735 and '443 patents are "currently listed" in the Orange Book.

In reality, the structure of the Hatch-Waxman Act's 180-day exclusivity provisions, as amended by the MMA, prohibits FDA from delisting a patent from the Orange Book after a first applicant has filed a paragraph IV certification with respect to such a patent for at least the "earlier of" date derived from a FDC Act § 505(j)(5)(D)(i)(I)(aa) analysis.[4] Under the MMA's "failure to market" provisions, this

---

not take place until August 7, 2008, and it is a virtual impossibility that an appellate decision, mandate, remand and lower court final judgment will all occur within 6 business days following oral argument.

[4]    Of course, if final ANDA approval cannot be granted because of pediatric exclusivity,

Memorandum
July 11, 2008
Page 10

HYMAN, PHELPS & MCNAMARA, P.C.

is the earliest time that 180-day exclusivity can be forfeited even if there is an earlier court decision or attempted patent withdrawal. As a matter of statutory construction, the only possible way to preserve a first applicant's 180-day exclusivity is to require subsequent applicants to submit and maintain paragraph IV certifications with respect to the same patents because only ANDAs containing such paragraph IV certifications can be subject to a 180-day delay in approval. Thus, if FDA actually delisted a patent immediately upon receipt of a request from a patent holder, even though 30 months had not passed, subsequently filed ANDAs which were technically approvable within less than 30 months from the date of the first applicant's submission would not contain a paragraph IV certification to such patent and would have to be approved even though such an approval would wrongfully deprive the first applicant of 180-day exclusivity.

Ironically, in refraining from delisting the Acarbose patent until the 30 months had passed, FDA was actually applying the rationale of Ranbaxy Labs., Ltd. v. Leavitt, 469 F. 3d 120 (D.C. Cir. 2006), which held that the delisting of a patent is not permitted if, to do so, would oust a first applicant from the 180-day exclusivity to which it was entitled. Yet, for inexplicable reasons, FDA's Acarbose decision claims that Ranbaxy is inapplicable to post-MMA cases. In truth, FDA is trying to read the same provisions of the MMA literally and non-literally at the same time – a clearly impossible proposition. Specifically, FDA is seeking to treat a patent as continuing to be listed for purpose of preserving a first applicant's exclusivity while simultaneously treating it as delisted for the purpose of construing the MMA forfeiture provision relating to the withdrawal of a patent.[5] As the facts here prove, however, it is simply not possible for FDA to have its cake and eat it too. A patent is either listed in the Orange Book or it is not. If a patent remains listed, subsequent ANDA applicants (and presumably 505(b)(2) applicants as well, although this issue is not relevant to Hi-Tech's case) are required by law to certify to that patent, and such applicants are encouraged by law to seek judgments that would remove the patent as a barrier to marketing  – just as Apotex did in filing a paragraph IV certification and subsequently commencing a declaratory judgment action with respect to the '735 and '443 patents covering COSOPT. FDA, having allowed the patent to remain

_____

then the 30-month period referred to in FDC Act § 505(j)(5)(D)(i)(I)(aa)(BB) should be tolled.

[5]    Indeed, FDA's description in the Orange Book of the status of patents, like the '735 and '443 patents, for which a delisting request has been submitted to the Agency states: "[s]ponsor has requested patent be delisted. This patent has remained listed because, under Section 505(j)(5)(D)(i) of the Act, a first applicant may retain eligibility for 180-day exclusivity based on a paragraph IV certification to this patent for a certain period. Applicants under Section 505(b)(2) are not required to certify to patents where this flag is set to Y. Format is Y or null." FDA, Orange Book Information Data Files, http://www.fda.gov/cder/orange/obreadme.htm (emphasis added).

Memorandum
July 11, 2008
Page 11

HYMAN, PHELPS & MCNAMARA, P.C.

listed in the Orange Book in order to protect generic exclusivity, cannot subsequently disregard the legal effect of that continued listing in creating the Apotex challenge, by literally construing the MMA amendments, after the fact, as though the delisting occurred before the challenge was commenced.

In short, FDA was simply wrong when the Agency stated in the Acarbose decision that it made no difference whether the patent delisting was treated as occurring when the delisting was published in the Orange Book or when delisting was requested by the patent owner. At most, it made no difference to the outcome of the Acarbose case because, unlike the situation here, no subsequent applicant commenced patent challenge litigation between the date of the request for delisting and when the delisting was published in the Orange Book.[6] Here, FDA cannot treat the Merck patents as being delisted as of the date the request for delisting was made without undermining the Court's jurisdiction to hear the Apotex patent challenge which arose solely because the patents remained listed. Nor can it properly oust Apotex from its legal right to seek a judgment that might have triggered a forfeiture event under the MMA .

In summary, with respect to the MMA forfeiture provisions in Hi-Tech's case, despite the passage of 30 months from the company's ANDA submission, there are "later" forfeiture events under FDC Act § 505(j)(5)(D)(i)(I)(bb) which have not yet occurred but remain possible, including a final judgment in Apotex's declaratory judgment suit holding the listed patents invalid or not infringed or a delisting of the patents (which although requested by the patent holder prior to the expiration of 30 months, has not yet occurred for the reasons stated).

---

[6] It was also true only because of a clear flaw in the MMA provisions (or FDA's interpretation of those provisions) in failing to recognize that an extension of the time required to obtain tentative approval due to a change in FDA approval requirements should logically also extend the requirement that final approval must be obtained within 30 months to avoid forfeiture. In fact, FDA could have and should have refrained from delisting the Acarbose patent for the same length of time as the Agency was willing to extend Cobalt's time to obtain tentative approval. Otherwise the MMA produces an absurd result in concluding that forfeiture occurs after 30 months even though the failure to obtain tentative approval within 30 months is excused. Although FDA's position is that the "failure to market" forfeiture provisions, unlike the failure to obtain tentative approval forfeiture provision, are no-fault provisions, this notion runs counter to the logic of the statute – and to the Supreme Court's discussion of the term "fail" in Williams v. Taylor. A generic applicant, through no fault of its own, could be delayed from marketing within 30 months of ANDA submission as a result of, for example, an innovator's market exclusivity. Such a delay should not result in a forfeiture event.

Memorandum                          HYMAN, PHELPS & McNAMARA, P.C.
July 11, 2008
Page 12

The FDA has also recognized that the language of the MMA forfeiture provisions "reasonably anticipates that a first applicant will not forfeit its exclusivity unless another applicant has met the technical and scientific requirements for approval of its ANDA." FDA Acarbose Decision at n. 11. In this case, neither Apotex nor any other subsequent ANDA applicant has received tentative approval. Therefore, no forfeiture could possibly have been triggered prior to the expiration of the '413 patent and it cannot be said that Hi-Tech's entitlement to 180-day exclusivity is delaying or preventing Apotex from entering the market. Assuming FDA grants final approval for ANDA 77-847, Hi-Tech will commence commercial marketing of its generic version of COSOPT on October 28, 2008, and any subsequent ANDA approval will only be delayed for 180 days. That is precisely the reward that the Hatch-Waxman Act promised Hi-Tech as the first applicant to challenge a listed patent. In exchange, the public will get the benefit of full generic competition with respect to COSOPT more than two years prior to when that would have occurred if the listed Merck patents had not been successfully challenged by Hi-Tech.

### 

As the FDA has noted in previous rulings, the MMA's forfeiture provisions are quite complex and, because of the value of 180-day exclusivity, are of substantial interest to applicants like Hi-Tech. Moreover, there are no additional facts which could affect FDA's exclusivity ruling. That is, as of August 15, 2008 (i.e., within 75 days of October 28, 2008), nothing more can happen factually that could be relevant to a final decision from FDA on Hi-Tech's 180-day exclusivity. Under these circumstances, fairness requires that FDA issue a ruling on Hi-Tech's exclusivity as promptly as possible in order to preserve the right of judicial review in the event of an adverse ruling before significant economic interests are permanently and improperly affected. Accordingly, Hi-Tech respectfully requests that FDA provide notice to Hi-Tech by August 15, 2008 as to whether or not the Agency intends to award 180-day exclusivity to Hi-Tech so that expedited judicial review can be sought with the expectation that a ruling could be made by a court before the pediatric exclusivity applicable to the '413 expires on October 28, 2008.

RAD/KRK/jlb
3652.001

# EXHIBIT 1

01/31/2006 10:07 FAX 1 212 218 4550    FITZPATRICK NY    ☒002

# FITZPATRICK, CELLA, HARPER & SCINTO
30 ROCKEFELLER PLAZA
NEW YORK, NY 10112-3800
212-218-2100
FACSIMILE (212) 218-2200
WWW.FITZPATRICKCELLA.COM

WASHINGTON OFFICE
1900 K STREET, N.W.
WASHINGTON, D.C. 20006-1110
(202) 530-1010
FACSIMILE (202) 530-1055

CALIFORNIA OFFICE
650 TOWN CENTER DRIVE, SUITE 1600
COSTA MESA, CALIFORNIA 92626-7130
(714) 540-8700
FACSIMILE (714) 540-9123

BRUCE M. WEXLER
DIRECT DIAL (212) 218-2229
E-MAIL bwexler@fchs.com

January 31, 2006

<u>VIA FACSIMILE</u>

William L. Mentlik, Esq.
Lerner David Littenberg Krumholz & Mentlik LLP
600 South Avenue West
Westfield, New Jersey 07090

Re:  <u>Merck's Covenant Not To Sue Hi-Tech Pharmacal on</u>
     <u>U.S. Patent Nos. 6,248,735 and 6,316,443</u>

Dear Mr. Mentlik:

    We are authorized by our client Merck & Co., Inc. ("Merck") to provide
your client Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") with the following express written
covenant not to sue with respect to U.S. Patent Nos. 6,248,735 and 6,316,443.

    Merck, on behalf of itself, its subsidiaries and affiliates, and all
predecessors, successors, successors-in-interest, agents and assigns, unconditionally
covenants and agrees that it or they will not commence or prosecute against Hi-Tech, its
successors and/or affiliates, or their customers, distributors or end users any suit, action or
proceeding of any kind based upon an assertion of infringement of U.S. Patent No.
6,248,735 or U.S. Patent No. 6,316,443.

    We trust that this covenant not to sue confirms that Hi-Tech had and should
have no reasonable apprehension of being sued by Merck with respect to these patents.

                              Very truly yours,

                              Bruce M. Wexler

cc:    Alfred Engelberg, Esq.

NY_MAIN 249770v1

# EXHIBIT 2

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MERCK & CO., INC., | : | |
| | : | CIVIL ACTION NO. 06-5789 (MLC) |
| Plaintiff, | : | |
| | : | **MEMORANDUM OPINION** |
| v. | : | |
| | : | |
| APOTEX, INC., et al., | : | |
| | : | |
| Defendants. | : | |

COOPER, District Judge

Defendants, Apotex, Inc., and Apotex Corporation (collectively, "Apotex"), asserted counterclaims against plaintiff, Merck & Co., Inc. ("Merck"), for, inter alia, a judgment declaring non-infringement and invalidity of United States Patent Nos. 6,248,735 ("'735 patent") and 6,316,443 ("'443 patent"). (Dkt. entry no. 17, Ans. & Countercl.) Merck moves to dismiss Counts IV, V, VI, and VII of Apotex's counterclaims, which concern the '735 and '443 patents, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1). (Dkt. entry no. 33.) Apotex cross-moves for summary judgment in its favor pursuant to Rule 56(c). (Dkt. entry no. 34.) The Court, for the reasons stated herein, will grant the motion to dismiss, and deny the cross motion for summary judgment as moot.

BACKGROUND

I.   Statutory Background

A pharmaceutical company is required to submit a New Drug Application ("NDA") to the Federal Food and Drug Administration

("FDA") before introducing or delivering for introduction a new drug into interstate commerce. See 21 U.S.C. § 355(a). The NDA must, inter alia, identify any patents for "which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1). When an NDA is approved by the FDA, this patent information is published in an official FDA publication entitled the Approved Drug Products with Therapeutic Equivalence Evaluations, known as the "Orange Book." Merck & Co., Inc. v. Hi-Tech Pharmacal, Inc., 482 F.3d 1317, 1319 (Fed. Cir. 2007).

Generic drug manufacturers may subsequently file an Abbreviated New Drug Application ("ANDA") for FDA approval of a generic version of a drug approved under an NDA. 21 U.S.C. § 355(j). An ANDA filer must submit, inter alia, one of four certifications with respect to each patent listed in the Orange Book by the NDA holder. 21 U.S.C. § 355(j)(2)(A)(vii). The type of certification at issue here is a "paragraph IV certification," where the ANDA filer, for each of the patents listed in the Orange Book by the NDA holder, certifies "that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the ANDA is submitted." 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

2

The filing of an ANDA constitutes an act of infringement. 35 U.S.C. § 271(e)(2)(A); Teva Pharm. USA, Inc. v. Novartis Pharm. Corp., 482 F.3d 1330, 1342 (Fed. Cir. 2007). Therefore, an ANDA filer making a paragraph IV certification is required to give notice of this filing to the NDA holder and the patentee. 21 U.S.C. § 355(j)(2)(B). Then, the patentee may bring suit on any of the challenged patents within forty-five days of receiving notice of the ANDA filing. 21 U.S.C. § 355(j)(5)(B)(iii). If the patentee does bring such a suit, the ANDA cannot be approved until the earlier of a period of thirty months, or a court decision in that patent infringement case. Id.

The ANDA can be approved immediately if the patentee does not sue on the challenged patent within forty-five days of receiving notice of the paragraph IV ANDA filing. Id. The expiration of the forty-five day time period, however, does not preclude the patentee from pursuing future infringement suits under 35 U.S.C. § 271(e)(2)(A), as the patentee retains the right to sue on the patents listed in the Orange Book. See 35 U.S.C. § 271(e)(2)(A); see Teva Pharm. USA, Inc., 482 F.3d at 1341 (noting that expiration of forty-five day time period did not preclude patentee from bringing action for infringement). Thus, if the patentee does not bring an action for infringement within forty-five days, in order to obtain patent certainty, an ANDA filer may bring a civil action for a judgment declaring that the patent at issue is invalid or will not be infringed by the drug for which

3

the ANDA was submitted.  21 U.S.C. § 355(j)(5)(C)(i)(II).[1]
Federal courts are to exercise jurisdiction over such actions "to
the extent consistent with the Constitution."  35 U.S.C. §
271(e)(5).

The first ANDA filer making a paragraph IV certification is
given a period of 180 days of marketing exclusivity before any
subsequent ANDA filers making a paragraph IV certification can
receive FDA approval.  21 U.S.C. § 355(j)(5)(B)(iv).

## II.  Factual Background

Merck received FDA approval on an NDA for the drug product
COSOPT in April 1998.  (Dkt. entry no. 33, Pl. Br., at 3.)  Merck
identified to the FDA the United States Patent No. 4,797,413
patent ("'413 patent"), the '735 patent, and the '443 patent for
the COSOPT product.  (Id. at 3-4.)  The FDA listed these three
patents in the Orange Book.  (Id. at 4.)

Merck received notice from Hi-Tech Pharmacal, Co., Inc.
("Hi-Tech") in December 2005 that Hi-Tech had submitted an ANDA
to market a generic version of COSOPT, challenging the validity

---

[1] An ANDA filer may only seek a declaratory judgment if (1)
the forty-five day time period has expired, (2) neither the
patentee nor the NDA holder has brought an action for
infringement during the forty-five day time period, and (3) the
ANDA filer challenging the Orange Book patents has provided an
offer of confidential access to the ANDA to the NDA holder and
patentee for the purpose of determining whether an action for
infringement under 21 U.S.C. § 355(j)(5)(B)(iii) should be
brought.  21 U.S.C. §§ 355(j)(5)(C)(i)(I)(aa-cc), (III).  Apotex
has apparently satisfied these requirements here.  (Dkt. entry
no. 46, Def. Br., at 9.)

of the three listed Orange Book patents under a paragraph IV certification. (Id.) Hi-Tech was the first ANDA filer to make a paragraph IV certification as to these patents. (Dkt. entry no. 51, Pl. Reply Br., at 3.) Merck brought an action in this Court in January 2006 alleging infringement of the '413 patent only ("Hi-Tech litigation"). (Pl. Br., at 4.) This Court entered judgment in favor of Merck and against Hi-Tech on April 25, 2006. (No. 06-266 (MLC), dkt. entry no. 23.)

Merck filed statutory disclaimers in the United States Patent and Trademark Office in April 2006, disclaiming all claims of the '735 and '443 patents. (Pl. Br., at 4.) Merck also wrote to the FDA and requested that the agency remove, or "de-list" the disclaimed '735 and '443 patents from the Orange Book in April 2006. (Id.) The FDA apparently did not de-list the patents. (See Def. Br., at 11.)

Apotex submitted an ANDA to the FDA, seeking approval to market a generic version of COSOPT and challenging the three listed Orange Book patents under a paragraph IV certification in March 2006. (Dkt. entry no. 35, Decl. of Andrew M. Alul, Ex. I, ANDA Application, Ex. J, Paragraph IV Certification.) Apotex notified Merck of this ANDA filing in October 2006. (Dkt. entry no. 37, Decl. of Andrew M. Alul, Ex. M, Notice Letter; Pl. Br., at 4.) Merck responded to Apotex's notice letter, noting that it could not and did not intend to sue on the '735 and '443 patents as Merck disclaimed these patents. (Pl. Br., at 5.) Merck also

sent a second letter to the FDA in December 2006, repeating the request to de-list the '735 and '443 patents from the Orange Book. (Id.) The FDA apparently did not de-list the patents. (See Def. Br., at 11.)

Merck then filed a complaint in December 2006, alleging Apotex infringed the '413 patent due to Apotex filing an ANDA to market a generic version of COSOPT. (No. 06-5791 (MLC), dkt. entry no. 1, Compl.)[2] In March 2007, Apotex answered the complaint filed under No. 06-5791, and counterclaimed against Merck, requesting a judicial declaration of the (1) unenforceability of the '413 patent, (2) invalidity of the extended term of the '413 patent, (3) invalidity of the '413 patent, (4) non-infringement of the '735 patent, (5) invalidity of the '735 patent, (6) non-infringement of the '443 patent, and (7) invalidity of the '443 patent. (Ans. & Countercl.)

This Court stayed the proceedings of this action on March 8, 2007, pursuant to a stipulation by the parties as to the '413

---

[2] Merck also filed a complaint in December 2006 alleging infringement of the '413 patent due to Apotex filing an ANDA to market a generic version of Merck's drug product TRUSOPT. (Dkt. entry no. 1, Compl.) This Court consolidated No. 06-5791 (MLC) into No. 06-5789 (MLC) pursuant to Rule 42(a). As discussed infra, this Court granted final judgment in favor of Merck and against Apotex as to the '413 patent. (Dkt. entry no. 39, Final J.) Because Merck's NDA for the TRUSOPT product only identified the '413 patent, any claims related to the TRUSOPT product were fully disposed of by the Court's final judgment. (See Pl. Br., at 3; Final J.)

patent only, agreeing that if this Court's decision in the Hi-Tech litigation was affirmed by the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), judgment would be entered in favor of Merck and against Apotex with regard to the '413 patent. (Dkt. entry no. 22, Stip. & Order.) This Court's judgment in the Hi-Tech litigation was subsequently affirmed by the Federal Circuit on April 2, 2007. (No. 06-266 (MLC), dkt. entry no. 30.) This Court then granted final judgment in favor of Merck and against Apotex as to all claims concerning the '413 patent only on April 12, 2007. (Final J.) Because all claims as to the '413 claim were fully disposed of in this Court's final judgment, only Counts IV through VII of Apotex's counterclaims as to the '735 and '443 patents remain. (Id.)

Hi-Tech may begin to market a generic version of COSOPT on October 28, 2008 as a result of the Hi-Tech litigation. (Pl. Reply Br., at 5.) This date reflects the expiration of the '413 patent on April 28, 2008, plus six months of additional exclusivity due to Merck's performance of pediatric clinical studies requested by the FDA. (Id.) As the first challenger to Merck's listed Orange Book patents, Hi-Tech is entitled to 180 days of exclusivity to market a generic version of COSOPT over any subsequent ANDA challenger. (Id. at 3, 5.) Hi-Tech's 180-day period of marketing exclusivity exists despite the fact that

Hi-Tech's challenge to the validity of the '413 patent was unsuccessful. (<u>Id.</u>; <u>see</u> No. 06-266 (MLC), dkt. entry no. 30.) Hi-Tech is not a party to this action, which is between Merck, as the patent holder, and Apotex, as a subsequent ANDA challenger.

Merck now moves to dismiss Counts IV, V, VI, and VII of Apotex's counterclaims pursuant to Rule 12(b)(1), arguing that there is no actual case or controversy as to the '735 and '443 patents to support entry of a declaratory judgment of invalidity or non-infringement of those two patents. (Pl. Br., at 10-13.)

DISCUSSION

I.   **Standard of Review for a 12(b)(1) Motion to Dismiss**

A party may move under Rule 12(b)(1) to dismiss a claim for lack of subject matter jurisdiction at any time. Fed.R.Civ.P. 12(b)(1); <u>Iwanowa v. Ford Motor Co.</u>, 67 F.Supp.2d 424, 437-38 (D.N.J. 1999). The nonmovant bears the burden of persuasion to show subject matter jurisdiction exists when it is challenged under Rule 12(b)(1). <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406, 1409 (3d Cir. 1991). Moreover, a court should consider a Rule 12(b)(1) motion first, because if such a motion is granted, the claim at issue must be dismissed for lack of subject matter jurisdiction. <u>Pashun v. Modero</u>, No. 92-3620, 1993 WL 185323, at *2 (D.N.J. May 26, 1993). The accompanying defenses, therefore, become moot and need not be addressed. <u>Id.</u>

A movant may challenge subject matter jurisdiction facially. Iwanowa, 67 F.Supp.2d at 438. In doing so, the movant asserts that the claim, on its face, does not allege sufficient grounds to establish subject matter jurisdiction. Id. Under this standard, the Court assumes that the allegations in the claim are true, and may dismiss the claim only if it appears to a certainty that the nonmovant will not be able to assert a colorable claim of subject matter jurisdiction. Cardio-Med. Assocs., Ltd. v. Crozer-Chester Med. Ctr., 721 F.2d 68, 75 (3d Cir. 1983); Iwanowa, 67 F.Supp.2d at 438.

A movant also may attack subject matter jurisdiction by factually attacking the nonmovant's jurisdictional allegations as set forth in the claim at issue. Iwanowa, 67 F.Supp.2d at 438. Under this standard, no presumptive truthfulness attaches to the nonmovant's allegations, and the existence of disputed material facts will not preclude the Court from evaluating the merits of jurisdictional claims. Robinson v. Dalton, 107 F.3d 1018, 1021 (3d Cir. 1997). The Court may consider affidavits, depositions, and testimony outside of the claim to resolve factual issues, and is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. Id.; Iwanowa, 67 F.Supp.2d at 438.

A movant need not have yet answered the claim to factually attack subject matter jurisdiction. Berardi v. Swanson Mem'l

Lodge No. 48, 920 F.2d 198, 200 (3d Cir. 1990). A district court may consider evidence beyond the allegations of the claim at issue when a movant moves to dismiss. Id. Although an answer to the claim has not yet been served, a movant may submit an affidavit disputing a nonmovant's factual basis for jurisdictional allegations. Id. at 199. This is a sufficient method of factually attacking a claim. Id. at 200; see Iwanowa, 67 F.Supp.2d at 438 (treating Rule 12(b)(1) motion as a factual attack because both parties attached declarations to their briefs).

Merck disputes Apotex's factual basis for its jurisdictional allegations as set forth in Apotex's counterclaims. (See Pl. Br.) Therefore, the Court will evaluate the 12(b)(1) motion as a factual challenge to subject matter jurisdiction, and consider the declarations submitted by both parties.

## II. Jurisdiction under the Declaratory Judgment Act

### A. General Standard

The Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, 2202, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The burden of proving jurisdiction is on the party claiming such jurisdiction. Benitec

Austl., Ltd. v. Nucleonics, Inc., 495 F.3d 1340, 1344 (Fed. Cir. 2007). That party must establish that such jurisdiction existed at the time the claim for declaratory relief was filed and that it has continued since. Id.

The phrase "case of actual controversy" in 28 U.S.C. § 2201 refers to the type of "Cases" and "Controversies" that are justiciable under Article III of the United States Constitution. MedImmune, Inc. v. Genentech, Inc., 127 S.Ct. 764, 771 (2007). A declaratory judgment action is justiciable if the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of relief. Id. The party asserting jurisdiction, however, need not assert that it was in "reasonable apprehension of suit" by the other party in order to establish jurisdiction in an action seeking a declaratory judgment. See MedImmune, 127 S. Ct. at 774 n.11; SanDisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1380 (Fed. Cir. 2007) (noting that MedImmune opinion rejected Federal Circuit's requirement that party seeking declaratory judgment show reasonable apprehension of suit by other party in order to establish jurisdiction).

**B. Standard Applied Here**

There is no actual case or controversy under all the circumstances here to support jurisdiction. The '735 and '443

patents have been statutorily disclaimed by Merck.  (Pl. Br., at

4.)  "A statutory disclaimer under 35 U.S.C. § 253 has the effect

of canceling the claims from the patent and the patent is viewed

as though the disclaimed claims had never existed in the patent."

Guinn v. Kopf, 96 F.3d 1419, 1422 (Fed. Cir. 1996).  As a result

of a disclaimer, the patentee has no further right to enforce the

claims that have been disclaimed, or to obtain a reissue of any

of these claims.  W.L. Gore & Assocs., Inc. v. Oak Materials

Group, Inc., 424 F.Supp. 700, 702 (D. Del. 1976); see also

Altoona Publix Theatres, Inc. v. Am. Tri-Ergon Corp., 294 U.S.

477, 492 (1935) (noting that when patentee filed disclaimer, "the

original claims were withdrawn from the protection of the patent

laws, and the public was entitled to manufacture and use the

device originally claimed as freely as though it had been

abandoned.")  Thus, because Merck has formally disclaimed the

'735 and '443 patents, and can no longer enforce any claims as to

these patents, there is no justiciable case or controversy to

support jurisdiction in an action for a declaratory judgment

here.  See W.L. Gore & Assocs., Inc., 424 F.Supp. at 702 (finding

no jurisdiction with respect to validity or invalidity of patent

because plaintiff disclaimed all claims of patent).

The Federal Circuit recently held that there was a

justiciable controversy in a factually similar dispute between an

NDA holder and an ANDA filer asserting jurisdiction in an action

for a declaratory judgment.  See Teva, 482 F.3d at 1340-46.  That

case, however, is distinguishable here. Novartis, the NDA holder, sued Teva, the ANDA filer, for infringement on only one of the five Orange Book patents listed for the drug at issue that were challenged by Teva's paragraph IV certification. Id. at 1334-35. Novartis did not, however, disclaim the four other Orange Book patents. See id. at 1345. Novartis thus retained the right to sue Teva for infringement of those patents based on Teva's ANDA that challenged all five of the Orange Book patents for the drug at issue. Id. As a result, Teva's legal rights under its ANDA were uncertain, and it faced possible future litigation on the four other Orange Book patents, thus creating legal injuries sufficient to establish a justiciable controversy. Id. Merck, by contrast, cannot further enforce any claims as to the '735 and '443 patents because it statutorily disclaimed these patents. See W.L. Gore & Assocs., 424 F.Supp. at 702. Therefore, the legal status of Apotex's ANDA is not uncertain, nor does Apotex face possible future litigation, as a result of Merck not bringing an action for infringement on the '735 and '443 patents. See id.

The legislative history of the applicable statutory provisions also indicates that jurisdiction does not exist here. See Teva, 482 F.3d at 1343. In particular, the Teva court cited to legislative history noting that "the only circumstance in which a case or controversy might not exist would arise in the

13

rare circumstance in which the patent owner and brand drug company have given the generic applicant a covenant not to sue, or otherwise formally acknowledge that the generic applicant's drug does not infringe." Id. (quotation and citation omitted). This circumstance is present here, as Merck has formally acknowledged by statutory disclaimer that Apotex's generic version of COSOPT will not infringe on the '735 and '443 patents. (Pl. Br., at 10.)

**III. Apotex's Cross Motion for Summary Judgment**

Apotex cross-moves for summary judgment, asserting that it is entitled to summary judgment as a matter of law because the generic version of COSOPT it seeks approval for under its ANDA will not infringe on the '735 and '443 patents, as Merck has disclaimed those patents. (Dkt. entry no. 35, Def. Br., at 11.) As discussed supra, this Court does not have jurisdiction with respect to infringement of the '735 and '443 patents. Therefore, Apotex's cross motion is moot.

CONCLUSION

The Court, for the reasons stated supra, will (1) grant the motion to dismiss, and (2) deny the cross motion as moot. The Court will issue an appropriate order and judgment.

_____s/ Mary L. Cooper_____<br>
**MARY L. COOPER**<br>
United States District Judge

**Dated**: November 15, 2007

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MERCK & CO., INC, | ) | |
| Plaintiff, | ) | **DOCUMENT ELECTRONICALLY FILED** |
| v. | ) | |
| | ) | **Civil Action Nos.** |
| APOTEX INC. and | ) | **06-5789 & 06-5791 (MLC)** |
| APOTEX CORPORATION | ) | (Consolidated) |
| Defendants. | ) | |

## FINAL JUDGMENT

WHEREAS, plaintiff Merck & Co., Inc. ("Merck') and defendants Apotex Inc. and Apotex Corp. (collectively, "Apotex") have entered into a Stipulation And Order to stay proceedings on U.S. Patent No. 4,797,413 ("the '413 patent") pending a decision by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in a related case, which Stipulation And Order was entered by this Court on March 8, 2007 ("the Stipulation"; Dkt. Entry #22), a copy of which is attached hereto as Exhibit A and incorporated by reference herein; and

WHEREAS, the related case to which the Stipulation refers is the case styled as *Merck & Co., Inc. v. Hi-Tech Pharmacal, Co., Inc.*, Appeal No. 2006-1401 (Fed. Cir.); and

WHEREAS, the Stipulation provides, *inter alia*, that "[i]f the Federal Circuit affirms the decision in the Merck v. Hi-Tech litigation, final and non-appealable judgment will be entered against Apotex in this case regarding the '413 patent"; and

WHEREAS, the Stipulation applies only to proceedings involving the '413 patent, and does not apply in any manner to U.S. Patent Nos. 6,248,735 and 6,316,443; and

WHEREAS, on March 29, 2007, the Federal Circuit affirmed the final judgment in the prior *Merck & Co., Inc. v. Hi-Tech Pharmacal, Co., Inc.* litigation referred to in the Stipulation;

IT IS HEREBY ORDERED AND ADJUDGED, THAT:

1.  Final and non-appealable judgment is entered in favor of Merck and against Apotex regarding the '413 patent in both of the above-identified consolidated actions;

2.  Apotex's counterclaims, relating to the '413 patent, in its answers to both of Merck's complaints for Civil Action Nos. 06-5789 and 06-5791, are dismissed with prejudice;

3.  Pursuant to 35 U.S.C. § 271(e)(4)(B), Apotex, its officers, agents, attorneys, and employees, and those acting in privity or concert with it, are hereby permanently enjoined from engaging in the commercial manufacture, use, offer to sell, or sale within the United States, or importation into the United States, of any drug containing the active ingredient, dorzolamide, until a date which is not earlier than October 28, 2008, the expiration of the '413 patent, together with the pediatric exclusivity for that patent;

4.  Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval of Apotex's ANDA Nos. 78-395 and 78-201 be a date that is not earlier than October 28, 2008, the expiration of the '413 patent, together with the pediatric exclusivity for that patent; and

5.  This judgment applies only to the '413 patent, and does not apply in any manner to U.S. Patent Nos. 6,248,735 and 6,316,443 or Apotex's pending counterclaims on those patents.

- 2 -

6. Each side shall bear their own costs and attorneys' fees, if any, related to the '413 patent.

IT IS SO ORDERED,

Dated: _Apr. 11, 2007_

_Mary L. Cooper_
Honorable Mary L. Cooper

# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RANBAXY LABORATORIES LIMITED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Case No.  05-1838 (RWR) |
| | ) | |
| MICHAEL O. LEAVITT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FEDERAL DEFENDANTS' MEMORANDUM IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs, IVAX Pharmaceuticals, Inc. ("Ivax") and Ranbaxy Laboratories Ltd., Ranbaxy

Inc., and Ranbaxy Pharmaceuticals, Inc. (collectively "Ranbaxy"), manufacturers of generic

drugs, brought this action against the Food and Drug Administration ("FDA" or "agency")

seeking to preserve what they characterize as their "entitlement" to 180 days of generic

marketing exclusivity.  They contend that FDA has improperly delisted the patents upon which

their alleged entitlement is based.  Under the Federal Food, Drug, and Cosmetic Act ("FDCA" or

the "Act") and its implementing regulations, an innovator pharmaceutical company that seeks or

has obtained FDA approval to market a new drug is required to submit information on any patent

that it claims protects its drug from competition.  Applicants, such as Ivax and Ranbaxy, seeking

approval to market generic versions of such a drug submit abbreviated new drug applications

("ANDAs") in which they must "certify" to each patent listed for that drug.  One of the

certification options (a "paragraph IV certification") is to assert that a listed patent is invalid,

unenforceable, or would not be infringed by the product proposed in the ANDA, and therefore

the patent does not bar immediate approval of the ANDA. If the ANDA applicant selects that option, the innovator company may sue the ANDA applicant for patent infringement.

As an incentive and reward to the generic applicant that is first to challenge an innovator company's patent by submitting such a certification, the Act authorizes FDA to delay approval of subsequent generic applications for 180 days. 21 U.S.C. § 355(j)(5)(B)(iv). That period has come to be known as the "180-day exclusivity period." If the innovator company requests that its patent submission be revoked or "delisted" before FDA has made any 180-day exclusivity determination, then the first generic company to have submitted a challenge to that patent will in many circumstances lose the potential 180-day exclusivity that it could have received had the patent remained listed. The statute is silent with respect to an innovator's request to remove patent information and with respect to whether ANDA applicants are entitled to receive 180 days of exclusivity for withdrawn patents. FDA has implemented the statute to permit an innovator to delist a patent, except in the rare circumstance – not present in the instant case – when the patent is the subject of patent litigation. 21 C.F.R. § 314.94(a)(12)(viii)(B).

Merck & Co. ("Merck") holds an approved new drug application ("NDA") for Zocor tablets (simvastatin), which is approved for the reduction of elevated cholesterol levels. Merck submitted three patents for submission in "Approved Drug Products with Therapeutic Equivalence Evaluations," also known as the "Orange Book," for simvastatin. Plaintiffs Ivax and Ranbaxy submitted ANDAs for simvastatin, each of which included challenges to two of the three patents. Merck did not sue Ivax or Ranbaxy for those patent challenges. Well over a year after being notified of those challenges, Merck requested that FDA delist the two patents that had been challenged, which FDA did pursuant to its regulation which allows such delisting when the patents are not the subject of litigation. *See* 21 C.F.R. § 314.94(a)(12)(viii)(B). Accordingly,

any ANDA for simvastatin that contains a challenge to one of the delisted patents will no longer

be considered as continuing to maintain that challenge because there is no patent to challenge.

Thus, when the simvastatin ANDAs are ready for final approval, FDA does not anticipate that it

will award any 180-day exclusivity for that drug product, and it may approve all eligible ANDAs

for the drug at that time.

Plaintiffs filed citizen petitions objecting in advance to that outcome, contending that

FDA must keep the patents listed in contravention of the NDA holder's instructions because

plaintiffs somehow became "entitled" to exclusivity by virtue of filing patent challenges, even

when those patents were withdrawn and were thus no longer barriers to market entry. FDA

denied those petitions.

As demonstrated below, nothing in the statute supports, much less compels, plaintiffs'

argument that they are entitled to 180 days of exclusivity for a withdrawn patent. Plaintiffs'

proposal that FDA keep such patents listed – contrary to the patent holder's request – is wrong as

a matter of both law and public policy, as it is not compelled by the statute or regulations and

would result in unjustified awards of exclusivity at the expense of public access to cheaper

generic drugs. In making their strenuous arguments that FDA cannot require "litigation" prior to

awarding 180-day exclusivity, plaintiffs cite statutory provisions and case law that do not

encompass the circumstances of the instant case: that is, where a patent holder has voluntarily

withdrawn its own patent prior to any litigation about that patent. In these circumstances, FDA's

decision to delist patents is a permissible implementation of the statute.

In making their arguments, plaintiffs focus on the provision of the FDCA that provides

the 180-day exclusivity benefit in isolation from the rest of the statute. Relying on this statutory

section, plaintiffs argue that once a paragraph IV certification is made, the patent holder is

forbidden from withdrawing the patent. However, as explained in greater detail below, FDA

does not make decisions about exclusivity until it actually approves an ANDA, and there are a

number of situations in which a paragraph IV certification might not lead to exclusivity. In

addition to ignoring the actual circumstances of this case, plaintiffs repeatedly mischaracterize

FDA's regulation and Federal Register discussions relevant to these issues, as discussed in more

detail below. Because the material facts are undisputed, and because FDA has reasonably

applied the governing statute and regulation, plaintiffs' motions for summary judgment should be

denied, and the federal defendants' motion for summary judgment should be granted.

## STATUTORY AND REGULATORY FRAMEWORK

**I.     New Drug Applications (NDAs)**

Under the FDCA, pharmaceutical companies seeking to market "pioneer" or "innovator"

drugs must first obtain FDA approval by filing an NDA containing extensive scientific data

demonstrating the safety and effectiveness of the drug. 21 U.S.C. § 355(a), (b). The statute also

provides:

> The applicant *shall* file with the application the patent number and the expiration
> date of any patent which claims the drug for which the applicant submitted the
> application or which claims a method of using such drug and with respect to
> which a claim of patent infringement could reasonably be asserted if a person not
> licensed by the owner engaged in the manufacture, use, or sale of the drug.

21 U.S.C. § 355(b)(1), (c)(2) (emphasis added). FDA must publish the patent information it

receives, and does so, in the Orange Book. *Id.*; *see also* 21 C.F.R. § 314.53(e).

The statutory provisions governing patent listings assign control over patent submissions

to the NDA holder. 21 U.S.C. §§ 355(b)(1) and (c)(2). Although the statute gives control over

the listing to patent holders, it does not give discretion. As reflected in the statute, patents

meeting the statutory requirements *shall* be listed, and obviously those not meeting the

4

requirements are not to be listed.  There may be many reasons why an NDA holder would delist a

patent, the most obvious one being that the NDA holder no longer believes that the patent meets

the criteria set forth in 21 U.S.C. §§ 355(b)(1) and (c)(2) and at 21 C.F.R. § 314.53.  In addition,

the NDA holder could delist a patent as a result of an FTC settlement, or after reevaluating the

patents in view of FDA's revised regulations on the criteria for patent listing.  *See* 68 FR 36676,

36703-05 (June 18, 2003) (revising 21 C.F.R. § 314.53).

FDA interprets these provisions to afford FDA a ministerial role in the patent listing

process.  Rather than substantively review the accuracy of the patent listing itself – which the

agency lacks the resources and expertise to do – FDA has established a "challenge" process

whereby an outside party can express any doubts it has about the accuracy of a patent listing to

the NDA holder through FDA.  21 C.F.R. § 314.53(f).  Under this regulation, if a challenge is

made, the NDA holder is given an opportunity to correct the listing.  If the NDA holder does not

alter or amend the listing, the patent remains listed.  The regulation recognizes that a patent

holder may generally withdraw or amend its patent as a result of the challenge, which could not

occur if FDA were required to keep a patent listed when any paragraph IV certification had been

filed to that patent.  FDA's ministerial approach to patent listings has been upheld against

numerous challenges.  *Apotex, Inc. v. Thompson*, 347 F.3d 1335 (Fed. Cir. 2003); *aaiPharma

Inc. v. Thompson*, 296 F.3d 227 (4th Cir. 2002); *Alphapharm PTY Ltd. v. Thompson*, 330 F.

Supp. 2d 1 (D.D.C. 2004).

None of the statutory provisions specifically addresses what is to happen when an NDA

holder requests FDA to delist a patent, either generally or in the context of 180-day exclusivity.

The agency believes that the general rule of deference to the NDA holder's views on the scope of

a patent and its appropriateness for listing should apply equally to the decision to list a patent and

to delist a patent from the Orange Book. The agency does not require an NDA holder to state the basis for delisting a patent, nor are such reasons relevant to the FDA's general ministerial role in delisting patents upon the NDA holder's request. As noted, the agency has established, by regulation, one narrow exception to the deference accorded an NDA holder's request (*i.e.*, if the patent is the subject of litigation), which is not applicable in this case. *See* 21 C.F.R. § 314.94(a)(12)(viii)(B).

## II.    Abbreviated New Drug Applications (ANDAs)

The Drug Price Competition and Patent Term Restoration Act of 1984 (known as the "Hatch-Waxman Amendments"), codified at 21 U.S.C. § 355 and 35 U.S.C. §§ 156, 271, 282, permits ANDAs to be submitted seeking approval for generic versions of approved drug products. 21 U.S.C. § 355(j).[1] The timing for approval of ANDAs depends, in part, on patent protections for the innovator drug.

### A.    Patent Certifications

Among other things, an ANDA must contain one of four specified certifications for each patent that "claims the listed drug" or "a use for such listed drug for which the applicant is seeking approval." 21 U.S.C. § 355(j)(2)(A)(vii).[2] This certification must state one of the following:

---

[1] Congress amended 21 U.S.C. § 355(j) in 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) (the "MMA"). The relevant provisions of these amendments do not apply to the patent certifications at issue in this case because the first relevant certification was submitted before the December 8, 2003 enactment date of the amendments. *See id.* § 1102(b)(1). Except where otherwise noted, this memorandum refers to the pre-December 2003 version of the statute.

[2] FDA has defined the "listed drug" to mean the approved new "drug product." 21 C.F.R. § 314.3(b).

(I)   that the required patent information relating
       to such patent has not been filed;
(II)  that such patent has expired;
(III) that such patent will expire on a particular date; or
(IV) that such patent is invalid or will not be infringed
       by the drug for which approval is being sought.

*See id.* § 355(j)(2)(A)(vii). If an applicant wishes to challenge the validity of a patent, or to claim

that the patent would not be infringed by the product proposed in the ANDA, the applicant must

submit a certification pursuant to paragraph IV of this provision. *Id.* § 355(j)(2)(A)(vii)(IV).[3]

The applicant must also provide notice of its so-called "paragraph IV certification" to the NDA

holder and the patent owner explaining the factual and legal basis for the applicant's opinion that

the patent is invalid or not infringed. *Id.* § 355(j)(2)(B).

The filing of a paragraph IV certification "for a drug claimed in a patent or the use of

which is claimed in a patent" is an act of infringement. 35 U.S.C. § 271(e)(2)(A). This enables

the NDA holder and patent owner to sue the ANDA applicant. If such a suit is brought within 45

days of the date notice of the certification was received by the patent owner or NDA holder, FDA

must stay approval of the ANDA for 30 months from that date (commonly referred to as the "30-

month stay"), unless a final court decision is reached earlier in the patent case or the court orders

a longer or shorter period. 21 U.S.C. § 355(j)(5)(B)(iii). If no action is brought within the

requisite 45-day period, FDA may approve an ANDA with a paragraph IV certification effective

---

[3] If a certification is made under paragraph I or II indicating that patent information pertaining to
the drug or its use has not been filed with FDA or the patent has expired, the ANDA may be
approved immediately. 21 U.S.C. § 355(j)(5)(B)(i). A paragraph III certification indicates that
the ANDA applicant does not intend to market the drug until after the applicable patent has
expired, and approval of the ANDA may be made effective on the expiration date. 21 U.S.C.
§ 355(j)(5)(B)(ii).

immediately, provided that other conditions for approval have been met.  21 U.S.C.

§ 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(f)(2).

### B.     180-Day Period of Market Exclusivity

In certain circumstances, the statute provides an incentive and reward to generic drug

manufacturers that expose themselves to the risk of patent litigation.  It does so by granting a

180-day period of marketing exclusivity *vis-à-vis* other ANDA applicants to the manufacturer

who is first to file an ANDA containing a paragraph IV certification to a listed patent, provided

certain conditions are met.  21 U.S.C. § 355(j)(5)(B)(iv); *see Teva Pharm. Indus. v. Crawford,*

410 F.3d 51, 52 (D.C. Cir. 2005); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1064 (D.C.

Cir. 1998); *Mylan Pharm., Inc. v. Henney,* 94 F. Supp. 2d 36, 40 (D.D.C. 2000), *vacated as moot*

*sub nom. Pharmachemie B.V. v. Barr Labs., Inc.,* 276 F.3d 627 (D.C. Cir. 2002).  The statutory

provision governing 180-day exclusivity provides:

> If the application contains a certification described in subclause (IV) of paragraph
> (2)(A)(vii) and is for a drug for which a previous application has been submitted
> under this subsection [containing] such a certification, the application shall be
> made effective not earlier than one hundred and eighty days after-
>
>> (I) the date the Secretary receives notice from the applicant under the
>> previous application of the first commercial marketing of the drug under
>> the previous application, or
>>
>> (II) the date of a decision of a court in an action described in clause (iii)
>> holding the patent which is the subject of the certification to be invalid or
>> not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv).[4] Thus, under the statute, an ANDA applicant with a patent

certification that is "previous" to all others for that patent may become eligible for a 180-day

exclusivity period.[5] During that period, it can market its product and approvals of other ANDAs

for the same product are held in abeyance. This 180-day exclusivity is triggered by the earlier of

(i) the ANDA applicant's first commercial marketing of the drug (the "commercial marketing

trigger"), or (ii) a decision of a court finding the patent at issue invalid or not infringed (the

"court decision trigger"). *Id.*

## C.    Timing of Exclusivity Decisions

FDA makes exclusivity determinations only when an ANDA applicant is ready for final

approval. FDA bases its decision upon the circumstances as they exist at that time, not at some

time in the past. *See Dr. Reddy's Labs., Inc. v. Thompson*, 302 F. Supp. 2d 340, 353 (D.N.J.

---

[4] Courts have observed that the word "continuing" as it appears in the statute reflects a
typographical error and should probably be read as "containing." *See Purepac Pharm. Co. v.
Friedman*, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); *Mova*, 140 F.3d at 1064 n.3. *See also* 21
C.F.R. §§ 314.107(c)(1) & (2).

[5] FDA awards exclusivity for each patent that has been challenged, an approach that has been
litigated extensively. In *TorPharm, Inc. v. FDA*, No. 03-2401 (D.D.C. Jan. 8, 2004) (final order)
(Roberts, J.), this Court held that an award of shared exclusivity pursuant to FDA's patent-based
approach was not permissible under the statute. That decision was vacated when the D.C. Circuit
found the issue moot on appeal. *Apotex Inc. (f/k/a TorPharm, Inc.) v. FDA*, Nos. 04-5046 & 04-
5047 (D.C. Cir. Dec. 17, 2004). In a second case, Judge Huvelle came to the opposite
conclusion and upheld FDA's patent-based approach on the merits. *Apotex, Inc. v. FDA*, No. 04-
CV-00605 (D.D.C. June 3, 2004). On appeal, the D.C. Circuit upheld Judge Huvelle's *res
judicata* determination and vacated her alternative holding on the merits. *Apotex Inc. v. FDA*,
393 F.3d 210 (D.C. Cir. 2004). In yet another case, the court approved FDA's application of
patent-based exclusivity pursuant to the agency's regulations without discussing the statutory
provisions. *Dr. Reddy's Labs., Inc. v. Thompson*, 302 F. Supp. 2d 340, 358-60 (D.N.J. 2003).
Thus, to date, no appellate court has addressed the merits of FDA's patent-based approach, and
two district court decisions from this district that reached opposite conclusions have been
vacated. Apotex is currently challenging FDA's patent-based policy again in *Apotex Inc. v. FDA*,
No. 05-125 (D.D.C.) (Bates, J.).

2003); *see also* Memorandum from Office of Generic Drugs re 180-day Exclusivity for

Omeprazole 40 mg at 2-4 (Sept. 2, 2005) (attached hereto as Ex. A).[6]  For example, if an ANDA

applicant filed the first paragraph IV certification to a patent that expired before any ANDA was

ready for approval, it would not be entitled to exclusivity based on that patent because the patent

would not be a barrier to marketing when the approval decision was finalized.  *Dr. Reddy's*, 302

F. Supp. 2d at 353-55.  Although an ANDA applicant may believe that it was first to have filed a

paragraph IV certification, FDA makes no determination whether a specific ANDA applicant

may in fact be eligible for exclusivity until an ANDA is ready for approval because

circumstances may change.

### D.     Patent Delisting and Certification

An FDA regulation provides that, if a patent is delisted, an ANDA applicant who has

certified to that patent must amend its certification.  21 C.F.R. § 314.94(a)(12)(viii)(B).  The

regulation states:

> If a patent is removed from the list, any applicant with a pending application
> (including a tentatively approved application with a delayed effective date) who
> has made a certification with respect to such patent shall amend its certification.
> The applicant shall certify under paragraph (a)(12)(ii) of this section that no
> patents described in paragraph (a)(12)(i) of this section claim the drug or, if other
> relevant patents claim the drug, shall amend the certification to refer only to those
> relevant patents.  In the amendment, the applicant shall state the reason for the
> change in certification (that the patent is or has been removed from the list).  A
> patent that is the subject of a lawsuit under Sec. 314.107(c) shall not be removed
> from the list until FDA determines either that no delay in effective dates of
> approval is required under that section as a result of the lawsuit, that the patent has
> expired, or that any such period of delay in effective dates of approval is ended.
> An applicant shall submit an amended certification.  Once an amendment or letter

---

[6] This memorandum, which explains FDA's timing procedures for making exclusivity
determinations, was submitted to the court in *Apotex Inc. v. FDA*, No. 05-125 (D.D.C.) (JDB)
(Docket No. 21) as part of the supplemental administrative record.

for the change has been submitted, the application will no longer be considered to
be one containing a certification under paragraph (a)(12)(i)(A)(4) of this section.

*Id.* This regulation recognizes a limited exception to this delisting and amendment requirement

when the patent is the subject of a lawsuit. This limited exception is not applicable here because

there has been no litigation regarding the relevant patents. The reason for this limited exception

is to avoid an unjust result that would occur if an ANDA applicant who is eligible for exclusivity

prevails in the patent litigation but lost exclusivity if the NDA holder decided to delist.

Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions, 59 Fed. Reg.

50,338, 50,348 (Oct. 3, 1994) (attached hereto as Ex. B) ("If a patent were removed from the list

immediately upon a court decision that the patent is invalid or unenforceable, an applicant with a

subsequently filed application might seek to certify that there is no relevant patent and seek an

immediately effective approval."). One court has observed: "It would be cruelly ironic, and quite

perverse, to use an ANDA applicant's success in such an infringement action as the basis for

denying exclusivity to the applicant." *Torpharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 83 n.15

(D.D.C. 2003) (emphasis in original), *aff'd sub nom. Purepac Pharm. Co. v. Thompson*, 354 F.3d

877 (D.C. Cir. 2004).

Without proper paragraph IV certifications, the statute is clear that no ANDA applicant

can obtain 180-day exclusivity. 21 U.S.C. § 355(j)(5)(B)(iv) ("If the application contains a

[paragraph IV] certification . . . and is for a drug for which a previous application has been

submitted [containing a paragraph IV certification], the application shall be made effective not

earlier than one hundred and eighty days after . . ."). Absent either a previous application

containing a paragraph IV certification or a subsequent application containing a paragraph IV

certification, there will be no delayed effective date of the subsequent ANDA, and thus no exclusivity. *Id.*

## FACTUAL BACKGROUND AND ADMINISTRATIVE PROCEEDINGS

### I.     Zocor Approval

Merck holds approved NDA No. 19-766 for Zocor tablets, 5 milligrams (mg), 10 mg, 20 mg, 40 mg, and 80 mg.  Zocor is also known by its generic name, simvastatin.  FDA approved the NDA for Zocor 5 mg, 10 mg, 20 mg, and 40 mg in 1991, and the 80 mg strength in 1998.[7] Merck submitted U.S. Patent No. 4,444,784 ("'784 patent"), which was listed when the NDA was approved in 1991.  The '784 patent and its associated pediatric exclusivity will expire on June 23, 2006.  In 2000, Merck submitted U.S. Patent Nos. RE 36,481 ("'481 patent") and RE 36,520 ("'520 patent") for listing in the Orange Book.

### II.    Ivax's ANDA

On December 15, 2000, Ivax submitted ANDA No. 76-052 for the 5 mg, 10 mg, 20 mg, and 40 mg strengths of simvastatin, which contained paragraph IV certifications to the '481 and '520 patents.  Supplemental Administrative Record ("Supp. AR") Tab 1.  Ivax provided notice to Merck of its paragraph IV certifications.  Supp. AR Tab 3.  Merck did not sue Ivax for patent infringement based on those certifications.  *Id.*

FDA has not tentatively approved Ivax's ANDA, meaning that the ANDA has not met all scientific and procedural conditions for approval.[8]  In addition, Ivax's ANDA contains a

---

[7]  *See* Electronic Orange Book, *available at*
http://www.accessdata.fda.gov/scripts/cder/ob/docs/obdetail.cfm?Appl_No=019766&TABLE1=
OB_Rx.

[8]  FDA grants "tentative approval" to an ANDA when all scientific and procedural conditions for approval have been met, but the application cannot be fully approved because approval is blocked by a 30-month stay, some form of marketing exclusivity, or some other barrier to

paragraph III certification to the '784 patent indicating that the applicant does not plan to market

its product until that patent expires (*see* note 3, *supra*), and thus is barred from final approval at

least until expiration of that patent on June 23, 2006. Supp. AR Tab 1.

## III.    Ranbaxy's ANDA

On November 28, 2001, Ranbaxy submitted ANDA No. 76-285 for all strengths of

simvastatin, including the 80 mg strength. Administrative Record ("AR") Tab 1. Ranbaxy's

ANDA also contained paragraph IV certifications to the '481 and '520 patents. *Id.* at 7.

Ranbaxy notified Merck of those certifications. AR Tab 2. Merck did not sue Ranbaxy or any

other ANDA applicant for patent infringement based on paragraph IV certifications to those

patents. *Id.*; *see also* AR Tab 23 at 2. FDA tentatively approved Ranbaxy's ANDA on

September 26, 2003. AR Tab 4. Ranbaxy's ANDA contains a paragraph III certification to the

'784 patent, and thus is barred from final approval until expiration of that patent on June 23,

2006.

## IV.    Requests to Delist the '481 and '520 Patents

On October 10, 2003, Merck requested that the agency delist the '481 and '520 patents.

AR Tab 6. Merck made this request long after Merck had received notice of paragraph IV

certifications – some two and a half years after receiving notice from Ivax on April 11, 2001, and

more than a year and a half after receiving notice from Ranbaxy on March 6, 2002. *See* AR Tab

2; Supp. AR Tab 3.

On November 3, 2003, FDA received a letter challenging the listing of those patents

pursuant to the "challenge" regulation at 21 C.F.R. § 314.53(f). AR Tab 7. Accordingly, FDA

forwarded the letter to Merck on November 21, 2003. Merck later confirmed that it had already

approval arising from patent infringement litigation. *See* 21 C.F.R. § 314.105(d).

13

requested that those patents be withdrawn from the Orange Book. AR Tab 8. On June 14, 2004,

FDA received another request that the '481 and '520 patents be withdrawn. AR Tab 10. FDA

withdrew the patents from the Orange Book in September 2004, pursuant to its regulation which

allows such delisting upon the NDA holder's request unless the patents are the subject of

litigation.[9] On July 5, 2005, FDA received a letter from Ranbaxy's counsel requesting FDA to

ask Merck to rescind its request to withdraw the listing. AR Tab 11. Merck has declined that

request.

## V.     Citizen Petitions

On October 18, 2004, Ranbaxy submitted a letter to FDA requesting that the agency relist

the '481 and '520 patents, out of concern that Ranbaxy would no longer be eligible for

exclusivity for the 80 mg product as a result of FDA's delisting. AR Tab 5. Ranbaxy argued that

the FDCA "contains no provision authorizing the removal of a patent from the list based on the

withdrawal of a patent submission." *Id.* at 5.

On January 12, 2005, Ivax submitted a citizen petition, arguing that its eligibility for

exclusivity for simvastatin was "established" when it submitted what it believed was the first

substantially complete ANDA for simvastatin (5 mg, 10 mg, 20 mg, and 40 mg) containing

paragraph IV certifications to the '481 and '520 patents, and that FDA erred in delisting those

patents and thereby violated Ivax's "right" to exclusivity. AR Tab 12 at 1.

Ranbaxy submitted its own citizen petition on February 1, 2005, which made arguments

similar to those in its October 18, 2004 letter, emphasizing the policy goals underlying

---

[9] Although there was some delay between Merck's request to delist and FDA's actual delisting
of the patents, that delay made no material difference to the ANDAs for simvastatin because all
ANDAs are blocked from final approval by the unchallenged '784 patent until June 23, 2006,
and any exclusivity issues based on the listed status of the patents will have no effect on the
ANDAs until that date.

exclusivity. AR Tab 23. The Federal Trade Commission ("FTC") submitted comments in full

support of FDA's patent delisting regulation, 21 C.F.R. § 314.94(a)(12)(viii)(B). AR Tab 14 at 6

("Because Orange Book listing serves as the predicate for the 30-month stay and the 180-day

exclusivity provisions of Hatch-Waxman, it is critical that only those patents meeting the

statutory and regulatory criteria for inclusion in the Orange Book be listed."). Teva

Pharmaceuticals USA also submitted comments in support of FDA's approach to delist patents,

but subsequently withdrew those comments.[10] AR Tabs 19 & 24. Ivax and Ranbaxy submitted

supplementary comments in response to the FTC's and Teva's submissions. AR Tabs 15, 16, 17,

21, & 22.

FDA responded to the citizen petitions on October 24, 2005. AR Tab 23. In its response,

FDA observed that, based on the statutory silence with respect to patent delisting, it could have

addressed delisting requests in any number of ways, including by (1) refusing to delist a patent

once a paragraph IV certification has been submitted (as Ranbaxy and Ivax requested);

(2) delisting the patent immediately, regardless of the situation (even if there were patent

litigation); or (3) withdrawing the patent in some circumstances, but not others. *Id.* at 8. The

agency rejected the first option, disagreeing that petitioners had a "vested" exclusivity right upon

the mere submission of a paragraph IV certification, regardless of the later status of the patent

listing or paragraph IV certifications. *Id.* at 9. FDA also rejected the second option, noting the

unfairness that would result if the first ANDA applicant were successful in challenging a patent,

but that applicant's exclusivity was denied by the delisting of the patent. *Id.* at 12. The agency

---

[10] Teva and Ivax plan to merge by late 2005 or early 2006. *See* Teva and Ivax Shareholders
Approve Pending Merger (Oct. 27, 2005), *available at* http://www.tevapharm.com/pr/2005/
pr_554.asp.

adopted the third option, *i.e.*, that the patent should be withdrawn when it is delisted by the patent

holder except in the limited circumstance when it is the subject of litigation.

## VI.  Litigation

Ranbaxy sued FDA on September 16, 2005, seeking a declaration that the patents should

be relisted and that Ranbaxy is entitled to exclusivity for the 80 mg product based on its

certifications to those patents.  The parties agreed to a schedule that included issuance of FDA's

decision on the citizen petitions and summary judgment briefing.  Ivax sued FDA on November

7, 2005, seeking consolidation of its suit with the Ranbaxy case, and requested leave to file a

summary judgment motion on that date and thereby comply with the FDA-Ranbaxy summary

judgment briefing schedule.  Neither Ranbaxy nor the government opposed Ivax's motions; this

Court has not yet ruled on those motions.  Because the issue presented in both cases is identical

and the parties' arguments largely overlap, the government is responding to both parties'

memoranda in support of their motions for summary judgment in this memorandum.

## ARGUMENT

This Court may grant a motion for summary judgment under Federal Rule of Civil

Procedure 56(c) if "there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When ruling on cross-motions

for summary judgment, the court shall grant summary judgment "only if one of the moving

parties is entitled to judgment as a matter of law upon material facts that are not genuinely

disputed." *Barr Labs Inc. v. Thompson*, 238 F. Supp. 2d 236, 244 (D.D.C. 2002).  Because the

parties agree that there are no disputed material facts that would bar summary judgment at this

time, and because the issues for resolution in this case are purely legal in nature, entry of

summary judgment for the party entitled to prevail as a matter of law is appropriate. *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333-34 (D.C. Cir. 1992).

## I.    FDA'S DECISION IS ENTITLED TO DEFERENCE

FDA's administrative decisions are subject to review by the Court under the Administrative Procedure Act ("APA"), and may be disturbed only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is highly deferential to the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Indeed, "[t]here is a presumption in favor of the validity of the administrative action." *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 216 (D.D.C. 1996). The reviewing court must consider whether the agency's decision was based upon consideration of the relevant factors and whether there has been a clear error of judgment. *Overton Park*, 401 U.S. at 416. However, "under this narrow scope of review, 'the court is not empowered to substitute its judgment for that of the agency.'" *Bristol-Myers*, 923 F. Supp. at 216 (quoting *Overton Park*, 401 U.S. at 416).

When a court is reviewing an agency's construction of a statutory provision, the first step is to determine "whether Congress has spoken to 'the precise question at issue.'" *Consumer Electronics Ass'n v. FCC*, 347 F.3d 291, 297 (D.C. Cir. 2003) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984)) ("*Chevron* step one") (internal citation omitted). To the extent there exists any ambiguity in the statutory provisions at issue and their relationship to other relevant portions of the Act, the Court should defer to FDA's well-considered interpretation of its own statute. *See Chevron*, 467 U.S. at 843-44 & n.11 (in case of ambiguity, court must uphold agency's interpretation if construction is permissible under the statute; court need not conclude that agency construction was only one it permissibly could

have adopted or even a reading that the court would have reached) ("*Chevron* step two"); *see also id.* at 843-44 ("The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.") (citing *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)); *Barnhart v. Walton*, 535 U.S. 212, 222 (2002) ("In this case, the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue."); *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).

*Chevron* deference applies where, as here, "Congress delegated authority to the agency generally to make rules carrying the force of law." *Mead*, 533 U.S. at 226-27. Congress has authorized and directed FDA to decide not only what drugs may lawfully enter the marketplace through the NDA and ANDA approval process, but also when they may enter the market. The statute is replete with references to findings and determinations that must be made by the agency in the drug approval process. *See, e.g.*, 21 U.S.C. §§ 355(d), 355(j)(4), 355(j)(5). Such determinations necessarily require interpretation of a statutory scheme that is undeniably "complex." *See, e.g., American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1079 (D.C. Cir. 2001); *Mova*, 140 F.3d at 1062.

The D.C. Circuit has repeatedly given *Chevron* deference to FDA's interpretation of the FDCA, as well as the agency's implementing regulations. *See, e.g., Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1281 (D.C. Cir. 2004); *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319, 1320 (D.C. Cir.

1998) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).  When, as here, a court is evaluating

an agency's interpretation of its own regulations, the agency is entitled to "substantial deference."

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *United States Air Tour Ass'n v.*

*FAA*, 298 F.3d 997, 1005 (D.C. Cir. 2002) (courts "defer to an agency's reading of its own

regulation, unless that reading is plainly erroneous or inconsistent with the regulation") (internal

citations omitted); *Wyoming Outdoor Council v. U.S. Forest Service,* 165 F.3d 43, 52 (D.C. Cir.

1999) (agency's construction of own regulation is controlling unless plainly erroneous or

inconsistent with regulation); *Bristol-Myers*, 923 F. Supp. at 216.

   Even if the governing regulation were invalidated and FDA left to regulate directly from

the statute, *Chevron* deference extends to administrative determinations that are not embodied in

rulemaking or formal adjudication.  As the Supreme Court made clear in *Barnhart*:

> [T]he fact that the Agency previously reached its interpretation through means less formal
> than "notice and comment" rulemaking . . . does not automatically deprive that
> interpretation of the judicial deference otherwise its due.  If this Court's opinion in
> [*Christensen v. Harris County*, 529 U.S. 576 (2000)] suggested an absolute rule to the
> contrary, our later opinion in [*Mead*] denied the suggestion.  Indeed, *Mead* pointed to
> instances in which the Court has applied *Chevron* deference to agency interpretations that
> did not emerge out of notice-and-comment rulemaking.

535 U.S. at 221-22 (citations omitted).

   In *Mylan v. Thompson*, 389 F.3d at 1279-80, for example, the D.C. Circuit extended

*Chevron* deference to FDA's exclusivity determination, embodied in a letter decision, which was

less formal than FDA's citizen petition response in this case.  The court explained that deference

was appropriate because of "the complexity of the statutory regime under which FDA operates,

the FDA's expertise or the careful craft of the scheme it devised to reconcile the various statutory

provisions . . . [and that] FDA's decision made no great legal leap but relied in large part on its

previous determination of the same or similar issues and on its own regulations." *Id.* at 1280.

Pursuant to *Chevron* step one, the Court first examines the language of the statute. In this case, the statute is silent with respect to an NDA holder's request to delist a patent. *See* 21 U.S.C. § 355(a), (b). Indeed, none of the statutory provisions address patent delisting, including those governing 180-day exclusivity. *See* 21 U.S.C. § 355(a) and (b) (referring only to conditions for patent listing); 21 U.S.C. § 355(j)(5)(B)(iv) (governing exclusivity based on certifications to patents, without addressing listing or delisting).

Plaintiffs argue that the statute "unambiguously forbids" FDA's interpretation, citing the exclusivity provision at 21 U.S.C. § 355(j)(5)(B)(iv). Ranbaxy Mem. at 14-15; *see also* Ivax Mem. at 22. That argument is untenable, when, as here, the FDCA is completely silent on the issue of patent delisting, as even Ranbaxy concedes ("The statute does not address patent withdrawal."). Ranbaxy Mem. at 23. This statutory silence cannot "unambiguously forbid" the agency's interpretation. FDA's interpretation of the statutory silence and the gap between the patent listing and exclusivity provisions in this complex regulatory regime is entitled to considerable deference. *See Mylan*, 389 F.3d at 1279-80 (granting *Chevron* deference to FDA's interpretation of exclusivity provisions where several interrelated provisions resulted in ambiguities).

## II.     FDA'S INTERPRETATION IS REASONABLE

### A.     FDA Reasonably Determined to Delist Patents When They are Withdrawn by the Patent Holder

The statutory provisions governing patent listings assign control over patent submissions to the patent holder. AR Tab 23 at 4. FDA performs only a ministerial role in the patent listing process, a role which has been approved by various courts. *See Apotex, Inc. v. Thompson*, 347 F.3d 1335; *aaiPharma Inc. v. Thompson*, 296 F.3d 227; *Alphapharm PTY, Ltd. v. Thompson*, 330

F. Supp. 2d 1. Instead of reviewing patents, FDA has established the challenge process by which

a party can convey its doubts about the accuracy of a patent listing to the NDA holder through

FDA, and the NDA holder may correct patent listings, either by withdrawing the patent or

amending its information. 21 C.F.R. § 314.53(f).[11]

Given the statutory silence, FDA could have adopted a number of approaches to patent

delisting, including the one urged upon this Court by the plaintiffs, *i.e.*, maintaining the patent in

the Orange Book if any ANDA has filed a paragraph IV certification. AR Tab 23 at 8.[12] In its

regulation, however, FDA chose instead to honor the NDA holder's request to withdraw a patent.

21 C.F.R. § 314.94(a)(12)(viii)(B). This regulation also provides that the certifications of ANDA

applicants must be amended when patents are delisted. Because a withdrawn patent no longer

serves as a barrier to ANDA approval, FDA does not believe that – absent special circumstances

not present here – the public should be denied the benefits of broad generic competition for a

drug for six months based solely on an ANDA applicant's paragraph IV certification to that

patent. AR Tab 23 at 10. The statute is silent on these issues – delisting and amendment of

certifications – and thus FDA's interpretation is entitled to substantial deference.

---

[11] Ranbaxy recognizes that this ministerial role has been approved by courts, but argues that "no court has required it." Ranbaxy Mem. at 23. Whether it has been "required" is not relevant to whether it is reasonable and permissible.

[12] Ranbaxy proposes a secondary option: FDA could purportedly allow an NDA holder to withdraw a patent but leave the patent in the Orange Book "so as to preserve the statutory grant of 180-day exclusivity." Ranbaxy Mem. at 23. Ranbaxy's proposal makes no practical sense: a patent that is "withdrawn" is *withdrawn from the Orange Book*; it does not remain fictitiously listed there for some purposes but not for others. And, as the agency explained in its citizen petition response, FDA "does not believe that leaving all 'delisted' patents as to which an applicant has submitted a paragraph IV certification in the Orange Book only until the exclusivity expires is an acceptable way to reconcile delisting and exclusivity." AR Tab 23 at 18. "[T]he patent may have to remain in the Orange Book for many years until the exclusivity expires, all the while acting as a barrier to ANDA approvals." *Id.*

Plaintiffs assert that the exclusivity provision somehow vests an ANDA applicant with exclusivity at the very moment that it files a first paragraph IV certification – without any regard to later developments in the status of the patent listing or paragraph IV certifications. Ranbaxy Mem. at 15; Ivax Mem. at 34. Plaintiffs' argument runs counter to the language of the statute, the purposes of the statute, FDA regulations, FDA administrative precedent, and case law.

### 1.     A Paragraph IV Certification Does Not Automatically Entitle the Applicant to Exclusivity Without Regard to Changed Circumstances

Although plaintiffs argue that the filing of a paragraph IV certification automatically entitles them to 180-day exclusivity despite a later change in circumstances, that is not the case. In fact, there are various situations in which a paragraph IV certification does not lead to exclusivity, as explained in FDA's citizen petition response:

> there are a number of circumstances in which an ANDA applicant that was first to file a paragraph IV certification to a listed patent may, as a result of the passage of time or a change in circumstances, be required to amend its certification to something other than the paragraph IV certification upon which exclusivity depends.

AR Tab 23 at 9. One of these circumstances is when the listed patent expires before the ANDA is approved. *Id.* The correct certification in such a situation is a paragraph II, which is a certification that the patent has expired. *Id.* Another circumstance is when the ANDA applicant loses its patent litigation, in which case it will be required to amend its paragraph IV certification to a paragraph III, reflecting the fact that it will not be eligible for final approval until expiration of the patent. *Id.* It defies logic that the ANDA applicant would be entitled to exclusivity in that circumstance, as Ivax itself recognizes, Ivax Mem. at 17 n.7, notwithstanding that the ANDA applicant had incurred the risk and actual defense of patent litigation. In addition, a patent

22

certification must also be amended if for any reason the original certification is no longer accurate. 21 C.F.R. § 314.94(a)(12)(viii)(C). AR Tab 23 at 9.

Once an applicant amends its ANDA so that it no longer contains a paragraph IV certification, the applicant will lose its eligibility for exclusivity. *See, e.g.,* 21 U.S.C. § 355(j)(5)(B)(iv); *Dr. Reddy's Labs.*, 302 F. Supp. 2d at 354-55; *Mylan Pharm., Inc. v. Henney,* 94 F. Supp. 2d at 54. In its citizen petition response, the FDA noted that "the fact that an ANDA applicant may have undertaken some risk and incurred certain costs in challenging a patent is not an adequate basis for maintaining eligibility for exclusivity for which the applicant may once have qualified. . . ." AR Tab 23 at 10.

To account for possible changes in the status of patents and paragraph IV certifications, FDA does not make any specific exclusivity determinations until exclusivity could bar final approval of an ANDA, which is generally when any ANDA for the drug product is ready for final approval. *See* Ex. A. at 2-4. FDA's practice of considering the status of the patents and paragraph IV certifications at the time of making its exclusivity determinations is fully consistent with the statute and has been upheld. Ex. A. at 2-4; *Dr. Reddy's*, 302 F. Supp. 2d at 353.

In sum, contrary to plaintiffs' arguments, nothing in the statute requires exclusivity when, as here, circumstances change after a paragraph IV certification was filed.

## 2.    FDA's Reasoning has been Upheld

FDA's approach toward patent listing and its effect on 180-day exclusivity have been upheld in litigation. In *Dr. Reddy's*, plaintiff (Reddy) made a very similar argument to that made by plaintiffs here. Reddy argued that it should be entitled to exclusivity based on a first-filed paragraph IV certification. *Dr. Reddy's*, 302 F. Supp. 2d at 353-55. FDA determined that Reddy was required to amend its certification to a paragraph II certification upon expiration of the

patent (which occurred before FDA approved Reddy's ANDA), and thus was not entitled to

exclusivity. *Id.* at 354-55. Reddy argued that because the 180-day exclusivity provision referred

to an application "containing" a paragraph IV certification, an application that contained such a

certification "at some time during the approval process" should be entitled to exclusivity even if

the paragraph IV certification was amended before final approval. *Id.* at 355. The court,

however, upheld FDA's decision to deny exclusivity to an applicant who no longer had a valid

paragraph IV certification on file at the time of final approval. *Id.* The court rejected the

argument that the statute "requires the award of exclusivity if the ANDA applicant is the first

applicant to file a paragraph IV certification on a patent, without more, because at that time the

ANDA applicant exposes itself to patent litigation by providing the requisite notice of the

certification." *Id.* at 351.

 In its citizen petition response in the instant case, FDA noted that the *Dr. Reddy* "court

found it reasonable for FDA to conclude that eligibility for exclusivity expired with the patent,

even though the ANDA sponsor was the first to challenge the patent and had been sued by the

NDA holder, thus incurring the cost of litigation." AR Tab 23 at 10. The court in *Dr. Reddy's*

also held:

> the purpose of the exclusivity period is to provide an incentive to challenge
> patents that block ANDA approval. . . . Once a listed patent expires, there is no
> longer a need to provide an incentive to challenge it in court. Consistent with this
> statutory purpose, the FDA construes the statute to award 180-day exclusivity
> based only upon paragraph IV certifications to unexpired patents. *See* 59 Fed.
> Reg. 50338, 50348. This construction makes sense in terms of the basic statutory
> objective of encouraging applicants to challenge listed patents that prevent final
> ANDA approval.

302 F. Supp. 2d at 354. The reasoning applies to a withdrawn patent, because a withdrawn

patent no longer "prevents final ANDA approval." AR Tab 23 at 10.

Similarly, in *Purepac,* Torpharm had submitted a paragraph IV certification to the patent at issue (the '479 patent), and had been sued by the NDA holder based on that certification. 354 F.3d at 886. After it was determined that the patent was improperly filed, FDA delisted the patent because, in the unusual circumstances of that case, the patent should never have been listed. *Id.* The court held that 21 C.F.R. § 314.94(a)(12)(viii)(B) posed no bar to the delisting, even though Torpharm had filed a paragraph IV certification and was sued. *Id.* at 886-88. The D.C. Circuit accepted FDA's delisting of the patent and the loss of any related exclusivity (even though there had been litigation), *id.*, thus further supporting FDA's decision in this case that "exclusivity does not vest with the initial submission of the first paragraph IV certification to the patent, but can be lost as a result of subsequent changes in the status of the patent." AR Tab 23 at 20.

### 3.    Plaintiffs' Proposal Would Undermine the Patent Challenge Process

Under FDA's patent challenge regulation, any party with doubts about the correctness of a patent listing can submit a statement to FDA challenging the patent listing, which FDA then forwards to the NDA holder. 21 C.F.R. § 314.53(f). The NDA holder then has an opportunity to correct the patent listing, either by withdrawing or amending the patent. Plaintiffs' argument would prevent such a withdrawal in response to a challenge under this regulation if there had been any paragraph IV certification filed to the patent.

As FDA observed in its citizen petition response, usually little time passes between listing a patent and submission of ANDAs containing paragraph IV certifications. AR Tab 23 at 15. Thus, if – as plaintiffs propose – all patents remained in the Orange Book after such a certification had been filed, ANDA applicants would have little incentive to use the challenge

25

process because the NDA holder would not have a meaningful opportunity to withdraw its

patent, even if it believed that the patent no longer met the listing criteria. *Id.*

Ranbaxy argues that this rationale "makes no sense" because ANDA applicants can

always object to a patent listing, and because keeping a patent listed to reward "successful

notice" is no more a barrier to the use of the challenge process than keeping a patent listed when

the patent is the subject of litigation. Ranbaxy Mem. at 29.[13]  This is not correct.  First, although

ANDA applicants can always object to a patent listing, they would have much less incentive to

do so when it could not possibly result in delisting of the patent and would thus do nothing to

relieve them of the burden of filing a paragraph IV certification or otherwise result in earlier

generic approval.  Second, the exception that FDA has established for patents that are the subject

of litigation is much narrower than plaintiffs' proposal that all patents for which paragraph IV

certifications have been filed remain listed.  FDA will delist all patents upon an NDA holder's

request that are not the subject of litigation – and, for all of those unlitigated patents – the

challenge process may actually result in a substantive change.  Under plaintiffs' proposal, the

challenge process would result in a substantive change less often because, as noted, many

paragraph IV certifications are filed shortly after patent submissions, and the NDA holder would

not be able to correct its listings once a paragraph IV certification had been filed, even if it so

desired.

### 4.     FDA's Regulatory Approach Has Been Consistent

21 C.F.R. § 314.94(a)(12)(viii)(B) was promulgated in 1994 and has been followed – and

heretofore unchallenged – since that date.  FDA has not wavered from its policy of delisting a

---

[13] By "successful notice" plaintiffs mean a situation when the paragraph IV notice to the patent
holder (not litigation) allegedly causes delisting of the patent.  AR Tab 23 at 17; Ranbaxy Mem.
at 9.

patent upon an NDA holder's request if it is not the subject of litigation.  *See* AR Tab 23 at 18-20

(noting cases of FDA's consistent decisions regarding delisting).  Plaintiffs nevertheless argue

that FDA's decision in this case came as a surprise, citing alleged inconsistencies in FDA's past

statements concerning exclusivity in circumstances when an ANDA is not sued.  Those

arguments are baseless.

Plaintiffs argue that FDA "exercised its authority in a manner consistent with the

structure Congress enacted when it promulgated its 1994 regulations" – in contrast to how

plaintiffs characterize FDA's exercise of its authority in its decision in this case.  Ranbaxy Mem.

at 24.  Those regulations, however, include the very same regulation that Ranbaxy challenges

here.  Plaintiffs also wholly mischaracterize the regulation and the preamble from the Federal

Register setting forth the final rule.  Ranbaxy's careful selection of language would suggest that

FDA decided that anytime a patent is withdrawn by an NDA holder, the patent should

nevertheless be "deemed to be relevant" until the applicable exclusivity period had expired.

Ranbaxy states, for example, that "FDA then recognized that an [sic] pioneer's withdrawal of a

patent should not result in the loss of exclusivity."  *Id.* (citing Ex. B, 59 Fed. Reg. at 50,348); *see*

*also id.* at 28 ("[FDA] accomplished [the purpose of Hatch Waxman] by prohibiting delisting of

the pioneer's patents until any 180-day exclusivity expired."); *id.* at 35 ("the regulation did not

intend to provide that the withdrawal of a patent not in litigation would affect exclusivity."); Ivax

Mem. at 33-34.

These are mischaracterizations of both the regulation and the Federal Register preamble.

In the preamble, FDA's comments were directed to preserving exclusivity in the situation where

the NDA holder withdraws the patent "immediately upon a court decision that the patent is

invalid or unenforceable," Ex. B, 59 Fed. Reg. at 50,348, and thus only addressed preserving

27

exclusivity when there was litigation.  AR Tab 23 at 12.  Elsewhere in the preamble (as well as in

the text of the final rule), FDA made it clear that patents that were not the subject of lawsuits

were subject to delisting.  *See* Ex. B, 59 Fed. Reg. at 50,348, col. 3 ("A patent that is the subject

of a lawsuit under § 314.107(c) will not be removed from the list until FDA determines either

that no delay in effective dates of approval is required as a result of the lawsuit or that any such

period of delay in effective dates of approval is ended.").  FDA said the same thing in the

preamble to the proposed rule in 1989:

> If, after one or more applicants have made paragraph IV certifications on a patent,
> that patent has been removed from the list for any reason other than because that
> patent has been declared invalid in a lawsuit brought by that patent owner within
> 45 days of receiving notice under § 314.95 any applicant with a pending
> application . . . should submit an amended patent certification. . . .

54 Fed. Reg. 28872, 28895-96 (July 10, 1989).  *See also* AR Tab 23 at 11-12.

Ivax asserts that FDA's post-*Mova* Guidance for Industry and November 1998 interim

rule represent the agency's position that exclusivity should be granted to the first ANDA

applicant who files a paragraph IV certification without regard to whether there is a lawsuit.  Ivax

Mem. at 30-31 (citing Guidance for Industry: 180-Day Generic Drug Exclusivity Under the

Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act (June 1998)

("Guidance"), *available at* www.fda.gov/cder/guidance/2576fnl.pdf; and 180-day Generic Drug

Exclusivity for Abbreviated New Drug Applicants Interim Rule, 63 Fed. Reg. 59,710, 59,711

(Nov. 5, 1998).  Notably, in the portions of those documents that Ivax cites there was no

discussion of exclusivity when there has been a request to delist a patent.  Rather, FDA was

characterizing the holdings in the *Inwood* and *Mova* district court decisions, and addressed the

"threshold question of whether a ANDA applicant that was not sued for patent infringement as a

result of its paragraph IV certification would nonetheless be eligible for exclusivity."  Guidance

at 5 (noting that "[t]here are many additional issues related to the application of the statutory

provisions that have yet to be resolved."). Moreover, the D.C. Circuit's decision in *Mova*

expressly reserved judgment on the question whether FDA could impose a litigation requirement,

and limited its decision to striking down FDA's "win first" version of the successful defense

requirement. *Mova*, 140 F.3d at 1069.

In 1999, FDA proposed a rule which stated in part that "[p]ermitting an applicant who

avoids a lawsuit to be eligible for exclusivity is consistent with the statutory language and goal of

facilitating prompt entry of generic drug products into the market." 180 Day Generic Drug

Exclusivity for Abbreviated New Drug Applications, 64 Fed. Reg. 42873, 42,876 (Aug. 6, 1999)

(proposed rule). Ranbaxy cites that language in support of its assertion that, "until now, FDA has

been quite clear that it will not impose a litigation requirement in determining whether an

applicant is eligible for 180-day exclusivity." Ranbaxy Mem. at 17-18; *see also* Ivax Mem. at

32. Plaintiffs overstate the applicability of those general statements to this case. FDA's

proposed rule did not refer whatsoever to exclusivity in the circumstances of patent delisting, and

was in any event withdrawn by FDA in 2002. *See* 67 Fed. Reg. 66,593 (Nov. 1, 2002).

Nor has there been any shift in agency policy necessitating another round of notice and

comment rulemaking in order for the agency to continue to follow its long-standing regulation,

21 C.F.R. § 314.94(a)(12)(viii)(B), as Ranbaxy argues. Ranbaxy Mem. at 36. There is a

distinction between "rulemaking" and the clarification of an existing rule; only "new rules that

work substantive changes in prior regulations are subject to the APA's procedures." *Sprint Corp.

v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003). Here, FDA's decision is entirely consistent with

and in fact follows its existing regulation, and notice and comment rulemaking was not required.

**B.    FDA's Decision Furthers the Purposes of the Statute**

As FDA fully set forth in its response to the citizen petitions, FDA's interpretation and its rejection of the arguments advanced in the citizen petitions furthers the goals of the Hatch-Waxman Amendments as follows:  (1) FDA's decision maintains appropriate exclusivity incentives; (2) FDA's decision properly removes listed patents that would otherwise serve as unjustified barriers to entry; and (3) FDA's decision does not unduly place control of exclusivity in the NDA holder's hands.  AR Tab 23 at 14-17.

Ranbaxy argues, citing no authority, that FDA is not authorized to consider policy issues when implementing the statute.  Ranbaxy Mem. at 26.  FDA is authorized, however, to implement its organic statute and may reasonably fill in statutory gaps and account for policy objectives in doing so.  "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."  *Chevron*, 467 U.S. at 843-44 (citing *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)).  "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."  *Id.*

**1.    FDA's Decision Properly Maintains Incentives for Exclusivity**

FDA appropriately considered the effects of maintaining or delisting a patent in its decision, including the effects on the exclusivity incentive.  AR Tab 23 at 16-17.  The agency "determined that as a general rule, the benefit derived from maintaining exclusivity does not justify the delay in generic drug approvals that would arise from leaving a patent listed when the NDA holder has requested that the patent be withdrawn."  *Id.* at 16.  "The narrow exception

applicable when the patent has been the subject of a lawsuit serves to continue to provide an

incentive to the first applicant to pursue its patent litigation by assuring the applicant that the

exclusivity reward will not be extinguished if the patent is removed from the Orange Book as a

result of success in that litigation." *Id.* at 17.

In addition, as FDA noted in its decision, patent delisting is relatively uncommon, and

thus the lack of exclusivity in this circumstance is not likely to be a significant deterrent to an

ANDA applicant's patent challenge.[14]  Furthermore, as discussed above, exclusivity can be lost

in a number of ways that are outside the control of the ANDA applicant who might be otherwise

eligible:  the patent could expire, *see Dr. Reddy's*, 302 F. Supp. 2d at 353-54; or the exclusivity

could be triggered by a court decision in litigation brought by a subsequent ANDA applicant

before the first ANDA applicant can market its drug.  *See Teva Pharm., USA, Inc. v. FDA*, 182

F.3d 1003, 1005 n.3 (D.C. Cir. 1999) ("The court-decision trigger can be activated by any

subsequent ANDA applicant's litigation whether or not the first applicant has enjoyed a period of

exclusivity.").  In the latter case, the exclusivity may run before the first ANDA applicant is in a

position to use it.  All ANDA applicants who challenge patents are aware of the risk that, even if

they are first to file a paragraph IV certification and thus may be eligible for exclusivity in the

future, they may not have an opportunity to take advantage of that exclusivity period.  And, given

the relatively small risk that an ANDA applicant will certify to a patent that will subsequently be

delisted, plaintiffs' parade of horribles describing the potential behavior modifications that

---

[14]  Ranbaxy asserts that FDA's decision affects its potential exclusivity for four different drugs,
implying that FDA's decision has fallen upon it with especially burdensome weight.  Ranbaxy
Mem. at 32.  That argument is not relevant here, where FDA reasonably approached the delisting
question from a broad, agency standpoint without regard to how it might affect one particular
company.

ANDA applicants might undertake to avoid such a scenario is grossly overstated. *See* Ranbaxy Mem. at 32 (arguing that FDA's decision will invite unnecessary litigation).

Plaintiffs argue that the exclusivity incentive will be diminished for those ANDA applicants who lose their exclusivity as a result of a delisting when there has been no litigation, arguing that many such ANDA applicants provided "successful notice" that prompted the delisting and are as deserving of exclusivity as an applicant who provokes litigation by filing a paragraph IV certification. Ranbaxy Mem. at 19, 32; Ivax Mem. at 19, 29. FDA does not believe that "successful notice" is a relevant criterion for delisting decisions.

Importantly, plaintiffs do not simply propose that FDA refuse to delist only those patents for which an ANDA applicant has provided "successful notice" and thereby prompted the NDA holder to withdraw its patent. FDA does not inquire into the reasons why a patent is delisted, "and it would be entirely impractical to have a delisting decision depend upon an ANDA applicant's characterization of why the delisting was sought." AR Tab 23 at 17. Nor would it be reasonable for FDA to be expected to divine the reasons underlying the NDA holder's request, which could be varied and complex. *See* Statutory Framework Section at I, *supra*. Rather, plaintiffs propose that FDA refuse to delist *all* patents for which *any* ANDA applicant has filed a paragraph IV certification, thus expanding eligibility for exclusivity even to those applicants who may not have provided "successful notice" and who simply benefitted from the NDA holder's independently revised views on the scope of its patent. Thus, although plaintiffs suggest that "successful notice" should justify an award of exclusivity, their proposed solution is hardly tailored to reward that behavior.

Nor is it at all clear that "successful notice" is what happened in this case. Merck requested that its patents be delisted a year and a half after receiving Ranbaxy's notice, and over

two and a half years after receiving Ivax's notice. *See* Background Section at IV, *supra*. Merck made its request in October 2003, shortly after FDA issued revised regulations at 21 C.F.R. § 314.53 describing what types of patents must and must not be submitted to FDA. 68 Fed. Red. 36,703 (Jun. 18, 2003); AR Tab 23 at 4 n.4. Thus, it seems unlikely on its face that the notices provided to Merck by Ivax and Ranbaxy prompted Merck's request to delist the patents. AR Tab 23 at 17 n.20.

Finally, even if "successful notice" did occur in this case, FDA has rationally distinguished between "successful notice" and litigating a patent for purposes of patent delisting decisions. AR Tab 23 at 17. By keeping a patent listed when it is the subject of litigation, FDA assures the ANDA holder that is litigating the case that it will not be deprived of its exclusivity if the case seems to be progressing in its favor and the NDA holder delists the patent. *Id.* Such assurance provides a continuing incentive to pursue the litigation to an ultimate conclusion of a court decision of invalidity, noninfringement, and unenforceability – a result that will potentially benefit the public by creating greater certainty about the status of the patent for other ANDA applicants. *Id.*[15] In contrast, an ANDA applicant who has provided "successful notice" has defused litigation and requires no further incentive to pursue its patent infringement defenses. AR Tab 23 at 17.

---

[15] Ranbaxy argues that such an applicant needs no further incentive to defend itself in a patent infringement case. Ranbaxy Mem. at 31. The vigor of that defense, however, can reasonably be expected to be commensurate with the expected reward, especially when the ANDA applicant has not marketed the drug and is not liable for infringement damages. If the applicant loses the litigation, absent extenuating circumstances, the result will be simply a delay in approval until expiration of the patent.

    **2.**    **Listed Patents are Barriers to Generic Drug Entry and Should be Removed Upon an NDA Holder's Request Unless there is Sufficient Justification for Not Delisting**

FDA properly considered the effects of maintaining or delisting a patent in its decision, including the significant delay that a listed patent may impose on generic drug entry. AR Tab 23 at 15. As with expired patents, a delisted patent no longer bars generic drug approval. *Id.* at 10. Listed patents can result in exclusivity and thus delay market entry for subsequent ANDA applicants, due to potential 30-month stays, the statutory 180-day delay, and the possible delay by the ANDA eligible for exclusivity in marketing the drug.[16] Even if FDA's regulation provided that a patent were to be delisted upon expiration of the 180-day exclusivity period, ANDA applicants might still be required to wait for long periods of time before exclusivity is triggered at all (if, for example, the applicant eligible for 180-day exclusivity is unable to obtain approval of its ANDA, or fails to begin marketing). *Id.* at 15. Thus, FDA's regulation brings generic competition to the market sooner.

Ranbaxy discounts the relevance of delay that might result from the first applicant's inability to market or decision not to market because such delay "is inherent in 180-day exclusivity and is wholly unrelated to whether the exclusivity was earned by successful notice or design or by successful defense." Ranbaxy Mem. at 30. However, the likelihood of such delay

---

[16] Ranbaxy argues that 30-month stays do not apply to patents for which the NDA holder has requested delisting, and thus such stays cannot delay generic entry in a delisting situation, citing a letter in which FDA assured an NDA holder that the request for delisting terminated any 30-month stays. Ranbaxy Mem. at 30; AR Tab 32. FDA does not disagree with that conclusion, but Ranbaxy's argument misses the points being made in that section of FDA's decision. First, a listed patent generally delays generic entry due to the possibility of a 30-month stay, and second, the possibility of losing such a stay is likely to deter an NDA holder from abusing the delisting process by withdrawing a listable patent because such a stay can be very valuable to the NDA holder. AR Tab 23 at 15-16.

would increase if eligibility for exclusivity were expanded in the manner sought by plaintiffs. AR Tab 23 at 15. Plaintiffs' proposed expansion of exclusivity would likely delay generic drug entry for those drugs that plaintiffs' proposal would affect. *Id.*

Nor does this decision generally reflect "the agency's disagreement with Congress over the value of 180-day exclusivity." Ranbaxy Mem. at 30. In fact, FDA has interpreted the statute as granting multiple periods of exclusivity when multiple patents are listed – which greatly expands eligibility for exclusivity – in the face of repeated challenges. *See* note 5, *supra.* FDA's decision in this case, as in all of its exclusivity decisions, simply interprets the statute in light of the Congressional purpose.

FDA properly accounted for the burden upon subsequent ANDA applicants who would be required to certify to patents if they remained listed, even after an NDA holder's request to withdraw the patent. AR Tab 23 at 14-15 ("If a patent remains listed, any applicant submitting an ANDA for the drug product after the NDA holder requests delisting must nonetheless comply with the patent certification requirements of section 505(j)(2) [21 U.S.C. § 355(j)(2)]." Ranbaxy attempts to trivialize that burden, stating that a listed patent "is no obstacle to entry by subsequent ANDA applicants" because any ANDA applicant must undertake a patent analysis if it intends to market a drug before patent expiration, and "[w]riting down its analysis and sending it to the patent holder is hardly a burden and certainly not one that has any perceptible effect on approval by FDA." Ranbaxy Mem. at 29. FDA disagrees that an ANDA's filing of a paragraph IV certification, an act that is automatically considered an act of patent infringement – as well as being required to disclose its defenses to the very party who may sue it for infringement – is trivial. Nor are the administrative burdens accompanying those tasks a small matter. Indeed,

35

Ranbaxy argues that it deserves exclusivity *because* it went to the trouble of complying with all of the requirements for a paragraph IV certification.

Ranbaxy further argues that a delisted patent and an expired patent are entitled to different treatment, and that an applicant who has certified to a later-delisted patent should still be entitled to exclusivity. Ranbaxy Mem. at 33. Ranbaxy cannot deny, however that a withdrawn patent no longer bars *approval* of an ANDA, and would not dispute that FDA should delist such patents if there had been no paragraph IV certification filed to that patent. Thus, Ranbaxy is left to argue that a withdrawn patent "can still serve as a barrier to *competition*" because an ANDA applicant can still face a legal risk if it markets its drug under threat of infringement of the delisted patent. *Id.* at 34 (emphasis added). Although that may be theoretically true, it is notable that such a barrier to competition is of little concern to the FTC, which, informed by its expertise in matters concerning competition, fully supports FDA's approach to delist patents upon an NDA holder's request. AR Tab 14. Ranbaxy also argues that there may be "as there is in this case" a substantial question about whether the patent claims the drug and should be listed at all. Ranbaxy Mem. at 34. The fact that there may be such lingering questions of proper listing and liability suggests that plaintiffs did not in fact provide the "successful notice" that they assert, and does not justify granting plaintiffs exclusivity on the ground of the purported value of that contribution.

### 3.    FDA's Decision Properly Defers to the NDA Holder's Request to Withdraw a Patent

FDA appropriately determined to defer to the NDA holder's request to delist a patent except in limited circumstances. AR Tab 23. Plaintiffs argue that FDA's decision is at odds with the statute because it allegedly places the exclusivity decision in the hands of the patent

holder. Ranbaxy Mem. at 31; Ivax. Mem. at 25. This is not so. As FDA stated in its petition response, the statute already gives unfettered control to the NDA holder over patent listing (but not discretion as to which patents must be listed), and a listed patent is an absolute prerequisite to exclusivity. AR Tab 23 at 15. Thus, there can be nothing "at odds" with interpreting the statute to give control to the NDA holder to delist a patent that it need not have listed in the first place.

FDA cited several reasons why an NDA holder would be unlikely to abuse the patent withdrawal process. NDA holders have no discretion to list or delist a patent, but must make such decisions based on statutory and regulatory criteria. In addition, an NDA holder who delists a patent will no longer be able to obtain a 30-month stay of generic approval, 21 U.S.C. § 355(j)(5)(B)(iii), or enjoy the delay in approval of multiple generics as a result of 180-day exclusivity. AR Tab 23 at 15-16. Thus, even if an NDA holder had discretion to abuse the patent listing process, it would have little economic incentive to do so.

Neither *Mova* nor *Inwood Laboratories, Inc. v. Young*, 723 F. Supp. 1523, 1526 (D.D.C. 1989), cited by Ranbaxy (Ranbaxy Mem. at 31-32), addressed an NDA holder's power over listing or delisting, and do not support plaintiffs' position that the power to delist patents grants too much power over exclusivity decisions to the NDA holder. FDA's decision does not impermissibly "shift[s] its responsibility to make eligibility decisions to a private party." Ranbaxy Mem. at 32 n.6. The statute already gives complete control to the NDA holder for listing a patent, which inherently gives NDA holders control over the possibility of exclusivity. AR Tab 23 at 15 n.19. FDA's delisting decision and regulation do no more than reflect the NDA holder's inherent control over exclusivity by patent listing.[17]

---

[17] Plaintiffs also argue without any merit that the NDA holder's listing decisions places too much power in the hands of the NDA holder because FDA declines to substantively review the propriety of patent listings. Ranbaxy Mem. at 32 n.6; Ivax Mem. at 27-28 n.9 (further arguing

Nor does *Torpharm Inc. v. FDA*, No. 03-2401, 2004 U.S. Dist. LEXIS 524 (D.D.C. Jan.

8, 2004) (RWR), vacated as moot by *Apotex Inc. (f/k/a TorPharm, Inc.) v. FDA*, Nos. 04-5046 &

04-5047 (D.C. Cir. Dec. 17, 2004), support Ivax's position in this case. Ivax Mem. at 26. That

case concerned an entirely different issue: FDA's "shared exclusivity" policy, under which FDA

grants shared exclusivity to two ANDA applicants who file first paragraph IV certifications to

two different patents for the same drug, and each is blocked from being approved by the other's

exclusivity. Ex. B to Ivax Mem. at 53-55. In such a situation, FDA will approve each

application and grant the applicants shared exclusivity to avoid lengthy delays in generic market

entry. *See* Shared Exclusivity for Paroxetine Hydrochloride Tablets (FDA Decision Jul. 30,

2003), *available at* http://www.fda.gov/cder/ogd/shared_exclus_paroxetine.htm.

C.    **FDA's Regulation Survives *Mova* and is Consistent with the *Mova* Holding**

Plaintiffs also argue that the agency has improperly conditioned exclusivity on whether

the patent is the subject of litigation, in violation of the text of the exclusivity provision and of

the D.C. Circuit's decision in *Mova*, 140 F.3d 1060. Ranbaxy Mem. at 16; Ivax Mem. at 21. In

so arguing, plaintiffs improperly conflate the agency's grant of exclusivity, at issue in *Mova*, with

the agency's determination to delist patents in certain circumstances, at issue here.

As FDA explained in its decision, *Mova* held that FDA's "win first" successful defense

requirement for exclusivity was inconsistent with the text of the exclusivity provision because it

essentially wrote the commercial marketing trigger out of the statute. *Mova*, 140 F.3d at 1069-

70; AR Tab 23 at 14. The court did not decide that the agency could never condition eligibility

---

that an NDA holder has *de facto* discretion to list or delist patents because there is no adequate
enforcement mechanism to assure compliance with the requirements). As noted above, FDA's
ministerial approach to patent listing has been repeatedly upheld. *See, e.g., Apotex*, 347 F.3d
1335; *aaiPharma*, 296 F.3d 227.

for exclusivity on a litigation requirement and in fact recognized that FDA could have adopted a

"wait and see" approach to exclusivity, *i.e.*, it could have waited until the conclusion of litigation

to determine whether the applicant won the litigation and thus obtained exclusivity, or lost the

litigation and thereby lost exclusivity. *Mova*, 140 F.3d at 1069.

Following *Mova*, FDA determined that it would regulate directly from the statute and

deleted the "successful defense" requirement that had been present in 21 C.F.R. § 314.107(c).

AR Tab 23 at 14. In so doing, the agency determined that eligibility for exclusivity would not be

conditioned on being sued by the patent holder. AR Tab 23 at 13-14. This approach was upheld

in *Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201 (D.C. Cir. 1998), although the court did not

hold that the statute required that particular outcome, *i.e.*, having no litigation requirement at all.

*Mova* stands for nothing more than the proposition that the agency could not adopt a "win first"

litigation requirement for granting exclusivity; following *Mova*, the agency has declined to

impose any litigation requirement for exclusivity.[18]

Notably, nothing in *Mova* addresses the "delisting" issue in the instant case or otherwise

supports plaintiffs' arguments that the agency cannot consider whether a paragraph IV

certification resulted in litigation in determining whether to delist a patent upon an NDA holder's

---

[18] Ivax argues that FDA "seriously misreads *Mova*" in its decision, stating that the basis of the court's decision was that the successful defense requirement was inconsistent with the explicit language of the statute itself, and that FDA cited only the court's secondary conclusion that the successful defense requirement wrote the commercial marketing trigger out of the statute. Ivax Mem. at 30 n.10. Ivax's argument is baseless: FDA clearly acknowledged that "[t]he *Mova* court held that FDA's then-prevailing 'win first' successful defense approach to awarding exclusivity was inconsistent with the plain statutory language" and stated one reason for the court's decision: the court decision trigger. AR Tab 23 at 14; *see also Mova*, 140 F.3d at 1069. The court also decided that the "win first" requirement was inconsistent with the statute because it permitted later applications to be approved even before a first applicant could become eligible for exclusivity upon conclusion of its litigation; FDA clearly stated that the "win first" requirement did not survive *Mova*. *See Mova*, 140 F.3d at 1069; AR Tab 23 at 14.

request. AR Tab 23 at 14. Absent patent litigation, FDA will delist a patent upon an NDA

holder's request. FDA's decision allows for more extensive generic competition, sooner, and

significantly decreased prices for consumers.

Plaintiffs also argue in vain that the "subject of a lawsuit under § 314.107(c)" language in

21 C.F.R. § 314.94(a)(12)(viii)(B) improperly cross-references the pre-*Mova* version of 21

C.F.R. § 314.107(c). Ranbaxy Mem. at 19-20; Ivax Mem. at 24. Plaintiffs' arguments are

irrelevant for the obvious reason that there has been no patent litigation of any type in this case,

so it does not matter what type of lawsuit is referenced in the regulation. Even if this issue were

relevant, plaintiffs' arguments are not persuasive. Ivax argues that the agency has no rationale

for using the pre-*Mova* definition of a lawsuit, *i.e.*, a defensive lawsuit in which the first ANDA

applicant is sued within 45 days of the patent owner's receipt of notice, rather than a broader

definition that would include declaratory judgment actions brought by ANDA applicants. Ivax

Mem. at 24-25 (citing AR Tab 23 at 12 n.17). Although the agency has never had occasion to

consider whether a broader definition should apply to include suits both against and by the first

ANDA applicant, it in fact characterized the "lawsuit" referenced in the regulation as "a lawsuit

as a result of the first applicant's paragraph IV certification." AR Tab 23 at 12 n.17. This is

broader than the pre-*Mova* requirement that there be a successful defense in this litigation.

Ivax also argues that FDA has no rationale to distinguish between suits by the NDA

holder against first and later ANDA applicants. Ivax Mem. at 24-25. This limitation of the

exception in 21 C.F.R. § 314.94(a)(12)(viii)(B) to lawsuits resulting from the first applicant's

paragraph IV certification, however, narrowly tailors the exception so that it will apply only in

circumstances when the litigation concerns the first ANDA applicant and that applicant could

lose its exclusivity as a result of delisting. That exception provides a continuing incentive to the

first ANDA applicant to challenge the patent in the litigation. AR Tab 23 at 17. In contrast, if

FDA were to keep a patent listed contrary to the NDA holder's request when only a subsequent

ANDA applicant were sued, the subsequent ANDA would have *less* incentive to challenge the

patent in its litigation because the first ANDA would retain its eligibility for exclusivity and

would thus block the second ANDA from marketing the drug for 180 days, even if the second

applicant were to prevail in the litigation.

Perhaps even more important, even if this Court were to invalidate the regulation on the

ground that it cross-references the pre-*Mova* regulation, FDA would be left to do as it did

following *Mova*: regulate directly from the statute. The statute is silent on the issues raised in

this case, and it is clear from the agency's decision letter that, even in the absence of the

regulation, the agency would make the same decision and that decision would be permissible

under the statute. AR Tab 23 at 17.

### D.    FDA's Approach is Not Arbitrary

Ivax proposes a hypothetical in which Merck sues Ivax but not Ranbaxy and then

dismisses its suit against Ivax. Ivax asserts that, under FDA's approach, FDA would delist the

patents for the 80 mg strength because Ranbaxy (the purported first-filer for that strength) was

not sued, but would not delist for the 5, 10, 20, and 40 mg strengths because Ivax (the purported

first-filer for that strength) was sued. Ivax Mem. at 18. Ivax argues that "the absurdity of this

result [and the converse of that result] is obvious." *Id.*

FDA disagrees that such a result would be patently absurd, as each strength of a drug is a

separate listed drug product and thus ANDA applicants submitting paragraph IV certifications for

each strength may be eligible for separate periods of exclusivity. *See Apotex Inc. v. Shalala*, 53

F. Supp. 2d 454, 460-63 (D.D.C. 1999), *aff'd*, 1999 WL 956686 (D.C. Cir. Oct. 8, 1999)

(summary affirmance). Therefore, although the agency has not had to address this issue, delisting a patent for one strength and not for another would not be absurd, and would be no different from the case in which the same patent is listed for multiple similar drug products (*e.g.*, for both tablet and capsule forms), and in response to the NDA holder's request to delist, FDA delists as to one of the products for which there are no pending ANDAs and retains the listing for the drug for which the ANDA applicant filed the first paragraph IV certification and is in litigation.

Nor is it clear that FDA would retain a patent in the Orange Book if the lawsuit were dismissed, as Ivax's hypothetical asserts. Although the agency has not decided that issue and does not do so here, FDA observes that the regulation's litigation requirement is notably in the present tense, *i.e.*, "a patent that *is* the subject of a lawsuit," and it is possible that termination of a lawsuit would remove the barrier to delisting. And, even if Ivax were correct that FDA would maintain the patent in the Orange Book as a result of a lawsuit that was dismissed, the result (preserving the eligibility of the ANDA who was sued) would not necessarily be "absurd," as that ANDA both exposed itself to the risk of litigation and was forced to defend itself in litigation. In any event, the fact that FDA's decision could result in unforeseen consequences in a hypothetical situation not at issue here does not undermine the deference due to that decision, especially in view of the very complex statutory and regulatory Hatch-Waxman regime.

### E.    The MMA Does Not Inform FDA's Construction of the Applicable Statute

Finally, Ranbaxy argues that the MMA "confirms that a delisted patent does not nullify 180-day exclusivity," citing 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC) (2005). That provision provides that an ANDA applicant will forfeit its exclusivity if a patent is withdrawn if it fails to commercially market the drug within 75 days of patent withdrawal. *Id.* Congress added the

forfeiture provisions as an entirely new subsection, and as part of its complete restructuring of the

exclusivity provisions in the MMA.  149 Cong. Rec. S15884 (Nov. 25, 2003).  Nothing in the

cited forfeiture provision confirms that, in the applicable statute, Congress intended that a first

applicant with a paragraph IV certification should be entitled to exclusivity when a patent is

withdrawn, even in the absence of patent litigation.  AR Tab 23 at 5 n.7.  The subsequent

legislation cannot be used to "confirm" Ranbaxy's preferred interpretation of the statute at issue

when it is clear that Congress meant to entirely restructure that statute.  *See United States v.*

*Wilson*, 503 U.S. 329, 336 (1992) ("We have no difficulty with the general presumption that

Congress contemplates a change whenever it amends a statute."); *Fowler v. Unified School Dist.*,

128 F.3d 1431, 1436 (10th Cir. 1997) ("[A]bsent a clear indication that Congress intended the

Amendments merely to clarify the proper interpretation of its prior Act, we consider the

Amendments to implement a change in the Act.").

## CONCLUSION

For the foregoing reasons, federal defendants' motion for summary judgment should be granted, and plaintiffs' motions for summary judgment should be denied.

Of counsel:                                  Respectfully submitted,

PAULA M. STANNARD                            PETER D. KEISLER
Acting General Counsel                       Assistant Attorney General
                                             Civil Division

SHELDON T. BRADSHAW
Associate General Counsel                    EUGENE M. THIROLF
Food and Drug Division                       Director
                                             Office of Consumer Litigation
                                             Civil Division
ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

WENDY S. VICENTE
Associate Chief Counsel                      _____
U.S. Dept. of Health & Human Services        DRAKE CUTINI
Office of the General Counsel                Attorney
5600 Fishers Lane                            U.S. Department of Justice
Rockville, MD  20857                         P.O. Box 386
301-827-7138                                 Washington, D.C.  20044
                                             202-307-0044

December 2, 2005

# EXHIBIT 9

M E M O R A N D U M       DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH

---

DATE:      September 30, 2004

FROM:      Gary Buehler, Director    *Gary Buehler*    9/30/04
Office of Generic Drugs

SUBJECT:      Removal of Simvastatin Patent No. Re. 36,481 and Patent No. Re. 36,520 from
the Orange Book at Merck's Request

TO:      MaryAnn Holovac
Orange Book Staff, OGD

The agency will not always remove a patent from the Orange Book at the NDA holder's request.
Whether FDA will delist a patent depends in part upon 180-day exclusivity considerations. The
general approach is as follows:

- When no ANDA containing a paragraph IV certification to the patent has been submitted,
  FDA <u>will remove</u> the patent from the Orange Book promptly upon request by the NDA
  holder.

- When the first applicant to submit a paragraph IV certification has not been sued as a result
  of the certification, FDA <u>will remove</u> the patent if requested to do so by the NDA holder.
  FDA will remove the patent from the Orange Book, even if a subsequent applicant with a
  paragraph IV certification has been sued. This is the case with Simvastatin.

- When the ANDA applicant that submits the first paragraph IV certification to the patent (the
  applicant who may be eligible for exclusivity) has been sued as a result of notice of that
  certification, the agency <u>will not remove</u> the patent until the patent has expired or until the
  exclusivity has run. See 21 CFR 314.94(a)(12)(viii)(B)("A patent that is the subject of a
  lawsuit ... shall not be removed from the list until FDA determines either that no delay in
  effective dates of approval is required under [314.107(c)] as a result of the lawsuit, that the
  patent has expired, or that any such period of delay in effective dates of approval has
  ended").

A detailed legal analysis and a summary of Simvastatin patent certifications follow.

306

<u>Legal Analysis</u>

The Federal Food, Drug, and Cosmetic Act (the act) places the responsibility for submitting patent information for new drugs on the new drug application (NDA) applicant.  Section 505(b)(1) and (c)(2).  The act further directs that FDA publish the submitted patent information, *id.*, and update that information every thirty days.  Section 505(j)(7)(A)(iii).  FDA anticipated in its regulations that NDA applicants would, on occasion, correct patent information by withdrawing or amending that information.  21 CFR 314.53(f).

FDA regulations describe one limited situation in which the agency will maintain a patent listing even after the NDA holder requests FDA remove it from the Orange Book.  This exception is described in 21 CFR 314.94(a)(12)(viii)(B).  It provides that:

> A patent that is the subject of a lawsuit under [21 CFR 314.107(c)] shall not be removed from the list until FDA determines either that no delay in effective dates of approval is required under that section as a result of the lawsuit, that the patent has expired, or that any such period of delay in effective dates of approval is ended.

FDA interprets this regulation to mean that, if the listed patent has been the subject of a lawsuit as a result of the paragraph IV certification submitted by the "previous" (first) applicant under section 505(j)(5)(B)(iv), FDA will not remove that patent until 1) the patent expires, 2) an ANDA applicant prevails in patent litigation and the exclusivity that is triggered by the court decision finding the patent invalid or not infringed has expired, 3) exclusivity is triggered by commercial marketing and has expired, or 4) the first ANDA applicant loses the lawsuit and changes its certification to a paragraph III.

FDA's interpretation conforms to the regulatory scheme in effect at the time the regulation was promulgated, whereby an ANDA applicant had to have been sued – and ultimately prevail – to earn its exclusivity.  *See* 21 CFR 314.107(c) (1998)(the applicant submitting the first application must successfully defend against a suit for patent infringement).  FDA amended some of its regulations as a result of *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) to remove the "successful defense" requirement for exclusivity, 63 Fed. Reg. 59710 (Nov. 5, 1998).  However, FDA retained the lawsuit requirement in the patent delisting context.  The statutory language that the court found controlling in *Mova*, section 505(j)(5)(B)(iv), is not directly applicable to this circumstance.  Instead, the only applicable statutory provision generally gives control over patent listings to the NDA holder.  Section 505(b)(1) and (c)(2).  FDA's interpretation of the regulation -- limiting the exception to patent delisting to instances where NDA holder or patent owner has sued the ANDA applicant as a result of the paragraph IV certification -- is consistent with this statutory provision and the overall regulatory scheme.  Under the circumstances, FDA has maintained a reasonable balance between allowing NDA applicants to correct patent listings and protecting the incentive for ANDA applicants who are sued as a result of a patent certification and bear the cost of that litigation.

The agency considered and rejected whether, alternatively, it is required to maintain a patent in the Orange Book when at least one ANDA was submitted containing a paragraph IV certification, even if the first applicant with a paragraph IV certification is not sued.  Under

FDA's current interpretation of section 505(j)(5)(B)(iv), the first ANDA applicant to submit a paragraph IV certification to a patent need not be sued as a result of that certification to be eligible for 180 days of exclusivity. 21 CFR 314.107(c)(2003); *Purepac v. Friedman*, 162 F.3d 1201 (D.C.Cir. 1998). However, the agency does not believe that, because an ANDA applicant may be eligible for exclusivity merely by submitting a paragraph IV patent challenge, the FDA must maintain the patent listing when no litigation has resulted from that certification and the NDA holder requests that the patent be removed from the list. Moreover, even if FDA were to believe that it would be reasonable to leave the patent in the Orange Book based on the broad eligibility for exclusivity, the statutory language giving control over patent listings to the NDA holder - and the very limited exception in the regulations - mitigate against doing so.[1]

The above analysis applies only with respect to patent delisting issues that arise under section 505 of the act prior to its recent modifications. The 2003 amendments to the 180-day exclusivity provisions of section 505(j) will require that the agency make certain changes to its patent delisting process. The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act (MMA), Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) contain a provision under which a first applicant may forfeit 180-day exclusivity if it fails to market the drug within 75 days after the patent (as to which it qualified for exclusivity) is withdrawn by the NDA holder. Section 505(j)(5)(D)(i)(I)(bb)(CC)(2004). These new forfeiture provisions apply to exclusivity applicable to ANDAs for drug products as to which the first ANDA containing a paragraph IV certification to a listed patent was submitted on or after December 8, 2003. See MMA, Pub. L. No. 108-173, § 1102(b)(1)(2003). The patent delisting issues raised by the MMA changes will be addressed in the proposed regulations.

---

[1] Similarly, under FDA's regulations, an ANDA applicant also will not maintain its eligibility for exclusivity beyond the expiration of the patent, even if the applicant has vigorously defended patent litigation resulting from its paragraph IV certification. 21 CFR 314.94(a)(12)(viii); *Dr. Reddy's Laboratories, Inc., et al. v. Thompson, et al.*, No. 02-452, slip op at 27-39 (D.N.J. July 17, 2003).

SUMMARY OF SIMVASTATIN PATENT CERTIFICATIONS
SUBMITTED BY ANDA HOLDERS



| ANDA# | FIRM# | RE36,481 | RE36,520 | 4,444,784 |
|-------|-------|----------|----------|-----------|

Attachments:  Letters from Merck dated October 10, 2003 and December 19, 2003

cc:    Dan Troy, OCC

4

# EXHIBIT 10

HFA-305

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
Rockville MD 20857

APR  6 1992                    09 APR -8  AM 10: 33

Thomas A. Hayes, M.D.
Director Regulatory Affairs
Bristol-Myers Squibb Co.
U.S. Pharmaceutical Group
Evansville, IN 47721-0001          Re: Docket No. 90P-0240/CP

Dear Dr. Hayes:

This letter responds to your July 13, 1990, citizen petition.
Your petition requested that the Food and Drug Administration
(FDA) deny approval of the pending applications submitted by
Gema Liesa (Gema) and Zenith Laboratories (Zenith) for
cefadroxil products.  Your petition was followed by a letter,
dated July 15, 1991, in which you pleaded for a timely
response to your petition.

For the reasons stated below, we are denying your petition.

### PETITIONER'S STATEMENT OF GROUNDS

Section 442.6 of the Code of Federal Regulations (21 CFR
442.6) sets forth standards (a monograph) for the identity,
strength, quality, and purity found necessary to adequately
ensure the safety and efficacy of products containing
cefadroxil monohydrate and test methods to determine
compliance with such standards.  You state that the monograph
for bulk cefadroxil monohydrate (21 CFR 442.6) specifies that
the product must be a "monohydrate" and that its moisture
content must be between 4.2 and 6.0 percent.  You further
state that the monographs for cefadroxil monohydrate capsules,
tablets, and oral suspension (21 CFR 442.106a-c) incorporate
by reference the requirements of the monograph for the bulk
drug.

You assert that, based on an analysis of a sample of the bulk
cefadroxil product manufactured by Gema and provided by Zenith
to Bristol-Myers Squibb in a court proceeding, the product is
not a monohydrate[1].  Therefore, it does not comply with the
monograph at 21 CFR 442.6 and the applications for approval
sought by Gema and Zenith must be denied.

---

[1]FDA informed Bristol-Myers Squibb by letter of August 12,
1991, to Allan Fox, Esq., Attorney for Bristol-Myers Squibb Co.,
that the bulk drug substance manufactured by Gema is a
hemihydrate.  FDA's position on whether the Gema product conforms
to the monograph for cefadroxil monohydrate is contained in this
letter rather than that earlier preliminary response.

90P-0240                                                    PDN1

Thomas A. Hayes, M.D.                                                      2

Although you request denial of approval of specific
applications, the basic issue raised by your petition is
whether FDA can accept and approve an abbreviated antibiotic
application for an antibiotic drug product whose only
difference from an established monograph is a difference in
water of hydration.  Therefore, a decision on your request
depends on FDA's resolution of this issue.

### AGENCY RESPONSE

**I.  FDA's Authority to Approve Antibiotic Drugs**

**A.  Statutory Authority**

The statutory authority for approving antibiotics, including
generic versions, is section 507 of the Federal Food, Drug,
and Cosmetic Act (the act) (21 U.S.C. 357).  To obtain the
initial approval of a new antibiotic drug for human use, an
applicant must file with FDA an application (Form 5)
containing data showing the safety and effectiveness of the
new antibiotic in accordance with section 507 of the act.
Under section 507, approval of an antibiotic drug product by
FDA results in the establishment of a monograph for the
product, which is a regulation codified in the Code of Federal
Regulations.  An antibiotic monograph describes standards of
identity, strength, quality, and purity that are necessary to
assure the safety and efficacy of the drug, and test methods
to determine compliance with such standards.

FDA has always approved a generic copy of an antibiotic (i.e.,
the same drug made by a different firm) upon a showing that
the generic conformed to the specifications set out in the
applicable monograph.  In addition, as with generic copies of
nonantibiotic drugs, generic copies of approved antibiotic
drugs must also show bioequivalence to the approved antibiotic
drug for which FDA has established a monograph.  Historically,
approval of a generic copy of an antibiotic drug has been
obtained by the filing of a "Form 6," containing the same data
as a Form 5, minus the basic safety and effectiveness testing.

Section 507(a) requires that FDA certify that each batch of an
antibiotic drug conform to the applicable monograph, unless FDA
has exempted such drug from the certification process in
accordance with section 507(c).  Because of antibiotic drug
manufacturers' high level of compliance with existing
monographs, in 1982, FDA concluded that all classes of
antibiotic drugs could be exempted from the batch
certification requirements of section 507(a).[2]  Pursuant to

---

[2] 47 FR 39155 (1982)

Thomas A. Hayes, M.D.                                                      3

section 507(e) of the act, these exempted antibiotics, upon
approval, are subject to section 505 of the act.  An approved
antibiotic application (Form 5) is regarded as an approved new
drug application (NDA) under § 314.50 (21 CFR 314.50) and an
approved abbreviated antibiotic application (Form 6) is
regarded as an abbreviated new drug application (ANDA) under
§ 314.55 (21 CFR 314.55).

As part of an effort to simplify procedural requirements, FDA
now requires a similar application submission (Form FDA 356h)
for antibiotics and nonantibiotics so that a former Form 5
equates with an NDA and a former Form 6 equates with an ANDA.
In addition, for review purposes, FDA applies the same
approval procedures to human antibiotic applications as to
nonantibiotic applications.

B.    Applicable Regulations

Section 314.56(e) (21 CFR 314.56(e)) provides that abbreviated
applications are suitable for "duplicates of an antibiotic
drug for which FDA has approved an application."  Section
314.55(c)(1) (21 CFR 314.55(c)(1)) provides that "a finding by
FDA that an abbreviated application is suitable for a drug
product applies only to a product that is the same in active
ingredient, dosage form and strength, route of administration,
and conditions of use as the drug product that was the subject
of the finding."  In proposing this regulation, FDA stated
that "the agency accepts antibiotic Form 6's . . . for all
antibiotic drugs that are comparable to an antibiotic drug for
which the agency's regulations provide for certification"
(emphasis added).[3]

II.   Are Active Ingredients with Different Waters of Hydration
Considered "Duplicates?"

FDA has on several occasions stated its position on the
meaning of "same" or "identical" active ingredient.  In its
proposed rule to implement Title I of the Drug Price
Competition and Patent Term Restoration Act of 1984 (Pub. L.
98-417), FDA interpreted the statutory requirement that "the
active ingredients in the proposed drug product be the same as
that of the listed drug" to mean that the active ingredients
must be identical, i.e., a different salt or ester of the
active ingredient in the proposed drug product would not be
identical to the active ingredient in the listed drug.[4]  In
its evaluation of pharmaceutical equivalence, FDA will not

_____

[3] 47 FR 46626 (1982)

[4] 54 FR 28881 (1989)

Thomas A. Hayes, M.D.                                                4

evaluate two drug products as therapeutic equivalents if the
products contain different salts or esters of the same
therapeutic moiety; however, anhydrous and hydrated entities
are not considered to be different salts or esters. Thus, in
the case of ampicillin and ampicillin trihydrate, if they meet
the same standards and their equivalence is supported by
appropriate bioavailability/bioequivalence studies, FDA would
consider them pharmaceutical equivalents.[5]

Cefadroxil hemihydrate is neither a salt nor an ester of
cefadroxil monohydrate. The active moiety of each ingredient
is cefadroxil, i.e., it is cefadroxil that achieves the
intended effect in the diagnosis, cure, mitigation, treatment,
or prevention of a disease or in affecting the structure or
function of the human body (See 21 U.S.C. 321(g)(1)). FDA
considers differences in waters of hydration resulting in
polymorphic crystal forms of the same active moiety (i.e.,
different forms of the same active ingredient) to be the same
when dissolution, solubility, and absorption are shown to be
equivalent. Demonstration of such equivalence is a required
part of the approval process for an abbreviated antibiotic
application. On the other hand, esters or salts of the same
active moiety are not considered the same active ingredient
because they require metabolic conversion before the active
moiety is made available. Therefore, a cefadroxil hemihydrate
product would be considered a "duplicate" of a cefadroxil
monohydrate product in accordance with the regulation at
§ 314.56(e). Consequently, FDA may accept and approve an
abbreviated antibiotic application for cefadroxil hemihydrate
if the applicant can meet all of the standards of the
monohydrate monograph except the moisture content
specification, and the applicant shows that its product is
bioequivalent to the cefadroxil monohydrate product.

I do not, and cannot, comment on or imply that we have made
any findings on Gema's and Zenith's applications. I simply
conclude that you have not demonstrated sufficient reason to
require FDA to deny approval of an abbreviated application for
an antibiotic product whose only difference from an
established monograph is its water of hydration.

---

[5] 44 FR 2950 (1979); Approved Drug Products with Therapeutic
Equivalence Evaluations, 12th Edition (1992) at xii. The
agency's position with respect to therapeutic equivalence and
ingredients with different waters of hydration is a long-standing
one. It did not evolve in the context of this petition
concerning cefadroxil products. This is evidenced by FDA's
conclusions about ampicillin and ampicillin trihydrate in
establishing Maximum Allowable Costs (MAC's) for certain forms
and strengths of ampicillin (41 FR 51087 (1976)).

Thomas A. Hayes, M.D.                                                    5

## CONCLUSION

For the reasons described above, your petition requesting FDA
to deny approval of applications submitted by Gema and Zenith
for their versions of cefadroxil is denied.

                    Sincerely yours,

                    Carl C. Peck, M.D.
                    Director
                    Center for Drug Evaluation
                        and Research



**DEPARTMENT OF HEALTH & HUMAN SERVICES**        Public Health Service

Food and Drug Administration
Rockville MD 20857

Donald O. Beers, Esq.                    OCT 16 1998  5583  '98  OCT 21  P 3:45
David E. Korn, Esq.
Arnold & Porter
555 12th Street, N.W.
Washington, DC 20004

Re: 98P-0334/PSA1

Dear Messrs. Beers and Korn,

This responds to your petition for stay of action,[1] dated May 15, 1998, requesting that the
Food and Drug Administration (FDA) stay the effective date of approval of any abbreviated
new drug application (ANDA) for ticlopidine hydrochloride other than one submitted by
TorPharm Inc. until 180 days after the date of the first commercial marketing of the drug
under TorPharm's ANDA 75-089. Your petition is granted[2] for the following reasons:

As you note in your petition, the Court of Appeals for the District of Columbia recently struck
down that portion of FDA's regulation requiring that, to qualify for 180 days of market
exclusivity for its drug product, an ANDA applicant successfully defend against a suit for
patent infringement brought within 45 days of the patent owner's receipt of notice of a patent
challenge. *(See Mova Pharmaceutical Corp. v. Shalala*, 140 F3.d 1060 (D.C.Cir. 1998); *see
also* 21 CFR 314.107(c)(1).) The *Mova* court subsequently issued an order holding the
"successful defense" requirement of § 314.107(c)(1) invalid, and permanently enjoining FDA
from enforcing it (*Mova Pharmaceutical Corp. v. Shalala*, Civ. No. 966-2861, Order (D.D.C.
filed June 1, 1998)). As your petition further notes, the "successful defense" requirement was
also deemed unsupported by the Federal Food, Drug, and Cosmetic Act (the Act) in *Granutec,
Inc. v. Shalala*, No. 97-1873 and No. 97-1874, 1998 U.S. App. LEXIS 6685, (4th Cir. Apr.
3, 1998).

Following these court decisions, FDA published a guidance on June 22, 1998, to clarify for
industry how the Agency will now apply the 180-day generic drug exclusivity provisions of
the Act (*Guidance for Industry, 180-Day Generic Drug Exclusivity Under the Hatch-Waxman
Amendments to the Act*). A copy of the guidance is enclosed. The guidance addresses the
issue raised in your petition: when the first applicant to submit a substantially complete ANDA

---

[1] The petition is titled a petition for stay of *approval*, but a petition like this submitted under 21 CFR 10.35
is a petition for stay of *action*.

[2] You indicate that Hoffman-La Roche Inc. and Syntex (U.S.A.) Inc. (referred to jointly as "Roche") are
not presently involved in patent litigation related to Ticlid (Petition at 1). If this were to change and prior to
commercial marketing of TorPharm's generic version of ticlopidine hydrochloride, Roche were to become involved
in Ticlid-related patent litigation in which a court finds the relevant patent invalid or infringed, that decision would
trigger commencement of the 180-day period of market exclusivity for TorPharm. See section 505(j)(5)(B)(iv) of
the Federal Food, Drug, and Cosmetic Act.

98P-0334                                                                    PAV 1

Docket No. 98P-0334/PSA1

with a paragraph IV certification is not sued as a result of the notice provided to the holder of the NDA and the patent owner, the applicant is nevertheless eligible for 180 days of market exclusivity. Exclusivity runs either from the date that the applicant begins commercial marketing or from the date of a court decision finding the patent invalid or not infringed, whichever is earlier (Guidance at 5).

The guidance also explains that FDA intends to withdraw the "successful defense" provisions from § 314.107(c)(1) and initiate proceedings to issue new regulations under section 505(j)(5)(B)(iv) of the Act. The Agency welcomes your comments on both the guidance and any subsequent proposed rule.

Sincerely yours,

Ronald G. Chesemore
Associate Commissioner
for Regulatory Affairs

Enclosure

2



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
Rockville MD 20857

MAR 2 1999

James F. Hurst, Esq.                    6149 '99 MAR -5 AIO :01
Winston & Strawn
35 West Wacker Drive
Chicago, Illinois 60601

Re:   Docket No. 98P-0493/PSA1 & RC1

Dear Mr. Hurst:

This responds to your Petition for Stay of Action,[1] dated June 26, 1998, requesting that the Food and Drug Administration (FDA) stay the effective date of approval of any abbreviated new drug application (ANDA) for tamoxifen citrate other than one submitted by Barr Laboratories, Inc., until 180 days after the date of the first commercial marketing of the drug under Barr's ANDA 70-929, or the date of a final decision of a court holding the tamoxifen citrate patent to be invalid or not infringed. After careful review of your petition and supplement, as well as comments to the petition received by FDA, the Agency grants the petition for the following reasons.

## I. BACKGROUND

Barr Laboratories, Inc. (Barr), submitted an ANDA in December 1985 requesting FDA approval to market a generic version of tamoxifen citrate. When Barr amended its application in September 1987 to include a paragraph IV certification under section 505(j)(2)(A)(vii)(IV) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 355(j)(2)(A)(vii)(IV)) challenging the patent covering tamoxifen citrate (the "'516 patent"), it became the first applicant to file an ANDA with such a certification.

Imperial Chemical Industries, PLC (ICI) held the '516 patent in 1987 and sued Barr for patent infringement. While a district court decision[2] favorable to Barr was on appeal, ICI and Barr entered into a settlement agreement that included vacateur of that court decision.[3] Barr then changed the certification in its application to a paragraph III certification under section 505(j)(2)(A)(vii)(III) of the Act.

---

[1] The petition is titled a petition for stay of *approval*, but a petition like this submitted under 21 CFR 10.35 is a petition for stay of *action*.

[2] *Imperial Chemical Industries, PLC v. Barr Laboratories, Inc.*, 795 F. Supp. 619 (S.D.N.Y. 1992).

[3] See *Imperial Chemical Industries, PLC v. Barr Laboratories, Inc.*, 991 F.2d 811 (Fed. Cir. 1993).

98P-0493                                                        PA√1

Docket No. 98P-0493/PSA1 & RC1

Although Barr has never marketed a tamoxifen citrate product under its own ANDA, it is licensed by Zeneca Limited (Zeneca), the current owner of the '516 patent, to sell a tamoxifen product manufactured by Zeneca.[4]  Subsequent ANDA applicants have challenged the '516 patent, but no court decisions have been issued in those cases finding the patent invalid, unenforceable, or not infringed.

## II. DISCUSSION

On April 14, 1998, the Court of Appeals for the District of Columbia struck down that portion of FDA's regulation requiring that, to qualify for 180 days of market exclusivity for its drug product under section 505(j)(5)(B)(iv) of the Act, an ANDA applicant must successfully defend against a suit for patent infringement brought within 45 days of the patent owner's receipt of notice of a patent challenge.  (See *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998); see also 21 CFR 314.107(c)(1)(1998).)  The *Mova* court subsequently issued an order invalidating the "successful defense" requirement of § 314.107(c)(1) (21 CFR 314.107(c)(1)) and permanently enjoining FDA from enforcing it (*Mova Pharmaceutical Corp. v. Shalala*, Civ. No. 966-2861, Order (D.D.C. filed June 1, 1998)).  (See also *Granutec, Inc. v. Shalala*, No. 97-1873 and No. 97-1874, 1998 U.S. App. LEXIS 6685, (4th Cir. Apr. 3, 1998) ("successful defense" requirement deemed unsupported by the Act)).

Following these court decisions, FDA published a guidance to clarify for industry how the Agency will apply the 180-day generic drug exclusivity provisions of the Act in light of the *Mova* decision (*180-Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act*) (June 1998).  A copy of the guidance is enclosed. FDA then published an interim rule to withdraw the "successful defense" provisions from § 314.107(c)(1).  (See 63 FR 59710, November 5, 1998.)  As indicated in the guidance, the Agency intends to initiate proceedings to issue new regulations under section 505(j)(5)(B)(iv) of the Act.

Although the Agency will modify the regulations that were premised upon the "successful defense" requirement, FDA has not yet published a proposed rule.  The regulatory provision that your petition places at issue, § 314.94(a)(12)(viii)(A), was issued concurrently with the "successful defense" regulatory requirement and interfaces with that now defunct requirement. However, in contrast to § 314.107(c)(1), which includes the "successful defense" requirement, § 314.94(a)(12)(viii)(A) remains intact.

---

[4] Zeneca is the holder of an approved new drug application, NDA 17-970, for tamoxifen citrate tablets, brandname "Nolvadex."

2

Docket No. 98P-0493/PSA1 & RC1

Section 314.94(a)(12)(viii)(A) reads as follows:

> An applicant who has submitted a certification under paragraph (a)(12)(i)(A)(4) of
> this section and is sued for patent infringement within 45 days of the receipt of
> notice sent under § 314.95 shall amend the certification if a final judgment in the
> action against the application is entered finding the patent to be infringed. In the
> amended certification, the applicant shall certify under paragraph (a)(12)(i)(A)(3)
> of this section that the patent will expire on a specific date. Once an amendment
> or letter for the change has been submitted, the application will no longer be
> considered to be one containing a certification under paragraph (a)(12)(i)(A)(4) of this
> section. If a final judgment finds the patent to be invalid and infringed, an
> amended certification is not required.

This regulation requires an ANDA applicant who has lost its patent infringement litigation to
change its paragraph IV certification to a Paragraph III certification. Although Barr did not lose
its litigation with ICI, but instead settled the dispute, it changed its certification to the '516 patent
from a IV to a III. A voluntary change of patent certification is permitted under these
circumstances by 21 CFR 314.94(a)(12)(viii). For purposes of this petition response, the effect of
a voluntary or involuntary change in patent certification would be the same.

Although Barr has changed its certification from a paragraph IV to a paragraph III certification,
the Agency has not interpreted its regulation to render an applicant ineligible for exclusivity after
such a change in certification. (See *Mova,* 140 F.3d at 1071.) Currently, this regulation
regarding changes in patent certification fulfills a purely administrative function for the Agency.
The Agency has, as in the *Mova* litigation, described that regulatory provision as fulfilling only the
"housekeeping" function of informing the agency that the ANDA would not be approved until the
patent expired, and clarified that the provision had no implications for exclusivity eligibility. That
interpretation is consistent with the entire previous regulatory scheme, which was built around the
"successful defense" requirement. Under the previous scheme, the status of the first paragraph IV
certification alone had no bearing on eligibility for exclusivity; the ANDA applicant also had to
successfully defend the patent litigation. The removal of the "successful defense" requirement has
resulted in a somewhat fragmented regulatory framework, but it has not changed the effect of this
regulation. The agency recognizes that a new interpretation of section 505(j)(5)(B)(iv) in light of
*Mova* may require a new interpretation or a revision of § 314.94(a)(12)(viii). Should the
regulatory effect of a change in patent certification from a paragraph IV to a paragraph III be
modified, Barr's eligibility for exclusivity may be affected.

Until FDA has completed a rulemaking, however, the Agency will continue to regulate from the
existing regulations when they are applicable, as with your petition. When the regulations do not
pertain to the case before it, the Agency will regulate directly from the statute as announced in the
guidance.

Docket No. 98P-0493/PSA1 & RC1

Barr therefore remains eligible for 180 days of exclusivity. Barr has signaled with its change in certification that currently it does not intend to market under its own ANDA until the '516 patent expires. Moreover, Barr has settled its patent litigation without a decision of a court finding the patent invalid, not infringed or, unenforceable. Therefore, it is possible that Barr's exclusivity could begin to run with such a decision of a court hearing a case involving another ANDA applicant's challenge to the '516 patent. This interpretation of section 505(j)(5)(B)(iv)(II) of the Act is discussed in FDA's June 1998 guidance and in the *Granutec* decision.

## III. CONCLUSION

Your request that the Agency stay the effective date of approval of any ANDA for tamoxifen citrate other than one submitted by Barr Laboratories, Inc., until 180 days after the date of the first commercial marketing of the drug under Barr's ANDA, or the date of a final decision of a court holding the tamoxifen patent to be invalid or not infringed, is therefore granted.

Sincerely yours,

Janet Woodcock, M.D.
Director
Center for Drug Evaluation and Research

Enclosure

4



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
Rockville MD 20857

Marcy Macdonald                                    JUN 11 2002   '02  JUN 12  P 1 :43
Associate Director, Regulatory Affairs
Apotex Corp.
50 Lakeview Parkway
Suite 127
Vernon Hills, IL  60061

Deborah A. Jaskot
Executive Director, Regulatory Affairs
Teva Pharmaceuticals USA
1090 Horsham Road
P. O. Box 1090
North Wales, PA  19454-1090

James F. Hurst, Esq.
Winston & Strawn
35 West Wacker Drive
Chicago, IL  60601-9703

Re:  Docket Nos. 01P-0495/CP1, 02P-0191/CP1,  & 02P-0252/CP1

Dear Ms. Macdonald, Ms. Jaskot, and Mr. Hurst:

This letter responds to three petitions concerning approval of abbreviated new drug
applications (ANDAs) submitted under section 505(j) of the Federal Food, Drug, and
Cosmetic Act (the Act) for generic tramadol hydrochloride (tramadol) 50 milligram (mg)
tablets.  Ultram is the reference listed drug for the subject ANDAs.  The petitions, dated
October 24, 2001, April 30, 2002, and May 30, 2002, respectively, were submitted by
Apotex Corp. (Apotex petition), Teva Pharmaceutical USA (Teva petition), and Caraco
Pharmaceuticals Laboratories, Ltd. (Caraco petition).[1]  The petitions ask the Food and
Drug Administration (FDA) to immediately approve generic products that are labeled
with dosage instructions to administer 50 to 100 mg of tramadol hydrochloride every 4 to
6 hours as needed for pain relief, not to exceed 400 mg per day.[2]

---

[1] Apotex submitted comments dated February 12, 2002, April 11, 2002, May 2, 2002, May 8, 2002, and
June 6, 2002. Teva submitted comments dated April 30, 2002, May 23, 2002, and June 5, 2002. Johnson
submitted comments dated January 22, 2002, May 17, 2002, and May 31, 2002. Eon Labs submitted a
comment dated March 7, 2002. The Caraco petition was also submitted as a comment to the Apotex and
Teva petitions.

[2] The October 24, 2001, Apotex petition asked FDA to determine that the non-titrated dosing regimen
originally approved for Ultram tablets was not withdrawn from the labeling for reasons of safety or
effectiveness, that a generic tramadol labeled with the discontinued dosing regimen will not be less safe or
effective than Ultram with its current labeling, and that an ANDA for a generic tramadol may use the
discontinued dosing regimen.  In response to Teva's petition, Apotex submitted a supplement to its petition
dated May 8, 2002, asking FDA to immediately approve its ANDA for a generic tramadol.  This

O1P-0495                                    PAV 1

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

The petitions are granted in part and denied in part. Teva's petition is denied insofar as it proposes that generic tramadol be labeled only for use for acute pain and contain only the second paragraph of Ultram's "Dosage and Administration" section. Teva's petition is granted insofar as the Agency will approve Teva's ANDA if it is labeled as described below and all other conditions of approval are met. The labeling described below omits an aspect of labeling protected by patent or exclusivity while not rendering the proposed drug product less safe or effective than the listed drug for all remaining, non-protected conditions of use. *See* 21 CFR 314.127(a)(7).

Apotex's petition is granted in part. Apotex's petition is granted insofar as the Agency will approve Apotex's ANDA if it is labeled as described below and all other conditions of approval are met. Because adequate information to label a generic tramadol remains in the unprotected portion of Ultram's existing labeling, FDA does not reach the question raised in the Apotex petition of whether an ANDA can rely on information that has been discontinued from Ultram's labeling.

Caraco's petition is granted in part and denied in part. Caraco's petition is granted insofar as it "respectfully asks that the FDA describe precisely what label it would find acceptable." Because the Agency has identified the appropriate labeling for a generic tramadol, FDA does not reach the question of whether Caraco's ANDA can be approved using the alternative labeling Caraco suggests.

I.      Background

When Ultram was originally approved on March 3, 1995, for management of moderate to moderately severe pain, the approved dosing regimen was 50 to 100 mg administered every 4 to 6 hours as needed for pain relief, not to exceed 400 mg per day.

On August 21, 1998, R.W. Johnson Pharmaceutical Research Institute (Johnson), the NDA holder for Ultram, received approval for a dosing schedule that provided for titration in increments of 50 mg per day every 3 days until an effective dose (not exceeding 400 mg per day) was reached.[3] The labeling approved to reflect the results of the 50 mg, 10-day titration trial included the original non-titration dosing information followed by the statement, "In a clinical trial, fewer discontinuations due to adverse events, especially dizziness and vertigo, were observed when titrating the dose in increments of 50 mg/day every 3 days until an effective dose (not exceeding 400 mg/day) was reached." Although this titration schedule did not specify a starting dose, a 50 mg/day starting dose can be inferred from the titration schedule specified. Clinical trials supporting this change demonstrated that titration from 50 mg over 10 days to reach an

---

supplement also asks the Agency to decide what labeling is appropriate for a generic tramadol product and to give Apotex the opportunity to propose such labeling.

[3] This schedule contemplates dosing as follows: Days 1-3, 50 mg; Days 4-6, 100 mg (50 mg 2 times per day); Days 7-9, 150 mg (50 mg 3 times per day); Day 10, 200 mg (50 mg 4 times per day); thereafter, 50-100 mg every 4-6 hours as needed up to 400 mg/day).

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

effective dose increases the tolerability of Ultram and results in statistically significant
reductions in discontinuations due to dizziness and vertigo. This 50 mg, 10-day titrated
dosing schedule was granted 3 years of marketing exclusivity (that expired on August 21,
2001) and then received a pediatric exclusivity extension that expired February 21, 2002.

On December 23, 1999, Johnson received approval for an even slower, 16-day titration
schedule that uses a 25 mg/day starting dose. This schedule recommends titration in 25
mg increments every 3 days until a 100 mg dose is reached, followed by a dose increase
in 50 mg increments, as tolerated, every 3 days to reach 200 mg/day.[4] Clinical trials
supporting this titration schedule were conducted in a population of patients who, during
an open label run-in phase, had previously discontinued use of tramadol due to nausea
and vomiting. The trials demonstrated that, for patients who have previously shown
intolerance to a higher dose of tramadol, the 25 mg, 16-day titration resulted in a
statistically significant reduction in discontinuations due to nausea and vomiting and
fewer discontinuations due to any cause than did a 10-day or 4-day titration schedule.
The labeling approved to reflect the results of the 25 mg, 16-day titration trial added the
slower titration schedule, and it also indicated that the original, non-titrated dosing
instructions were for patients who require "rapid onset of analgesic relief." Johnson was
granted 3 years of marketing exclusivity (to expire on December 23, 2002) for this dosing
schedule, and then received a pediatric exclusivity extension that will expire on June 23,
2003. Johnson also has listed a use patent in *Approved Drug Products with Therapeutic
Equivalence Evaluations* (the Orange Book) for a titration dosing regimen for the
treatment of pain using an initial dose of about 25 mg.[5]

Teva and Apotex contend that despite the exclusivity and patent protection for the 25 mg,
16-day titration schedule, generic tramadol products nevertheless may be approved with
appropriate labeling describing the safe and effective use of the drug.

II.    Ultram's Current Labeling

Ultram (tramadol hydrochloride tablets) is a synthetic compound with opioid activity.
The "Indications and Usage" section of Ultram's labeling states: "ULTRAM is indicated
for the management of moderate to moderately severe pain. "

---

[4] This schedule contemplates dosing as follows: Days 1-3, 25 mg; Days 4-6, 50 mg (25 mg 2 times per
day); Days 7-9, 75 mg (25 mg 3 times per day); Days 10-12, 100 mg (25 mg 4 times per day), Days 13-15,
150 mg (50 mg 3 times per day); Day 16, 200 mg (50 mg 4 times per day); thereafter, 50-100 mg every 4-6
hours as needed up to 400 mg/day).

[5] When a drug product is granted three years of exclusivity under sections 505(c)(3)(D)(iv) and
505(j)(5)(D)(iv) of the Act for new clinical investigations essential to the approval of an NDA supplement,
FDA may not approve an NDA described in section 505(b)(2) or an ANDA for the change described in the
supplement for 3 years. When a method of using a drug is claimed in a listed patent, an ANDA applicant
may either seek approval for labeling that omits the protected use, section 505(j)(2)(A)(viii), or challenge
the method of use patent by filing a "paragraph IV certification" under section 505(j)(2)(A)(vii)(IV). This
petition response addresses the former case, when an ANDA applicant seeks to omit protected labeling.

3

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

The "Dosage and Administration" section of Ultram's labeling currently states:

> Adults (17 years of age and over)
>
> For patients with moderate to moderately severe chronic pain not requiring rapid onset of analgesic effect, the tolerability of ULTRAM can be improved by initiating therapy with the following titration regimen: ULTRAM should be started at 25 mg/day qAM and titrated in 25 mg increments as separate doses every 3 days to reach 100 mg/day (25 mg q.i.d.). Thereafter the total daily dose may be increased by 50 mg as tolerated every 3 days to reach 200 mg/day (50 mg q.i.d.). After titration, ULTRAM 50 to 100 mg can be administered as needed for pain relief every 4 to 6 hours **not to exceed 400 mg/day.**
>
> For the subset of patients for whom rapid onset of analgesic effect is required and for whom the benefits outweigh the risk of discontinuation due to adverse events associated with higher initial doses, ULTRAM 50 mg to 100 mg can be administered as needed for pain relief every four to six hours, **not to exceed 400 mg per day.**

Ultram's current labeling contains a section entitled "Titration Trials" that describes the clinical studies that were performed for approval of the current 16-day titration dosing regimen and the 10-day titration dosing regimen approved in the 1998 supplement. That section states:

> In a randomized, blinded clinical study with 129 to 132 patients per group, a 10-day titration to a daily ULTRAM dose of 200 mg (50 mg q.i.d.), attained in 50 mg increments every 3 days, was found to result in fewer discontinuations due to dizziness or vertigo than titration over only 4 days or no titration. In a second study with 54 to 59 patients per group, patients who had nausea or vomiting when titrated over 4 days were randomized to re-initiate ULTRAM therapy using slower titration rates. A 16-day titration schedule, starting with 25 mg qAM and using additional doses in 25 mg increments every third day to 100 mg/day (25 mg q.i.d.), followed by 50 mg increments in the total daily dose every third day to 200 mg/day (50 mg q.i.d.), resulted in fewer discontinuations due to nausea or vomiting and fewer discontinuations due to any cause than did a 10-day titration schedule.

4

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

III.    FDA's Authority to Approve an ANDA That Omits Labeling Protected by
       Exclusivity or Patent

FDA has authority to approve ANDAs that omit protected labeling carried by the listed
drug. The Act requires that an ANDA contain "information to show that the conditions
of use prescribed, recommended, or suggested in the labeling proposed for the new drug
have been previously approved for a [listed drug]." 21 U.S.C. 355(j)(2)(A)(i). The Act
also requires that an ANDA contain "information to show that the labeling proposed for
the new drug is the same as the labeling approved for the listed drug . . . ." 21 U.S.C.
355(j)(2)(A)(v). The Act specifies two exceptions to this requirement. ANDA labeling
may differ from that of the listed drug because changes from the listed drug were
approved pursuant to an ANDA suitability petition, or because the drugs are produced or
distributed by different manufacturers. 21 U.S.C. 355(j)(2)(A)(v). This requirement that
the ANDA labeling be the same as that of the reference listed drug (except for differences
approved under a petition or because the drugs are produced and distributed by different
manufacturers) is repeated in the section of the Act that provides the grounds for not
approving an ANDA. 21 U.S.C. 355(j)(4)(G).

FDA regulations flesh out the statutory exceptions to the "same labeling" requirement.
21 CFR 314.94, "Content and format of an abbreviated application," provides:

> Labeling (including the container label and package insert)
> proposed for the drug product must be the same as the
> labeling approved for the reference listed drug, except for
> changes required because of differences approved under a
> petition filed under § 314.93 or because the drug product
> and the reference listed drug are produced or distributed by
> different manufacturers. Such differences between the
> applicant's proposed labeling and labeling approved for the
> reference listed drug may include differences in expiration
> date, formulation, bioavailability, or pharmacokinetics,
> labeling revisions made to comply with current FDA
> labeling guidelines or other guidance, *or omission of an
> indication or other aspect of labeling protected by patent
> or accorded exclusivity under section 505(j)(4)(D) of the
> act.*"

21 CFR 314.94(a)(8)(iv)(emphasis added).

The regulations further provide that to approve an ANDA that omits an aspect of labeling
protected by patent or exclusivity, the Agency must find that the "differences do not
render the proposed drug product less safe or effective than the listed drug for all
remaining, non-protected conditions of use." 21 CFR 314.127(a)(7).

5

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

The courts have upheld FDA's authority to approve generic drugs with necessary labeling differences from the listed drugs they reference. In *Bristol-Myers v. Shalala*, 91 F.3d 1493, 1500 (D.C. Cir. 1996), the court rejected a challenge to FDA's regulations at 21 CFR 314.94(a)(8)(iv) and 21 CFR 314.127(a)(7). In so doing, the court upheld FDA's authority to approve a generic captopril that omitted from its labeling an indication in the listed drug's labeling that was protected by exclusivity, as well as protected indication-specific dosing instructions. The court held that omission of an indication protected by exclusivity was a difference in labeling "required . . . because the drug and the listed drug are produced or distributed by different manufacturers" within the meaning of the statute.

Finally, the Act contemplates that an innovator company may submit to FDA's Orange Book patents claiming a method of using a drug product and that ANDA applicants may omit from proposed labeling methods of use covered by those patents. Sections 505(b)(1) and (c)(2) of the Act state that innovators may submit patents to FDA that claim the approved drug "or method of using such drug." If a method-of-use patent listed by the innovator does not claim a use for which an ANDA applicant is seeking approval (because it is omitted from the proposed ANDA labeling), the ANDA applicant may submit a statement to FDA that it is not seeking approval for a use claimed by a listed patent. 21 U.S.C. 355(j)(2)(A)(viii). These two statutory provisions, which use the same "method of use" term, mirror each other; a method of use claimed by a patent is also a method of use that an ANDA applicant may propose to carve out of the labeling.[6]

Whether the proposed ANDA may be approved is a separate question. That issue depends on whether the generic product, when labeled to exclude protected information, will be rendered less safe or effective than the listed drug "for all remaining, non-protected conditions of use." 21 CFR 314.127(a)(7).

Thus, FDA has the authority to approve ANDAs with labeling that is not identical to that of the listed drug. The specific question at issue is not whether a generic drug may omit protected information from its labeling. It is whether generic tramadol products, when labeled to exclude protected information currently in the Ultram labeling, will be rendered less safe or effective than Ultram "for all remaining, non-protected conditions of use." 21 CFR 314.127(a)(7).

IV.    Safety and Effectiveness of a Tramadol Product with Protected Labeling Omitted

      A.    The Positions of the Parties

---

[6] FDA's regulation implementing this statutory provision uses the term "indications" to refer to what the ANDA applicant omits from its labeling in the context of submitting a statement that a protected use of a drug is not claimed in a listed patent. 21 CFR 314.94(a)(12)(iii). However, the preambles for the proposed and final rule express no intent to distinguish between method of use and indication, and use the terms interchangeably. See, for example, 59 Fed. Reg. 50338, 50347 (October 3, 1994).

6

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

In determining whether the protected portions of Johnson's Ultram labeling can be carved out to allow the approval of a generic, the parties have devoted considerable attention to the question of whether Ultram has been approved for both acute and chronic pain. Teva states that Ultram's labeling "provides for two separate and distinct therapeutic uses of tramadol, each of which requires a separate and distinct dosing regimen." Teva Petition at 3. Teva asserts that these two uses are: (1) "treatment of 'moderate to moderately severe <u>chronic</u> pain not requiring rapid onset of analgesic effect" and (2) "[t]reatment of <u>acute</u> pain, i.e., pain for which 'rapid onset of analgesic effect is required." Teva Petition at 3. In support of its position that Ultram was approved for two different uses, Teva points to a 1996 FDA talk paper stating that Ultram was approved for the management of acute and chronic pain, Talk Paper T-96-23 (April 3, 1996), as well as excerpts from the review history that suggest that approval for both chronic and acute pain was intended. Medical Team Leader Review, Anti-Inflammatory, Analgesic and Ophthalmic Drug Products Division, NDA #20-281, Feb. 23, 1999, p. 4 (available at http://www.fda.gov/ohrms/dockets/dailys/01/Oct01/102501/cp00001.pdf at 77).

Johnson argues, on the other hand, that Ultram was and is approved for only a single indication – the treatment of moderate to moderately severe pain. Johnson points to the "Indications and Usage" section of Ultram's labeling, which states simply: "Ultram is indicated for the management of moderate to moderately severe pain," and contains no reference to chronic pain or to acute pain. Johnson notes that acute pain relief has only accounted for a small proportion of Ultram's prescriptions. It contends that Teva's labeling, which proposes to limit dosing instructions to those for "acute pain," would be impermissibly silent as to the appropriate dosing regimen for the majority of patients for whom it is indicated. Both Teva and Johnson marshal evidence from the labeling, the review history, and the postmarketing history to support their respective views.

The question of whether Ultram is separately indicated for chronic and acute pain does not need to be resolved at this juncture for FDA to approve generic tramadol during Johnson's exclusivity period for the 25 mg, 16-day titration regimen. ANDAs for tramadol may be approved without deleting all of the labeling regarding dosage and administration for what Teva characterizes as "chronic" pain. Portions of Ultram's current labeling related to the 50 mg, 10-day titration schedule are not protected by patent or exclusivity and they may – and should – be included in the labeling. In fact, the labeling proposed in the citizen petitions, because it would omit non-protected information from the innovator's labeling, fails to comply with the statutory and regulatory "sameness" requirement. Inclusion of this labeling would result in generic products that are not "less safe and effective than the listed drug for all remaining non-protected conditions of use." 21 CFR 314.127(a)(7).

> B.    Ultram's Protected Labeling and the Safety and Effectiveness of Generic Tramadol Products

Teva's proposed labeling (which seeks to include dosage and administration information only for pain requiring rapid onset of analgesic relief and proposes to carve out all

7

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

references to titration) poses difficult questions that would require resolution before a product with the labeling proposed could be approved. The scope of Johnson's exclusivity does not, however, require such a dramatic deletion from the approved labeling. Johnson's remaining protection covers only the information about the 25 mg, 16-day titration that was new and essential to the approval of the 1999 labeling supplement – it does not protect information included in the labeling related to the 50 mg, 10-day titration trial or in the original pivotal clinical trials (for which all exclusivity has now expired).

Generic tramadol applications can be approved without including the 25 mg, 16-day titration schedule. Although the 25 mg, 16-day trial provided information related to the narrow question of the tolerability of the drug in patients who have previously been shown to be tramadol-intolerant, and although the reduction of nausea and vomiting in this tramadol-intolerant population was statistically significant, labeling derived from information learned in that trial can be carved out of Ultram's labeling without rendering a generic tramadol less safe and effective than Ultram for the remaining non-protected conditions of use. The study supporting the supplemental new drug application for the 25 mg titration schedule did not test the hypothesis that a 16-day titration schedule will result in better tolerance (or fewer discontinuations due to nausea and vomiting) than a 10-day titration schedule in patients who have not previously reacted adversely to tramadol. Because the trial supporting the 1999 labeling supplement to add the 25 mg, 16-day titration information was conducted in patients previously shown to be intolerant of tramadol, it does not necessarily reflect the response of the general population to the drug. It cannot be assumed that a 25 mg, 16-day titration schedule will result in a statistically significant reduction in discontinuations due to nausea and vomiting compared to a 10 day titration in the general population. Therefore, the utility of the information granted exclusivity for doctors prescribing tramadol to patients who have not previously shown tramadol intolerance is limited.

Johnson argues that the slower titration schedule increases efficacy by increasing the number of patients who can tolerate it long enough to reach an effective dose. It is not obvious, however, that the slower titration increases tolerability for patients who have not been shown to be intolerant of tramadol previously. Moreover, as considered by FDA's physicians, it may be that the protected schedule results in decreased efficacy by delivering a subtherapeutic dose for up to 16 days.

In contrast to the 25 mg, 16-day trial, the 10-day, 50 mg trial provided essential safety information that can and should remain in the labeling. It was the 10-day, 50 mg titration trial that convinced FDA that titration improves the tolerability of Ultram for the general population of patients who do not require rapid relief. Information derived from that trial allows physicians to weigh the benefits of titration against those of rapid onset of relief. Because exclusivity relating to this dosing information has expired, general information about the benefits of titration (learned from this trial) can remain in the "Dosage and Administration" section. Only information relating to the specific 25 mg, 16-day titration schedule remains protected. Similarly, in the "Titration Trials" section of the labeling,

8

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

references to the 10-day, 50 mg titration can remain in the labeling while references to the 25 mg, 16-day titration must be carved out. Information about side effects of tramadol in the adverse events section of the labeling was obtained from the initial clinical trials and thus will also appear in a generic product's labeling. From this information, a physician evaluating patient treatment options can assess the risks and benefits to the general population related to the use of tramadol in a titration regimen.

In Johnson's May 31, 2002, submission to the docket, the company asserts that a certain portion of the Ultram labeling regarding rapid onset of analgesic effect is also protected by exclusivity, and thus may not be included in labeling for generic tramadol. Specifically, Johnson claims that the underlined portion of the labeling below must be omitted from generic tramadol:

> For the subset of patients for whom rapid onset of analgesic effect is required and for whom the benefits outweigh the risk of discontinuation due to adverse events associated with higher initial doses, ULTRAM 50 mg to 100 mg can be administered as needed for pain relief every four to six hours, **not to exceed 400 mg per day.**

Johnson argues that because this language was part of the supplement to add information regarding the 25 mg, 16-day titration schedule to the Ultram labeling, it is protected by exclusivity.

Although certain labeling regarding the 25 mg, 16-day titration schedule is protected by exclusivity, it is not necessarily the case that all labeling added at the same time is also protected.[7] The labeling identified by Johnson is not protected by the exclusivity granted to the 25 mg, 16-day titration schedule. The underlined portion of the labeling relies upon information related to risk of discontinuation due to adverse events associated with the higher doses (50 mg and greater on a non-titrated schedule), which was available to the division in data from the 50 mg, 10-day titration trial, and the original approval trials. The 25 mg, 16-day titration trial information was not essential for approval of this portion of the labeling. Accordingly, it is not protected by Johnson's exclusivity. The 3 years of exclusivity does apply to aspects of the current labeling for which the 25 mg, 16-day titration trial provided information essential to approval. That protected labeling must be omitted from the labeling proposed in any ANDA.

---

[7] A sponsor may not obtain exclusivity for changes that do not require clinical trial data for approval by including them in an application or supplement that also includes changes for which exclusivity is appropriate. The regulation governing 3-year exclusivity for supplements states in relevant part that if a supplement contained reports of new clinical investigations that were essential to approval, the Agency will not make effective for a period of 3 years the approval of an abbreviated new drug application for a change "that relies on the information supporting a change approved in the supplemental new drug application." 21 CFR 314.108(b)(5).

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

     C.     Proposed Tramadol Labeling

FDA has reviewed the approved ULTRAM labeling to determine what may be included in labeling for generic tramadol, and whether such labeling may be approved under 21 CFR 314.127(a)(7). When protected information is deleted from the approved ULTRAM labeling to generate labeling for generic tramadol, the "Dosage and Administration" section would read:

> For patients with moderate to moderately severe chronic pain not requiring rapid onset of analgesic effect, the tolerability of tramadol can be improved by initiating therapy with a titration regimen. The total daily dose may be increased by 50 mg as tolerated every 3 days to reach 200 mg/day (50 mg q.i.d.). After titration, tramadol 50 to 100 mg can be administered as needed for pain relief every 4 to 6 hours **not to exceed 400 mg/day.**

> For the subset of patients for whom rapid onset of analgesic effect is required and for whom the benefits outweigh the risk of discontinuation due to adverse events associated with higher initial doses, tramadol 50 mg to 100 mg can be administered as needed for pain relief every 4 to 6 hours, **not to exceed 400 mg per day.**

Thus the "Dosage and Administration" section will include a titrated and a non-titrated 50 mg dosing schedule. The 50 mg titration schedule that remains in the "Dosage and Administration" section (and that is further described in the "Titration Trials" section) is the same titration schedule that was previously approved for Ultram. Including the statement from the first paragraph of the "Dosage and Administration" section that "the tolerability of tramadol can be improved by initiating therapy with a titration regimen," and including the table of adverse events from the pivotal trials that appears in Ultram's labeling gives the physician a context to understand the statement regarding the risk-benefit calculation that the second paragraph requires.

The "Titration Trials" section would not contain the discussion of the 16-day, 25 mg titration trial and would not include the 16-day titration component in the graph that follows that discussion. However, that section would include the first sentence from Ultram's labeling that states:

> "In a randomized, blinded clinical study with 129 to 132 patients per group, a 10-day titration to a daily tramadol dose of 200 mg (50 mg q.i.d.), attained in 50 mg increments every 3 days, was found to result in fewer discontinuations due to dizziness or vertigo than titration over only 4 days or no titration."

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

This sentence would help the physician understand that titration reduces discontinuations due to adverse reactions. It would also provide the practitioner seeking to titrate a patient on the 10-day, 50 mg schedule with information about how to do so safely. Although this paragraph does not state an explicit starting dose for titration, a physician can infer a 50 mg/day starting dose from the dosing schedule as it is described. Ultram's labeling (before the 25 mg, 16-day titration schedule was added) also did not include a specific starting dose in the context of the 10-day, 50 mg titration regimen.

The "Adverse Reactions" section of a generic tramadol product's labeling would be exactly the same as in Ultram's labeling because these adverse reactions were reported in the original clinical trials for the drug. The first and second most frequent adverse reactions listed in the table of adverse reactions are dizziness/vertigo and nausea. Vomiting is listed as the sixth most common side effect. Thus, inclusion of the "Adverse Reactions" section would also acquaint physicians with the adverse reactions to tramadol.

In sum, FDA believes that a generic tramadol product labeled as described above would be as safe and effective as Ultram for the remaining non-protected conditions of use.

V.    Tablet Scoring

There are two issues pertaining to the scoring of generic tramadol tablets. The first is whether FDA may approve ANDAs for 50 mg tablets that are not scored. The second is whether FDA may approve ANDAs for 50 mg tablets that are scored.

FDA may approve ANDAs for generic tramadol tablets that are not scored. Drug products approved under Section 505(j) of the Act are required to be the same as the listed drug in certain enumerated ways. Section 505(j)(2)(A). FDA's regulations implementing these provisions provide additional detail on the application of these requirements. 21 CFR 314.94 Neither the statute nor the regulations address ANDA approval requirements when the listed drug is scored to permit it to be administered in doses smaller than the labeled strength of the drug product. However, because drug products (generally tablets) are scored to permit dosing of the drug in accordance with the Dosage and Administration section of the approved labeling,[8] it is appropriate to use the approved labeling of the innovator product as the reference point for considering whether the generic product must also be scored.

The current Ultram labeling describes a titration regimen using a 25 mg dose. Ultram 50 mg tablets are scored so that tablets may be divided into two 25 mg doses that may be used for this 25 mg titration dosing regimen. When generic tramadol products do not include the 25 mg titration schedule in the labeling, it is reasonable to conclude that the 50 mg tablets need not be scored. The 50 mg minimum dose in the labeling for the generic products may be achieved by administering the entire 50 mg tablet. Because the

---

[8] An alternative to scoring a tablet to achieve the lower dose is to obtain approval for the drug product in the same dosage form, but for the lower strength.

11

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

unscored 50 mg tablet will permit the patient to use the product in accordance with the approved labeling, the lack of scoring is not a bar to approval of the ANDA.[9]

The next issue is whether FDA may approve ANDAs for generic tramadol tablets that are scored to permit 25 mg doses. The Agency concludes that, because of Johnson's exclusivity, scored generic tramadol tablets may not be approved.

The 25 mg dosing regimen is protected by 3-year exclusivity. Johnson asserts that therefore FDA may not approve a scored generic tramadol product without violating Ultram's exclusivity. May 17, 2002 Johnson letter at 8-9. FDA agrees with Johnson that the score was added to the Ultram tablet to allow users of the product to split the tablet to reach a 25 mg starting dose. Because that starting dose is part of the 16-day titration regimen and has no other basis in the approved labeling, and because that regimen remains protected by exclusivity and patent, the Agency currently will not approve an ANDA for a scored generic tramadol product.

FDA has described its general approach to scoring issues in MAPP 5223.2 "Scoring Configuration of Generic Drug Products." The approach taken to generic tramadol is consistent with that described in the MAPP.

VI.    AB Rating

Johnson argues that Teva's tramadol product, using the labeling Teva proposes, cannot be AB-rated as therapeutically equivalent to Ultram because the safety profile of Teva's product would be "far different" from the safety profile of Ultram. May 17, 2002 Johnson letter at 7. Johnson supports its position with a number of statements from FDA's Orange Book (21st ed.):

> Drug products are considered to be therapeutic equivalents only if they are pharmaceutical equivalents and if they can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling. Orange Book at viii.

> Products evaluated as therapeutically equivalent can be expected, in the judgment of FDA, to have equivalent clinical effect and no difference in their potential for adverse effects when used under the conditions of their labeling. Orange Book at xii.

---

[9] FDA's Orange Book acknowledges that certain permissible differences among therapeutically equivalent products may require attention on the part of the health professional. It states that in such cases, "[t]he Agency will use notes in this publication to point out special situations such as potential differences between two drug products that have been evaluated as bioequivalent and therefore therapeutically equivalent, when they should be brought to the attention of health professionals. . . . For example, in rare instances, there may be variations among therapeutically equivalent products in their use or in conditions of administration. Such differences may be due to patent or exclusivity rights associated with such use. When such variations may, in the Agency's opinion, affect prescribing or substitution decisions by health professionals, a note will be added to section 1.8." Orange Book at xv.

12

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

Johnson also refers to the statement in the Orange Book that drugs considered to be therapeutically equivalent may differ only in "minor aspects of labeling (e.g., the presence of specific pharmacokinetic information)." Orange Book at viii. Johnson argues that the "reference to pharmacokinetic information is telling because such information would rarely if ever be used by a physician in prescribing a product. By contrast, an entirely different dosing regimen for a product would be pivotal to how it is used and could hardly be characterized as a difference in a minor aspect of its labeling." May 17, 2002, Johnson letter at 8.

FDA disagrees with Johnson that a generic tramadol product cannot be AB-rated to Ultram. As noted above, FDA routinely approves ANDAs that omit a condition of use, such as an indication, found in the innovator's labeling. Although the labeling that FDA would approve in this instance does not omit an indication, it does omit a portion of the labeling that is protected by exclusivity and patent. In assessing whether two drugs may be rated as therapeutically equivalent to each other, FDA assesses whether they "can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling." In this case, dosing the generic product in conformance with the proposed labeling set forth in section IV above permits a generic tramadol to be as safe and effective as Ultram when used in conformance with its labeling.[10] This assessment involves the same considerations as the determination under 21 CFR 314.127(a)(7) that an omission of protected labeling information from a generic will not render the proposed product less safe or effective for the remaining, non-protected conditions of use.

FDA has consistently maintained that the omission of information protected by exclusivity will not be a basis for altering a therapeutic equivalence rating. 59 Fed. Reg. 50338, 50357 (October 3, 1994). In the present case, FDA has determined there is no reason to believe that a tramadol product approved under an ANDA would not be therapeutically equivalent to Ultram, when administered to patients under the conditions specified in the labeling.

VII.    Conclusion

Teva's petition is denied in part and granted in part. Teva's petition is denied insofar as it proposes that generic tramadol be labeled only for use for acute pain and contain only the

---

[10] The question of AB ratings when one product is scored and the other is not also bears mentioning. The Orange Book discussion of therapeutic equivalence notes that drug products are considered by FDA to be therapeutically equivalent if they meet the criteria described in the Orange Book "even though they may differ in certain other characteristics such as ... scoring configuration.... When such differences are important in the care of a particular patient, it may be appropriate for the prescribing physician to require that a particular brand be dispensed as a medical necessity." (Orange Book at viii). As noted above, the Orange Book permits notation of additional information when differences in A-rated products require attention on the part of prescribers and dispensers of drugs. Orange Book at xv. Because the generic product will not be scored and the 25 mg starting dose for the titration schedule suggested in Ultram's labeling cannot be obtained using an unscored tablet, FDA anticipates that this difference may be brought to the attention of health care professionals through an Orange Book notation.

Docket Nos. 01P-0495/CP1, 02P-0191/CP1, & 92P-0252/CP1

second paragraph of Ultram's "Dosage and Administration" section. Teva's petition is granted insofar as the Agency will approve Teva's ANDA if it is labeled as described in section IV above and all other conditions of approval are met.

Apotex's petition is granted in part. Apotex's petition is granted insofar as the Agency will approve Apotex's ANDA if it is labeled as described in section IV above and all other conditions of approval are met. Because adequate information to label a generic tramadol remains in the unprotected portion of Ultram's existing labeling, FDA does not reach the question of whether Apotex can rely on sections that have been discontinued from Ultram's labeling.

Caraco's petition is granted in part. Caraco's petition is granted insofar as it "respectfully asks that the FDA describe precisely what label it would find acceptable." Because the Agency has identified the appropriate labeling for a generic tramadol, FDA does not reach the question of whether Caraco's ANDA can be approved using the alternative labeling Caraco suggests.

Sincerely yours,

_Janet Woodcock, M.D._
Director
Center for Drug Evaluation and Research



DEPARTMENT OF HEALTH & HUMAN SERVICES

_____

Food and Drug Administration
Rockville MD 20857

Victor Raczkowski, M.D.                                    APR 2 5 2008
Vice President, U.S. Regulatory Affairs
Solvay Pharmaceuticals, Inc.
901 Sawyer Road
Marietta, GA  30062

                                    Re:  Docket No. FDA-2007-P-0169

Dear Dr. Raczkowski:

This responds to the citizen petition submitted to the Food and Drug Administration
(FDA or the Agency) by Unimed Pharmaceuticals, Inc. (Unimed), a subsidiary of Solvay
Pharmaceuticals, Inc., on October 29, 2007 (Petition).[1]  The petition requests that we
require any abbreviated new drug application (ANDA) for a generic version of Marinol
to contain, not only the indication and safety information for the treatment of nausea and
vomiting associated with cancer chemotherapy in patients who have failed to respond
adequately to conventional antiemetic treatments, but also the indication and safety
information for the treatment of anorexia associated with weight loss in patients with
AIDS.

We have carefully reviewed the arguments in your petition, the comments in opposition
to your petition submitted by Rakoczy Molino Mazzochi Siwik LLP on behalf of Cobalt
Laboratories Inc., dated January 22, 2008, and your comments in response dated April 3,
2008.  For the reasons stated below, we deny your request.  In accordance with the
Federal Food, Drug, and Cosmetic Act (the Act), FDA regulations, and case law, the
Agency may approve an ANDA for a dronabinol product whose labeling omits
information relating to use of the drug to treat anorexia associated with weight loss in
AIDS patients.

## I.    BACKGROUND

### A.    Marinol

Dronabinol is a cannabinoid that affects the central nervous system and is a stimulant of
central sympathomimetic activity.  The drug is abusable and is a Schedule III controlled
substance under the Controlled Substances Act (21 U.S.C. 812(b)(3)) and 21 CFR
1308.13(g).

_____

[1] This citizen petition was originally assigned docket number 2007P-0418/CP1.  The number was changed
to FDA-2007-P-0169 as a result of FDA's transition to its new docketing system (Regulations.gov) in
January 2008.

Docket No. FDA-2007-P-0169

On May 31, 1985, FDA approved the new drug application (NDA 18-651) for Unimed's dronabinol product, Marinol, for the treatment of nausea and vomiting associated with cancer chemotherapy in patients who have failed to respond adequately to conventional treatments (the CINV indication). Marinol is marketed as 2.5 milligram (mg), 5 mg, and 10 mg capsules. The 7 years of orphan drug exclusivity for this indication under section 527(a) of the Act (21 U.S.C. 360cc(a)) has expired. On December 22, 1992, we approved Marinol for the treatment of anorexia associated with weight loss in patients with AIDS (the AIDS indication). The AIDS indication for Marinol is protected by U.S. Patent No. 6,703,418 (the '418 patent), which expires on February 26, 2011.

## B.    Patent Protection for NDAs and Labeling Differences for ANDAs

Before addressing the arguments you make in your petition, it is appropriate to summarize the statutory and regulatory provisions relevant to the approval of a generic drug product whose labeling omits an indication that is protected by a patent.

The Act and FDA regulations require that a sponsor seeking to market an innovator drug submit an NDA. NDAs contain, among other things, extensive scientific data demonstrating the safety and effectiveness of the drug for the indication for which approval is sought. The Act and FDA regulations also require that a sponsor of an NDA submit to FDA a list of patents claiming the approved drug substance, drug product, or approved method of using the drug product described in the NDA. Specifically, section 505(b)(1) of the Act requires NDA applicants to file as part of the NDA "the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or *which claims a method of using such drug* and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug" (emphasis added).[2] FDA is required to publish patent information for drugs approved under section 505(c), and does so in its *Approved Drug Products with Therapeutic Equivalence Evaluations* ("the Orange Book" (sections 505(b)(1), (c)(2), and (j)(7) of the Act and 21 CFR 314.53(e)).

A drug product with an effective approval under section 505(c) is known as a *listed drug*.[3] Under provisions added to the Act by the 1984 Drug Price Competition and Patent Term Restoration Act (Hatch-Waxman Amendments), Public Law No. 98-417, 98 Stat. 1585, the Act permits submission of ANDAs for approval of generic versions of listed drugs (see section 505(j) of the Act). The ANDA process shortens the time and effort

---

[2] Section 505(c)(2) of the Act imposes an additional patent submission requirement on holders of approved NDAs when those holders subsequently obtain new patent information that could not have been submitted with the NDA.

[3] Under 21 CFR 314.3(b), "[*l*]*isted drug* means a new drug product that has an effective approval under section 505(c) of the act for safety and effectiveness or under section 505(j) of the act, which has not been withdrawn or suspended under section 505(e)(1) through (e)(5) or (j)(5) of the act, and which has not been withdrawn from sale for what FDA has determined are reasons of safety or effectiveness." A listed drug is identified as having an effective approval in the Orange Book, which includes patent information for each approved drug (§ 314.53(e)).

Docket No. FDA-2007-P-0169

needed for approval by, among other things, allowing an ANDA applicant to rely on FDA's previous finding of safety and effectiveness for a listed drug rather than requiring the ANDA applicant to independently demonstrate the safety and effectiveness of its proposed drug. To rely on such a finding, the ANDA applicant must show that its proposed drug product is the same as the listed drug in many respects (including active ingredient, dosage form, strength, and route of administration), and that its product is bioequivalent to the listed drug.

Each ANDA applicant must identify the listed drug on which it seeks to rely for approval. As described in more detail below, the timing of ANDA approval depends on, among other things, the intellectual property protections for the listed drug the ANDA references and whether the ANDA applicant challenges those protections (see section 505(b), (c), (j)(2)(A)(vii), and (j)(5)(B) of the Act.[4] In general, an ANDA may not obtain final approval until listed patents and marketing exclusivity have expired or until NDA holders and patent owners have had the opportunity to defend relevant patent rights in court.

Specifically, for each patent submitted by the sponsor for the listed drug and listed in the Orange Book, the ANDA applicant generally must submit to FDA one of four specified certifications under section 505(j)(2)(A)(vii) of the Act. The certification must state one of the following:

| | |
|---|---|
| (I) | that the required patent information relating to such patent has not been filed (Paragraph I certification); |
| (II) | that such patent has expired (Paragraph II certification); |
| (III) | that the patent will expire on a particular date (Paragraph III certification); |
| (IV) | that such patent is invalid or will not be infringed by the drug for which approval is being sought (Paragraph IV certification). |

The purpose of these certifications is "to give notice, if necessary, to the patent holder so that any legal disputes regarding the scope of the patent and the possibility of infringement can be resolved as quickly as possible" (*Torpharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 71 (D.D.C. 2003)).

If an applicant files a paragraph I or II certification, the patent in question will not delay ANDA approval. If an applicant files a paragraph III certification, the applicant agrees to wait until the relevant patent has expired before seeking full effective approval of its ANDA.

If, however, an applicant wishes to seek approval of its ANDA before a listed patent has expired by challenging the validity of a patent or claiming that a patent would not be

---

[4] Relevant intellectual property protections affecting the timing of ANDA approval include marketing exclusivity and listed patent protection for the listed drug. Because Unimed's orphan drug marketing exclusivity for Marinol has expired and Unimed currently has no other marketing exclusivity for dronabinol, this response does not address the effect of exclusivity on ANDA approval but focuses, instead, on relevant patent protection.

Docket No. FDA-2007-P-0169

infringed by the product proposed in the ANDA, the applicant must submit a paragraph IV certification to FDA. The applicant filing a paragraph IV certification must also provide a notice to the NDA holder and the patent owner stating that the application has been submitted and explaining the factual and legal bases for the applicant's opinion that the patent is invalid or not infringed (see section 505(b)(2)(B) and (j)(2)(B) of the Act). The filing of a paragraph IV certification "for a drug claimed in a patent or the use of which is claimed in a patent" is an act of patent infringement (35 U.S.C. 271(e)(2)(A)). If the patent owner or NDA holder brings a patent infringement suit against the ANDA applicant within 45 days of the date it received notice of the paragraph IV certification, the approval of the ANDA will be stayed for 30 months from the date of such receipt by the patent owner and NDA holder, unless a court decision is reached earlier in the patent case or the patent court otherwise orders a longer or shorter period (see section 505(c)(3)(C) and (j)(5)(B)(iii) of the Act). When the 30 months have expired, the patent ceases to be a barrier to final ANDA approval, even if the patent litigation is ongoing. Similarly, if the NDA holder and patent owner receive notice of a paragraph IV certification and decline to sue within 45 days of receipt of notice, the patent will not be a barrier to ANDA approval.

These four certifications are not the only manner in which an ANDA applicant may address all relevant patents. An ANDA applicant seeking to omit an approved method of use covered by a listed patent need not file a paragraph I-IV certification for that patent. Instead, the applicant may submit a "section viii statement" acknowledging that a given method of use patent has been listed, but stating that the patent at issue does not claim a use for which the applicant seeks approval (see section 505(j)(2)(A)(viii) of the Act). Specifically, section 505(j)(2)(A)(viii) of the Act provides that "if with respect to the listed drug referred to in [section 505(j)(2)(A)(i)] information was filed under subsection (b) or (c) for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, [the ANDA must contain] a statement that the method of use patent does not claim such a use." Such a statement requires the ANDA applicant to omit from its labeling information pertaining to the protected use (21 CFR 314.92(a)(1) and 314.94(a)(12)(iii)). If an ANDA applicant files a section viii statement, the patent claiming the protected method of use will not serve as a barrier to ANDA approval.[5]

FDA implementing regulations at § 314.94(a)(12)(iii) describe the applicability of the section viii statement. Section 314.94(a)(12)(iii) states that:

---

[5] The Agency's interpretation of the plain language of the Act is further supported by Congressional intent as evidenced by the passage below:

> . . .The [ANDA] applicant need not seek approval for all of the indications for which the listed drug has been approved. For example, if the listed drug has been approved for hypertension and angina pectoris, and if the indication for hypertension is protected by patent, then the applicant could seek approval for only the angina pectoris indication.

H.R. Rep. No. 857 (Part I), 98th Cong., 2d sess. 21.

Docket No. FDA-2007-P-0169

> If patent information is submitted under section 505(b) or (c) of the [A]ct
> and § 314.53 for a patent claiming a method of using the listed drug, and
> the labeling for the drug product for which the applicant is seeking
> approval does not include any indications that are covered by the use
> patent, [the ANDA applicant must submit] a statement explaining that the
> method of use patent does not claim any of the proposed indications.[6]

Accordingly, FDA regulations also expressly recognize that by submitting a
section viii statement, an ANDA applicant may omit from the proposed labeling a
method of use protected by a listed patent, and therefore need not seek approval
for that use.[7]

The right to file a section viii statement and carve out from labeling method of use
information protected by a patent has been upheld by the courts. In *Purepac
Pharmaceutical Company v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004), the D.C. Circuit
stated that a "section viii statement indicates that a patent poses no bar to approval of an
ANDA because the applicant seeks to market the drug for a use other than the one
encompassed by the patent" (id. at 880). Similarly, in *Torpharm*, 260 F. Supp. 2d at 73,
the D.C. District Court stated that a section viii statement "avers that the patent in
question has been listed, but does not claim a use for which the applicant seeks FDA
approval." These courts have upheld the Agency's interpretation that an ANDA
applicant may choose not to seek approval for a method of use protected by a listed
patent and, under those circumstances, that patent will not be a barrier to ANDA
approval.

Thus, under the procedures established in the Hatch-Waxman Amendments, an ANDA
will not be approved until all listed patents have (1) expired, (2) been successfully
challenged, (3) been subject to a paragraph IV certification pursuant to which the patent

---

[6] FDA regulations implementing this statutory provision use the term *indications* to refer to information an
ANDA applicant omits from its labeling in the context of submitting a statement that a protected use of a
drug is not claimed in a listed patent (§ 314.94(a)(12)(iii)). However, the preambles for the proposed rule
and final rule on patent and exclusivity provisions related to ANDA approval express no intent to
distinguish between method of use and indication, using the terms interchangeably (see, e.g., 59 FR 50338
at 50347 (October 3, 1994)). Moreover, the preamble to the final rule emphasizes that an ANDA applicant
does not have the option of choosing between a paragraph IV certification and a section viii statement;
where the labeling does not include the indication, only the section viii statement is appropriate (id.). The
preamble to the proposed rule states that where "the labeling for the applicant's proposed drug product does
not include any indications that are covered by the use patent," the ANDA applicant would submit a section
viii statement rather than a paragraph IV certification (54 FR 28872 at 28886 (July 10, 1989)).

[7] See also the final rule entitled *Applications for FDA Approval to Market a New Drug: Patent Submission
and Listing Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug
Applications Certifying That a Patent Claiming a Drug Is Invalid or Will Not Be Infringed*, 68 FR 36676
(June 18, 2003). In the preamble to this final rule, we stated that the section viii statement permits an
ANDA applicant to "avoid certifying to a patent by stating that it is not seeking approval for the use
claimed in the listed patent" (68 FR 36676 at 36682). We stated, "Our position has been that, for an
ANDA applicant to file a section viii statement, it must 'carve-out' from the proposed ANDA labeling, the
labeling protected by the listed patent" (id.).

Docket No. FDA-2007-P-0169

owner or NDA holder has declined to sue within 45 days, (4) been subject to a paragraph IV certification that led to a lawsuit and a 30-month stay that has since expired, or (5) are subject to a section viii statement and a corresponding labeling carve-out.

## C.    Requirements Regarding ANDA Labeling

Section 505(j)(2)(A)(i) of the Act requires that an ANDA contain "information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a [listed drug]." This language reflects Congress' intent that the generic drug be safe and effective for each "condition of use" prescribed, recommended, or suggested in the generic drug labeling. However, it does not require that an ANDA be approved for each condition of use for which the reference listed drug is approved. In § 314.92(a)(1), FDA has explicitly stated that a proposed generic drug product must have the same conditions of use as the listed drug, except that "conditions of use for which approval cannot be granted because of . . . an existing *patent* may be omitted" (emphasis added).

The Act also requires that an ANDA contain "information to show that the labeling proposed for the new [generic] drug is the same as the labeling approved for the listed drug . . . except for changes required because of differences approved under a petition filed under [section 505(j)(2)(C) of the Act] or because the new drug and the listed drug are produced or distributed by different manufacturers" (section 505(j)(2)(A)(v) of the Act). A parallel provision appears in section 505(j)(4)(G) of the Act.[8]

Similarly, the regulations at § 314.94(a)(8)(iv) require the following:

> Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the [generic] drug product must be the same as the labeling approved for the reference listed drug, except for changes required because of differences approved under a petition filed under § 314.93 [21 CFR 314.93] or because the drug product and the reference listed drug are produced or distributed by different manufacturers.

Section 314.94(a)(8)(iv) sets forth examples of permissible differences in labeling that may result because the generic drug product and reference listed drug are produced or distributed by different manufacturers. These differences include the following:

> . . . differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA

---

[8] Section 505(j)(4)(G) of the Act provides that FDA must approve an ANDA unless, among other things, "the information submitted in the application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for [the reference listed drug] except for changes required because of differences approved under [an ANDA suitability petition] or because the drug and the listed drug are produced or distributed by different manufacturers."

Docket No. FDA-2007-P-0169

> labeling guidelines or other guidance, or *omission of an indication or other aspect of labeling protected by patent* [emphasis added] or accorded exclusivity under section 505(j)(4)(D) of the Act.[9]

The regulations at 21 CFR 314.127(a)(7) further provide that to approve an ANDA containing proposed labeling that omits "aspects of the listed drug's labeling [because those aspects] are *protected by patent* [emphasis added]," we must find that the "differences do not render the proposed drug product less safe or effective than the listed drug for all remaining non-protected conditions of use."

Relevant case law affirms an ANDA applicant's ability to carve out protected labeling without violating the "same labeling" requirement. For example, in *Bristol Myers Squibb v. Shalala*, F.3d 1493, 1500 (D.C. Cir. 1996), the D.C. Circuit ruled that "the statute expresses the legislature's concern that the new generic be safe and effective for each indication that will appear on its label; whether the label for the new generic lists every indication approved for the use of the pioneer is a matter of indifference." Similarly, in *Sigma-Tau Pharmaceuticals, Inc.* v. *Schwetz*, 288 F.3d 141, 148, fn. 3 (4th Cir. 2002), the Fourth Circuit upheld the right of an ANDA applicant to carve out an indication protected by orphan drug exclusivity as a permissible difference due to difference in manufacturer.

Thus, under the statute, regulations, and applicable case law, the carve-out of patent-protected labeling is generally permitted as a permissible difference due to difference in manufacturer if the omission does not render the proposed drug product less safe or effective for the conditions of use that remain in the labeling.

## II.    ANALYSIS

You state that you have reason to believe that there are one or more pending ANDAs seeking approval of a generic version of Marinol without the AIDS indication. You state that if approved, such a product would have neither the prescribing information (in the package insert) nor the patient information leaflet created especially for Marinol's AIDS indication. You claim that, without this labeling, a generic product: (1) would be misbranded under section 502(a) of the Act (21 U.S.C. 352(a)) because the labeling would not provide material information necessary for a "customary or usual" use of the generic drug (i.e., the AIDS indication), which would make the labeling misleading under section 201(n) of the Act (21 U.S.C. 321(n)); and (2) would be unable to adequately promote the safe and effective use of dronabinol in AIDS patients (Petition at 2).

For the reasons stated below, we are denying your petition. A generic version of Marinol would not be misbranded because it lacked the AIDS indication, and there is no basis for requiring that such a product promote the safe and effective use of dronabinol in AIDS patients when the ANDA applicant does not seek approval for the AIDS indication.

---

[9] We note that, because of a series of amendments to the Act, the reference in § 314.94(a)(8)(iv) to section 505(j)(4)(D) of the Act corresponds to current section 505(j)(5)(F) of the Act.

Docket No. FDA-2007-P-0169

In our April 6, 2004, response to the citizen petition in Docket No. 2003P-0321/CP1,[10] we affirmed our authority to approve generic ribavirin drug products with labeling that omits protected information, and rejected arguments similar to the ones you are making here.  We reiterated this position in our March 13, 2008, response to a citizen petition in Docket No. 2006P-0410/CP1 concerning ANDAs for amifostine with a protected indication carved out.[11]  In rejecting your arguments as discussed below, we again reaffirm our authority to approve generic drug products with carved-out labeling, and we deny your request that any ANDA for a generic version of Marinol be required to include the AIDS indication, as this would mean that we could not approve such an ANDA until the patent covering the AIDS indication had expired, been successfully challenged, or otherwise ceased to be a barrier to approval (e.g., after expiration of the 30-month stay).

**A.     Labeling for a Generic Version of Marinol With the AIDS Indication Carved Out Will Not Be Misleading Under the Act and FDA Regulations.**

You state that you do not challenge our general authority to permit ANDA applicants to carve out protected indications or other protected conditions of use under the Act and §§ 314.94(a)(8)(iv) and 314.127(a)(7).  Moreover, you acknowledge, as you must, that our authority to do so has been upheld by the courts.  You also acknowledge that we do not regulate the substitution of generic drug products for innovator drug products.  Nevertheless, you maintain that with regard to Marinol in particular, we should require that a generic version contain the carved-out AIDS indication because without that indication the product and patient labeling would be misleading, in violation of sections 502(a)[12] and 201(n)[13] of the Act (Petition at 4 to 5).

You state that our authority to approve a generic drug product with carved-out labeling must be read in conjunction with sections 502(a) and 201(n).  You state that under section 201(n), if a product's labeling fails to reveal material facts concerning the consequences that may result from use of the product under customary or usual conditions of use, the labeling is misleading and the product is misbranded.  You contend that because of the

---

[10] April 6, 2004, letter from Steven K. Galson, Acting Director, Center for Drug Evaluation and Research, to David M. Fox, Docket No. 2003P-0321/CP1 (Ribavirin Response Letter).

[11] March 13, 2008, letter from Janet Woodcock, Director, Center for Drug Evaluation and Research, to William C. Bertrand, Jr., Docket No. 2006P-0410/CP1 (Amifostine Response Letter).

[12] Under section 502(a), a drug is misbranded, in pertinent part, if its labeling is false or misleading in any particular.

[13] Under section 201(n), if an article is alleged to be misbranded because the labeling or advertising is misleading, in determining whether labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual.

8

Docket No. FDA-2007-P-0169

substantially different daily dose, timing of administration, duration of treatment, and likelihood of central nervous system adverse events for the AIDS indication, dronabinol labeling with information concerning the AIDS indication carved out would fail to reveal material facts about the consequences resulting from use of the drug for that unapproved indication. You contend that for purposes of sections 502(a) and 201(n), the most customary or usual use of a generic version of Marinol will be as an appetite stimulant for AIDS patients (Petition at 5 to 7).[14]

You do not provide adequate support for your contention that the circumstances regarding the use of Marinol justify rejecting FDA's acknowledged authority to approve generic drugs with carved-out indications. As we explained in our response to a similar argument in the Amifostine Response Letter, your interpretation of the misbranding provisions in sections 502(a) and 201(n) of the Act cannot be reconciled with a reading of the Act as a whole. If a carve-out of protected information that did not render a drug less safe and effective for the remaining nonprotected conditions of use would nonetheless render the drug misbranded for failure to include information pertinent to the carved-out use, the provisions permitting such carve-outs would be superfluous. To interpret these provisions as you do would be to read section 505(j)(2)(A)(viii) (permitting the ANDA applicant to decline to seek approval for one or more patented conditions of use) out of the statute. Such a reading would be contrary to the fundamental canon that an individual statutory provision should be construed in the context of the statutory scheme in which it appears.[15] As stated in section I.B of this response, in authorizing the submission of a section viii statement, the Act allows an ANDA applicant to carve out from labeling a method of use claimed by a listed patent.

---

[14] You contend that your interpretation of customary or usual use in section 201(n) of the Act is supported by statements in our rulemaking to require drug sponsors of drugs that have indications occurring both in adults and children to conduct pediatric clinical studies of those drugs in those indications under certain circumstances. You note that in the preamble to the proposed rule, the Agency stated that we may consider pediatric use to be "customary or usual" when the drug is indicated for a disease or condition that affects both children and adults and is not contraindicated in children (citing 62 FR 43000 at 43907-43908 (August 15, 1997)). You further state that in the preamble to the final rule, we maintained that the uses for which a drug must be adequately labeled go beyond those explicitly included in product labeling (citing 63 FR 66632 at 66657-66658 (December 2, 1998)). You state that having articulated this position, we "cannot disavow it without a clear explanation of the policy basis for doing so" (Petition at 7). As you note, however, the 1998 final rule on pediatric studies was invalidated by the court in *Ass'n of American Physicians and Surgeons, Inc. v. FDA*, 226 F. Supp. 2d 204 (D.D.C. 2002), on the ground that FDA overstepped its bounds in promulgating it without more explicit statutory authority to do so. In addition, even had that rule been upheld, as explained in greater detail below, references to previous Agency statements about the meaning of "customary or usual use" under section 201(n) in contexts other than generic labeling carve-outs are inapposite to the question of whether a generic version of Marinol with the AIDS indication omitted is misbranded, because the Act and FDA regulations specifically authorize us to approve generic drugs with patent-protected indications omitted as long as the drugs are safe and effective for the remaining nonprotected conditions of use.

[15] *See United Savings Ass'n v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 371 (1988); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995).

9

Docket No. FDA-2007-P-0169

Although the Act requires that an ANDA contain information showing that the proposed conditions of use have been previously approved for the listed drug, the Act does not require that an ANDA be approved for each indication for which the reference listed drug is approved. Similarly, although the Act requires that the labeling of a generic drug be the same as the labeling approved for the listed drug, it provides an exception for changes resulting from the fact that the generic drug and the listed drug are produced or distributed by different manufacturers.

Your position — that the labeling for a generic dronabinol product without the AIDS indication is misleading under sections 502(a) and 201(n) of the Act because the drug will be prescribed off label for the AIDS indication — would effectively nullify the provisions in the Act that permit the approval of a generic drug with a carved-out indication. Conversely, our interpretation — that a generic drug product is not misbranded if its labeling omits an indication protected by patent — is consistent with the Act's provisions on ANDA patent certifications and sameness of conditions of use and labeling for generic products, yet still gives effect to statutory provisions regarding misbranding and adequate directions for use (in circumstances where the law does not specifically permit omission of protected information).

Moreover, unlike your interpretation of the misbranding provisions, our interpretation is consistent with the underlying goals of the Hatch-Waxman Amendments. The Hatch-Waxman Amendments provided sponsors of innovator drugs with marketing exclusivity and patent listing provisions that protect certain aspects of innovator drugs from generic competition for certain periods of time. As a quid pro quo for this increased protection, the Amendments created an abbreviated approval mechanism allowing sponsors of generic drugs to rely on the Agency's findings of safety and effectiveness for innovator drugs in seeking approval of their generic drug products when intellectual property barriers to approval expire or are otherwise removed.

The Amendments thus strike a balance between encouraging the research and development of new drugs and enabling the marketing of lower-cost, generic versions of those drugs at the earliest possible time. Under your interpretation of the misbranding provisions, the existence of patent protection for Marinol's AIDS indication would prohibit the approval of a generic dronabinol product for any indication for the duration of the patent on the use of the drug for the AIDS indication, thereby completely eliminating the opportunity for consumers to benefit from the existence of a lower-cost generic product, even for the nonprotected CINV indication, during this period. On the other hand, our interpretation allows innovators to enjoy the benefits associated with their efforts to develop new indications (including patent protection and exclusivity for those indications) while promoting competition with respect to indications for which innovators are not entitled to protection (either because they have not conducted research that entitles them to protection or because any applicable protection has expired, been successfully challenged, or has otherwise ceased to be a barrier to approval).

Docket No. FDA-2007-P-0169

**B.      Labeling for a Generic Version of Marinol Need Not Contain the AIDS Indication and Related Safety Information to Ensure the Safe and Effective Use of the Product.**

You acknowledge that under § 314.127(a)(7), we may approve an ANDA containing proposed labeling that omits protected aspects of the listed drug's labeling if those omissions "do not render the proposed drug product less safe or effective than the listed drug for all remaining non-protected conditions of use." However, you maintain that the intended reach of this regulation is broader than the text would suggest. In support of this, you cite the following statement in the preamble of the 1992 final rule on ANDA regulations that adopted § 314.127(a)(7): "FDA cautions that it will not approve an ANDA with different labeling if the labeling differences affect product safety or efficacy" (57 FR 17950 at 17968 (April 28, 1992)). You contend that if a generic dronabinol product that lacked the prescribing information and patient leaflet for the AIDS indication were used as an appetite stimulant in AIDS patients, this would pose a risk of medication errors due to improper dosage and usage (as the daily dose, timing of administration, and duration of treatment for the AIDS indication differ from those for the CINV indication). Therefore, you claim that approval of a generic dronabinol product with carved-out labeling would be contrary to our intended interpretation of § 314.127(a)(7) (Petition at 9 to 10).

Your argument misinterprets our statements in the 1992 ANDA final rule concerning § 314.127(a)(7). The quoted statement was in response to a comment stating that the regulation should reflect that labeling differences in a generic product might be due to patent protection (in addition to differences due to production or distribution by different manufacturers). We agreed with the comment regarding the need to revise the regulation so that it also covered labeling differences due to patents or exclusivity. The quoted statement in the final rule only summarizes the revised provision, which specifically authorizes the Agency to approve generic product labeling that omits protected portions of the innovator labeling when "such differences do not render the proposed drug product less safe or effective than the listed drug *for all remaining, nonprotected conditions of use.*" Thus, the regulation requires us to look at whether the generic drug product that carves out patent- or exclusivity-protected labeling will remain safe and effective for its labeled indications (i.e., its remaining nonprotected conditions of use). It does not require us to consider the safety or effectiveness of that product for indications for which it will not be labeled. To interpret the statement you quote in the manner you suggest would effectively nullify an important aspect of the provision adopted in the final rule.

You state that the recommended starting dosage for the CINV indication is 5 mg/meter$^2$, or 5 mg, given 1 to 3 hours before chemotherapy, then every 2 to 4 hours after chemotherapy, for a total of four to six times a day (with upward titration; most patients respond to 5 mg three or four times daily). In contrast, the recommended starting dosing for the AIDS indication is 2.5 mg twice daily, before lunch and dinner, with titration to a maximum of 10 mg twice a day or a minimum of 2.5 mg once a day, based on tolerability of side effects (Petition at 10 to 11).

11

Docket No. FDA-2007-P-0169

You state that explicit dosing instructions for physicians and safety information for patients are needed for the two Marinol indications to prevent inappropriate medication use and patient harm due to adverse events. You note that Unimed provides a patient information leaflet to promote the safe and effective use of Marinol as an appetite stimulant by AIDS patients. You state that the patient leaflet is of critical importance for use in the AIDS indication because it consists of both drug-specific information and non-drug information relevant to AIDS patients that ensures the safety and efficacy of Marinol. You argue that the leaflet is especially important because it provides information on the adverse events associated with the AIDS indication, which are of greater significance for these patients (compared to CINV patients) because of the long duration of treatment for the AIDS indication. You state that the patient leaflet plays a significant role in promoting the safe and effective use of Marinol and is one reason we approved the material. You add that you distribute 2.5 mg Marinol, a strength intended primarily for AIDS patients, in unit-of-use packaging with the leaflet enclosed. You state that a generic version of Marinol approved solely for the CINV indication would not include the leaflet information provided to a patient prescribed Marinol for the AIDS indication; instead, the information provided to the patient who received the generic product would describe a dosing regimen that is two to sixteen times higher and two to six times more frequent than would be appropriate for an AIDS patient (Petition at 11 to 15).

As you acknowledge, the Act and FDA regulations give the Agency the authority to approve a generic drug product whose labeling carves out an indication of the reference listed drug, and the courts have recognized this authority. Given that fact, the relevant question with respect to the carve-out of the AIDS indication is whether the omission would render a generic dronabinol product less safe or effective than Marinol for the nonprotected, CINV indication under § 314.127(a)(7). You make no claim and provide no evidence that the carved-out labeling would make a generic dronabinol product less safe or effective in the treatment of cancer patients.[16] Although we agree that the recommended initial dosing for the AIDS indication is 2.5 mg twice daily, and the 2.5 mg dose is distributed in unit-of-use packaging, a patient undergoing chemotherapy might also be prescribed the same dose dispensed in the same packaging. Moreover, the lack of a patient information leaflet would not make a generic dronabinol product less safe for CINV patients. As you acknowledge, the leaflet was created at Unimed's initiative; we did not require the company to develop the leaflet to ensure the safe use of Marinol. In addition, the leaflet concerns only the AIDS indication, and therefore is unrelated to the safe and effective use of the drug for the CINV indication.

After reviewing the information available to us, we have concluded that a dronabinol product with the AIDS indication omitted would not be less safe or effective than

---

[16] The claims you make about the safety of a dronabinol product with the AIDS indication carved out only concern the use of such a product for the AIDS indication, not for the nonprotected CINV indication. As such, they are not relevant to the inquiry that the statute and regulations require.

Docket No. FDA-2007-P-0169

Marinol for the CINV indication.[17] The generic labeling will include all of the information necessary to use dronabinol safely and effectively for the CINV indication (just as the Marinol labeling did before the AIDS indication was approved). Thus, the fact that the labeling for a proposed generic dronabinol product would omit information on Marinol's AIDS indication provides no basis for refusing to approve the ANDA for the CINV indication under the Act or our regulations.

Our approval of an ANDA for dronabinol with the AIDS indication omitted also would be consistent with our approvals of other generic drug products with carved-out indications and conditions of use. For example, in *Bristol-Myers Squibb*, the innovator company marketed the reference listed drug Capoten (captopril), which was approved and labeled with four indications. The ANDA applicant submitted an ANDA for a generic captopril drug product and referenced Capoten as the listed drug. We approved the ANDA with labeling that excluded two protected indications and corresponding protected, indication-specific dosing information. We did so even though the dosing and administration for the approved generic use was twice as high as the dosing for the carved-out indication. The D.C. Circuit held that omission of the indications protected by exclusivity was a difference in labeling "required . . . because the drug and the listed drug are produced or distributed by different manufacturers" within the meaning of the Act (91 F.3d at 1500). Other examples of generic drug products with protected labeling carved out include:

- Tramadol with labeling that omitted a protected slower titration schedule but included information on the unprotected faster titration schedule also appearing in the labeling of the innovator product

- Oxandrolone with labeling that omitted protected information on geriatric use

- Ribavirin with labeling that omitted use of the drug in combination with PEG Intron (peginterferon alfa-2b) for a protected indication (see Ribavirin Response Letter)

- Amifostine with labeling that omitted a patent-protected indication (see Amifostine Response Letter)

Significantly, for three of these drugs (captopril, tramadol, amifostine), the carved-out indication had a lower dosing schedule than the nonprotected indication, as would be the case with a generic version of Marinol. Thus, in accord with FDA's statute, regulations, and long-standing Agency practice, the possibility that a generic dronabinol product

---

[17] This determination, based on our experience and expertise in reviewing product labeling and making judgments regarding the safety and effectiveness of drugs, is entitled to judicial deference (*Zeneca v. Shalala*, 213 F.3d 161, 169 (4th Cir. 2000)).

13

Docket No. FDA-2007-P-0169

approved for the CINV indication might be prescribed by physicians to treat anorexia associated with weight loss in AIDS patients provides no basis for denying approval of an ANDA for dronabinol with the AIDS indication carved out. Requiring FDA to consider the safety and efficacy of a generic dronabinol product in the treatment of AIDS patients when the generic applicant does not seek approval for that indication would effectively create new approval requirements beyond those established by Congress and the Agency. In addition, it would be inconsistent with our long-standing policy of not interfering with the practice of medicine, in particular with physicians' ability to prescribe approved drug products for their patients for any purpose deemed appropriate in their professional judgment.

**C.     The Possibility That a Generic Version of Marinol Without the AIDS Indication Will Be Dispensed for That Indication Does Not Bar Approval of Such a Product.**

You state that the pharmacy laws and regulations of all states allow a pharmacist to dispense a generic drug in place of a brand-name product named on a prescription, and in some states generic substitution is required absent express direction from the physician or patient. You also state that many state Medicaid programs and most private insurance programs have provisions that strongly encourage generic substitution. You further state that generic substitution policies are often based on FDA's Orange Book and apply to generic products that are listed in the Orange Book as "therapeutically equivalent" to brand-name products. You argue that an approved generic version of Marinol with the AIDS indication carved out will nevertheless be rated therapeutically equivalent to Marinol. You maintain that there will be no way for a pharmacist relying on the Orange Book to know that such a generic dronabinol product is not labeled for the AIDS indication. You contend that this will result in frequent dispensing of the generic product for the AIDS indication, even though the generic product does not contain patient information for that indication (Petition at 15 to 16).

The existence of state generic drug substitution laws, which might require the substitution of a generic dronabinol product for Marinol, provides no basis for refusing to approve an ANDA for dronabinol without the AIDS indication. We acknowledge that in some states a generic dronabinol product might be substituted for Marinol even when the drug is intended for treating anorexia in AIDS patients, but we have no control over the operation of these substitution laws. As you note, in *Bristol-Myers Squibb*, the D.C. Circuit recognized that the existence of "some state laws and health insurers that mandate substitution of generic drugs" could diminish the value of marketing protection given to the manufacturers of innovator drugs under the Act (91 F.3d at 1500). However, you fail to mention that the court, although acknowledging the effect of this substitution, upheld FDA's interpretation of the Act and implementing regulations (e.g., §§ 314.94(a)(8)(iv) and 314.127(a)(7)) as permitting the Agency to approve an ANDA for a generic drug with labeling that omitted exclusivity-protected indications (and corresponding indication-specific dosing information) for which the innovator drug was approved. The court stated that the potential diminution in marketing protection was "not a sufficient basis upon which to conclude that the Congress intended to confer upon the

14

Docket No. FDA-2007-P-0169

manufacturers of pioneer drugs the much broader protection" which would be conferred if we could not approve generic drug products with carved-out indications (id.). Thus, the fact that state substitution laws may result in the dispensing of generic dronabinol for the protected AIDS indication provides no basis for denying approval of an ANDA for a generic version of Marinol with the AIDS indication carved out.

## III.    CONCLUSION

We have reviewed your petition, the submitted comments, and other relevant information available to us. For the reasons stated above, we deny your request that we require any ANDA for a generic version of Marinol to contain the protected AIDS indication and safety information related to this indication. Instead, we have concluded that approval of a generic version of Marinol with the AIDS indication carved out would be consistent with the Act and FDA regulations because such a generic dronabinol product would be no less safe or effective for the remaining nonprotected condition of use (the CINV indication).

Sincerely,

Janet Woodcock, M.D.
Director
Center for Drug Evaluation and Research

15

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HI-TECH PHARMACAL CO., INC. )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>U.S. FOOD AND DRUG ADMINISTRATION)<br>)<br>Defendant. )<br>) | Case No. 1:08-cv-01495(JDB) |

## DECLARATION OF WILLIAM PETERS

I, William Peters, submit this Declaration, which is based upon personal knowledge

1.  I am the Chief Financial Officer for Hi-Tech Pharmacal Co., Inc. ("Hi-Tech").

2.  I am familiar with the market for generic drug products, and particularly the unique opportunity presented when a generic drug company is entitled to 180-day generic drug exclusivity.

3.  Hi-Tech is a small publicly traded company with 258 full-time and 18 part-time employees.

4.  Hi-Tech's payroll for those employees is approximately $17 million.

5.  In the most recently completed fiscal year ended April 30, 2007 (FY 2007), Hi-Tech's sales for all products for the entire year totaled $62.0 million.

6. For that same fiscal year (FY 2007), Hi-Tech recorded a loss of $5.1 million. Hi-Tech also recorded a loss for the prior fiscal year.

7. According to data from IMS Health ("IMS"), a leading provider of data concerning pharmaceutical markets, there is currently over a $330M market for Cosopt, the brand name drug, for which Hi-Tech should have 180-day generic drug exclusivity.

8. Using IMS data on the current price of Cosopt, and an FDA analysis ,U.S. FDA, Generic Competition and Drug Prices, available at http://www.fda.gov/cder/ogd/generic_competition.htm. I have calculated that with 180-day exclusivity, Hi-Tech could have $134 million in sales for this product during its 180-day exclusivity period, which could result in $39 million in net income for the company during those 180 days.

9. On the other hand, based on FDA's data, if Hi-Tech were deprived its statutory entitlement to 180-day exclusivity and were competing with another generic manufacturer from Hi-Tech's commencement of commercial marketing, Hi-Tech's net income could drop to $10.2 million. Moreover, if Hi-Tech were competing against two or more other generic manufacturers, its net income could be $5.5 million or less.

10. A decrease from $39 million in net income to $5.5 million or less, depending on the number of entrants, could be disastrous for Hi-Tech.

11. Hi-Tech has already invested $2 million in an external research and development project that will require $6 million to complete. Additionally, the Company has 20 other research and development projects in development.

12 In anticipation of launch, Hi-Tech has also purchased raw materials and components worth approximately $2 million and has committed to purchase additional $1 million of these materials and components.

13. In addition, the company has begun a $2 million capital expenditure.

14 Both the $2 million investment in research and development and the $2 million capital expenditure were made by Hi-Tech based on the expectation that it would enjoy its statutory entitlement to 180-day exclusivity on dorzolamide with timolol ("generic Cosopt"), and that the expected $39 million in net income would bring the company from a loss to a profit this year, and therefore generate the necessary cash to fund these investments.

15. Hi-Tech has been able to fund losses for the last two years with the cash on its balance sheet. The Company's cash balance dropped to $11 7 million at fiscal year-end last year. Therefore, Hi-Tech will have greater difficulty funding these losses.

16. If Hi-Tech is deprived of its statutory entitlement to 180-day exclusivity, and other generics are allowed to enter the market during what should be Hi-Tech's exclusivity period for its generic Cosopt, the company will not have the profits, and therefore will not have the cash, to continue with the research and development project or the capital expenditure in which it has already invested $4

million without making changes to its current cost structure. In other words, that $4 million investment will be completely lost.

17. In such circumstances, Hi-Tech's cost structure will be such that the company will also have to consider laying-off employees.

18. Apotex, the other company that has also received tentative approval from FDA for a generic Cosopt drug product has revenues ten times greater than Hi-Tech, and a demonstrated ability and inclination to "flood" the generic market in a very short time period.

19. Once Apotex floods the market, Hi-Tech will be permanently deprived of its exclusivity and very likely will never get contracts with customers that would have placed orders and entered into contracts with Hi-Tech, but for an FDA decision denying Hi-Tech its statutory entitlement to 180-day exclusivity.

20. Hi-Tech is fully prepared to launch its generic Cosopt on the very first day that it is permitted to do so by law. The only reason that Hi-Tech has not already launched its product is because it is legally prohibited from doing so by the brand manufacturer's period of pediatric exclusivity.

21. On the very first day that it is permitted to market its generic Cosopt, Hi-Tech plans to ship approximately 500,000 units, which is the equivalent of two months worth of drug product based upon IMS market data. Apotex has the capacity to ship as many, if not more, units as soon as it receives approval, and therefore could put two months or more of its drug product into the hands of

customers before Hi-Tech could even apply to a Court could for a temporary restraining order.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 2 2008.

William Peters

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HI-TECH PHARMACAL CO. INC., | ) |
| | ) |
| Plaintiff, | ) Case No. 1:08-cv-01495  (JDB) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FOOD AND DRUG | ) |
| ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |

## <u>ORDER</u>

Upon consideration of the Motion for Expedited Preliminary Injunctive Relief of Plaintiff Hi-Tech Pharmacal Co., Inc. ("Hi-Tech"), any Opposition thereto, and the entire record herein, it is this ____ day of _____ 2008 ordered:

(1) That Plaintiff's Motion is GRANTED; and

(2) Defendant U.S. Food and Drug Administration is enjoined from approving any generic drug manufacturer's abbreviated new drug application for a generic version of the brand-name drug COSOPT for 180 days from when Hi-Tech begins to commercially market its generic drug product under ANDA 77-847.

_____
U.S. District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HI-TECH PHARMACAL CO. INC., | ) |
| | ) |
| Plaintiff, | ) Case No. 1:08-cv-01495 (JDB) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FOOD AND DRUG | ) |
| ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |

I certify that on September 3, 2008, I electronically filed the following:

(1)PLAINTIFF'S MOTION FOR EXPEDITED PRELIMINARY INJUNCTIVE RELIEF, (2) STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR EXPEDITED PRELIMINARY INJUNCTIVE RELIEF, (3) SUPPORTING EXHIBITS, AND (4) PROPOSED ORDER

in the above-captioned case using the electronic case filing ("ECF") system for the

United States District Court for the District of Columbia which sent notice to the

following:

DRAKE CUTINI
Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
202-307-0044
drake.cutini@usdoj.gov

_/s/_____
James P. Ellison